UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
SIMON DAVID ANDRIESZ,                                    Docket No:

                   Petitioner,                         PETITION

For an Order Pursuant to 9 U.S.C.A. §1 *et seq*.
and CPLR § 7551 Vacating or Amending an
Arbitration Award

        - against -

BGC FINANCIAL, L.P.,

              Respondent.

--------------------------------------------------------X

      COMES NOW Petitioner, Simon David Andriesz ("Andriesz") by and through his

undersigned counsel, The Law Offices of Neal Brickman, P.C., 420 Lexington Avenue, Suite

2811, New York, New York 10170, and as and for his Petition herein, respectfully states and

alleges as follows:

<u>Nature of Petition</u>

      1.      This Petition seeks to vacate the June 17, 2024 award of the FINRA Arbitration

Panel (the "Award" (a copy of the Award is attached to the Leonard Declaration ("LD") as Exhibit

"A")) on the grounds that the Panel manifestly disregarded the law and evidence in issuing an

Award that is both internally inconsistent, as well as factually and logically inexplicable. Two

claims were proved as a matter of law and beyond question through overwhelming evidence.  The

damages awarded are not consistent with the statutory and clear and admitted language of the

relevant documents.  First, and dispositively, Plaintiff had an explicit contract for a prescribed term

with a minimum value (a value that was greater than the amount provided for in the Award) that

was unequivocally breached by Respondent. Second, it is also undisputed that Andriesz had a long

1

and successful career during which he received no complaints and made no complaints of a regulatory nature prior to his employment at BGC Financial, L.P. ("BGC").  In fact, even while employed by BGC and its related companies, Andriesz was promoted and given increased opportunities prior to his complaints of regulatory issues at BGC.  However, as soon as he began making complaints of a regulatory nature, he became the victim of a retaliatory scheme in which he was falsely labeled insubordinate, subjected to unwarranted discipline, and placed on leave. Then, within weeks of his making complaint to the SEC and advising BGC of that complaint (triggering the protections of Dodd-Frank), BGC subjected him to additional retaliation, harassment while undergoing emergency medical treatment, clearly pretextual discipline, which, thereafter, led directly to BGC's retaliatory – and legally baseless – suspension and termination of Andriesz's employment.  The underlying facts were unequivocal and the relevant law and standards undisputable.  Simply, the Arbitrators – while improperly failing and refusing to provide a basis for the Award despite both Parties request that it do so -- ignored the undisputed evidence and the clear and irrefutable law in rendering the Award.  As such, the Award should be vacated or, in the alternative, modified to reflect the legally required damages under these two causes of action.

<u>Parties</u>

2.      Petitioner Andriesz is a natural person currently domiciled and residing in in Cullomton in Devon in the United Kingdom. Andriesz worked hard and developed his talent for futures trading, not only succeeding financially, but also developing a strong network of relationships and gaining the confidence and respect of his peers, managers, and supervisees. For most of his career, he lived and worked in London, including during the time that he worked for

BGC Brokers. From 2014 through 2017, Andriesz lived in New York, New York as he worked for BGC. He returned to London in 2017.

3.       Respondent BGC is a Delaware limited partnership with its principal place of business in New York, New York. BGC is a FINRA member and has been registered with the SEC since 2008, when it was spun off from Cantor Fitzgerald. It is an inter-dealer broker that facilitates transactions in securities and other financial instruments between broker-dealers, dealer banks, and other financial institutions. BGC employed Andriesz from November 2014 to the end of January 2017. BGC's principal offices are located at 55 Water Street, New York, New York 10041.  BGC is, and was at all relevant times hereto, an authorized broker-dealer and a member organization of the Financial Industry Regulatory Authority ("FINRA").

<u>Procedural Background</u>

4.       Andriesz, after being improperly terminated by BGC, filed a FINRA Arbitration, FINRA No: 19-01751.  Due to various circumstances beyond his control, including medical emergencies, a change in counsel and a Global Pandemic, the hearings in that matter were adjourned at various times.

5.       On July 27, 2022, Andriesz made a request for an adjournment based on medical necessity to the Panel.  Rather than ruling on the merits for the request, the Panel failed to even consider that request, but instead dismissed the Arbitration – mandating that Andriesz be forced to re-file and pay an additional fee to recommence his arbitration.[1]

---

[1] Specifically, the Panel purportedly based its decision on FINRA Rule 13601(c) which provides that, "If all parties jointly request, or agree to, more than two postponements, the panel may dismiss the arbitration without prejudice."  However, that Panel in so ruling failed to even consider the adjournment request then before it and blatantly ignored the actual facts and circumstances of the matter including the plain language of the documents submitted to it by the Parties and that it had in its possession at the time of its determination. In summary – and dispositively – the clear and uncontested facts reveal that the parties never jointly requested nor agreed to more than two postponements: thus dismissal under the plain terms of FINRA Rule 13601(c) was improper and in direct and manifest disregard for its plain terms.

6.      Andriesz, despite the improper ruling by that panel and the lack of any assistance from FINRA, Andriesz duly re-filed his claims under a new case number 22-02539 and a new Statement of Claim on or about November 8, 2022.

7.      The hearings were held across eleven (11) days (January 9-12, 16-18, 24-25; and February 8-9, 2024) at FINRA's main offices located at 1 Liberty Plaza in lower Manhattan before arbitrators Robert J. Kheel, Geoffrey Elkind, and Dakota Shawn Harbison (together the "Arbitrators" or the "Panel").  (Copies of the relevant portions of the transcripts are attached as noted below to the Leonard Decl.).

8.      In the course of the hearings, Andriesz withdrew various claims and discontinued against various individual respondents.  By the close of the hearings, claims remained for Breach of Contract, Dodd-Frank whistleblower retaliation, Securities Fraud, Common Law Fraud, Fraud in the Inducement, Breach of Fiduciary Duty, Conversion, Breach of Implied Covenant, Unjust Enrichment, RICO, Defamation, Tortious Interference, Intentional Infliction of Emotional Distress, Civil Conspiracy, and Violations of NY Labor Law.

9.      In order to facilitate a comprehensive decision – and specifically an explained decision as anticipated by Andriesz – the Panel directed that the Parties submit post-hearing briefs and appear for oral argument.

10.      Then, prior to argument, the Panel issued a series of questions that they requested the Parties to respond to prior to oral argument.

11.      Argument was duly held on May 15, 2024, whereupon the matter was fully presented to the Panel for determination – and again, what Andriesz believed would be an explained decision, especially given the extra filings that were made at the Panel's request.

12.     On June 17, 2024, the Arbitrators issued the Award and damages in Andriesz's favor and against BGC in the amount of $500,000.00, dismissed each of the other parties therein, and assessed the total hearings session fees against BGC.

13.     Thereafter, Andriesz requested that the Panel provide the explained decision that had been requested by both parties prior to, and in the course of, the hearings.

14.     However, the Panel refused to consider the request as FINRA maintained that it was untimely despite the fact that the award had not been paid out (the Award still remains unpaid in violation of FINRA's rules and regulations based on BGC's ongoing refusal to make payment of the monies directed as set forth and identified in the Award), the matter had not been closed by FINRA, and FINRA had not closed its account with Andriesz.  (Copies of the relevant correspondence between Petitioner's counsel and FINRA are attached to the LD as Exhibits "B" through "E") (Copies of correspondence between counsel for Petitioner and counsel for BGC are attached collectively as Exhibit "F" to the LD).

<u>Relevant Background Facts</u>

15.     Prior to May 28, 2012, Andriesz had a successful career as a broker selling listed products at several well-respected financial institutions.  (LD Ex. G - D1: SA 133:12 - 137:24)[2].

16.     BGC Brokers recruited Andriesz and his team to join it in May of 2012, with Andriesz heading a futures and options desk in London. (LD Ex. G - D1: SA 137:25 - 140:3).

17.     On May 28, 2012, Andriesz signed a BGC Brokers, L.P. Broker's Contract and on

---

[2] Due to the variant pagination of the various reporters, for clarity's sake, each record cite will commence with D# wherein # refers to the day of hearing testimony (e.g. 1-11).  (The transcript excerpts are attached to the Leonard Decl. as Exhibits "G" to "P" with the excerpts from each day constituting a separate exhibit). The additional exhibits will be designated in order with a parenthetical reference to their Arbitration Exhibit number ("AE#") for additional ease of reference.

June 25, 2013, Andriesz was notified that, as part of a reorganization, his employment transferred to BGC Services (Holdings) LLP.

18.    In 2012, Jean Pierre Aubin ("Aubin"), Andriesz's direct supervisor, illegally tried to move Andriesz's London desk to Paris, where it was not licensed.  (LD Ex. N - D9 54:9 - 55:4).

19.    During his two and a half years of working under his May 28, 2012 contract, Andriesz's performance and production were exemplary. He had no customer complaints, no regulatory or supervisory issues, nor any human resources concerns. The desk he supervised was, from the outset, profitable and he distributed a bonus pool to that desk each year. (LD Ex. G - D1: SA 154:5 - 155:16).

20.    In or about the second quarter of 2014, Aubin terminated Michael Riffice ("Riffice"), a Managing Director, who was supervising the futures and options desk in New York for BGC Financial, L.P. ("BGC") for purported "insubordination". (LD Ex. G - D1: SA 145:7-21). The New York desk was not profitable. Prior to his termination, Riffice repeatedly complained about BGC's accounting irregularities, supervisory failures, regulatory violations, and its defrauding and depriving employees of desk bonuses and other monies they were due. (LD Ex. G - D1: SA 160:10-24; 163:21-23).

21.    In or about the third quarter of 2014, Andriesz was recruited to move to New York to run both the New York and Chicago futures and options desks for BGC as well as to continue to run the London desk. (LD Ex. G - D1:162:23 - 164:8).

22.    With BGC's assistance, on December 11, 2014 Andriesz obtained a work visa, allowing him to move to, and work from, New York for BGC. (LD Ex. P - D11: JM103:19 - 104:17; 107:7 - 108:16).

23.     Prior to signing a new BGC contract, and prior to his obtaining a Series 30 license, BGC insisted that Andriesz make an off-contract payment of $10,000 to Kristi Haas, who already had a Series 30 license, so that she could supervise the New York desk. (LD Ex. G - D1: SA 168:16 – 169:25; 171:17 - 172:8).

