UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
SIMON DAVID ANDRIESZ,                          Case No: 24-CV-07004

                        Petitioner,

For an Order Pursuant to 9 U.S.C.A. §1 *et seq*.
and CPLR § 7551 Vacating or Amending an
Arbitration Award

            - against -

BGC FINANCIAL, L.P.,

                        Respondent.
------------------------------------------------------X

MEMORANDUM OF LAW IN SUPPORT PETITION TO VACATE THE ARBITRATION
AWARD, OR, IN THE ALTERNATIVE TO MODIFY OR REMAND SUCH AWARD

Neal Brickman (NB0874)
Ethan Leonard (EL2497)
The Law Offices of Neal Brickman P.C.
420 Lexington Avenue - Suite 2811
New York, New York 10017
(212) 986-6840
Attorneys for Petitioner Andriesz

Table of Contents

**Page(s)**

Table of Authorities …………………………………………………………… ii

Preliminary Statement …………………………………………………… 1

Procedural Background …………………………………………………… 2

Limited Statement of Relevant Facts ………………………………………. 4

Argument ……………………………………………………….... 8

General Standard For Vacatur ………………………….………………… 8

Point I

    The Laws That The Panel Disregarded Are Clear And Irrefutably Applicable And Petitioner Clearly And Irrefutably Demonstrated Liability Inconsistent With The Award's Damages Warranting Vacatur…………….……………... 10

        Breach of Contract ………………………………............... 11

        Dodd-Frank Whistleblower Retaliation Claim ……..………… 19

Point II

    In The Alternative, The Award Should Be Amended Or The Matter Remanded 24

Conclusion ………………………………………………………….. 25

Table of Authorities

*Cases*:

*327 Realty, LLC v. Nextel of New York. Inc.,*
    150 A.D.3d 581, 55 N.Y.S.3d 202
    (1st Dept. 2017) …….……………………………….……….   11

*Beth Israel Medical Center v. Local 814,*
    2000 WL 1364367 (S.D.N.Y. 2000) ………………………..………   9

*Berger v. New York City Police Department,*
    304 F.Supp.3d 360 (S.D.N.Y March 30, 2018) ……………………   14

*Berman v. Neo@Ogilvy LLC,*
    801 F.3d 145 (2nd Cir. 2015) ………………………………………   23

*Cabrera v. Canela,*
    412 F.Supp.3d 167 (E.D.N.Y 2019) ..…………………………………   17

*Chatterjee Fund Management, L.P. v. Dimensional Media Assocs.,*
    260 A.D. 159, 687 N.Y.S.2d 364
    (1st Dept. 1999) ……………..………………………………………   11

*Conroy v. NY State Dep't of Corr. Serv.,*
    333 F.3d 88 (2nd Cir. 2003) ………..………………………………   14

*Digital Realty Tr., Inc. v. Somers,*
    583 U.S. 149 (2018) ………………..…………………………………   19, 23

*First Investors Corp v. Liberty Mut. Ins. Co.,*
    152 F.3d 162 (2nd Cir. 1998) ………………………………………   11

*Franco v. Port Authority of New York & New Jersey,*
    643 F.Supp.3d 459 (D.N.J. 2022) …………….…………………………   13-14

*Freeman v. Quicken Loans, Inc.,*
    566 U.S. 624, 132 S.Ct. 2034 (2012) …………………………………   15

*Gamero v. Koodoo Sushi Corp.,*
    272 F.Supp.3d 481 (S.D.N.Y 2017)
    *aff'd,* 752 F.Appx 33(2nd Cir. 2018) ..………………………………   17, 18

*Gutt v. Nassau Health Care Corp.,*
    No. 04 CV 57, 2005 WL 3605273
    (E.D.N.Y. Mar. 15, 2005) ……..…………………………………………   11

*Halligan v. Piper Jaffray, Inc.,*
    148 F.3d 197 (2nd Cir. 1998) ……………………………………….    9

*Hannah P. v. Coats,*
    916 F.3d 327 (4th Cir. 2019) ………….…………………………….    14

*Hernandez v. Jrpac Inc.,*
    No. 14 CIV. 4176 (PAE), 2016 WL 3249493
    (S.D.N.Y June 9, 2016) …...................…………………………………    16

*In re Colleen,*
    74 A.D.3d 1644, 904 N.Y.S. 2d 796 (2010) ...………………………    16

*Kroll v. White Lake Ambulance Auth.,*
    963 F.3d 619 (6th Cir. 2014) ………….…………………………….    14

*Lenzi v. Systemax, Inc.,*
    944 F.3d 97 (2nd Cir. 2019) ………….………………………….…    22

*Lopez v. Hollisco Owners' Corp.,*
    147 F.Supp 3d 71 (E.D.N.Y. 2015)
    *aff'd,* 669 F.Appx 590 (2d Cir. 2016) ……………………………….    15-16

*McManus v. Tetra Tech Constr., Inc.,*
    260 F.Supp. 3d 197 (N.D.N.Y. 2017) ……………………………….    22

*McNulty v. County of Warren,*
    2019 WL 1080877 (N.D.N.Y 2019) ..……………………………….    14

*Moniodes v. Autonomy Corp. (Jersey) LP,*
    2021 WL 3605385
    (S.D.N.Y. Aug. 11, 2021) ……………………………………....…    20

*Murray v. UBS Sec., LLC,*
    No. 14 CIV. 927 (KPF), 2017 WL 1498051
    (S.D.N.Y. April 25, 2017) …………………………………………..    21

*Pachter v. Bernard Hodes Grp., Inc.,*
    541 F.3d 461 (2nd Cir. 2008) ……………………………………….    17, 18

*People v. W.H.,*
    69 Misc. 3d 278, 127 N.Y.S.3d 705
    (N.Y. Sup. Ct. 2020) …………………………………………………    19

*Pierce v. Better Holdco, Inc.,*
    2023 WL 6386920 (S.D.N.Y. Sept. 29, 2023) ………………………    19-20, 21

*Polycast Tech Corp v. Uniroyral, Inc.,*
No. 87 Civ. 3297 (CSH), 1992 WL 123185
(S.D.N.Y. May 28, 1992) ….…………………………………….    16

*Port Authority Police Benevolent Ass'n, v. Port Authority of New York and New Jersey,*
283 F.Supp.3d 72 (S.D.N.Y 2017) …………………………………    14

*Rao v. New York Cirt Health & Hosps. Corp.,*
882 F.Supp. 321 (S.D.N.Y. 1995) …………………………………    16

*Rinaldi v. NICE Ltd.,*
No. 19 CIV. 424 (LGS), 2021 WL 4295263
(S.D.N.Y. Sept. 21, 2021)
*aff'd sub nom, Rinaldi v. Mills,*
No. 21-2630, 2022 WL 17480081
(2nd Cir. Dec. 7, 2022) ………….……………………….…………    19

*Sands Brothers & Co., Ltd. v. Generex Pharmaceuticals,*
298 A.D. 307, 749 N.Y.S.2d 17
(1st Dept. 10/29/02) …………………………………………    10

*Sanders v. Gardner,*
7 F.Supp.2d 151 (E.D.N.Y 1998) ….……………………………    9

*Teichman v. Community Hospital,*
87 N.Y.2d 514, 540 (1996) ……...……………………..…………………    11

