EXHIBIT "K"

Direct - Kampers

statins and aspirin and medicine to help him -- help him sleep. At the time that I saw him, he admitted to me that he -- he had been drinking alcohol to excess, but there wasn't any history of any -- of any other -- of being -- any other substance abuse. So he -- he -- he did have a history of having suffered with, you know, suffering with anxiety and depression but had never ever before I saw him ever been diagnosed with either posttraumatic stress disorder or complex posttraumatic stress disorder. And you know, they -- there was no -- there was no history or evidence to support that this was in any way a preexisting condition.

Q. Preexisting meaning preexisting before what?

A. Well, before the -- before the events that unfolded after the whistleblowing, the whistleblowing incident, and you know, in his role as -- as you know, in his role when he was in financial arbitration and you know, when he -- when he -- you know, in connection with the whole whistleblowing which of course is what this case is really about and he, you know -- he told me that in



Direct - Kampers

his role that, you know, towards the end of 2016 he -- I think it was 2016, he said that the company -- that he suffered criminal activity within the company and that he felt duty-bound to respond to the appropriate authorities and that, you know, subsequent to that, you know, the stress levels and the harassment that he was subjected to really resulted in the -- you know, the development of posttraumatic stress disorder and complex posttraumatic stress disorder, and I don't think that he has ever recovered from this.

Every single time I have seen him, he has really demonstrated very, very profound -- very profound symptoms. And highly stressed and you know, in a state of 24/7 very high levels of anxiety. And he actually mentioned he was in one -- in a recent Zoom session, he actually -- he actually took his computer and actually showed me the sort of environment that he was working in and to -- it looked to me there were so many computers that were surrounding him, all with the type of thing that you would see in financial institutions, it almost looked to me like -- like the type of environment you would see, you know, when you watch



Direct - Kampers

a space launch and have all these computers and activities around you and the environment he was working in even in recently in his home was just an environment that he was just constant very, very high levels, high levels of stress, and it was towards the end of each day when he was finally able to disconnect from that that he would then describe these dissociative episodes he described in his dissociative seizures that because I witnessed these before, you know, it was very clear to me that those were stress-related dissociative symptoms that he was experiencing on a regular basis.

So yes, he had been treated on various medications at the time that I -- at the time that I saw him, but in terms of how he presented, I am going to describe to you exactly what it was in my additional -- my initial -- my initial diagnosis and treatment on him was a man who not only had complex PTSD but was demonstrating all of the symptoms of amygdala hijack. In those situations, the only way that you can try and help calm the situation down that you have to try to quiet him down the safety sense of the amygdala, and in my



Direct - Kampers

experience, the most effective medication for that is a medication called Pregabalin, which is used in various disciplines in medicine. It's used by neurologists, it's used by pain physicians, and it's used by psychiatrists, in fact, in the UK. Pregabalin is licensed for the treatment of generalized anxiety disorder, and when you use Pregabalin in combination with a small dose of a benzodiazepine, something like diazepam which the main public would know as Valium, it really does help to calm down the amygdala, and that was what I initially recommended that he needed. He needed to be on this combination of medication in order to try and you know, quiet down his amygdala and take -- at least take some of the edge off the very, very high levels of stress that he was under.

Q. Dr. Kampers, just a few more questions and I appreciate your time. Do you still see Simon?

A. Yes.

Q. As a patient?

A. I mean, there have been times where Simon has -- there have been times where Simon has of his own volition recognized that, you know, both

Page 1412

Direct - Kampers

him and his -- and his wife were -- you know, were not coping very well. You know, he has always been very honest with me and has said to me that, you know, he found -- he found solace in drinking alcohol and so he had checked himself into a rehabilitation facility in Thailand. So there have been periods of time where he has been in rehab and then has come back. So there have been gaps, there have been gaps in the times that, you know, where he has been -- where he has been elsewhere receiving treatment for, you know, for -- you know, for solving medication with alcohol, but I have seen him -- I have seen him -- I have seen him over the years at intervals, and as I say, every time that I have seen him, he has -- he has presented in virtually the exactly the same way as I have -- as I have described to you.

Q. Dr. Kampers, did there come a time when this hearing was previously scheduled when you wrote a summary of your treatment and findings of Simon?