24.     On January 21, 2015, Andriesz signed a new Employment Agreement with BGC (the "Contract" see LD Ex. "Q" (AE38)).

25.     From early December 2014 through early May 2015 BGC did not pay Andriesz pursuant to either his May 28, 2012 contract or his January 21, 2015 contract. During this period of time Andriesz continued to work, supervising both desks and generating substantial revenue for BGC. (LD Ex. G - D1: SA172:21 - 174:8).

26.     Shortly thereafter, in April 2015, Andriesz expressed various concerns about the regulatory impact – as well as the political and business drawbacks – of Anthony's trading futures and his trading generally, because of his failure to meet the "best execution" standard and the fact that he was trading on a separate floor and could not be properly supervised, especially since he used the separate FFastFill trading platform with Aubin's imprimatur. (LD Ex. G - D1: SA 201:18 - 210:20; 217:9 – 218:4).  Andriesz properly refused to sign off on Anthony's trading of listed futures on April 29, 2015 as he could not monitor the same, which would have created a regulatory issue for BGC. (LD Ex. "R" (AE64); LD Ex. G - D1: SA 211:2 – 213:23). Later, in or about September 2015, Anthony would execute an enormous illegal VIX block trade through Blackrock that Andriesz, as the relevant Series 30, flagged (and later reported to regulators) because there was an inexperienced futures broker crossing unsupervised that could easily result in a regulatory investigation, especially where, as in that case, it appeared that the broker was taking improper inducements from a market maker for a trade that was not following "best execution" policy.

Andriesz's concerns were certainly reasonable. (LD Ex. R (AE64); LD Ex. "S" (AE113); LD Ex G - D1: SA 201:18 - 210:20; 211:2 - 213:23; 217:9 - 218:4; 271:2; 275:15-21; 276:3-7; 277:3-7; 277:9 - 281:13).

27.    It is not a coincidence that until that point, Andriesz was treated as the stellar employee that he was and had no performance complaints of any kind, prior to his raising complaints concerning accounting irregularities and supervisory concerns in 2015.   In fact, in his decades-long career prior to joining BGC, Andriesz did not have a single regulatory or other performance related complaint, nor had been forced to take any whistleblower action or make complaint of any regulatory violations at any prior employer.  Even during his tenure with BGC Broker L.P. (later changed to BGC Services (Holdings) LLP, Andriesz had received no performance or regulatory warnings whatsoever.  (LD Ex. G - D1: SA 155:8-16).

28.    Also, in or about April 2015 BGC trader Mourad Jridi ("Jridi") lost approximately $800,000 trading unsupervised from his NYC apartment. He was terminated some eight months later on or about December 2015. (LD Ex. "T" (AE58); LD Ex. "U" (AE486); LD Ex. M - D8: RV 2165:15 - 2167:22; 2273:21-24).

29.    At or about the end of the 1st Quarter of 2015 Aldric Marinos ("Marinos") replaced John McLachlan ("McLachlan") as Aubin's business manager, responsible for calculating the bonus pools for the desks that Andriesz managed. (LD Ex. G - D1: SA 257:3 - 260:8; LD Ex. P - D11: JM 135:15-18).

30.    Prior to Marinos' assuming these responsibilities, the New York and London desks' bonus pools were not aggregated (they were treated separately, with no offsetting) and the desks' bonus pools were allocated all revenue attributable to voice brokerage activities, including market

maker matches and volume/pit rebates. (LD Ex. "V" (AE75); LD Ex. "W" (AE204); LD Ex. G -
D1: SA 257:3 - 260:8; LD Ex. P - D11: JM 158:13 - 159:15).

31.    In calculating the 2015 Q1 and Q2 bonus pools for the desks that Andriesz
managed, Marinos improperly netted the New York desk's alleged losses against the London desk's
profits and did not allocate the revenue realized from market maker matches or volume/pit rebates
to those desks. He would make the same error many times thereafter.  (LD Ex. "X" (AE150) (by
way of example only); LD Ex. G - D1: SA 257:3 - 260:8; 331:2 - 333:6; 333:20 - 334:6).

32.    Beginning in or about March 2015, at the request of an important hedge fund client,
BlueCrest Capital, Andriesz introduced Elise Choukroun ("Choukroun") to BGC and urged it to
hire her to work from its Singapore office. (LD Ex. G - D1: SA 185:4 - 186:13; 225:20 - 229:25;
234:4 - 235:21).

33.    In or about June 2015, Choukroun visited the Singapore office and reported to
Andriesz that it did not seem like a real office; there wasn't much there; that she was shocked that
it was not a legitimate office; and it was weird. (LD Ex. G - D1: SA 187:9-21).

34.    In or about July 2015 BGC informed Andriesz that it could not offer Choukroun
employment because it was not licensed to do business in Singapore. In connection with this
advice, by letter dated September 17, 2015, Mark Webster ("Webster"), BGC's executive in charge
of the firm's Asian operations, threatened Andriesz's job and called him, among other insults and
profanity, a "juvenile retard" despite the fact that it was Webster, himself, along with Aubin, who
had signed off on her initial hiring forms. Andriesz duly complained about this abuse and
unprofessionalism. (LD Ex. G - D1: SA 190:3 - 191:23).

35.    In or about November 18, 2015, BGC hired Choukroun to work out of its Singapore
office. BGC did not have a license to do business in Singapore when it hired Choukroun and, to

date, it has never obtained that license. (LD Ex. L - D6: JPA 1597:10-13).  As a result, BGC summarily terminated Choukroun after only a few months leaving her in a precarious position in Singapore and causing her significant personal hardship.  (LD Ex. "Y" (AE473)).

36.    In or about July 2015, Andriesz, a previously healthy active adult, unexpectedly suffered a heart attack. (LD Ex. G - D1: SA 260:12 - 263:11).

37.    Commencing in or about the end of the first quarter of 2015 and escalating throughout the remainder of his employment with BGC (January 31, 2017), Andriesz consistently complained to his managers, to the HR department, and to other appropriate channels about the following:

(a)    rogue brokers trading without any supervision (LD Ex. R-U; LD Ex. G - D1: SA 201:18 - 210:20; 211:2 - 213:23; 217:9 - 218:4; 271:2; 275:15-21; 276:3-7; 277:3-7; 277:9 - 281:13; LD Ex. M - D8: RV 2165:15 – 2167:22; 2273:21-24);

(b)    BGC conducting business from jurisdictions without appropriate, or any, licenses or registrations and having brokers operating at one locale, but being registered in a different locale, to evade taxes (*e.g.*, LD Ex. I - D3: SA 835:9 - 836:8; LD Ex. L - D6: JPA 1668:6-18; LD Ex. "Z" (AE392).)

(c)    tax fraud (*e.g.*, LD Ex. M - D8: 2140:6-15 (HNRC tax sanction), 2149:7-21, RV 2222:2-21; LD Ex. N - D9: SA 107:6-23);

(d)    fraudulent accounting relating to netting losses from one desk against profits from another desk (*e.g.*, LD Ex. G - D1: 319:10 - 324:23; 251; 368, 369, 371; 139, 155);

(e)    fraudulent accounting relating to not allocating earned revenue to his desks' bonus pools, and improperly showing fictitious losses (LD Ex. "AA" (AE156); "BB" (AE157); "CC" (AE174));

(f)      improper harassment and verbal abuse by senior leadership against him (*e.g.*, LD Ex. "DD" (AE185); "EE" (AE196); "FF" (AE316); "GG" (AE343); "HH" (AE370).

38.      Again, Andriesz had a well-founded reasonable belief that these activities constituted violations of applicable law, industry rules, and securities regulations.

39.      BGC failed to investigate any of Andriesz's complaints, instead insisting that, by consistently reiterating those complaints, Andriesz was being "inappropriate, unprofessional and insubordinate." (LD Ex. "II" (AE173); "JJ" (AE181); LD Ex. H - D2: SA 395:23- 396:25; 398:3 - 399:4; 495:23 - 496:14; 675:2-9; 693:14-19; D3: SA 758:14 - 760:5; LD Ex. O - D10: PD 98:6- 12; 131: 4-20; 162:9-25; 182:24 - 184:14).

40.      In September 2015 Aubin summoned Andriesz and Velez to meet with him in London in the office of disgraced former BGC/Cantor executive Lee Amaitis ("Amaitis"). At that meeting Aubin told Andriesz that unless he "shut up" (*i.e.* stopped complaining), Aubin was going "ruin him" and that he would go the way of Riffice who was fired for alleged "insubordination" in retaliation for Andriesz's complaining about regulatory issues. (LD Ex. H - D2: SA 369:2-8; LD Ex. M - D8: RV 2176:12 - 2177:9).[3]

41.      Then, starting at the end of 2015 and into early 2016, Andriesz began raising issues with the accounting procedures affecting both his and his team's compensation, as well as the regulatory practices of BGC.  These concerns: the improper transfer of commissions, failure to honor contracts, compliance issues, and regulatory issues were raised to various individuals,

---

[3] Velez corroborated this recollection remembering that Aubin had told him to get Andriesz under control, "or he's going to end up like Riffice." (LD Ex. M - D8: RV 2176:12 - 2177:9). Riffice, the individual who ran the NY Desk prior to Andriesz, had similarly been targeted and then terminated by Aubin for "insubordination" after raising regulatory complaints concerning Aubin and how BGC operated its business. (LD Ex. G - D1: SA160:10 - 161:9).

including Aubin, McLoughlin, Scotto, Marinos, Annette Fong ("Fong"), and HR in both New York and London. (LD Ex. G - D1: SA 314:24 - 317:3).

42.    At the end of January 2016, Marinos divulged confidential bonus information to members of Andriesz's team in London and told them – improperly – that despite their nearly $1M in profits, they were getting no bonuses because of the NY Desk's alleged deficit. (LD Ex. G - D1: SA 318:21 - 319:25). This was improper as a business methodology, but also incorrect from an accounting perspective and a contractual one. (*Id.*)

43.    Andriesz confirmed his belief as to the regulatory impropriety of offsetting London with New York by speaking to Fong, Head of Compliance, who stated with regard to the proposed offsets between the London and New York desks, "You can't do that" as it would constitute "illegal accounting" and is "completely illegal." (LD Ex. G - D1: SA 320:1-7; 321:11-322:2; 324:2-9; 332:3-6). Andriesz relied on the Head of Compliance. (KLD Ex. G - D1: SA 332:3-6; 324:2-9).