*The Citizen's Bank v. Alfabco,*
539 U.S. 52, 123 S.Ct 2037,
156 L.Ed.2d 46 (2003)………………………………………    9

*Tice v. Ctr Area Transp. Authority,*
247 F/3d 506 (3d Cir. 2011) …….…....…………………………    14

*Transp. Workers Union. Local 100 v. N.Y. City Transit Authority,*
341 F.Supp.2d 432 (S.D.N.Y 2004) ...……………………………    14

*Tripi v. Prudential Securities, Inc.,*
303 F.Supp.2d 349 (S.D.N.Y. 2003) ……………………………...    24

*Wien & Malkin LLP v. Helmsley-Spear, Inc.,*
12 A.D.3d 65, 783 N.Y.S.2d 339
(1st Dept. 10/14/04)……………………………………………    9

iv

*Yates v. United States,*
  574 U.S. 528, 135 S. Ct 1074 (2015)  …..……..…………………….    15

<u>*Rules*</u>:

CPLR §7511…………………………………………………………    9

FINRA Rule 13601(c)……………………………………………….    2

<u>*Statutes*</u>:

9 U.S.C §10 …..……………………………………………………    8

9 U.S.C §11……..…………………………………………………    8

15 U.S.C. §78U-6 *et seq* …..………………………………….…..    19

29 U.S.C. § 794(d) …………………………………………...……..    14

42 U.S.C. §12112(d)(1)(4) ………..………………………………...    14

42 U.S.C. §12112(d)(4)(A) ………………………………………...…    13, 14

NYLL §190 *et seq* ……………………………………………...    17, 18

Petitioner, Simon David Andriesz ("Andriesz") by and through his undersigned counsel, The Law Offices of Neal Brickman, P.C., 420 Lexington Avenue, Suite 2811, New York, New York 10170, respectfully submits this Memorandum of Law in support of his Petition to Vacate the Arbitration Award issued in FINRA Case No: 22002539, pursuant to 9 United States Code §§9-10, *et seq.*, New York's CPLR §7511, and the relevant case law.

<u>Preliminary Statement</u>

This Petition seeks to vacate the June 17, 2024 award of the FINRA Arbitration Panel (the "Award" (a copy of the Award is attached to the Leonard Declaration ("Decl.") as Exhibit "A")) on the grounds that the Panel manifestly disregarded the law and evidence in issuing an Award that is both internally inconsistent, as well as factually and logically inexplicable. On the basis of overwhelming evidence, Andriesz demonstrated, *inter alia*, two of his claims through irrefutable documentary and testimonial evidence: his Breach of Contract claim and his Dodd-Frank whistleblower retaliation claim. The damages awarded are not consistent with the clear, relevant, and irrefutable statutory authority and admitted and unequivocal language of the relevant documents. First, and dispositively, Plaintiff had an explicit contract for a prescribed term with a minimum value (a value that was greater than the amount provided for in the Award) that was unequivocally breached by Respondent. Second, it is also undisputed that Andriesz had a long and successful career during which he received no complaints and made complaints of a regulatory nature prior to his employment at BGC Financial, L.P. ("BGC"). In fact, even while employed by BGC and its related companies, Andriesz was promoted and given increased opportunities prior to his complaints of regulatory issues at BGC. However, as soon as he began making complaints of a regulatory nature, he was labeled insubordinate, subject to discipline, and placed on leave. Then, within weeks of his making complaint to the SEC (triggering the protections of Dodd-

Frank), BGC subjected him to additional retaliation, harassment while undergoing emergency medical treatment, clearly pretextual discipline, which, thereafter, led directly to BGC's retaliatory – and legally baseless – suspension and termination of Andriesz.  The underlying facts were unequivocal and the relevant law and standards undisputable.  Simply, the Arbitrators – while failing and refusing to provide a basis for the Award -- ignored the undisputed evidence and the clear and irrefutable law in rendering the Award.  As such, the Award should be vacated or, in the alternative, modified to reflect the legally required damages under these causes of action.

<u>Procedural Background</u>

Andriesz, after being improperly terminated by BGC, filed a FINRA Arbitration, FINRA No: 19-01751.  Due to various circumstances beyond his control, including medical emergencies, a change in counsel and a Global Pandemic, the hearings in that matter were adjourned at various times. On July 27, 2022, Andriesz made a request for an adjournment based on medical necessity to the Panel.  Rather than ruling on the merits for the request, the Panel failed to even consider that request, but instead dismissed the Arbitration – mandating that Andriesz be forced to re-file and pay an additional fee to recommence his arbitration.[1]  Andriesz, despite the improper ruling by that panel and the lack of any assistance from FINRA, Andriesz duly re-filed his claims under a new case number 22-02539 and a new Statement of Claim on or about November 8, 2022.

---

[1] Specifically, the Panel purportedly based its decision on FINRA Rule 13601(c) which provides that, "If all parties jointly request, or agree to, more than two postponements, the panel may dismiss the arbitration without prejudice."  However, that Panel in so ruling failed to even consider the adjournment request then before it and blatantly ignored the actual facts and circumstances of the matter including the plain language of the documents submitted to it by the Parties and that it had in its possession at the time of its determination. In summary – and dispositively – the clear and uncontested facts reveal that the parties never jointly requested nor agreed to more than two postponements: thus dismissal under the plain terms of FINRA Rule 13601(c) was improper and in direct and manifest disregard for its plain terms.

The hearings were held across eleven (11) days in early 2024 at FINRA's main offices before arbitrators Robert J. Kheel, Geoffrey Elkind, and Dakota Shawn Harbison (together the "Arbitrators" or the "Panel").  In the course of the hearings, Andriesz withdrew various claims and discontinued against various individuals.  By the close of the hearings, claims remained for Breach of Contract, Dodd-Frank whistleblower retaliation, Securities Fraud, Common Law Fraud, Fraud in the Inducement, Breach of Fiduciary Duty, Conversion, Breach of Implied Covenant, Unjust Enrichment, RICO, Defamation, Tortious Interference, Intentional Infliction of Emotional Distress, Civil Conspiracy, and Violations of NY Labor Law.

In order to facilitate a comprehensive decision – and specifically an explained decision as anticipated by Andriesz – the Panel directed that the Parties submit post-hearing briefs and appear for oral argument. Then, prior to argument, the Panel issued a series of questions that they requested the Parties to respond to prior to oral argument.  There can be no question but that the Panel received unequivocal statements of relevant and undisputed law. Argument was duly held on May 15, 2024, whereupon the matter was fully presented to the Panel for determination – and again, what Andriesz believed would be an explained decision, especially given the extra filings that were made at the Panel's request.

On June 17, 2024, the Arbitrators issued an award (the "Award") in Andriesz's favor and against BGC in the amount of $500,000.00, dismissed each of the other parties therein, and assessed the total hearings session fees against BGC.  Thereafter, Andriesz requested that the Panel provide the explained decision that had been jointly requested prior to, and in the course of, the hearings. However, the Panel refused to consider the request as FINRA maintained that it was untimely despite the fact that the award had not been paid out (the Award still remains unpaid in violation of FINRA's rules and regulations based on BGC's ongoing refusal to make payment of

3

the monies directed as set forth and identified in the Award), the matter had not been closed by FINRA, and FINRA had not closed its account with Andriesz.