A. I -- I -- I wrote a medical report in April of 2023.

Q. That's what I am referring to. So --

Page 1413

Direct - Kampers

A. Yes. I wrote -- I wrote a medical report in April of '23, and I detailed that I hadn't seen him, you know, for a considerable period of time but that -- you know, my concerns about him, you know, have always been the same in terms of, you know, the very high level of stress, hypervigilance and constant autonomic hyperarousal that he was in. You know, described that -- described that as what we call threat physiology where you are literally in a persistent fight or flight state. As if you are -- you know, that there is real imminent danger around you.

Q. All right, Dr. Kampers, if the panel can turn to Exhibit 453. It's in the fourth volume.

MS. CARDENAS: Does Dr. Kampers have access?

MR. BRICKMAN: He has access, but we are going to share the screen so we can see it again.

Q. Dr. Kampers, can you see the shared screen document?

A. Yes, I could see that.

Q. Is that the report you wrote in April 2023?

Page 1414

Direct - Kampers

A. That's correct.

MR. BRICKMAN: Is the panel able to see the exhibit?

ARBITRATOR KHEEL: Thank you. We should note we appreciate very much counsel giving us the thumb drive. It's been remarkably useful to us.

Q. Looking if we could, Dr. Kampers, I want to draw your attention to, "He does continue to take his regular prescription", that paragraph. Do you see that?

A. Yes.

Q. "Which he gets from his GP as follows:" I just want you to describe for the panel the first is -- and a terrible pronunciation -- Citalopram?

A. So the first one is Citalopram. So Citalopram is -- it's a medication that's known as an SSRI, selective serotonin reuptake inhibitor. I mean, the panel would most likely -- would all probably recognize the name Prozac. Prozac is in the same family as that class of medications. So it's a selective serotonin reuptake inhibitor, and what it means is it's used to treat both anxiety and depression, and when you see somebody who is on

Page 1415

Direct - Kampers

Cialopram at that dose, which is 40 milligrams and he -- that was under -- that's the dose he was on when he came to see me, that is, you know -- that is indicative of somebody that has been treated, you know, for depression and anxiety and that's the medication that he initially came to see me on. So that's what Citalopram is. It's a medication used to treat depression and anxiety. The second one --

Q. Yes.

A. -- is called Lamotrigine. So Lamotrigine is used by psychiatrists. It's also used by neurologists as an antiepileptic medication. In psychiatry it's used more as a medication to stabilize the mood. That's -- at that dose 200 milligrams per day, it is used as a mood stabilizer. The third one is Zolpidem. So those are known as the Z drugs that could be very similar to hypnotics that people would use. Valium, diazepam. Those are sleeping tablets and then the fourth one which is Trazodone, that is an old style antidepressant not used that much more as an antidepressant. It was at that dose, 50 milligrams at night, that was being used for more for its sedative effects. So he was taking

Direct - Kampers

In terms of -- in terms of your digestive system, your immune system, your lymphatic system, every single system of the body that needs to operate in, you know, in homeostasis is -- is negatively affected, which is why people present with such a variety of symptoms, physical symptoms, emotional symptoms and can have -- and can have negative consequences on all your -- people are more prone to injuries, and if they are injured, they take much longer to recover. It's -- it's the most unhealthy state to be in is a state of persistent autonomic arousal because you are in in survival mode, and in survival mode that is all your body and your brain do is they -- they are -- they are fighting to survive, and so you know, day-to-day things no longer are important because it's -- it's all that is important as -- as I said to you before, the amygdala is -- it's a primitive part of our brain. It's not very good at being specific about what it considers to be dangerous or a threat. It's what you or I think well, that's not that bad, that's not that stressful, why should it do it. That's not how the amygdala works. It's a reptilian part of our brain that is trying to do



Direct - Kampers

its job. It perceives that a person is in high state of threat as if they were going to lose their life. They literally are -- your brain is in survival mode. I mean, your brain is in survival mode. That's all it's doing is you are just surviving.