44.    Any such offset or netting would also violate Andriesz's contract (not only because one cannot contract to do an illegal act, but also by the plain language of the contract as drafted by BGC). Moreover, such an offset would clearly be inequitable to the London brokers.

45.    BGC's failure to safeguard its brokers was routine. Unfortunately, such abuses are often covered up and not reported in the industry which allows entities like BGC to continue to flout the rules and bolsters their resolve when retaliating against whistleblowers, like Andriesz herein.

46.    By way of example only, in the course of the hearings, it was learned that Mr. Velez[4] – by his own admission -- had agreed to take on expenses incurred as a result of a sexual harassment

---

[4] Velez had been terminated by BGC and filed numerous whistleblower filings corroborating many of Andriesz's, Riffice's, and others' complaints. However, while this proceeding was ongoing, BGC rehired Riffice after which his willingness to come forward as a witness for Andriesz diminished significantly.

case, in which Aubin was individually named as a defendant, thereby reducing his and his team's pool without telling his team why their commission income was being drained in a material way for his personal benefit and standing with BGC and Aubin. The Arbitrators took no action with regard to this confession exhibiting either a lack of understanding of the applicable rules or some other bias. (See correspondence between Andriesz and FINRA, et al., LD Ex. "KK").

47.    Marinos' accounting also did not address the revenue realized from relevant market maker matches, pit rebates, volume rebates, and CME rebates: if properly applied, the New York Desk would not have been in a deficit. (LD Ex. G - D1: SA 330:3-22; 334:7 - 335:24). On January 28, 2016, Andriesz made written complaint to Sandra Carmichael, HR in the UK. (LD Ex. X; LD Ex. "LL" (AE164); LD Ex. G - D1: SA 330:25 - 334:6). As Marinos was non-responsive, Andriesz escalated his concerns on February 1, 2016, to Rosado (Id; LD Ex. G - D1: SA 337:7 - 338:9). Andriesz once again shared that the revenue assessments were incorrect and problematic from a regulatory, contractual, and equitable perspective. (LD Ex. G - D1: SA 338:10 - 339:2; 342:5 - 343:14).

48.    The accounting was no small matter, the shortfall due from 2015 was $1,823,844.14. (LD Ex. "MM" (AE165); LD Ex. H - D2: SA 373:24 - 377:13). As Andriesz noted, not declaring these monies in connection with the pool constituted a false accounting as a regulatory matter -- separate and apart from BGC's obligations to actually pay out those monies – as did transferring funds out of the US without reporting the same. (LD Ex. MM).[5]

---

[5] Other brokers, including Mouradian, were receiving market maker matches. (LD Ex. H - D2: SA 378:20 - 379:7). Similarly, other brokers were allowed to use external pit brokers and receive rebates, while Andriesz was precluded and over-charged by BGC. (LD Ex. H - D2: SA 379:8-19). These facts were corroborated by Velez (LD Ex. "NN" (AE171); Ex. M - D8: RV 2175:4-23) and McLachlan as to Mouradian (LD Ex. P - D11: JM 119:20 - 120:7).

49.     Notably, during the period commencing January 21, 2015 (when he first signed his BGC contract) through February 2016, BGC expressed no concerns regarding Andriesz's performance as a Broker or with his conduct.

50.     On February 4, 2016, Andriesz forwarded the proper accounting and his concerns to Michael Sulfaro, compliance in New York, and informed Rosado that he had spoken to Sulfaro and that, in connection with an impending NFA audit, he, Andriesz, would not "lie about what is going on" concerning the serious accounting issues which he felt compelled to report, despite Aubin's urging him not to. (LD Ex. CC).  Also, in advance of his scheduled meeting with HR, with the encouragement of Velez, Andriesz forwarded a list of issues concerning disparate treatment by Aubin. (LD Ex. H - D2: SA 402:2-23). That afternoon, Andriesz met with Rosado and Dreste during, and after, which Andriesz expressed his concern that BGC was covering up substantial issues, given that his concerns over illegal (as per Fong) accounting procedures, breaches in regulations and accounting protocols, as well as Aubin's conduct, were summarily dismissed without any investigation whatsoever. (LD Ex. II; Ex. H - D2: SA 395:23 - 396:25; 398:3 - 399:4).

51.     The next day, February 5, 2016, Andriesz requested that Dreste and Rosado open an investigation into various actions, including regulatory and disparate treatment concerns and also warned that corrective action should be taken before someone ends up dying. (LD Ex. "OO" (AE177); Ex. "PP" (AE179); Ex. QQ (AE182); Ex. H - D2: SA 404:21 - 406:2; Ex. 181).

52.     On February 8, 2016, because of the continued failure to address the false accounting and illegal offset being pushed by Aubin and Marinos, Andriesz contacted John Skitt, UK HR, in attempt to get his London team some of their deserved bonuses and reiterated his accounting complaints. (LD Ex. "RR" (AE187)). In response, later that very same day, BGC improperly suspended Andriesz for two (2) weeks alleging that he had engaged in unspecified

"unprofessional, inappropriate, and insubordinate" behavior. (LD Ex. DD; Ex. H - D2: SA 417:20 - 418:19).

53.     Andriesz immediately requested an explanation of what objectionable behavior was being referenced in his suspension letter. BGC refused to provide any sort of explanation. (LD Ex. H - D2: SA419:7-21; 424:10 - 427:12; Ex. O - D10: PD 58:25 - 59:12).

54.     Aubin and Patti Dreste ("Dreste"), head of BGC/Cantor's Human Resources Department, testified that the objectionable behavior consisted primarily of Andriesz complaining about his belief that BGC had engaged, and was continued to engage, in illegal and fraudulent activities. Dreste admitted that it was not improper for Andriesz to discuss his complaints with McLoughlin or HR, but just not subordinates as that could disrupt the investigation: this despite the fact that no subordinates were consulted in the course of the "investigation." (LD Ex. O - D10: PD: 47:9-13; 51:8 - 53:23; 56:19 - 57:2). The other basis, his alleged refusal to engage with Aubin, was admitted to be inaccurate by Dreste. (LD Ex. O - D10: PD 53:14-18 and relevant emails). Finally, Dreste admitted that the actual alleged reason for the suspension was supposedly unprofessional conduct, but that Andriesz was never asked another question in the course of the "investigation." (LD Ex. "SS" (AE190); Ex. O - D10: PD 60:18 - 61:16). Clearly, the only basis for this suspension was retaliation for Andriesz making repeated complaints concerning, among other things, improper, fraudulent and, as per Fong, illegal accounting practices.

55.     The day Andriesz returned from suspension (February 23, 2016) he received another written warning from BGC at the direction of Aubin regarding an alleged off contract payment arrangement that Andriesz had made with one of the brokers on his desk. This written warning again threatened Andriesz with further discipline up to and including termination. (LD Ex. EE; Ex. O - D10: PD 79:24 - 80:12).

56.     Upon receiving the warning for requesting funds through the proper channels to ensure that one of his London brokers got some of the money that was due him and recognizing the same was purely retaliatory harassment, Andriesz promptly provided a copy of correspondence evidencing that Rosado one year prior had directed him to make a similar off-payroll payment to Kristi Haas and explaining that the bonus of the broker at issue had been discussed with, and approved by, MacLachlan, Marinos, and Aubin and the methodology approved.   In response, Dreste and Aubin requested that he execute an NDA. (LD Ex. "TT" (AE193); "UU" (AE200); Ex. H - D2: SA 430:12 - 433:15-20).  He immediately advised Rosado and Dreste that, if this kind of improper retaliation continued, he would be forced to file a formal complaint with the SEC. (LD Ex. G - D1: SA 106:12 - 108:9; Ex. O - D10: PD 80:13 - 81:14).

57.     Andriesz also repeatedly asked for explanations and any specific acts that provided the basis for the suspension, made complaints concerning accounting issues and retaliation (whistleblowing), and requested that his file be cleared of the retaliatory suspension and disciplinary warning, including on March 15, March 16, March 30, April 16, but information was provided. (LD Ex. "VV" (AE225 and AE234). BGC ultimately withdrew the February 23, 2016 written warning, although it remains unclear, to date, what that withdrawal entailed. (LD Ex. "WW" (AE215); Ex. "XX" (AE237);  Ex. H - D2: SA 419:7-21; 424:10 - 427:12; 495:23 - 496:14; 549: 8-15; Ex. O - D10 PD 58:25 - 59:12; 93: 2-8; 98:6-12).

58.     On or about March 14, 2016 Michael Sulfaro ("Sulfaro"), BGC's Chief Compliance Officer, pressured Andriesz to continue to sign off on the New York desk's activities, despite the accounting fraud, the rogue trading of Anthony and Jridi, and other regulatory issues that Andriesz had repeatedly raised. Andriesz duly explained his position and the relevant concerns. (LD Ex. "YY" (AE223).

59.      In March 2016 Andriesz, through Tommy Attrill, identified $1,823,844.14 in market maker and pit rebate revenue that was wrongfully withheld from his desks' bonus pools calculation for 2015. (LD Ex. MM; Ex. H – D2: SA 477:20 - 480:10).

60.      On March 21, 2016, Andriesz emailed Aubin in an attempt to set forth the necessary circumstances to be made to move forward.  Thereafter, Andriesz met with McLoughlin and Aubin who verbally promised to make good on market maker match payouts, but never actually made payment on the $1.823+M due from 2015. (LD Ex. MM; Ex. H - D2: SA 477:20 - 480:10).

61.      Rather than remove the rest of the retaliatory documents and discipline from Andriesz's record, BGC promoted Rosado on or about April 18, 2016 to SVP with additional responsibilities for GFI.  On April 21, 2016, Andriesz reiterated his demand that the retaliatory actions taken against him for his lawful whistleblowing be rectified, especially as he had not received any explanation, much less exemplars, of his alleged improper conduct.  (LD Ex. XX; Ex. H - D2: SA 549:8-15).  Dreste never responded and cannot recall asking anyone else to respond to this request. (LD Ex. H - D2: SA495:23 - 496:14; Ex. O - D10: PD 98:6-12).