<u>Limited Statement of Relevant Facts</u>[2]

Prior to May 28, 2012, Andriesz had a successful career as a broker selling listed products at several well-respected financial institutions. (P15) BGC Brokers recruited Andriesz and his team to join it in May of 2012, with Andriesz heading a futures and options desk in London. (P16) Although Andriesz's supervisor, Jean Pierre Aubin ("Aubin"), tried to improperly move Andriesz's desk in violation of law and regulations, Andriesz made no complaint, resisted the move, and was highly successful with no customer or internal complaints. (P18-9) In the third quarter of 2014, Andriesz was recruited and promoted to move to New York and run additional desks. (P21). On or about January 15, 2015, Andriesz signed a new contract (the "Contract") with BGC governing this updated role which wholly superseded all prior contracts. (P21; LD Ex. Q). Despite not getting paid for the first four months in the United States, Andriesz did his job diligently and properly. (P25).

Starting in April 2015, Andriesz recognized that there were some regulatory issues with supervision within BGC and raised his concerns. (P26). Andriesz's concerns were later borne out. (P26,28). Again, up until this point in his several decade-long, highly successful, and highly profitable career in finance, Andriesz had neither received any performance, customer, regulatory, or personnel complaints whatsoever, nor been a position where he was compelled to make any regulatory complaints (P27; LD Ex. FFFF). At or about the same time, Aubin took on a new business manager who sought to change the then-existing accounting practices in improper ways.

---

[2] Petitioner respectfully refers to his Petition and the exhibits attached to the Leonard Decl. for a more fulsome discussion of the relevant facts, as well as the background and corroboration of the limited facts set forth herein. References to the Petition are to the relevant paragraphs of the Petition as "P#" herein).

(P29-31). In July 2015, Andriesz unexpectedly suffered a heart attack. (P36).

Throughout his employment, but escalating at the end of 2015 and throughout 2016, Andriesz made internal complaints – to upper management and HR – concerning improper supervision; conducting business without proper registration and licenses; various acts of fraudulent accounting, tax fraud; and improper harassment, abuse and retaliation: each in violation of applicable law, industry rules, and/or securities regulations. (P37-9). As a result of those initial complaints, in September 2015, Aubin threatened Andriesz that he would have him terminated if Andriesz did not desist. (P40).  When Andriesz continued to raise issues of improper accounting and securities violations and notified management that he would tell the truth if questioned during an annual audit, he was suspended.  (P41-4; 46-51).  The suspension came the same day as Andriesz's escalation of his complaint to HR and not surprisingly was based on the completely pretextual assertion that he had engaged in unspecified "unprofessional, inappropriate, and insubordinate" behavior. (P51).  Andriesz sought clarification, but he was never provided with examples.  At the arbitration, BGC admitted that the only basis for the charge of purported – but clearly pretextual -- unprofessional conduct was the fact that Andriesz continued to make complaints concerning improper accounting and regulatory actions within BGC that BGC continued to ignore. (P52-3).  Upon his return from leave, Andriesz was given an additional pretextual warning letter – that was ultimately withdrawn by BGC and thereby revealed as further pretext and retaliation. (P54-6).  Andriesz told BGC that further retaliation and failure to correct his personnel file would result in his filing a complaint with the SEC. (P55).

In April and May 2016, Andriesz escalated his concerns and complaints and involved counsel to write a whistleblower complaint on his behalf, but still no *bona fide* investigation was conducted and certainly no correct action was taken. (P57,59-65). Andriesz then, in September

2016, filed a complaint with the SEC and informed HR of the filing. (P68).

The retaliation and the false accusations – proffered in a thinly veiled attempt to justify later employment actions, but which were clearly abject pretext – followed directly. First, after ignoring working restrictions from Andriesz doctor for almost two weeks (the note called for restricted duty for two weeks), BGC locked Andriesz out of the office on his busiest trading day of the year – the stress of which landed him in the hospital. (P70-3). Then, despite Andriesz communicating to HR that he was in the hospital, and while he was heavily medicated and in cardiac distress, Aubin repeatedly contacted him and harassed him for missing a meeting that was in no way time sensitive (Aubin had when scheduling the meeting indicated that he did not care when it occurred). The harassment was so troubling that Andriesz's wife reached out to another colleague to see if it could be stopped. (P74-6,79). Upon his return to work, Andriesz was given a letter from Aubin – actually ghost written by HR, a fact never communicated to Andriesz – renewing the same insubordination trope that had been used against Mike Riffice ("Riffice"), another whistleblower retaliated against by Aubin and BGC whose claims were ignored by FINRA. (P77-9).

Andriesz responded to Aubin within the hour and made complaint to HR still not knowing that HR were the actual bad actors in conjunction with Aubin. HR then put Andriesz on a modified work schedule of 40 hours per week but, again, never monitored his compliance, demonstrating the clear pretextual nature of their defense of caring for Andriesz's health. (P80-3,88). Andriesz, contrary to the allegations, continued, as he had throughout his work at BGC to respond to instructions from Aubin and answer all of Aubin's questions. Andriesz did complain that same was improper and retaliatory. Tellingly, in the normal course, BGC would separate and create a different reporting line, even if temporarily, when an employee complained that they were being

harassed by a supervisor. (P84-5,98). HR did not even request from Aubin the communications that he sent to Andriesz while the hospital in cardiac distress and conducted no *bona fide* investigation whatsoever, but rather attempted to create a false record concerning the same. (P86-90). On December 1, 2016, Andriesz met with Aubin and again addressed all open questions; no mention of Andriesz's job performance was made aside from the knowingly false trope that he had not been in sufficient communication with Aubin. (P91-4). Nevertheless, on December 2, 2016, Andriesz was placed on an indefinite suspension and improperly directed to submit to examinations by two doctors to ascertain if he could fulfill the essential functions of his job. (P95).

At the arbitration, Dreste, after attempts at subterfuge, admitted that the only alleged function of his job that was at issue was his willingness to communicate with Aubin The evidence, both documentary and testimonial demonstrated that Andriesz – despite his complaints to management and HR – which were ignored – and the abusive behavior of Aubin had continued, as always, to communicate with and respond to the demands of Aubin). (P96-100). Andriesz was able to speak to Aubin, he just posited that he should not have to while his complaints of harassment against Aubin were under investigation, but nonetheless, Andriesz still did communicate with Aubin as directed. (P100). Dreste did nothing to vet either doctor: one, an infectious disease specialist, who was then involved with a suit concerning a patient misdiagnosed with AIDS; and the second, a doctor based two hours outside of New York City and known as a hired gun for school boards looking to certify teachers as unable to work. (P99). Andriesz wrote to Drest three times between December 7, 2016 and January 3, 2017, seeking a basis for his suspension and what alleged essential function of his job was to be examined by the "doctors," but Dreste – as admitted at the arbitration, never provide any substantive response, much less an answer to his repeated inquiries. She then transmitted, on January 31, 2017, just before an

additional $250,000 would have been due to Andriesz under the explicit terms of his Contract, a termination letter citing the debunked non-communication issue and Andriesz's failure to meet with the doctors as the sole bases for his termination. (P100-104). Thereafter, Andriesz was confirmed as whistleblower and given and award by the CFTC for the information that he provided leading to sanction against BGC for the same issue about which he had complained internally and then to the SEC. (P105-7).