Q. Dr. Kampers, when was the last time you saw Simon Andriesz either remotely or --

A. Yes. I would need -- if you can just take me out of this screen, just put me back into the normal mode so I can just look at my -- I guess the last time I saw Simon was towards the end of last year. So that was in November of last year, and again I am looking at my notes here. I saw him on Tuesday, the 14th of November last year, and he again described very high levels of anxiety and that is -- that is -- you know, he had sent me e-mails about this. That was when he was having these dissociative episodes that he described as seizures and that they would happen predominantly in the evening while he was no longer working and I explained to him then that the reason that was happening is that it wasn't epilepsy because you don't have -- you don't have epilepsy at the same



Direct - Kampers

time each day. Epilepsy is electrical activity in the brain that causes seizures to happen any time. When something happens more or less the same time each day, I explained to him he was able to function during the day.

I think it was last occasion I saw him he actually showed me the room with his computer. I explained to him that, you know, he was able to -- you know, while he was working during the day, he was able to engage his frontal lobe, but it was in the evenings, you know, when he wasn't that hyperfocused on what he was doing that then the stress that he was under would effectively take over and because the brain -- his brain does not know how to deal with that stress, it dissociates and it dissociates into physical symptoms and those physical symptoms that it dissociates into are -- were these seizures.

If you have ever, you know, read -- most people would have heard of something called hysterical blindness, which was described many, many years ago and that's where people -- you know, it used to happen in women who would go blind and as described as hysterical blindness, and they



Direct - Kampers

would often be admitted into psychiatric facilities. That's an example of how when somebody is dissociated by that amount of stress, they can actually go blind. So the visual system does not work anymore.

So when you asked me earlier how does it affect organ systems, hysterical blindness is a classic example of what stress can do to the system, and now you remove the stress and actually the people can see again. So you know, this has been documented in throughout history.

Q. Dr. Kampers, just two more questions for you. When you saw Mr. Andriesz in November of last year, 2023, did you make any sort of determination that he no longer needed to be on his medications?

A. Oh, no, no. What I actually suggested when I last saw him was I actually explained to him about somatic presentation, you know, that he was experiencing and that how his body was actually storing the trauma, I even recommended that if he could read the book that I described to you earlier by Dr. Bessel called The Body Keeps the Score so he could understand that, and at that time I also suggested that he also really needed to up-titrate

Page 1424

Direct - Kampers

the dose of his Pregabalin, and we needed to get his Pregabalin, you know, to as close to the recommended dose in psychiatry and that we use that in combination with a benzodiazapine.

And the benzodiazapine that I recommended was a medication called Clonazepam, and the reason I chose Clonazepam is because interestingly, Clonazepam is also used by neurologists for the treatment of epilepsy. Not that I thought that he had epilepsy, but it's very effectively when used in combination with Pregabalin as a -- as a synergistic medication. In other words, if by taking Pregabalin and Clonazepam together, the Clonazepam augments the Pregabalin and makes the Pregabalin work more effectively, and the Pregabalin augments the Clonazepam which makes the Clonazepam work more effectively. So you have two medications when used together augment each other, and you have a greater summary effect if you were using either of them as standalone medications.

That's how worried about him I was. It's very seldom that I would recommend somebody up-titrate the dose of their Pregabalin to that

Page 1425

Direct - Kampers

level. That's how concerned I was about him that because now what happened was he -- his -- you know his body was now starting to -- to -- you know, to demonstrate the levels of trauma that he was holding onto.

Q. And my last question, Dr. Kampers, based on your treatment of Simon, did you make a determination as to whether or not he could function in his day-to-day life without being medicated?

A. There is no way that he would be able to function on a day-to-day basis without medication. The medication he is taking at the moment is at best holding -- holding the situation. It's -- I think it's -- at the moment in terms of the medication that he is taking, it's -- it's -- it's a little bit of a firefighting exercise almost. You are using medication as a hose to try and put out a burning building kind of thing. So at best it's holding him. Without medication, I would be -- I would be extremely concerned about -- about him. I think that -- I don't know. I don't know what, you know, that degree of stress and trauma could do to him. There are so many possibilities

Page 1426

Cross - Kampers

that are all negative.

Q. I really appreciate your time. Now the respondents get to ask you questions, Dr. Kampers, but I am done. I really appreciate you making yourself available.

A. Sure.

ARBITRATOR KHEEL: You can proceed but let me just ask Mr. Brickman a question. I understand your client is upset. I am prepared to go ahead. I assume Ms. Cardenas is. I just want to ask if you need a brief break.