62.      On April 22, 2016, Andriesz then properly made a complaint to Morgan Lewis & Bockius LLP, BGC's outside counsel, who promptly directed it back to BGC. (LD "ZZ" (AE239). Andriesz then spoke with BGC Legal, Popok (Cantor address) and Emily Milligan (GFI address), who requested documentation regarding his myriad of complaints, which Andriesz duly supplied on or about May 5, 2016. (LD Ex. "AAA" (AE250).

63.      In or about May 2016 Tim O'Leary ("O'Leary"), a market maker with Ronin Capital, began to defame Andriesz throughout the industry, calling him a "terrible broker" and "a drunk." O'Leary, with Aubin providing him cover and support, would continue to defame and harass Andriesz and other members of his desk through October 2016, and Andriesz individually

in the market for the following years, making good on his October 10, 2016, threat, "I am never stopping." (LD Ex. H - D2: SA 517:3 - 536:23; 578:5 - 580:19; 584:2 - 585:6; 589:20 - 592:9; Ex. N - D9: MS 218:8 - 226:25).

64.    On May 9, 2016, Andriesz's then counsel, William Fleming, filed a detailed whistleblower complaint with Popok which touched on many, but not all, of Andriesz's complaints and contained sections on: background; improper accounting; Andriesz's responses and BGC's retaliation; Andriesz's improper suspension and administrative leave; the baseless written warning; a restatement of the losses; the improper supervision of traders, including Jridi; and the attempts to force Andriesz to sign off on trading that violated regulatory rules and proper practice. (LD Ex. "BBB" (AE251); Ex. H - D2: SA 541:12 - 545:22). The Fleming letter did not include the details that Aubin had instructed Andriesz to come to him before ever speaking to compliance and the offer to withdraw the conduct warning if Andriesz would retract all allegations of retaliation and harassment and sign an NDA. (D2: SA 547:10 - 549:7).

65.    Dreste did not recall ever seeing the Fleming letter even after being shown a copy of the same and certainly does not recall investigating any aspect of the complaints in the Fleming letter. (D10: PD 100:3-13; 101:2-6; 101:12-17). Dreste was also unaware that Andriesz had been deemed a whistleblower and given an award by the CFTC concerning, *inter alia*, supervisory issues like the ones andriesz raised concerning Anthony and about which Andriesz "provided information that significantly contributed to the success of the Covered Action." (LD Ex. O - D10: DP 101:20-23; Ex. "CCC" (AE429); Ex. "DDD" (AE416) @ Andriesz004174 (Summary)).

66.    Popok never reported investigating these complaints, nor did he ever substantively respond to them or issue any findings that were shared with Andriesz. In fact, Popok's primary

response was to send Andriesz back to the business who did nothing to alleviate or address Andriesz's valid concerns. (LD Ex. H - D2: SA 566:10 - 568:23).

67.     In September 2016 Amaitis surrendered his FINRA licenses as a result of a lengthy money laundering probe by the SEC and BGC was fined $22.5 million. (LD Ex H - D2: SA 367:3-7; Ex. P - D11: JM 92:11 -93:19).

68.     From February 23, 2016 through November 8, 2016 Andriesz continued to perform his job without BGC's expressing any concerns regarding his performance, demeanor, or conduct. (LD Ex. O - D10: PD 107:6 - 108:25).

69.     BGC continued to do nothing to address Andriesz's concerns. As a result, in October 2016, Andriesz arranged for the filing of a written complaint with the SEC, including, *inter alia,* complaints concerning the accounting fraud, improper supervision, bonus pool theft, and other related regulatory issues, including those detailed in his counsel's May 9, 2016 letter. Andriesz later received written confirmation of that submission from Joanne Morris from the Office of Investor Education and Advocacy at the SEC on October 28, 2016.  (LD Ex. "EEE" (AE301); Ex. G - D1: SA 110:21 - 111:5; 126:9 - 127:20). Shortly thereafter, Andriesz advised Dreste and Dyanne Rosado ("Rosado"), both of BGC's Human Resources Department, that, as he had previously told them he would, he had escalated his unaddressed complaints to the SEC. (LD Ex. G - D1: SA 128:4-7; 128:12-21; 128:25 - 130:7; 131:2 - 132:17; 132:21 - 133:3).

70.     At or about this time, McLoughlin agreed to pay Andriesz the $1,823,844.14 in market makers and rebate revenue from 2015 that was wrongfully withheld from this desk pool. (LD Ex. MM; Ex. H - D2: SA 373:24 - 377:13). Although this revenue was properly allocated to the desks prior to, and after, 2015, BGC never made good on its promise to pay Andriesz the

approximately $1.823 million it wrongfully withheld from him for 2015. (LD Ex. H - D2: SA SA477:20 - 480:10).

71.     On October 28, 2016 Stuart Osher, Andriesz's doctor, wrote a note indicating that Andriesz needed a 2-3 week leave which Andriesz understood as allowing him the opportunity – as discussed with his Doctor – to have the flexibility not to come in if he was not feeling well. BGC expressed no concern about this note or Andriesz's health for nearly two (2) weeks. For a vast majority of the two weeks following October 28, 2016 Andriesz continued to report to work every day, with no restrictions from, or even any monitoring by, BGC. (LD Ex. "FFF" (AE300); Ex. H - D2: SA 599:25 - 602:4; 605:20 - 606:2; D10: DP 102:7 - 103:5).

72.     In the face of Andriesz's continued unaddressed complaints and BGC's being advised that he reported those complaints to the SEC, on the eve of election day 2016 -- one of the biggest trading days of the year -- BGC's UK Human Resources Department denied him access to the London office, insisting that he produce another note from his doctor indicating his fitness to return to work. (LD Dx. H - D2: SA 604:22 - 605:5; 603:8 - 611:2; 612:6 - 613:5). BGC provided no explanation for why it waited nearly two (2) weeks (some 12 days) after Andriesz's doctor's October 28, 2016 letter to express any concern regarding Andriesz's fitness to work. Clearly, it had no *bona fide* interest.

73.     On November 8, 2016, after jumping through logistical hoops, dealing with time change issues, and additional delays, Andriesz was able to access his office for the biggest trading day of the year with a corrected Doctor's note. (LD Ex. "GGG" (AE306); Ex. H - D2: SA 603:8 - 611:2; 612:6 - 613:5).[6] Andriesz's trading desk, under his guidance and leadership, generated

---

[6] There had been no complaints between February 23, 2016 and November 8, 2016 against Andriesz as a futures broker or Series 30 supervisor, much less any warnings or even any allegations of any unprofessional, inappropriate, or insubordinate behavior on the part of Andriesz. (D10: PD 107:6 - 108:17; 108:22-25; 109:2-7).

record revenue that Election Day and for the fourth quarter, was up 250% over the previous year. (LD Ex. H - D2: SA 604:22 - 605:5; 603:8 - 611:2; 612:6 - 613:5).

74.    Andriesz duly complained about the additional stress caused by being locked out on the 12th day – after being able to work the 1st 11 days -- of his supposed 2-3 week medical leave. (LD Ex. M - D8: SA 2103:8 - 2104:18).  Just as he always had, Andriesz continued to be responsive and professional towards Aubin during this period. (LD Ex. "HHH" (AE312).

75.    As a result of the harassment from BGC, from November 12, 2016 to November 13, 2016 Andriesz was hospitalized in London with a possible second heart attack. Immediately upon his discharge, Andriesz flew to New York and, the next day, he was rushed to NY Hospital with another heart attack like episode. (LD Ex. H - D2: SA 613:8 - 617:8). He advised BGC, through its Human Resource specialist, Carrie Fertig ("Fertig"), of his hospitalization as soon as he was physically able. (LD Ex. "III" (AE315); Ex. H - D2: SA 618:23 - 620:2).  Dreste believed that Aubin would have been told but does not specifically remember telling him. (LD Ex. O - D10: PD 340:14-23).

76.    Andriesz remained in the hospital in New York for three days, connected to all sorts of tubes and monitors, unable to work, and heavily medicated believing he was dying. (LD Ex. H - D2: SA 628:16 – 629:6). During his hospitalization, Aubin repeatedly harassed Andriesz through texts, threatening his job and fallaciously accusing Andriesz of insubordination for not immediately responding to him and having missed a previously scheduled Tandberg conference call. (LD Ex. H - D2: SA 617:14 - 618:14).

77.    Neither any of Aubin's texts nor any other communications were provided in discovery or produced at the hearings (same had been requested from Respondents in discovery). There was evidence, however, that Velez attempted to intervene with Aubin, at the request of

Andriesz's wife, who was terrified of the effects of Aubin's harassment on Andriesz and genuinely concerned that her husband might die.  In fact, she forwarded a picture of Andriesz that made it to Aubin and was, thereafter, circulated around the office to mock Andriesz. (LD Ex. JJJ (AE461); Ex. H - D2: SA 621:6 - 622:6; 623:2-14; 623:15 - 624:11; Ex. M - D8: RV 2242:3 - 2244:18). Andriesz was released from the hospital, but still medicated and shaky, not the least from the bewildering harassment from Aubin, especially given his initial flexibility in scheduling the Tandberg in question and was in the office part-time on Friday, November 18, 2016. (He had originally been considering the 18th or 19th (LD Ex. HHH).

78.     Andriesz was back in the office on November 18, 2016.  There was again no evidence presented at the hearings as to any attempts by Aubin to communicate with Andriesz on November 17, 2016, November 18, 2016 or over the subsequent weekend.

79.     The following Monday, November 21, 2016, at 10:46 a.m. Aubin sent Andriesz a clearly abusive correspondence which threatened him with insubordination and discipline in large part due to his missing the Tandberg that had been scheduled for the prior Tuesday while Andriesz was in emergency, despite his ability to email others on Tuesday (presumably Dreste and Skitt, Andriesz's HR representatives). (LD Ex. KKK (AE316).

80.     This letter was drafted by Dreste, Fertig (as evidenced by the reference to Andriesz's email to Dreste), and Aubin well before Monday the 21st,[7] but without any further communication with Andriesz whatsoever, and without even an attempt to make such contact by email or telephone.  The letter specifically directed Andriesz to explain, *inter alia*, why he did not attend the Tuesday am Tandberg while in the hospital, highly medicated, and in cardiac distress;

---

[7] By way of example only, "Carrie Fertig has requested to meet with you on Monday [not today]." LD Ex. LLL at BGC00010624).

why he did not message him when he was able to contact HR; why he did not respond to an email on Wednesday (again one that was never produced); and why he did not respond to messages while in the hospital on morphine and in cardiac distress (LD Ex. KKK) all despite clearly knowing the answers to each of these questions.  Dreste never advised Andriesz that she had authored the November 21, 2016 letter. (LD Ex. O - D10: PD 115:9-12).