Argument

General Standard For Vacatur

Although the Federal Arbitration Act ("FAA") creates a strong presumption favoring arbitration and limiting review of arbitrators' decisions, there are specific statutory and judicially created exceptions to this general rule.[1]   "While judicial review of an arbitrator's factual

---

[1] The relevant sections of the United States Code are 9 U.S.C. §§10-11 as set forth below:
Section 10. Same; vacation; grounds; rehearing
(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration
    (1) Where the award was procured by corruption, fraud, or undue means.
    (2) Where there was evident partiality or corruption in the arbitrators, or either of them.
    (3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.
    (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.
    (5) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.
(b) The United States district court for the district wherein an award was made that was issued pursuant to section 590 of title 5 may make an order vacating the award upon the application of a person, other than a party to the arbitration, who is adversely affected or aggrieved by the award, if the use of arbitration or the award is clearly inconsistent with the factors set forth in section 582 of Title 5.

Section 11. Same; modification or correction; grounds; order
In either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration
    (a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.
    (b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.

determinations is quite limited, a court may modify or vacate an arbitrator's award for manifest disregard of the law or the evidence if there is 'strong evidence' contrary to the findings of the arbitrator and the arbitrator has not provided an explanation of his decision." *Beth Israel Medical Center v. Local 814*, 2000 WL 1364367 (S.D.N.Y. 2000); see also, *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197 (2nd Cir. 1998) (Court vacated award finding strong evidence contradicting award and because no explanation or rationale for the denial of relief was proffered by the arbitrator); *Sanders v. Gardner*, 7 F.Supp.2d 151 (E.D.N.Y. 1998) (Court held if the error of arbitrators is perceivable by the average person qualified to serve as an arbitrator and a clearly governing legal principle was ignored or disregarded by the arbitrators, the award should be vacated); *Wien & Malkin LLP v. Helmsley-Spear, Inc.*, 12 A.D.3d 65, 783 N.Y.S.2d 339 (1st Dept. 10/14/04) (Relying on *The Citizen's Bank v. Alfabco,* 539 U.S. 52, 123 S.Ct.2d 2037, 156 L.Ed.2d 46 (2003), Court held FAA standards apply to any transaction affecting commerce and that an inference of manifest disregard can be made if error by arbitrators was so obvious as to be perceived by an average person qualified to serve as an arbitrator).

Under CPLR §7511[2], an arbitration award shall be vacated if the award was procured by fraud or by the partiality of one or the arbitrators or if it is irrational or void as against public

---

(c) Where the award is imperfect in matter of form not affecting the merits of the controversy. The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties.

[2] §7511 Vacating or modifying award

(b) Grounds for vacating

(1) The award shall be vacated on the application of a party who either participated in the arbitration or was served with a notice of intention to arbitrate if the court finds that the rights of that party were prejudiced by:

    (i) corruption, fraud or misconduct in procuring the award; or

    (ii) partiality of an arbitrator appointed as a neutral, except where the award was by confession; or

    (iii) an arbitrator, or agency or person making the award exceeded his power or so imperfectly executed it that a final and definite award upon the subject matter submitted was not made; or

    (iv) failure to follow the procedure of this article, unless the party applying to vacate the award continued with the arbitration with notice of the defect and without objection.

policy. See *e.g. Sands Brothers & Co., Ltd. v. Generex Pharmaceuticals*, 298 A.D.2d 307, 749 N.Y.S.2d 17 (1st Dept. 10/29/02) (After finding award irrational and arbitrator conflict of interest, Court remanded to new Panel for reassessment of damages). As in *Halligan* and *Wein*, the overwhelming facts and the irrefutable manifest disregard for the law by the Arbitrators in rendering the Award mandates vacatur.  Under the admitted factual circumstances the plain and common meaning of various applicable laws as presented to arbitrators, the Award is, simply, unsupportable in reason or logic. The quantum of damages awarded by the Panel is completely irrational, untethered to any evidence presented at the hearing, and in contravention of logic and the applicable and clear law presented to the Panel.

The Arbitrators' Award should be vacated as it is manifest disregard of the applicable, clearly presented, law and facts of this matter.  Vacatur is also warranted as the Award is irrational given that the Panel found exclusively for Andriesz, directing that BGC pay all applicable hearing fees, but awarded damages with no tie to the claims and evidence submitted and demonstrated by Andriesz at the hearing as necessarily computed per undisputable legal standards. See *e.g., Sands Brothers & Co., Ltd., v. Generex Pharmaceuticals, Inc.,* 298 A..2d 307 (1st Dept 2002) (An arbitration award will be vacated if it is irrational).

<u>Point I</u>

<u>The Laws That The Panel Disregarded Are Clear And Irrefutably Applicable And Petitioner Clearly And Irrefutably Demonstrated Liability Inconsistent With The Award's Damages Warranting Vacatur</u>

In the instant Petition, the laws that the Panel disregarded have the qualities required by courts -- namely that they are widely known, clear in intent and logic and directly applicable to the allegations proffered by Andriesz from the commencement of this dispute -- to support a vacatur.

<u>Breach of Contract</u>

In order properly to state a claim for breach of contract under New York law, a party must establish the following elements: "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages. *Gutt v. Nassau Health Care Corp.*, No. 04 CV 57, 2005 WL 3605273, at 5 (E.D.N.Y. Mar. 15, 2005) (quoting *First Investors Corp v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2nd Cir. 1998). It is also axiomatic that a written contract must be read and interpreted in accordance with the plain meaning of its words. See, *e.g. Teichman* v. *Community Hospital*, 87 N.Y.2d 514, 520 (1996). "To the extent that there may be ambiguity in a contract, it is properly construed against the drafter." *327 Realty, LLC* v. *Nextel of New York, In*c., 150 A.D.3d, 581, 55 N.Y.S.3d 202 (1st Dept 2017); *Chatterjee Fund Management, L.P.* v. *Dimensional Media Assocs.,* 260 A.D.159, 687 N.Y.S. 2d 364 (1st Dept 1999).

Section 4 of the Contract provides for the circumstances under which BGC could properly terminate Simon's employment:

> "(a) During the Term of Employment, BGC may terminate this Agreement with Employee for Cause and notice of such termination shall be sent to Employee. For the purposes hereof, "**Cause**" means Employee's (i) dishonesty, disloyalty, insubordination, unsatisfactory performance or attendance, or failure to follow BGC's policies rules, codes of conduct, or procedures, (ii) nonperformance or breach by Employee of any of the provisions of this Agreement (including inaccuracy of representations), (iii) conviction of a crime under U.S. Federal, state or local laws or any applicable foreign laws (including any pleas of *nolo contendere*), (iv) serious misconduct in connection with or affecting the business of BGC or any Affiliate, (v) serious neglect or gross negligence in performing Employee's duties hereunder, (vi) failure to perform Employee's duties hereunder ( other than as a result of being disabled) after delivery to Employee by BGC or an entity owned or controlled by BGC of written notice identifying the duties not performed by Employee, which failure may include the failure to maintain any regulatory approvals or licenses necessary to perform Employee's duties, (vii) violation by Employee or Employee aiding and abetting any violation by another, as reasonably determined by BGC, of any law, order, rule or regulation pertaining to Employee, BGC or its affiliates including, among others, the rules, regulations and by laws of the Financial Industry Regulatory Authority, (viii) illegal drug use by Employee, or (ix)

11

request for reimbursement of expenses not actually incurred by Employee and/or not in accordance with BGC's travel and entertainment policy, or assisting others in such efforts."