MR. BRICKMAN: No. We would like to push through because Dr. Morgan --

ARBITRATOR KHEEL: That's fine. I am in favor of that. Ms. Cardenas, it's your witness.

MS. CARDENAS: Thank you, Mr. Chair.

CROSS-EXAMINATION

BY MS. CARDENAS:

Q. Good morning, Dr. Kampers. My name is Virginia Cardenas. I am counsel for respondents. Thank you for joining us. Let me know if I need to speak up at all. I just want to start by

Page 1427

Cross - Kampers

clarifying the timing and frequency which which you saw Mr. Andriesz. The first time you testified was in July of 2022; is that correct?

A. Well, I have never testified before but the first time I saw him.

Q. Yes. First time you saw Mr. Andriesz.

A. Yes. First time I saw him was after being referred to me by his GP. I first saw him in June of 2019.

Q. The first time you saw him was in June of 2019?

A. Yes. He was referred to me. He was referred to me by his -- by his GP. I am just trying -- yes. My screen has frozen.

Q. Are you referring to some notes you took of Mr. Andriesz's visits, or what are you referring to?

A. Yes. So bear in mind that every time that I have seen -- I have only -- I have only ever been -- I have only ever seen Mr. Andriesz remotely. I haven't seen him face-to-face in terms of my -- the first time I saw him so I wrote the days wrong. My screen -- give me a second. My screen just froze on me. I need to go out of that

Page 1436

Cross - Kampers

were not the cause of how he presented to me. Those in the context of what tipped the balance, what was -- what was the -- what was the -- what tipped the balance in terms of, you know, whether or not he had PTSD that was previously not fully treated or not fully processed, what was -- for all intents and purposes, what was the straw that broke the camel's back, and it was very clear that that -- from a description of his GP and from a description of Simon were related to those events. He was not in that state for all those years.

Q. So Mr. Andriesz presented to you in June of 2022, July of 2022 and based on his state then, you determined that he was suffering from PTSD at that time, correct?

A. Complex PTSD.

Q. Complex -- I'm sorry. I don't mean to misspeak. Complex PTSD. Are you aware?

A. And I said complex PTSD and a state of what was really important, really was a state of amygdala hijack. That's how severe that trauma had been -- how severe his trauma presentation was that, you know, it -- it had the complexities that he had gone into amygdala hijack into persistent

Page 1437

Cross - Kampers

survival mode, and he was in persistent survival mode not because of what he witnessed in his childhood, not because of the events that had happened to him in his life. He had gone into that state of persistent amygdala hijack and persistent -- in relation to the events that were surrounding the whistleblowing events. That's what tipped the balance.

Q. Are you aware of in July of 2022 Mr. Andriesz had not been employed by my client or had any contact with them in more than five years?

A. I didn't know that specifically, no.

Q. Are you aware that Mr. Andriesz in the intervening five years had worked for other financial services firms?

A. I think he did mention that to me, yes.

Q. And you agree, based upon your discussions with Mr. Andriesz, that those were stressful work environments, right?

A. When a person is -- when a person is --

Q. Are you able to give me a yes or no to that? I just want to move this along.

A. It's -- well, it's not as simple as a yes or no.

Page 1438

Cross - Kampers

Q. Okay. Go ahead.

A. It's not as simple as a yes or no. Because obviously working in the financial sector, you know, all of those environments can be -- you know, can be stressful -- can be stressful events but so -- but that's not what was described to me. What was described to me was the events surrounding the whistleblowing litigation in relation to that. That is the -- that was the description of the -- despite it -- irrespective of how he had not seen that -- you know, his employer forward, as I said earlier, the amygdala is not a very good measure of time. It's not a very good measure of what is threatening in time. Yes, he may well be working in other stressful environments, but to attribute that that be the cause of his presentation in the way that he presented to me in the context of this case, I -- I -- I think that would be irrespective of other stressful environments. There was a far more -- a causal relationship in terms of the whistleblowing instance and how that -- how that unfolded for him.

Q. Are you aware in 2015 during the time he was employed by my client that Mr. Andriesz

Page 1439

Cross - Kampers

experienced a stressful divorce?