81.    Despite the outrageous, harassing, and retaliatory nature of this email (BGC was then also aware of the SEC filing), Andriesz duly responded to Aubin's email within the hour detailing the physical duress he had been suffering and the medications that he had been on the prior week and invited Aubin to express what he actually wanted (LD Ex. LLL (AE318) at BGC00010808-9).

82.    Later that same day, Andriesz made a formal complaint to Fertig against Aubin for harassing him while he was in the hospital and requesting that HR investigate, *inter alia*, the harassment by Aubin while he was in the hospital and through the November 21 letter, which HR had actually ghost written: a fact they kept hidden, though Andriesz sensed that a cover-up was already occurring. Andriesz then escalated his complaint to Paul Pion ("Pion"), BGC's Chief Administrator Officer, calling it "further intimidation" and retaliation for his complaints. (LD Ex. LLL @BGC00010808-9; Ex. MMM (AE324); Ex. NNN (AE317, 319, 322, and 329).

83.    In the evening on November 21, 2016, after Andriesz met with her per Aubin's directive, Fertig wrote to Andriesz to confirm his "part-time" schedule of 40 hours per week (7am - 3pm daily) and also noted that "your FMLA Certification sent to you on November 7, 2016 is due tomorrow.  Please be sure to have this document completed by your doctor and returned to me on a timely basis." Andriesz responded that, as he has just gotten out of the hospital, he could not guarantee any specific schedule and that given his heart condition and recent harassment and

aggression he did "not understand what you are asking around FMLA certification." (LD Ex. "OOO" (AE 323) Ex. O - D10: PD 128:19 - 129:7).

84.    Andriesz received no response concerning his FMLA query, and no other relevant documents were produced. Andriesz does not recall proposing 7am - 3 pm, but Dreste testified that, "He had to be there when the market was open, so I think, you know, that's probably the best we could do to accommodate him." (LD Ex. H - D2: SA 641:12-15; Ex. O - D10: PD 124:3-6).

85.    Andriesz specifically addressed all concerns raised by Aubin (and highlighted his then medical condition) either directly to Aubin or to HR (LLL Ex. LLL and MMM) – which, unbeknownst to Andriesz, were exactly the same in this instance. Despite having the specific basis for his not wanting to communicate directly with Aubin (and nonetheless doing so) -- namely Aubin's harassment and seemingly unstable behavior -- HR assisted Aubin with his further response to Andriesz's November 21, 2016 11:03 am response (LD Ex. LLL; Ex. O - D10: PD 127:4-7)).

86.    Even while serving as the intake for Andriesz's complaints and seemingly accepting his position that he should not have to speak to his harasser about whom he has made specific complaint (not knowing that material acts being complained of were actually perpetrated by HR), HR then helped Aubin draft a response threatening Andriesz with insubordination and discipline for maintaining the very approach they appeared to condone. Meanwhile, Andriesz was left waiting for HR to investigate their own harassment. Not surprisingly, but even more abusively – and dismissively -- than in February, when asked to explain her investigation of Andriesz's complaints, Dreste testified that "JP didn't do anything inappropriate. Andriesz reported to him. He was trying to reach him for business purposes and Andriesz was not engaging with him." (LD Ex. O - D10: PD 131:4-20).

87.    When pushed, Dreste confirmed that the extent of her investigation was that she spoke to Aubin and he denied wrongdoing. (LD Ex. O - D10: PD 131:4-20). Again, not a surprising response, given that HR had actively participated in the harassment. However, imagine a sexual harassment case in which HR asked the alleged perpetrator if he had assaulted a subordinate and immediately shut down the investigation as soon as the alleged perpetrator denied doing anything wrong. As deplorable and actionable as that would be, this circumstance was worse because HR actively participated in the abuse, harassment, and retaliation.

88.    Despite their repeated assertion that all they cared about was Andriesz's health, BGC again did nothing to monitor this 40 hour per week "part time" arrangement. (LD Ex. O - D10: PD 124:17-25). Again, during this time, Andriesz worked diligently and nobody criticized any aspect of Andriesz's performance or conduct. (LD Ex, H - D2: SA 676:7-13).

89.    Andriesz's complaint -- about being harassed in the hospital -- was dismissed by Dreste after hearing nothing but a denial from Aubin. (LD Ex, O - D10: PD 131: 4-20).

90.    Despite having already summarily decided the outcome of the complaint, in an attempt to mimic propriety, by way of pure subterfuge, one week later Dreste referred Andriesz's complaint to Daniel Aiken ("Aiken"), a person who reported to Dreste, the author of the November 21, 2016 letter. (LD Ex. "PPP" (AE328). Contrary to Dreste's testimony, Andriesz did communicate with Aiken, which Dreste should have known as many such communications copied Fertig, including the email chain in which Andriesz requested that the abuse stop and that the investigation remain confidential as per BGC stated policy. (LD Ex. NNN).

91.    On November 30, 2016, Andriesz spoke to Paul Pion and then memorialized their conversation in an email. (LD Ex. H - D2: SA 656:7 - 659:3). Dreste was aware that Andriesz had complained to Pion about a hostile work environment based on Aubin's, and − albeit unknown to

Andriesz – HR's, actions. (LD Ex. G - D1: SA 130:5 -9,15-18). There was no direct contact between Aubin and Andriesz for a week when Aubin wrote another overly aggressive and harassing email to Andriesz (likely again with HR's assistance) on November 30, 2016, which Andriesz then forwarded to Pion who advised him that he would revert when his investigation was complete. (LD "QQQ" (AE332)).  Andriesz never received word back from either Aiken or Pion as to their findings or even that they had actually conducted any investigation. (LD Ex. H - D2: SA 675:2-9; 693:14-19; LD Ex. I - D3: SA 758:14 - 760:5).

92.    On December 1, 2016, in accordance with instructions received from BGC, Andriesz participated in a Tandberg video conference with, among others, Aubin. During that video conference, Andriesz addressed any and all of Aubin's concerns, which consisted solely of his strategic plan to hire one of Andriesz's brokers, Steven Cortes ("Cortes"), away from his desk into a new position: this despite the inferences that Andriesz had made up his heart condition and had deliberately ignored Aubin, despite their repeated communications the week prior.[8]  Clearly, Aubin and HR were -- albeit inartfully -- attempting to create a false record upon which they could try to support their manifestly pretextual basis for acting against Andriesz.   As of December 1, 2016 there were no outstanding issues, involving Aubin, that required Andriesz's attention and no communications from Aubin to which Andriesz had not responded. (LD Ex. "RRR" (AE338); Ex. "SSS" (AE341); Ex. H - D2: SA 674:16-25; 669:17 - 671:11; 676:23 - 677:16).

---

[8] The Tandberg had two parts.  Initially, Aubin attempted to take credit for a business idea that Andriesz had been pushing for since 2015 and sought to use the same to justify his removing Cortes from Andriesz's team and hiring Holley likely to replace Andriesz. When Andriesz challenged Aubin's actions, the Tandberg cut-off. Upon Aubin's return, Aubin sought to improperly tar Andriesz as insubordinate, to which Andriesz responded by calling attention to Aubin's harassment and the extent of Andriesz's medical condition during the week of November 14, 2016.  There was nothing time sensitive discussed. (LD Ex. H - D2: SA 669:17 - 671:11). Dreste could not testify as to anything said at the Tandberg and testified that "I don't, I don't know if the meeting even occurred." (LD Ex. O - D10: PD 140:12-20).

93.     Tellingly, at no point during the Tandberg was there any discussion of Andriesz not performing the essential functions of his job or any performance related complaints concerning his trading, direct supervision, Series 30 supervision, team management, reporting, or other actual essential elements of his job. (LD Ex. H - D2: SA 676:23 - 677:16). Andriesz unsuccessfully sought the minutes of the meeting and made Pion aware of the substance of the meeting. (LD Ex. "TTT" (AE344)).

94.     From November 1, 2016 to December 2, 2016 BGC expressed no concern regarding Andriesz's performance or conduct, except for the November 21, 2016 letter, which concerns were addressed in the December 1, 2016 video conference. (LD Ex. H - D2: SA 674:16-25).

95.     Despite his compliance with all of BGC's directives, by letter dated December 2, 2016 from Dreste (LD Ex. GG), Andriesz was again placed on an indefinite suspension and instructed to visit, and submit to examinations by, two doctors -- a psychiatrist on the East End of Long Island and an infectious disease doctor in New York City -- to determine if he was fit to perform the essential functions of his job. (LD Ex. GG).

96.     In an abjectly brazen manipulation of the truth, Dreste asserted that Andriesz had admitted that he could not perform the essential functions of his job: an assertion explicitly denied by Andriesz and directly belied by the fact that he was, in fact, performing the essential functions of his job without any complaints. (LD Ex. "UUU" (AE347; Ex. "VVV" (AE 348); Ex. H - D2: SA 679:7-17). Andriesz directly reported the same to Pion as further retaliation. (LD ex. UUU).

97.     When asked, Dreste admitted that she could not recall any of the exact comments made by Andriesz for which she suspended him. (LD. Ex. O - D10: PD 148:13-20).

98.    Dreste further testified that the sole "essential function" of his job that Andriesz was accused of not performing was not interacting with his supervisor between November 17, 2016 and November 30, 2016. (LD Ex. O - D10: PD 151:6 - 153:22; 149:6-21).  This, as set forth above, had already been justified to HR and Aubin.  Moreover, Andriesz specifically expressed to Dreste that he did not feel that he should have to speak to Aubin as the latter was under investigation for harassing him and retaliating against him (which HR had directly participated, and certainly colluded, in) (LD Ex. O - D10: PD 320:5-10).  In any event, it is clear that BGC's general policy was to separate a manager accused of harassment by a subordinate.  (LD Ex. O - D10: PD 242:15-21). Again, neither Dreste nor anyone else in HR considered acting on the default policy, because Aubin had denied committing any harassment or bullying.  Dreste never even looked at the communications Aubin had with Andriesz while Andriesz was in the hospital. (LD Ex. O - D10: PD 301:8 - 302:9).