There was no "Cause," as that term is plainly defined, to terminate Andriesz's agreement, and BGC never provided written notice to Andriesz "identifying the duties [allegedly] not being performed by [him]." (LD Ex. Q, Section 4). There were no such lapses in performance, and no *bona fide* duties were testified to by Respondents at the arbitration. Such a failure, especially in light of the repeated requests for such information by Andriesz, is dispositive and precluded, as a matter of law, as the Arbitrators were duly informed, any argument that Andriesz was terminated for Cause. He was not terminated for Cause. Only two possibilities were even presented: that Andriesz repeatedly did not communicate with Aubin and that he refused to attend the two "doctors" as directed by BGC to assess his ability apparently to speak to Aubin, the only even alleged essential element of his job that was purportedly not performing.

As set forth above, as well as in the Petition, in material detail, and dispositively, Andriesz was responsive to Aubin except for the few days when he was in the hospital, heavily medicated, suffering from cardiac distress and while recovering from the same. Andriesz was in regular communication with Aubin regularly during the week directly prior to his hospitalization; communicated his medical status to BGC through his HR contact; responded to the letter inquiry the following Monday morning within one hour; met with the individuals directed by Aubin that week; communicated thereafter via email with Aubin; held the requested meeting with Aubin and the next time scheduled by BGC; and continued to complete all of his essential job functions during that same period with no complaint. In the two days before his suspension for allegedly not communicating with Aubin and his purported medical inability to do the same, Andriesz had an email exchange with Aubin and an over thirty-minute video conference. These are the facts. They

12

are not disputed, and they do not constitute Cause as a matter of fact and law.

The Panel did request additional information as to the propriety of BGC directing Andriesz to attend to two doctors to ascertain his ability to communicate with Aubin. As set forth above, even that inquiry was improper as Andriesz had already demonstrated – and there is no actual dispute of fact – that he could communicate with Aubin: he did, repeatedly and regularly. Just because Andriesz raised an issue of policy that he did not feel that it was proper to direct him to speak with his supervisor who had been accused of harassing, abusing, and retaliating against Andriesz, does not mean – and cannot reasonably be interpreted to mean – that Andriesz was medically or physically unable to communicate with Aubin. In fact, the very testimony and documents demonstrate a contrary reality as the two did communicate.

In any event, it is also clear, and also undisputed that the Americans with Disabilities Act ("ADA") 42 USC §12112(d)(4)(A) -- prohibits an employer from requiring an employee to submit to a mental and/or physical health examination, "…unless such examination or inquiry is shown to be job-related and consistent with business necessity."[3] With regard to an employer attempting to fit into the limited exemption to the default prohibition under the ADA and the Rehabilitation Act for medical examinations of employees or inquiries regarding their disability, "[t]he burden of establishing whether a medical examination or inquiry is job related and consistent with business necessity falls on the employer, not the employee. The employer's burden is high, and the test is an objective one." Franco v. Port Authority of New York & New Jersey, 643 F. Supp. 3d 459,467-

---

[3] The New York State and New York City anti-discrimination laws use the Federal law as a minimum standard, although both are even more protective of employees. *Williams* v. *New York City Housing Auth*., 61 A.D. 3d 62,66-67, 872 NYS 2d 27 (1st Dept 2009) (Claims under the NYCHRL are generally to be construed more liberally [than] their federal and state counterparts, which serve as a "floor below which the City's Human Rights Law cannot fall.") See also, *Cobb* v. *Ellab, Inc*., 2024 WL 1963430 *4-5 (NDNY May 2, 2024) (In August 2019, the NYSHRL was amended " to direct courts to construe the NYSHRL, like the NYCHRL, liberally for the accomplishment of the remedial purpose thereof…").

68 (D.N.J. 2022). See also, Transp. Workers Union, Local 100 v. N.Y. City Transit Authority, 341 F. Supp. 2d 432, 446 (S.D.N.Y. 2004); Tice v. Ctr Area Transp. Authority, 247 F. 3d 506, 518 (3d Cir. 2001); 42 U.S.C. §§12112(d)(1)(4) and 12112(d)(4)(A) (ADA); 29 U.S.C.§794(d) (Rehabilitation Act of 1973).

To demonstrate a "business necessity," an employer "must first show that the "business necessity" is vital to the business (employer cannot merely demonstrate that an examination or inquiry is "convenient or beneficial" to its business). An employer must also show that the examination or inquiry generally serves the business necessity and that the request is no broader or more intrusive than necessary." *Port Authority Police Benevolent Ass'n,* v. *Port Authority of New York and New Jersey*, 283 F. Supp. 3d 72, 81-82 (S.D.N.Y. 2017); see also, *Conroy v. NY State Dep't of Corr. Serv.,* 333 F.3d 88, 97 (2nd Cir. 2003) (same); *Hannah P. v. Coats*, 916 F.3d 327, 339 (4th Cir. 2019) (An employer's request for a medical examination is job related and consistent with business necessity only when: "(1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or others"); *Kroll v. White Lake Ambulance Auth.,* 963 F.3d 619, 623 (6th Cir. 2014); see also *Berger v. New York City Police Department*, 304 F.Supp.3d 360, 372 (SDNY March 30, 2018); *McNulty v. County of Warren*, 2019 WL 1080877 *11 (N.D.N.Y. 2019) (When employee placed on leave before medical examination on its own constituted a violation).

BGC did not come remotely close to meeting its "high" burden. Andriesz did not request an accommodation, he posed no danger to himself or others, and he had been performing the essential functions of his job -- and performing them well -- for nearly two years. Neither his July 2015 heart attack nor his several documented bouts of anxiety interfered with his continued job performance nor did these events cause BGC to conduct any sort of inquiry into the extent of

Andriesz's disability, if any. (LD Ex. UUU (AE347); Ex. VVV (AE348); Ex. H - D2: SA 679:7-17). Similarly, the receipt of two notes from Andriesz's doctor -- the two to three week leave letter (Exhibit 300) and the part time work letter (Exhibit 306) -- did not interrupt or diminish Andriesz's job performance, nor did these letters cause BGC to conduct any sort of inquiry into the extent of Andriesz disability, if any. (D2: SA: 676: 7-13; 679: 7-17). Instead, BGC instituted a "part time" work arrangement -- from 7 a.m. to 3 p.m., 5 days per week (LD Ex. OOO (AE323) -- that it did nothing to monitor. (LD Ex. O - D10: PD 124:17-25).