A. Sorry. Can you repeat the question?

Q. Are you aware during 2015 during the time that he was employed by my client Mr. Andriesz experienced a stressful divorce?

A. Yes. Yes. I mean, I know that he was going through a divorce.

Q. Just a couple more questions. I can take this down.

A. Just can I also just add to that? I have -- I have in my 25 years as a psychiatrist never seen a stressful divorce -- and I have seen many people go through a stressful divorce -- create this situation. So to attribute, you know, his presentation to -- you know, to a sequence of childhood events or to a stressful divorce as to why he presented like that at that time, I think that I have never -- I have never seen anybody present like that after a stressful divorce or even a -- during a stressful divorce.

Q. Stress is a trigger to PTSD; is that right? I think that was your testimony earlier.

A. That stress can trigger -- can trigger untreated unprocessed PTSD, yes.

Page 1464

Direct - Morgan

whom my secretary sent it out. We certainly shared it with Simon as a means of referral if he went to see somebody, but I am not sure -- I am not sure without recourse to the notes whether that was -- to whom it was sent.

Q. In the course of your initial consultations with Simon, were you made aware of anything that could have caused the symptoms you observed that had happened after he left his previous employer, between the time he left his previous employer which was in January -- late January, 31st of January, 2017, and when he saw you on October of 2017? Does that question make any sense to you, or do you need me to rephrase it?

A. I think I understand the question but so I will answer certainly. I guess the short answer is no, it -- I wasn't made aware of any other events as it were. My understanding was that he left his previous employment in early 2017, which for reasons as was previously discussed. At the time I saw him, he had moved back to London. As I say, had this new employment and had been working there for around a week and had found that he was -- as I understand it, there had been contact

Page 1465

Direct - Morgan

between his previous employer and his new employer which led to him being questioned about things which he felt was inappropriate contact and he was very much triggered and distressed by that situation. I wasn't aware of any events if you like in the intervening eight or nine months, whatever that is.

Q. And this is quintessentially a layman's question the way I am about to phrase it, and if you are able to answer, I would appreciate it, Dr. Morgan. Has Simon presented to you recently that he no longer suffers from the symptoms he described to you when you first met him? In other words, has he been cured?

A. No. In short --

Q. Is it your determination that he still needs these antidepressants and antianxiety medications?

A. Very much so.

Q. When you say "very much so", can you explain what you mean by that to the panel?

A. I mean, he still when I -- when I have spoken to him, as I say last time was in December, he remains unwell from a posttraumatic stress point

Page 1466

Direct - Morgan

of view. He describes physical symptoms of distress at various times. He has had unusual pains and tingling and different parts of the body. His sleep is disturbed. He -- he feels anxious. He has episodes where he is angry or irascible for what might be viewed as small external triggers. He experiences symptoms of dissociation. All and -- and I am sure other things which aren't coming to mind but all symptoms of ongoing active posttraumatic stress disorder, which is barely managed by the -- by the medication that we have him on.

Q. Dr. Morgan, have you ever treated Simon during the -- I guess it's more than six years now, correct, that you have seen him?

A. Correct. Yes.

Q. Have you ever treated him for alcoholism?

A. I have not. I think he told me -- I think he told me at some point that he had attended AA for alcohol dependency at some point in the distant past. Again, without consulting, I would struggle to give you the date, but I think around 2000 or early 2000s is when he stopped drinking.

Page 1467

Direct - Morgan

Q. Are you familiar with AA?

A. I am certainly familiar with the concept, yes.

Q. Do only alcoholics attend AA meetings?

A. Well, that's -- do I know enough to answer that question?

Q. And if you don't, I don't want you to speculate or answer something you don't know based on your experience and knowledge.

A. I mean, I guess what I would say is I know that AA is -- it's a voluntary organization. So people who are attending are attending for their own reasons, and I would say that, you know, they have taken themselves there because they feel they have a problem with alcohol. Whether you qualify that as being alcoholic is probably a hard to define thing.

Q. And I just want -- I want to end Dr. Morgan, and I think you mentioned in passing, when is the last time you saw Simon?

A. The last time I spoke to Simon by telephone was in December of 2023. The last face-to-face meetings with a little longer ago and I can't give you the exact date, but I think it was