99.    In addition to the blatant lies on which Dreste attempted to justify Andriesz's suspension, she also directed that Andriesz attend sessions with two doctors[9], who she did nothing to vet aside from confirming that they were licensed: Dr. Solomon, a doctor based two hours outside of New York City who was a hired gun for school boards and districts who specialized in certifying that unwanted teachers were unfit for their jobs and recommended by counsel who used to represent such school boards and districts; and Dr. Busillo, an infectious disease specialist who, at the time, was involved in a suit with a patient who had been misdiagnosed with AIDS.  (LD Ex. O - D10: PD 154:9 - 157:7; 157:8 - 159:12; 167:21 - 168:8; D2: SA 681:12 - 687:25). Dreste had worked with neither doctor before, but subsequently used Dr. Solomon who, not surprisingly,

---

[9] Based upon internet research he conducted, Andriesz learned that these doctors were hired guns, working primarily for school boards, who routinely reached a pre-determined result that any employee they examined was not fit to perform the essential functions of his/her job.  (LD Ex. WWW (AE3); Ex. XXX (AE405); Ex. H - D2: SA 681:12 - 687:25).

28

concluded that the employee then at issue was not fit to fulfill the material functions of their job. (LD Ex. O - D10: PD 154:4-8; 195:18 - 196:9).

100.    There was no valid reason to send Andriesz to any doctor, much less these two doctors – who had no particular knowledge of the financial industry whatsoever.  Andriesz medically could speak and interact with Aubin – and contrary to the allegations of BGC -- he regularly did so, including on November 30 and December 1, 2016, as well as at all times prior to Aubin's harassment of him while he was in the hospital fearing for his life, including the week prior. Andriesz just did not believe (as per BGC's policy) and as expressed to HR and Pion, that he needed to speak to Aubin, when Aubin was under investigation for harassment, creating a hostile work environment, bullying, and retaliating against Andriesz for making complaint for, *inter alia*, violation of security regulations.

101.    On December 7, 2016, Andriesz wrote to Dreste expressing his concerns about her suspension of him and requested clarification of her allegations and any support for the same. (LD Ex. VVV). Dreste never provided a response to those questions. (LD ex. O - D10: PD 162:9-25). Dreste's only response was to provide additional potential dates to meet with the two "hired gun" doctors. (LD Ex. "YYY" (AE349)).  Dreste did not have a detailed understanding of Andriesz's job or the essential elements of the same. (LD Ex. "ZZZ" (AE350); Ex. H - D2: SA 701:6 - 705:12; D10: PD 176:9-21; 178:12 - 179:9).  However, because the whole doctor requirement was solely to create a pretextual reason to terminate Andriesz, her knowledge was ultimately immaterial except to demonstrate that there was no real belief that Andriesz could not perform each and every one of his essential job functions.  The reality was that Aubin had decided he no longer wanted to work with an individual who had recognized his improper activities and had reported him internally and to the SEC.

102.    On December 21, 2016, Andriesz reminded Dreste (for a third time) that he was married on December 19, 2016 and that he was then on his honeymoon. (LD Ex. "AAAA" (AE360). Then on January 3, 2016, not having received any response to his queries of December 7, 2016, Andriesz wrote again to seek a resolution, as well as answers to his outstanding questions, including any viable justification for being subjected to the examination of the two doctors.  (LD Ex. BBBB (AE365)). When questioned, Dreste first contended that she responded in some manner, but when she understood that no response had been produced, she admitted that "perhaps I did not respond because he didn't go to them [the very doctors Andriesz was complaining about] and he was refusing to cooperate [by not going to those same doctors]." (LD Ex. O - D10: PD 182:24 - 184:14).

103.    Dreste ultimately admitted, and further demonstrating that the decision to terminate Andriesz had been made months before, that neither she nor anyone at BGC had any contact with Andriesz between December 2, 2016 and January 31, 2017, when she terminated him. (LD Ex. O - D10: PD 322:4-23; Ex. HH). Dreste also admitted that she never responded to his inquiries and requests to resolve the issues and for information as posed, *inter alia*, to her on December 7, 2016 and January 3, 2017. (LD Ex. O - D10: PD 182:24 - 184:14; 322:4-23).  The termination letter provided no new grounds for termination but relied solely on the disproven allegations of insubordination concerning Aubin and the improper, and unsupportable, demand that Andriesz be subjected to examination by visitation with the two doctors. (LD Ex. HH).  Nothing had changed since the fabricated November 21, 2016 letter, except that Andriesz had addressed the single business issue (Cortes) that Aubin wanted to discuss with him and duly responded to inquiries from Aubin and HR. BGC had no basis to terminate Andriesz and did so solely to complete their retaliation against him.

104.    By terminating Andriesz on January 31, 2017, BGC deprived him of (a) two years of compensation; (b) approximately $250,000 worth of bonuses for the fourth quarter of 2016; and (c) all of his earned, but unpaid deferred equity compensation, which was forfeited. (LD Ex. Q).

105.    On February 14, 2017 Andriesz submitted a whistleblower complaint to the CFTC (LD Ex. "CCCC" (AE371); Ex. I – D3: SA 750:9 – 755:6). This complaint reiterated the allegations contained in Andriesz's lawyer's May 9, 2016 whistleblower complaint to Popok and his October 28, 2016 written whistleblower complaint to SEC. (LD Ex. CCCC).

106.    As a result of Andriesz's Complaint, on November 22, 2019 the CFTC issued an Order Imposing Remedial Sanctions against BGC, including a $1.5 million fine (LD Ex. DDD). On November 22, 2021 the CFTC awarded Andriesz a whistleblower reward of $400,000, confirming his status as a recognized whistleblower. (LD Ex. "DDDD" (AE431)).

107.    Velez confirmed many of Andriesz's complaints in numerous filings with various regulatory agencies including the SEC, CFTC, NFA, and FCA. (LD Ex. "EEEE" (AE422, 423, 424, 426, and 427 combined). Velez had raised similar complaints while working at BGC in which he testified that he never lied to his managers.  (LD M – D8: RV 2160:25 – 2161:22).

108.    Subsequent to Andriesz's wrongful discharge, BGC continued to retaliate against him, including by refusing to cooperate with him to resolve tax issues creates by the forfeiture of his partnership shares; delaying and failing to update Andriesz's licensing information, thereby preventing him from joining other broker dealers; and through Aubin's advising all other BGC employees that he would terminate and sue anyone caught speaking to Andriesz, thereby irreparably damaging decades old relationships that Andriesz had developed in the industry.

<u>Andriesz Unequivocally and Undisputedly Proved His Claim For Breach Of Contract</u>

109.    It is axiomatic that a written contract must be read and interpreted in accordance

with the plain meaning of its words. See, *e.g. Teichman* v. *Community Hospital*, 87 N.Y.2d 514, 520 (1996). "To the extent that there may be ambiguity in a contract, it is properly construed against the drafter." *327 Realty, LLC* v. *Nextel of New York, In*c., 150 A.D.3d, 581, 55 N.Y.S.3d 202 (1st Dept 2017); *Chatterjee Fund Management, L.P.* v. *Dimensional Media Assocs.,* 260 A.D.159, 687 N.Y.S. 2d 364 (1st Dept 1999).

110.    There is one written contract issue[10] in this matter: the January 21, 2015 BGC contract related to Andriesz's employment as Managing Director supervising both BGC's North American Futures and Options Desk (in New York and Chicago) and the London Financial Futures and Options Desk (LD Ex. Q).

111.    The 2015 BGC contract provides for a variable non-recourse draw and salary aggregating $400,000 per annum and quarterly bonuses paid from an incentive pool compensation arrangement (the "Pool"). (LD Ex. Q Sections 3(a)(b)).

112.    The Contract provides that Andriesz was entitled to participate in an incentive pool compensation "… related to the performance of BGC's North American Futures and Options Desk (excluding the Chicago Futures Execution Desk) and the London Financial Futures and Options Desk (the "Desks")." (Section 3(b)). In describing the amount of the Pool, the contract provides that it:

> "… shall be an amount equal to: (x) 50% of the Net Revenue of the Desk [--not the Desk<u>s</u> --] (as determined on a calendar quarterly … basis in accordance with BGC's then current accounting policies and practices ( the "Calculation Period"), minus (y) Desk Compensation (as defined herein) for the same calendar quarterly period,

---

[10] The clear and unrefuted testimony also demonstrated an oral contract by and between Andriesz and BGC's co-President McLoughlin, pursuant to which BGC agreed to pay to Andriesz's incentive pool compensation arrangement (the "Pool") the $1.823 million in market maker match and rebate revenue for 2015 that was wrongfully withheld from it. (LD Ex. MM); Ex. H - D2: SA 477:20-480:10). The $1.823 million, or, at least, 50% of it, is also clearly recoverable as a breach of the January 21, 2015 contract. 50% of this amount should have been included in the Net Revenue calculation of the desks' 2015 bonus pools (LD Ex. Q Section 3(b)). That entitlement was modified by the undisputed oral contract, whereby BGC unequivocally promised to pay the entire $1.823 million to Andriesz.

BGC's employment-related expenses and any similar employment-related tax expenses for the Desk, all travel and entertainment expenses … incurred by employees on the Desk during the Calculation Period to the extent that they exceed 3% of Net Revenues, market data expenses … for the Desk … any other direct or indirect expenses attributable to the Desk, a one hundred fifty dollar ($150) per calendar month per Desk employee for front office support costs, client services charges for the Desk and a share of the Desk support ("Deductions")." (LD Ex. Q Section 3(b)).

113.    The only issue related to this contract language is the use of the singular DESK in describing two separate bonus pools, one for the New York desk and the other for the London desk. However, the language used is clear and unambiguous. More importantly, this interpretation comports with BGC's practice and policy of <u>NOT</u> netting the losses of one desk against the profits of another desk. According to Fong, who Andriesz properly relied upon, any contrary policy would be improper or illegal. (D1: SA 320:1-7; 321:11-322:2; 324:2-9; 332:3-6).

114.    Pursuant to both the plain meaning of the contract's words and BGC's practice and policy, the contract did not, and does not, provide for any netting of the losses from one desk against the profits of another desk.