Most importantly, in detailing to the two examining doctors the "essential functions" of Andriesz's job (LD Ex. ZZZ (AE350), BGC conceded that Andriesz had been performing each of those functions, without complaint, for his entire tenure with the Company. The examinations that BGC required Andriesz to submit to were neither "job related" nor "consistent with business necessity."[4] Under these circumstances, the case law is unanimous. If an employer fails to demonstrate that the requested mental and physical examinations are "job related" and "consistent with business necessity," the employee is not required to submit to those examinations. See, *Lopez*

---

[4] In attempting to justify Andriesz's termination and his being required to submit to otherwise prohibited mental and physical health examinations, BGC conflates two unrelated contractual provisions. See, LD Ex. Q, Sections 4(a) and 4(c). Section 4(a) permits BGC to terminate Andriesz's employment for "Cause", defined, in part, as his "(i) dishonesty, disloyalty, insubordination, unsatisfactory performance or attendance or failure to follow BGC's policies, rules, code of conduct, or procedures." Section 4(c) permits BGC to terminate Andriesz's employment if in "[its] judgment … by reason of physical or mental disability, Employee is incapable of performing the essential functions of his position, with or without reasonable accommodation, for a period of 60 out of 180 consecutive days …" BGC did not terminate Andriesz pursuant to Section 4(c). Instead, it invoked Section 4(a), claiming that Andriesz's failure to submit to the mental and physical health examinations constituted "insubordination." There clearly was no "insubordination." *Noscitur a sociis* is a cannon of construction that "counsels that a word is given more precise content by the neighboring words with which it is associated. *Freeman* v. *Quicken Loans, Inc.*, 566 U.S. 624. 634-35, 132 S. Ct. 2034 (2012). Employing *noscitur a sociis* helps prevent a court -- or in this case an arbitration panel -- from "ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the [words in a contract]." *Yates* v. *United States*, 574 U.S. 528, 543, 135 S. Ct. 1074 (2015). Here the undefined word "insubordination" is defined, in part, by its neighboring words, "dishonesty, disloyalty … unsatisfactory performance …" Nothing Andriesz did or did not do could possibly be "insubordination." To hold otherwise, would ascribe to that word ("insubordination") a meaning inconsistent with its accompanying words.

v. *Hollisco Owners' Corp.*, 147 F. Supp 3d 71,77 (E.D.N.Y. 2015), aff'd, 669 F. Appx. 590 (2d Cir. 2016); This case law is a logical corollary to the body of case law that provides that an employee, like Andriesz, is authorized/justified in refusing to comply with an illegal request by his employer. See, *In re Colleen*, 74 A.D.3d 1644, 1645, 904 N.Y.S. 2d 796, 797 (2010) (good cause existed for claimant attorney to leave her employment in order to avoid the performance of an illegal or unethical act); See also, *Polycast Tech Corp* v. *Uniroyal, Inc.*, No. 87 Civ. 3297 (CSH), 1992 WL 123185, at *11 (S.D.N.Y. May 28, 1992) (Acknowledging a public policy exception to the employment at will doctrine when an employee is discharged for refusing to commit an illegal act). Clearly, and also dispositively, there was no legal justification for BGC's directive to Andriesz to attend the two "doctors."

Absent Cause, the term of the Contract would have extended, by its express terms, to February 1, 2019. (Ex. 38, Section 1(a); "for a term beginning February 1, 2015, … and ending of the fourth (4th) anniversary of the State Date …"), mandating a minimum award of $400,000.00 per annum plus interest at 9%. See *e.g., Hernandez v. Jrpac Inc*., No. 14 CIV. 4176 (PAE), 2016 WL 3248493, at *36 (S.D.N.Y. June 9, 2016) ("Prejudgment interest is to be calculated pursuant to the New York prejudgment interest rate of nine percent (9%) per annum simple interest from a single reasonable intermediate date."); *Rao v. New York City Health & Hosps. Corp*., 882 F. Supp. 321, 327 (S.D.N.Y. 1995) ("Prejudgment interest is necessary to make the plaintiff whole, to avoid unfairness, and to accomplish the purposes of the statute.") 9% simple interest on $800,000.00 from January 2019 to January 2024 would have been $360,000.00, for a total of $1,160,000.00. However, absent his improper termination, as above, Andriesz would also have earned his Fourth Quarter bonus of no less than $250,000[5], which with 9% simple interest would have equaled

---

[5] Under the admitted and plain language of the Contract, Andriesz's, fourth quarter incentive bonus from 2016, which he had already earned, was payable "within 45 days after the last day of the Calculation Period.

$407,500 by January 2024, or a new total of $1,567,500.

The law is also clear that to the extent that BGC did not pay wages that were then due and owing – which Andriesz unequivocally demonstrated – under the strict and clear provisions of the New York Labor Law ("NYLL"), Andriesz was also entitled to liquidated damages of 100% of the unpaid wages. *Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 515–16 (S.D.N.Y. 2017), *aff'd*, 752 F. App'x 33 (2nd Cir. 2018); *Cabrera v. Canela*, 412 F. Supp. 3d 167, 184 (E.D.N.Y. 2019); *Pachter v. Bernard Hodes Grp., Inc.,* 541 F.3d 461 (2nd Cir. 2008); NYLL §§190-199-a). If this was applied to even the bare minimum clearly due and owing to Andriesz, the Award would have been $3,135,000 less the monies he actually earned ($812,175), or $2,322,825.

Beyond these bare minimums, which were clearly not awarded by the Panel, the evidence was undisputed that for 2016 Andriesz earned $734,756 from BGC. Notably, absent his improper termination, as above, Andriesz would also have earned his Fourth Quarter bonus of no less than $250,000, making his total compensation for 2016 $986,756.  If the Panel chose to improperly ignore the plain and indisputably applicable NYLL statutes, then it would have had to assume that Andriesz would have earned, at least, the same amounts, if permitted to work the remaining term of his contract, for 2017, 2018, and the first month of 2019, that he earned in 2016. This totals, at a minimum, $1,969,512 ($986,756 X 2). Instead, he earned only $812,175, not counting his non-compete payment from BGC, during this period of time (Ex. 459 at Table 10U; Ex. 396), leaving a damages delta on this claim of $1,157,337 ($1,969,512 minus $812,175). With simple interest

---

(Ex. LD EX. Q, Section 3(b)). Andriesz's testimony as to the amount of that incentive bonus -- $250, 000 -- was also undisputed..

of 9%, that amount would have equaled $1,678,138.65 by January 2024. Again, this figure does not include the 100% penalty mandated by the NYLL.[6]

Under New York Labor Law, formulaic commissions, like Simon's quarterly incentive compensation, constitute wages. *Pachter v. Bernard Hodes Grp., Inc.,* 541 F.3d 461 (2nd Cir. 2008). The Labor Laws impose various rules and conventions regarding the payment of wages, all aimed at ensuring that an employer timely and properly pays employees for work performed and that it not deduct from an employee's wages, unless either required by Federal or state law or the employee has provided written consent for the employer to do so. (N.Y. Labor Law Section 193). Employers must not require kickbacks (N.Y. Labor Law Section 198-b) and employers must supply any benefits or wage supplements that they promised or that employees have earned (N.Y. Labor Law Section 190(l)). An employer who violates the wage payment sections of the New York Labor Law is liable for the total unpaid wages; interest on the unpaid wages at a 9% rate; liquidated damages equal to 100% of the unpaid wages; and attorney's fees. (N.Y. Labor Law sections 190 to 199-a). *Gamero v. Koodo Sushi Corp.,* 272 F. Supp. 3d 481, 515–16 (S.D.N.Y. 2017), *aff'd,* 752 F. App'x 33 (2nd Cir. 2018).