115.    The next contract provision that is relevant to this dispute is the definition of "Net Revenues": "'Net Revenues' means revenue generated by the Desk with respect to voice brokering transactions …" (LD Ex. Q Section 3(b)).

116.    This definition is nearly identical to the definition of "Net Revenue" contained in Andriesz's May 28, 2012 contract. By its plain and unambiguous words, it necessarily includes market maker match and pit/volume rebate revenue because that type of revenue was revenue "generated by the Desk with respect to voice brokering transactions." (LD Ex. Q Section 3(b)). Again, these types of revenue were always included by BGC in the "Net Revenue" figure before Marinos became business manager and after 2015, as a result of Andriesz's complaints about the failure to include this revenue in the "Net Revenue" calculation. (LD Ex. Q; Ex. P - D11: JM

154:12 - 158:5).[11]

117.    The testimony and documentary evidence were unequivocal that: (a) there was a clear meeting of the minds with respect to all of the material terms of the January 21 2015 contract; (b) there is nothing in the January 21, 2015 contract that permits "netting" the losses of the New York desk against the profits of the London desk; (c) the plain wording of the January 21, 2015 contract, as well as BGC's consistent practice and policy, provides for the inclusion of market maker match revenue and pit/volume rebate revenue in the calculation of "Net Revenue";[12] (d) Management override bonuses were discretionary bonuses pursuant to Section 3(e) of the January 21, 2015 contract and were not contractually mandated. (Ex. 38); and (e) here was no grace period after which losses from the New York desk should have been netted against profits from the London desk.  To the extent that there is any ambiguity with respect to these terms, the contract must be construed by BGC as the drafter.  These facts are not in dispute, but for the purposes herein, only further demonstrate the justification of Andriesz's complaints.

118.    It is also undisputable that Section 4 (Ex. 38) provides for the circumstances under which BGC could properly terminate Andriesz's employment:

> "(a) During the Term of Employment, BGC may terminate this Agreement with Employee for Cause and notice of such termination shall be sent to Employee. For the purposes hereof, "**Cause**" means Employee's (i) dishonesty, disloyalty, insubordination, unsatisfactory performance or attendance, or failure to follow BGC's policies rules, codes of conduct, or procedures, (ii) nonperformance or breach by Employee of any of the provisions of this Agreement (including inaccuracy of representations),  (iii) conviction of a crime under U.S. Federal, state or local laws or any applicable foreign laws (including any pleas of *nolo*

---

[11] There was considerable testimony regarding whether BGC left out the word "less" immediately following the phrase "… with respect to voice brokering transactions" in Section 3(b) of Ex. 38. It was obvious -- to everyone except Aubin -- that this was a scrivener's error. However, it is irrelevant because there is no issue regarding what deductions were properly made to the "Net Revenue" calculation. The only issue was whether all appropriate revenue was included in the "Net Revenue" calculation. (LD ex. Q; Ex. P - D11: JM 154:12 - 158:5).

[12] (LD Ex. Q; Ex. P - D11: JM 154:12 − 158:5; Ex. G - D1: SA 329:5 - 332:15).

*contendere*), (iv) serious misconduct in connection with or affecting the business of BGC or any Affiliate, (v) serious neglect or gross negligence in performing Employee's duties hereunder, (vi) failure to perform Employee's duties hereunder ( other than as a result of being disabled) after delivery to Employee by BGC or an entity owned or controlled by BGC of written notice identifying the duties not performed by Employee, which failure may include the failure to maintain any regulatory approvals or licenses necessary to perform Employee's duties, (vii) violation by Employee or Employee aiding and abetting any violation by another, as reasonably determined by BGC, of any law, order, rule or regulation pertaining to Employee, BGC or its affiliates including, among others, the rules, regulations and by laws of the Financial Industry Regulatory Authority, (viii) illegal drug use by Employee, or (ix) request for reimbursement of expenses not actually incurred by Employee and/or not in accordance with BGC's travel and entertainment policy, or assisting others in such efforts."

119.    There was no "Cause," as that term is plainly defined, to terminate Andriesz's agreement, and BGC never provided written notice to Andriesz "identifying the duties [allegedly] not being performed by [him]." (LD Ex. Q Ex. 38, Section 4). There were none, and no *bona fide* duties were testified to by Respondents at the arbitration.

120.    Such a failure, especially in light of the repeated requests for such information by Andriesz, is dispositive and precluded, as a matter of law, as the Arbitrators were duly informed, the argument that Andriesz was terminated for Cause.

121.    Absent Cause, the term of the Contract would have extended, by its express terms, to February 1, 2019.  (LD Ex. Q Section 1(a); "for a term beginning February 1, 2015, … and ending of the fourth (4th) anniversary of the State Date …"), mandating a minimum award of $400,000.00 per annum ($800,000 for the remainder of the Contract) plus interest at 9%. See *e.g., Hernandez v. Jrpac Inc*., No. 14 CIV. 4176 (PAE), 2016 WL 3248493, at *36 (S.D.N.Y. June 9, 2016) ("Prejudgment interest is to be calculated pursuant to the New York prejudgment interest rate of nine percent (9%) per annum simple interest from a single reasonable intermediate date."); *Rao v. New York City Health & Hosps. Corp*., 882 F. Supp. 321, 327 (S.D.N.Y. 1995)

("Prejudgment interest is necessary to make the plaintiff whole, to avoid unfairness, and to accomplish the purposes of the statute.") 9% simple interest on $800,000.00 from January 2019 to January 2024 would have been $360,000.00, for a total of $1,160,000.00.

122.    However, absent his improper termination, as above, Andriesz would also have earned his Fourth Quarter bonus of no less than $250,000[13], which with 9% simple interest would have equaled $407,500 by January 2024, or a new total of $1,567,500.

123.    The law is also clear that to the extent that BGC did not pay wages that were then due and owing – which Andriesz unequivocally demonstrated – under the strict and clear provisions of the New York Labor Law ("NYLL"), Andriesz was also entitled to liquidated damages of 100% of the unpaid wages. *Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 515–16 (S.D.N.Y. 2017), *aff'd*, 752 F. App'x 33 (2nd Cir. 2018); *Cabrera v. Canela*, 412 F. Supp. 3d 167, 184 (E.D.N.Y. 2019); *Pachter v. Bernard Hodes Grp., Inc.,* 541 F.3d 461 (2nd Cir. 2008); NYLL §§190-199-a). If this was applied to even the bare minimum clearly due and owing to Andriesz under his Contract, the Award would have been $3,135,000 less the monies he actually earned ($812,175), or $2,322,825.  The Panel's Award of $500,000 bears no resemblance to these numbers or any other damage calculation presented – or legally available – to the Panel.

124.    Beyond the bare minimums, which were clearly not awarded by the Panel, the evidence was undisputed that for 2016 Andriesz earned $734,756 from BGC. (Ex. 363,364). Notably, absent his improper termination, as above, Andriesz would also have earned his Fourth Quarter bonus of no less than $250,000, making his total compensation for 2016 $984,756.  If the Panel chose to improperly ignore the plain and indisputably applicable NYLL statutes, then it

---

[13] Under the admitted and plain language of the Contract, Andriesz's, fourth quarter incentive bonus from 2016, which he had already earned, was payable "within 45 days after the last day of the Calculation Period. (LD Ex. Q Section 3(b)). Andriesz's testimony as to the amount of that incentive bonus -- $250, 000 -- was also undisputed.

would have had to assume that Andriesz would have earned, at least, the same amounts, if permitted to work the remaining term of his contract, for 2017, 2018, and the first month of 2019, that he earned in 2016. This totals, at a minimum, $1,969,512 ($984,756 X 2). Instead, he earned only $812,175, not counting his non-compete payment from BGC, during this period of time (LD Ex. FFFF (AE459) at Table 10U), leaving a damages delta on this claim of $1,157,337 ($1,969,512 minus $812,175). With simple interest of 9%, that amount would have equaled $1,678,138.65 by January 2024. Again, this figure does not include the 100% penalty mandated by the NYLL.[14]

125.    Clearly the Panel manifestly disregarded the clear and unequivocal law in regard to Andriesz's breach of contract claim.

### Andriesz Unequivocally and Undisputedly Proved His Claims For Whistleblower Retaliation Under Dodd-Frank

126.    In order properly to state a claim for Dodd-Frank whistleblower retaliation, Andriesz was required to show, by a preponderance of evidence[15], that, as an employee of BGC, a

---

[14] It is also noteworthy that Panel also necessarily completely ignored the testimony of the only expert presented at the arbitration. The only competent evidence presented at the hearings regarding the quantum of damages attributable to Andriesz's pain and suffering and his physiological injuries was Dr. Smith's report (LD EX. FFFF, at 8-10) and his testimony (D4: SS:1127:9-1228:10) He testified that depending upon a determination of the level Andriesz's impairment (either 50% or 75% for all years, except 80%-90% for 2022 and 2023), Andriesz suffered damages, for the reduction of his value of life, of as little as $2,718,196 to as much as $3,386,657. (LD Ex. FFFF, at 8-10). This testimony was not refuted in any way.  BGC did not present any expert or rebuttal of this testimony. Similarly, BGC did not put on any evidence or present any experts concerning the mental harm caused to Andriesz by their actions, while Andriesz presented three separate psychological healthcare professionals who had treated him – Dr. William Morgan, Dr. Wayne Kampers, and Paola Pomponi – and who each testified that Andriesz suffered, and suffers, from debilitating extreme post-traumatic stress disorder that was, and is, proximately caused by BGC's improper treatment of him while employed by BGC and, particularly, his wrongful termination. (LD Ex. "GGGG" (AE406); Ex. "HHHH" (AE453); Ex. K – D5: WK 1408:16 – 1412:22; 1423:13 - 1426:1; 1436:1 - 1437:9; 1438:3-23; WM 1464:7 - 1466:13; Ex. L – D6 PP 1499:18 - 1500:21; 1501:15-22; 1504:7 - 1507:19; 1508:7 - 1509:6; 1510:3 - 1512:12; 1520:7-18).