---

[6] It is also noteworthy that Panel also necessarily completely ignored the testimony of the only expert presented at the arbitration. The only competent evidence presented at the hearings regarding the quantum of damages attributable to Simon's pain and suffering and his physiological injuries was Dr. Smith's report (LD Ex. FFFF, at 8-10) and his testimony (D4: SS:1127:9-1228:10) He testified that depending upon a determination of the level Simon's impairment (either 50% or 75% for all years, except 80%-90% for 2022 and 2023), Andriesz suffered damages, for the reduction of his value of life, of as little as $2,718,196 to as much as $3,386,657. (LD Ex. FFFF, at 8-10). This testimony was not refuted in any way. BGC did not present any expert or rebuttal of this testimony. Similarly, BGC did not put on any evidence or present any experts concerning the mental harm caused to Andriesz by their actions, while Andriesz presented three separate psychological healthcare professionals who had treated him – Dr. William Morgan, Dr. Wayne Kampers, and Paola Pomponi – and who each testified that Andriesz suffered, and suffers, from debilitating extreme post-traumatic stress disorder that was, and is, proximately caused by BGC's improper treatment of him while employed by BGC and, particularly, his wrongful termination. (LD Ex. GGGG (AE406); Ex. HHHH (AE453); Ex. K - D6: WK 1408:16 – 1412:22; 1423:13 - 1426:1; 1436:1 - 1437:9; 1438:3-23; WM 1464:7 - 1466:13; Ex. L - D6 PP 1499:18 - 1500:21; 1501:15-22; 1504:7 - 1507:19; 1508:7 - 1509:6; 1510:3 - 1512:12; 1520:7-18).

As the Award was clearly erroneous and contrary clear and unequivocal to existing law, vacatur is warranted.

Dodd-Frank Whistleblower Retaliation Claim

During their opening, BGC circulated a tutorial which detailed what was required to make out a whistleblower retaliation claim under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, 15 U.S.C §78U-6 ("Dodd-Frank"), as opposed to a claim under SOX, emphasizing Andriesz's need to report his reasonable belief of corporate wrongdoing to a federal regulatory body and to advise BGC that he had so reported. Andriesz satisfied these requirements.

In order properly to state a claim for Dodd-Frank whistleblower retaliation, Andriesz was required to show, by a preponderance of evidence[7], that, as an employee of BGC, a publicly traded company, (1) he engaged in a protected activity by reporting corporate wrongdoing covered by the securities statutes to a federal regulatory body or law enforcement agencies; (2) he suffered an adverse employment action as a result of BGC learning of that reporting; and (3) the adverse action was causally connected to Andriesz's protected activity. *Digital Realty Tr., Inc v. Somers*, 583 U.S. 149, 157 (2018); (citing §78U-6 (k)(1)(b)(i), (iii)(1)(aa)*; Rinaldi v. NICE, Ltd.*, No. 19 CIV. 424 (LGS), 2021 WL 4295263, at *2 (S.D.N.Y. Sept. 21, 2021), *aff'd sub nom. Rinaldi v. Mills*, No. 21-2630, 2022 WL 17480081 (2nd Cir. Dec. 7, 2022). To have been engaged in protected activity, Andriesz: (a) must have had an objectively reasonable belief that BGC's reported conduct violated one of the enumerated provisions of securities law; and (b) establish that BCG knew about his report to the SEC. see *Pierce v. Better Holdco, Inc*., 2023 WL 6386920, at *8 (S.D.N.Y. Sept.

---

[7] To establish a fact by a preponderance of the evidence means to prove that something is more likely true than not true. In other words, a preponderance of the evidence in the case means such evidence when considered and compared with that opposed to it, has more convincing force, and produces in one's mind a belief that what is sought to be proven is more likely true than not true. *People v. W.H.*, 69 Misc. 3d 278, 282, 127 N.Y.S.3d 705, 708 (N.Y. Sup. Ct. 2020).

29, 2023).

The evidence overwhelmingly supports the notion that Andriesz satisfied each of these requirements. Andriesz repeatedly made internal complaints, to his supervisors, to Human Resources, and to individuals assigned to hear and investigate regulatory and ethical violations, including Popok, Shields, and BGC's outside counsel, that BGC had violated, and was continuing to violate, securities laws and regulations, including by engaging in "fraudulent accounting" and tax fraud, failing to maintain adequate internal controls, allowing rogue brokers to trade/broker unsupervised, and by allowing brokers to work in jurisdictions in which BGC was not properly licensed. (*e.g.,* LD Ex. I - D3: SA 835:9 − 836:8; D6: JPA 1668:6-18; LD Ex. Z (AE392)). A summary of many of Andriesz's securities laws and regulatory complaints was set forth in his counsel's whistleblower complaint letter to Popok. (Ex. 251). Prior to sending this letter, in or about February 2016, Andriesz expressly warned Dreste and Rosado that, if the retaliation against him continued, he would file a complaint with the SEC. (LD Ex. G - D1: SA 106:12 - 108:9; Ex − O - D10: PD 80:13 - 81:14).

In October 2016, while still employed by BGC, Andriesz had a written complaint setting forth his myriad complaints against BGC and Aubin filed with the SEC. (LD Ex. EEE (AE301); Ex. G - D1: SA 110:21 - 111:5; 126:9 - 127:20). The SEC duly confirmed receipt of that written complaint in an email dated October 28, 2019. (LD Ex. EEE).  Rule 21F-9 makes clear that in order for Andriesz to be considered a whistleblower he was required to provide this information to the SEC in any sort of written form, including "via mail, fax, or the SEC's website. *Moniodes v Autonomy Corp. (Jersey) LP*, 2021 WL 3605385, at *4 (S.D.N.Y. Aug. 11, 2021). Immediately thereafter, in or about late October 2016, Andriesz advised both Rosado and Dreste, as he had previously forewarned them, that he had reported BGC's and Aubin's wrongdoing to the SEC.

(LD Ex. G - D1: SA 128:4-7; 128:12-21; 128:25 - 130:7; 131:2 - 132:17; 132:21 - 133:3).[8]

Andriesz's October 2016 report to the SEC was based on his objectively reasonable belief that BGC violated securities law, which constituted a protected activity. *Pierce v. Better Holdco, Inc.*, 2023 WL 6386920, at *8 (S.D.N.Y. Sept. 29, 2023). The evidence was overwhelming that BGC retaliated against Andriesz for engaging in this protected activity. To prove illegal retaliation, employees need only show that the protected activity was a "contributing factor" in the employer's decision to take an unfavorable personnel action against them. *Murray v. UBS Sec., LLC*, No. 14 CIV. 927 (KPF), 2017 WL 1498051, at *12 (S.D.N.Y. Apr. 25, 2017) (a plaintiff "need not prove that [his] protected activity was the primary motivating factor in [his] termination," only that it was "a contributing factor," meaning that "alone or in connection with other factors" it "affect[ed] in any way the outcome of the decision."). Andriesz's whistleblower's activity does not even have to be the employer's sole or predominant reason for the adverse action. The protected activity only has to play some role in the employer's decision, however minor, and the employer's decision need not even be wrongfully motivated. *Id.*[9]

BGC clearly retaliated against Andriesz for his report to the SEC regarding his reasonable

---

[8] Shortly after his January 31, 2017 termination, Andriesz made a similar report -- including the allegations in his initial and subsequent SEC filings (including the TCRs drafted in January 2017 and filed at that time (LD Ex. IIII (AE368); Ex. JJJJ (AE369)) and in the May 9, 2016 whistleblower complaint letter (LD Ex. BBB (AE251)) -- to the CFTC. (LD Ex. CCCC (AE371), Simon's 2-14-17 Whistleblower Complaint and the CFTC's 2-17-17 Receipt of Filing Letter). Moreover, the TCRs drafted in January 2017, and filed at that time, clearly demonstrate that contact had previously been made with Ms. Keyes (her name appears as a prior contact) – further corroborating Simon's testimony. (LD Ex. EEE (AE301); Ex. IIII; Ex. JJJJ, both @ 3(a) and 3(b)).