[15] To establish a fact by a preponderance of the evidence means to prove that something is more likely true than not true. In other words, a preponderance of the evidence in the case means such evidence when considered and compared with that opposed to it, has more convincing force, and produces in one's mind a belief that what is sought to be proven is more likely true than not true. *People v. W.H.*, 69 Misc. 3d 278, 282, 127 N.Y.S.3d 705, 708 (N.Y. Sup. Ct. 2020).

publicly traded company, (1) he engaged in a protected activity by reporting corporate wrongdoing covered by the securities statutes to a federal regulatory body or law enforcement agencies; (2) he suffered an adverse employment action as a result of BGC learning of that reporting; and (3) the adverse action was causally connected to Andriesz's protected activity. *Digital Realty Tr., Inc v. Somers*, 583 U.S. 149, 157 (2018); (citing §78U-6 (k)(1)(b)(i), (iii)(1)(aa)*; Rinaldi v. NICE, Ltd.*, No. 19 CIV. 424 (LGS), 2021 WL 4295263, at *2 (S.D.N.Y. Sept. 21, 2021), *aff'd sub nom. Rinaldi v. Mills*, No. 21-2630, 2022 WL 17480081 (2nd Cir. Dec. 7, 2022).

127.    To have been engaged in protected activity, Andriesz: (a) must have had an objectively reasonable belief that BGC's reported conduct violated one of the enumerated provisions of securities law; and (b) establish that BCG knew about his report to the SEC. see *Pierce v. Better Holdco, Inc*., 2023 WL 6386920, at *8 (S.D.N.Y. Sept. 29, 2023).

128.    These legal standards are not disputed.  In fact, BGC, in the course of the hearings, provided the Arbitrators with an exhibit which set forth these very standards.

129.    Andriesz clearly demonstrated his repeated reporting of regulatory issues internally.

130.    Andriesz also clearly and unequivocally demonstrated that he had filed a complaint with the SEC in the Fall of 2026.

131.    Even a cursory review of the relevant documentary evidence demonstrates its validity as does the actual existence of Ms. Morris at the SEC. There is no basis for Respondents' fantastic assertion that this correspondence is a fabrication.  Moreover, as the TCRs drafted in January 2017, and filed at that time, clearly demonstrate, contact had previously been made with Ms. Keyes – further corroborating Andriesz's testimony. (LD Ex. EEE; LD Ex. "IIII" (AE368); Ex. "JJJJ" (AE369) both @ 3(a) and 3(b)).

132.    Similarly, Andriesz's testimony that, shortly after his SEC filing, he advised Dreste and Rosado, both of BGC's Human Resources Department, that he had escalated his unaddressed complaints to the SEC, was clear and unrefuted. (SA 128:4-7; 128:12-21; 128:25 - 130:7; 131:2 - 132:17; 132:21 - 133:3).

133.    Thereafter, Andriesz went to London for election day, and the final chain of retaliation against him began and was escalated through completely pretextual harassment, suspension, and termination.

134.    The damages proximately caused by this unlawful whistleblower retaliation are the lost wages and lost value of life detailed in Dr. Smith's report. (LD Ex. FFFF). *Berman v. Neo@Ogilvy LLC*, 801 F.3d 145, 150 (2nd Cir. 2015), abrogated by *Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 138 S. Ct. 767, 200 L. Ed. 2d 15 (2018) ("an employee who suffers retaliation after reporting wrongdoing simultaneously to his employer and to the SEC is eligible for Dodd–Frank remedies and those provided by Sarbanes–Oxley.")

135.    The unrefuted lost value of life suffered by Andriesz was $2,718,196 to $3,386,657. (LD Ex FFFF at 8-9). As set forth above, we know that Andriesz's reasonably calculated lost income for 2017 and 2018 was $1,157,337. Using the same calculus for years 2019 through 2033, Andriesz should have earned $984,756 per annum for a total of $4,923.780. In fact, he was only able to earn $941,331, resulting in a loss of $3,982,449. As such, Andriesz's losses attributable to this claim would be $7,857,982 ($2,718,196 + $1,157,337 + $3,982,449). This claim is irrefutable but its damages far exceed and bear no relation to the $500,000.00 awarded. Vacatur is warranted on this basis as well.[16]

---

[16] Tellingly, even if the owed, but unpaid, $250,000 was not made part of the calculus (as it clearly should have been), the net losses for 2017 and 2018 would have been $657,337 and for 2019 through 2023 would have been $2,732,449 (5 x $734,756 = 3,673,780 - $941,331) for compensatory losses of $3,389,

136.    Clearly the Panel manifestly disregarded the clear and unequivocal law in regard to Andriesz's Dodd-Frank claims.

<u>General Standard For Vacatur</u>

137.    Although the Federal Arbitration Act ("FAA") creates a strong presumption favoring arbitration and limiting review of arbitrators' decisions, there are specific statutory and judicially created exceptions to this general rule.[17]  "While judicial review of an arbitrator's factual determinations is quite limited, a court may modify or vacate an arbitrator's award for manifest disregard of the law or the evidence if there is 'strong evidence' contrary to the findings of the

---

786, without even accounting for interest or the lost value of life suffered by Andriesz valued at $2,718,196 to $3,386,657.  Clearly in excess of, and unrelated to, the $500,000 awarded.

[17] The relevant sections of the United States Code are 9 U.S.C. §§10-11 as set forth below:
Section 10. Same; vacation; grounds; rehearing
(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration
        (1) Where the award was procured by corruption, fraud, or undue means.
        (2) Where there was evident partiality or corruption in the arbitrators, or either of them.
        (3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.
        (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.
        (5) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.
(b) The United States district court for the district wherein an award was made that was issued pursuant to section 590 of title 5 may make an order vacating the award upon the application of a person, other than a party to the arbitration, who is adversely affected or aggrieved by the award, if the use of arbitration or the award is clearly inconsistent with the factors set forth in section 582 of Title 5.

Section 11. Same; modification or correction; grounds; order
In either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration
        (a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.
        (b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.
        (c) Where the award is imperfect in matter of form not affecting the merits of the controversy.
        The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties.

arbitrator and the arbitrator has not provided an explanation of his decision." *Beth Israel Medical Center v. Local 814*, 2000 WL 1364367 (S.D.N.Y. 2000); see also, *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197 (2nd Cir. 1998) (Court vacated award finding strong evidence contradicting award and because no explanation or rationale for the denial of relief was proffered by the arbitrator); *Sanders v. Gardner*, 7 F.Supp.2d 151 (E.D.N.Y. 1998) (Court held if the error of arbitrators is perceivable by the average person qualified to serve as an arbitrator and a clearly governing legal principle was ignored or disregarded by the arbitrators, the award should be vacated); *Wien & Malkin LLP v. Helmsley-Spear, Inc.*, 12 A.D.3d 65, 783 N.Y.S.2d 339 (1[st] Dept. 10/14/04) (Relying on *The Citizen's Bank v. Alfabco,* 539 U.S. 52, 123 S.Ct.2d 2037, 156 L.Ed.2d 46 (2003), Court held FAA standards apply to any transaction affecting commerce and that an inference of manifest disregard can be made if error by arbitrators was so obvious as to be perceived by an average person qualified to serve as an arbitrator).

138.    Under CPLR §7511[2], an arbitration award shall be vacated if the award was procured by fraud or by the partiality of one or the arbitrators or if it is irrational or void as against public policy. See *e.g. Sands Brothers & Co., Ltd. v. Generex Pharmaceuticals*, 298 A.D.2d 307, 749 N.Y.S.2d 17 (1st Dept. 10/29/02) (After finding award irrational and arbitrator conflict of interest, Court remanded to new Panel for reassessment of damages). As in *Halligan* and *Wein*,

---

[2] §7511 Vacating or modifying award
(b) Grounds for vacating
(1) The award shall be vacated on the application of a party who either participated in the arbitration or was served with a notice of intention to arbitrate if the court finds that the rights of that party were prejudiced by:
      (i) corruption, fraud or misconduct in procuring the award; or
      (ii) partiality of an arbitrator appointed as a neutral, except where the award was by confession; or
      (iii) an arbitrator, or agency or person making the award exceeded his power or so imperfectly executed it that a final and definite award upon the subject matter submitted was not made; or
      (iv) failure to follow the procedure of this article, unless the party applying to vacate the award continued with the arbitration with notice of the defect and without objection.

the overwhelming facts and the irrefutable manifest disregard for the law by the Arbitrators in rendering the Award mandates vacatur. Under the admitted factual circumstances the plain and common meaning of various applicable laws as presented to arbitrators, the Award is, simply, unsupportable in reason or logic.

139.    The Arbitrator's Award should be vacated as it is manifest disregard of the applicable, clearly presented, law and facts of this matter.

140.    It should be vacated as irrational given that the Panel found exclusively for Andriesz, directing that BGC pay all applicable hearing fees, but awarded damages with no tie to the claims or evidence presented and demonstrated by Andriesz as computed per undisputable legal standards. See *e.g., Sands Brothers & Co., Ltd., v. Generex Pharmaceuticals, Inc.,* 298 A..2d 307 (1st Dept 2002) (An arbitration award will be vacated if it is irrational).

141.    Alternatively, the Award should be amended to provide for the legally required damages for the clearly demonstrated causes of action for breach of contract and for retaliation in contravention of the protections of Dodd-Frank. As set forth above, the damages related to the breach of contract claim could be no less than $2,322,825 and to the Dodd-Frank claim no less than $6,107,982 as a matter of law. All well in excess of the $500,000 awarded.

142.    In the second alternative, remand is warranted. While arbitrators may present a lump sum award without disclosing any rationale for it, courts may inquire into the basis of such an award when there appears to be no legal or factual basis for it. See *e.g., Tripi v. Prudential Securities, Inc.,* 303 F.Supp.2d 349,353 (S.D.N.Y. 2003) (Court remanded for clarification based on difficulty in ascertaining justification for the arbitrators' award).

143.    WHEREFORE, for all of the foregoing reasons, Petitioner respectfully requests that the Court (1) vacate the Panel's Award, or, in the alternative, modify the Award as set forth above; (2) or, in the alternative, remand for clarification of the current Award; and (3) award to Andriesz any such other or further relief as this Court deems just and proper.

Dated: New York, New York
        September 16, 2024

Respectfully submitted,

*Neal Brickman*

Neal Brickman (NB0874)
Ethan Leonard (EL2497)
The Law Offices of Neal Brickman
420 Lexington Avenue - Suite 2811
New York, New York 10017
(212) 986-6840
Attorneys for Petitioner Andriesz

To:    BGC Financial, L.P.
       55 Water Street - 10th Floor
       New York, New York 10041