[9] BGC's own witnesses -- Aubin and Dreste -- admitted that BGC's decision to suspend Andriesz for two weeks early in February 2015 (LD Ex. DD (AE185) was directly related to, and in retaliation for, Andriesz's repeated unaddressed complaints about lack of supervision, rogue traders, fraudulent accounting, and tax fraud. This earlier adverse personnel decision was quintessential retaliation. Tellingly, Dreste originally contended that such suspension was for BGC's and Aubin's favorite pretextual basis, "insubordination," before acknowledging the truth

belief that it had engaged, and was continuing to engage, in wrongdoing covered by the securities statutes. There is no question regarding the "reasonableness" of Andriesz's belief. *Lenzi v. Systemax, Inc*., 944 F.3d 97, 114 (2nd Cir. 2019); "To meet the "reasonable belief" standard, "a plaintiff must show not only (1) that he [or she] believed that the conduct constituted a violation, but also (2) that a reasonable person in his [or her] position would have believed that the conduct constituted a violation." *McManus v. Tetra Tech Constr., Inc.,* 260 F. Supp. 3d 197 (N.D.N.Y. 2017). In other words, the term "reasonable belief contains both subjective and objective components." *Id*. "The objective prong of the reasonable belief test focuses on the basis of knowledge available to a reasonable person in the circumstances with the employee's training and experience." *Id*.

BGC illegally retaliated against Andriesz for his report to the SEC (a) by denying him access to the London office for Election Day 2016, one of the busiest brokering days of the year (LD Ex. GGG (AE306); (b) by indefinitely suspending Simon, without justification, on December 2, 2016 (LD Ex. GG (AE343); and (c) by terminating his contract, and, therefore, his employment, on January 31, 2017. (LD Ex. HH (AE370)). There were no legitimate business reasons for any of these adverse actions; these actions were inconsistent with BGC's behavior in the face of the same information previously provided to it; but these actions were clearly consistent with Aubin's explicit threat to Andriesz that Aubin would "ruin him" if he did not "shut up" and that he would go the way of Riffice who was fired for "insubordination" for complaining about regulatory issues. (D2: SA 369:2-8; D8: RV 2176:12 - 2177:9).

The CFTC's imposition of remedial sanctions against BGC (LD Ex. DDD (AE416) and its notice of whistleblower award to Andriesz (LD Ex. DDDD (AE431) provided further support to an already demonstrated claim: his initial written complaint to the SEC in October − as well as his

counsel's whistleblower complaint letter, his internal complaints, and later TCR filings -- contained the same allegations of impropriety, securities law violations, and regulatory concerns, including lack of internal controls and supervision (like those relating to Anthony and Jridi) that were contained in his complaint to the CFTC that resulted in the BGC sanction and Andriesz's financial whistleblower award; the CFTC reward confirms that Andriesz had a legitimate and reasonable belief that BGC had engaged, and was continuing to engage, in wrongdoing covered by the securities laws; and the CFTC award confirms that Andriesz did, in fact, engage in protected activity. The CFTC does not give out monetary awards for whistleblowing to individuals who did not complain about the issues for which the relevant sanction was issued.

The damages proximately caused by this unlawful whistleblower retaliation are the lost wages and lost value of life detailed in Dr. Smith's report. (LD Ex. FFFF). *Berman v. Neo@Ogilvy LLC*, 801 F.3d 145, 150 (2nd Cir. 2015), abrogated by *Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 138 S. Ct. 767, 200 L. Ed. 2d 15 (2018) ("an employee who suffers retaliation after reporting wrongdoing simultaneously to his employer and to the SEC is eligible for Dodd–Frank remedies and those provided by Sarbanes–Oxley.") The unrefuted lost value of life suffered by Andriesz was $2,718,196 to $3,386,657. (LD Ex. FFFF, p. 8-9). As set forth above, we know that Andriesz's reasonably calculated lost income for 2017 and 2018 was $1,157,337. Using the same calculus for years 2019 through 2033, Andriesz should have earned $984,756 per annum for a total of $4,923.780. In fact, he was only able to earn $941,331, resulting in a loss of $3,982,449. As such, Andriesz's losses attributable to this claim would be $7,857,982 ($2,718,196 + $1,157,337 + $3,982,449). This claim is irrefutable but its damages far exceed and bear no relation to the $500,000.00 awarded. Vacatur is warranted on this basis as well.[10]

---

[10] Tellingly, even if the owed, but unpaid, $250,000 was not made part of the calculus (as it clearly should have been), the net losses for 2017 and 2018 would have been $657,337 and for 2019 through 2023

Point II

<u>In The Alternative, The Award Should Be Amended Or The Matter Remanded</u>

Alternatively, the Award should be amended to provide for the legally required and proved damages for the clearly demonstrated causes of action for breach of contract and for retaliation in contravention of the protections of Dodd-Frank as set forth above.

In the second alternative, remand is warranted. While arbitrators may present a lump sum award without disclosing any rationale for it, courts may inquire into the basis of such an award when there appears to be no legal or factual basis for it.  See *e.g., Tripi v. Prudential Securities, Inc.,* 303 F.Supp.2d 349,353 (S.D.N.Y. 2003) (Court remanded for clarification based on difficulty in ascertaining justification for the arbitrators' award).

---

would have been $2,732,449 (5 x $734,756 = 3,673,780 **-** $941,331) for compensatory losses of $3,389,786 without even accounting for interest or the loss of life suffered by Andriesz valued at $2,718,196 to $3,386,657.  Clearly in excess of, and completely unrelated to, the $500,000 awarded.

<u>Conclusion</u>

WHEREFORE, for all of the foregoing reasons, Andriesz respectfully requests that the Court (1) vacate the Panel's Award, or, in the alternative, modify the Award as set forth above; (2) or, in the second alternative, remand for clarification of the current Award; and (3) award to Andriesz any such other or further relief as this Court deems just and proper.

Dated: New York, New York
   September 16, 2024


          Respectfully submitted,

          *Neal Brickman*

          Neal Brickman (NB0874)
          Ethan Leonard (EL2497)
          The Law Offices of Neal Brickman
          420 Lexington Avenue - Suite 2811
          New York, New York 10017
          (212) 986-6840
          Attorneys for Petitioner Andriesz