EXHIBIT "L"

Direct - Pomponi

Simon's wife was there to support him. And also to make sure that he was able and safe enough, or felt well enough to go back home, to leave my therapy room.

Q. All right. Going back to the sort of the intake, if we could, Ms. Pomponi.

Did -- do you attempt to ascertain what medications, if any, a new client is on?

A. I usually ask whether they are on medication, but the medical side of their wellbeing is outside my competence.

So I would usually ask whether they are seeing a psychiatrist, whether they are taking medication, and also whether they are being supported from a medical point of view, but that is all I do. Because as I said, the medical side is outside my competence so I would not give any advice or suggest any medication or any such thing.

Q. During the initial period from October of 2017 through 2019, how frequently did you see Simon?

A. More or less weekly, unless he was away for like business or for family reasons.

Q. And how long would each of your sessions

Direct - Pomponi

with Simon last?

A. My sessions are 50 minutes.

Q. Did there come a time, Ms. Pomponi, when you wrote a summary of your interactions with Mr. Andriesz?

A. I'm sorry, when I wrote a summary?

Q. Wrote a summary of your interactions with Mr. Andriesz.

A. At the end of the session what I do is I take just a short note for my own use. So I usually do a -- three or four sentences of what actually I got it -- from the -- gathered from the session, which is useful for me in order to then remember the narrative.

So my notes are not medical notes which would be recorded in any sort of official way; they are notes specifically for myself to actually be able to follow the course of our sessions and the narrative.

MR. BRICKMAN: Ethan, if you could put up Exhibit 406.

Q. We are going to do a screen share.

A. Okay.

Q. Can you see that, Ms. Pomponi?

Direct - Pomponi

A. Yes, I can. Yes, I can.

Q. All right. Did you write this note, To whom it may concern?

A. Yes. I wrote this in -- I think back in -- what was it, 2000? I can't remember exactly the date. 2018, sorry.

Q. If you would look at the signature block.

A. Yes, that's mine.

Q. And it says, London. And there is a date after the signature block.

A. Yes.

Q. What's the significance, if any, does that date have?

A. October 2018 was when I was asked by Mr. Andriesz to support him with this legal procedure and I was asked to write a report. Which I did.

Q. And what you wrote in this report, was it an accurate summary, from your perspective, of your interactions with Mr. Andriesz up to that date?

A. It is.

Q. And if we could go to the top of the

Direct - Pomponi

letter.

A. Yes.

Q. It says, "I have been Mr. Andriesz's psychotherapist since October 2017 when he moved from New York to London."

That is an accurate timeline of when you first saw Mr. Andriesz?

A. The October 17 is an accurate date, having psychotherapy relationship. In fact, it was -- the 20th of October was our very first session.

Q. And your next sentence says, "Mr. Andriesz sought therapy in order to deal with symptoms of severe PTSD following a series of distressing events that resulted in his move to the UK."

Did your observations of Mr. Andriesz confirm that he was -- confirm to you, at least, that he was suffering severe PTSD at the time you originally saw him?

A. That's my opinion, yes.

Q. And what do you base that opinion on?

A. I base it on his narrative, because he was actually describing how he was feeling.



Direct - Pomponi

High -- very, very high stress and anxiety.

I also based my opinion on the observation of the physical presence in my office. How they actually present, and whether they are expressing emotions of stress, fear, depression.

So it is both narrative and their presence.

Q. Did Mr. Andriesz do or say anything to you during the first two years of your seeing him that caused you to reconsider that opinion or caused you to question whether he was suffering severe PTSD?

A. Not at all. My opinion stayed exactly the same. In fact, as we went on with the sessions, I could notice, you know, definitely evidence of anxiety, fear, feeling physically ill.

As I said, he had a panic attack or two in my presence. He was sometimes crying, sometimes feeling very, very sick. So that confirmed that the initial evidence was going on.

Q. And again, the sentence we just read, "Following a series of distressing events that resulted in his move to the UK," did Mr. Andriesz explain to you the events that resulted in his move

Direct - Pomponi

back to the UK?

A. Yes. Based on his narrative, I understood that he had noticed that there were problems in his -- fulfilling his duties in his work, where he felt he was asked to conduct illegal transactions, which he was not prepared to do.

And so the stress and frustration, I think came from the fact that when he tried to discuss such transactions or sort of make them obvious to his superiors; he was not taken seriously, he was not considered. He probably felt that he was asked to just not discuss them. Basically his voice was not heard.

Which caused him obviously very, very high stress because he -- it basically involved moral or ethical stance that he had to decide whether to act on or not.

Q. Did he indicate to you that he felt that his employer had retaliated against him for moving forward with these complaints?

A. Yes, indeed. Many times.

Q. If we were to look at the next two paragraphs of your letter, one with working for Cantor Fitzgerald, and then realizing that his

Direct - Pomponi

company, is that a summary of what you just told the panel?

A. I would say so, yes.

Q. And the next paragraph, the one beginning, "The above events were highly traumatic and have provoked an ongoing degree of panic attacks, insomnia and extreme levels of anxiety and stress, often resulting in hospital assessments and admissions."

Do you see that?

A. Yes, I do see that and I can confirm that.

Q. Did you ever review any of his hospital records or admissions or assessments?

A. No, sir. I just listened to his narrative.

Q. And did you witness extremely high levels of anxiety and stress and panic attacks in connection with your sessions with Mr. Andriesz?

A. Yes, I did.

Q. It goes on to say, "Mr. Andriesz was hospitalized for a further three times, just for heart-related issues."

Where did you get that information?

Direct - Pomponi

A. Well, he told me he had suffered a heart attack at his desk, which in itself was quite a traumatic experience, and he lived in fear that he would have another heart attack and die. And he couldn't die because he was -- he had responsibility for looking after his son, his ex-wife and his present wife.

So they -- the heart attack he suffered, in itself, was one of the traumas that he experienced during and after being dismissed in his job.

Q. There is a sentence here that I would ask you to explain for the panel, Ms. Pomponi.

It starts with "Added to the physical implications of this situation, there is also a strong sense of danger to personal safety and life-threatening preoccupations, which are most often present during narrative in psychotherapy."

What are you referring to there?

A. The threatening preoccupations are the feeling that he could die at any time.

He could have another heart attack.

Or his life was in danger because there could be retaliations.



Page 1504

Direct - Pomponi

Or his life could be in danger in the sense that he would be out of work, not being able to provide, and have no money to actually survive.

Q. The next paragraph begins, "We are undertaking trauma therapy biweekly sessions."

Can you describe to the panel what that trauma therapy consisted of by Mr. Andriesz?

A. Yes. We tried to implement a protocol which is attached to the EMDR trauma therapy that I was talking about earlier.

However, I realized that in order to apply that type, that specific type of therapy, the trauma must be finished. It must be already something that has happened.

In the case of Mr. Andriesz, the trauma was ongoing because he was going through a threatening situation where he was badmouthed and he felt he could not find -- hold a job. He felt that his physical health was constantly in danger. So the trauma was ongoing.

And therefore we decided to -- or rather, I decided that talking therapy was at that point the best option. You cannot deal with the trauma which is ongoing. You can usually only deal

Page 1505

Direct - Pomponi

with a trauma that is like an incident that has happened, and then that creates PTSD.

But I felt that in the case of Mr. Andriesz, the trauma was actually ongoing. He was being traumatized by various situations that were happening there and then.

So we went back to actually talking therapy, which seemed to be the best options at the time.

Q. And you write in this same paragraph, "And although Mr. Andriesz is responding well to therapy, he is still often experiencing moments of intense worry akin to distress, intolerance where he can get overwhelming feelings, panic, and tearfulness."

A. Yes. Yes.

Q. "As well as physical pain and distress."

Is that more specifically describing what you just detailed for the panel?

A. Yes, indeed. I saw Mr. Andriesz cry during our sessions more than once. And also a lot of times feeling physically ill, because of the high anxiety that perhaps our narrative, or his narrative, was causing at the time.

Page 1506

Direct - Pomponi

Q. And I just want to jump ahead and then we will come back to the letter.

By 2019, during the first stretch of your seeing Mr. Andriesz, at the end of that period of time, did you feel that he was -- I'm sorry to use a layman's term -- cured, such that he was no longer suffering from PTSD?

A. No. I think we stopped our sessions because he was -- I think he was going away and I think there were also financial issues. So I -- we didn't stop because we felt that he was, let's say, cured; we stopped because we needed to -- or he needed a break.

But effectively then I didn't see him again until 2022 for just three sessions.

Q. So at the end of 2019, describe for the panel what conditions, if any, you observed Mr. Andriesz to still be suffering from.

A. He was still very, very concerned.

He was following the legal case, or the preparation for his legal case, which obviously was ongoing and taking a long time. And at the time, he was also looking after his wife as well as his son, and trying to concentrate on his job.

Page 1507

Direct - Pomponi

And I think Mr. Andriesz is very resilient because he has a very strong sense of duty. So despite of the high anxiety and distress which was ongoing, I think he was determined that he would just carry on with his legal case and really put all his energy and focus into that. And in hoping that he would be able to win it. And to make the right decisions, and to be on the lawful side of all his situations.

So I could see that he was strong on one side although still highly stressed.

Q. At the time you ended your initial sessions with Mr. Andriesz, which is in 2019, were you still of the opinion that he was suffering from post traumatic stress disorder?

A. Yes. In fact, we didn't end. It was more meant to be a suspension of our sessions with the idea of resuming at a later date.

Q. Now the last paragraph of your letter says that, "One feature of PTSD is shown as an alteration of responses to life difficulties by reexperiencing the initial traumatic events in a highly distressful and overwhelming psychologically and physically debilitating way."

Is that something that you observed with Mr. Andriesz?

A. It is. Yes. It was still present.

Q. Can you describe for the panel exactly what you are referring to in that sentence?

A. In my opinion, there were two stresses at the time. One was the heart attack because he had symptoms -- when he had panic attack, a panic attack is very similar to a heart attack where you experience what you believe you are dying.

Although, of course, nobody dies from a panic attack.

But at the time when it happens, it's very similar to a heart attack and there is a belief that you are actually dying in that moment.

So PTSD is basically reexperiencing something very traumatic, which is his heart attack at his desk. Although it isn't happening as such, but the experience is very, very similar, so much so that in that moment the person believes that they are actually dying. That is one.

The other traumatic event is being dismissed and being discharged, and basically not being listened or taken into consideration. So

it's as if what he was trying to say -- or his ethical stance was totally denied. So he felt that he had no voice and he was not -- or his opinion of his stance or his values were of no importance whatsoever.

Q. Just a few more questions if I could, Ms. Pomponi.

If you were to look at the second, third and fourth pages of what has been marked as Exhibit 406, I just want to understand.

Is that your -- essentially your curriculum vitae?

A. You are showing my CV?

Q. I am asking you: Is that what it is?

A. Yes, it is. It's my history.

Q. Including your voluntary work, your honorary post, your training, your achievements and your languages?

A. That is -- that is all -- it's all correct.

Q. Ms. Pomponi, when you first met Simon and sort of took his history, he discussed some traumatic events he had experienced as a child, correct?

A. Indeed, yes.

Q. Did you ever have discussions with Mr. Andriesz of whether the PTSD he was suffering now were at all attributable to those earlier childhood events?

A. In my opinion, the PTSD were connected to recent events.

However, you have to consider that what happens in childhood are part of who we develop when we become adults, so you can never disconnect some earlier experiences from who we are or who we have become during later years.

So I think there was a connection between his childhood as had been possibly, if I can use that term, a neglected child. With the fact that at the time as a child, he was not -- not heard or considered, or perhaps looked after. So that was an experience that happened many, many years before.

But what happens is then he suffered another trauma, which is, you know, the one most recent which somehow could be connected to the fact that again, he was basically not considered, he was not heard.

So what happens when you are traumatized in adult life is that it's as if you are opening a box and something from your past comes back because your past is still within us, it never goes away. And obviously, it will influence the way we react to the present times and what happens to us now.

So in the case of Mr. Andriesz, I think his childhood and whatever happened when he was a child made him the person that he was as an adult. And I think it's the way that he developed his moral values, and his sense of having to be on the right side, and to do the right thing, and to want to put things right when they were wrong. This is how he developed.

We all develop ourselves based on how we grow up, the kind of education, the family life that we have.

So I simply would not say that he was suffering with the initial trauma, not at all. The initial trauma is what made him act the way he acted in his work environment because he had grown as a person with a very, very strong sense of right and wrong, lawful and unlawful, and with a very determined attitude of wanting to be right and



Cross - Pomponi

wanting to do the right thing.

And I think this is what informed his decision to actually become a whistle-blower, because that was his ethical stance.

I don't know if I made myself clear.

So it was not the initial trauma that was causing his PTSD; it was his trauma as an adult. And as an adult, he developed in such a way because of the childhood he had of, you know, his history of growing up.

Does that make any sense?

Q. To me. If the panel has questions, they get to ask you as well, Ms. Pomponi.

MR. BRICKMAN: I have no further questions at this time.

ARBITRATOR KHEEL: Thank you, Mr. Brickman.

Ms. Cardenas, will you be doing the honors today?

MS. CARDENAS: Yes.

ARBITRATOR KHEEL: Please, you may proceed.

CROSS-EXAMINATION

BY MS. CARDENAS:

Cross - Pomponi

Q. Good morning, Ms. Pomponi. My name is Virginia Cardenas. I am counsel for the respondents.

A. Good morning.

Q. Thanks for taking the time today.

I just have some questions about your testimony. I just want to get the timeline straight first.

So you began seeing Mr. Andriesz in October 2017, correct?

A. Indeed, yes.

Q. And when did you stop seeing Mr. Andriesz, if at all?

A. We stopped in September '19, but I saw Mr. Andriesz again in 2022 for three sessions.

Q. And I believe the notes of the 2022 sessions, your counsel, Mr. Leonard, just handed to me.

MS. CARDENAS: Is that accurate, Mr. Leonard?

MR. LEONARD: We provided, yes.

Q. So I have your notes now.

ARBITRATOR KHEEL: Can I just interject? Are these new notes that we don't have?

Cross - Pomponi

MS. CARDENAS: That's correct.

You are going to provide them to the counsel?

MR. LEONARD: I will give copies to the panel.

MR. BRICKMAN: We weren't planning to introduce them.

MR. LEONARD: You guys have access to them.

ARBITRATOR KHEEL: There is no rush on it.

MS. CARDENAS: Yes. For the sake of completeness, I would like the panel to have them.

Q. And I want to confirm that you did take notes during those sessions in 2022?

A. Yes.

Q. And you took notes of all your sessions, right?

A. I take notes for my own benefit, yes, as I explained before.

MS. CARDENAS: Okay. And the notes, I will give the panel a second to look at them.

MR. BRICKMAN: Can we just make them

Cross - Pomponi

part of her other notes?

MS. CARDENAS: Yes. So 412 is the set of her notes that we did have produced. And so we will just go ahead and add these to 412.

Q. So I am going to share my screen, Ms. Pomponi, so that you see what I am looking at here.

MR. BRICKMAN: 412?

MS. CARDENAS: 412, yes.

Q. So Ms. Pomponi, this is a long, long document. It's 49 pages and I am happy to scroll whenever you like, but can you just confirm for me this is the format of the notes that you took during your sessions with Mr. Andriesz?

A. Yes, this is it, yes.

Q. So -- and they are written in first person. So did Mr. Andriesz write any of these or are these written by you?

A. No, these are my notes. And I write them in first person because it's useful for me to remember sentences or words or statements that would allow me to carry on with the narrative between one session and the next. So these are not exactly words that my client would have used; this



Page 1520

Cross - Pomponi

You testified with Mr. Brickman that you, in the course of your treating Mr. Andriesz, confirmed that he was suffering from PTSD; is that correct?

A. Yes.

Q. Are you offering any opinion as to the cause of that PTSD?

A. The cause of the PTSD as far as I -- and this is my opinion, my professional opinion -- the cause of the PTSD was due to what was going on at -- in that moment in his life.

Being dismissed, a legal case, being bad-mouthed, not -- not -- being worried about being able to have a job and provide for his family. And also the intense emotions and anxiety that I witnessed in the therapy room when he was with me.

Q. And you -- and this was -- these were observations you made between October 2017 and September 2019, correct?

A. Yes.

Q. Over the course of your treatment of Mr. Andriesz, you had some concerns about his level of anxiety, right?

Page 1521

Cross - Pomponi

A. Yes.

Q. Concerns about the level of his stress, right?

A. Yes.

Q. And you discussed the lawsuit with Mr. Andriesz, right?

A. And I discussed what?

Q. This lawsuit?

A. Yes.

Q. And you saw that that was contributing to his stress and anxiety, right?

A. It -- the notes took a long time to prepare and there were ups and downs. And obviously, it's not an enjoyable experience for most people.

I guess -- so I could witness the anxiety, the worry, the intense work of providing, I guess, all the information that he had to provide to his lawyers. And -- and also the not knowing when and if there would be a lawsuit. And I think the wait was very, very stressful. The wait went on for years, effectively until today.

Q. Are you aware that Mr. Andriesz initiated the lawsuit?

Page 1522

Cross - Pomponi

A. Initiate the lawsuit?

Q. Yes.

A. Probably, but I couldn't confirm 100 percent.

Q. Did you ever advise Mr. Andriesz that the lawsuit was bad for his health? Bad for his mental health?

A. No, I wouldn't give such advice because I have to respect what Mr. Andriesz decided was the right course of action. So just follow and you know, supporting his decisions.

MS. CARDENAS: I have no further questions. Thank you very much, Ms. Pomponi.

THE WITNESS: Thank you.

MR. BRICKMAN: I have no questions.

MR. ELKIND: No.

MR. HARBISON: I don't.

ARBITRATOR KHEEL: I have no questions either. We want to thank you very much for lending your expertise today, and we appreciate it.

And we wish you good-bye, and you could sign off.

THE WITNESS: You are very welcome. I

Page 1523

Direct - Aubin

am glad if I could help in any way, so thank you very much for listening to me.

And bye-bye, we will disconnect now.

ARBITRATOR KHEEL: What's next?

MR. BRICKMAN: Mr. -- well, I leave it to Mr. Shah. We can either begin with Mr. Aubin, or you can finish up with --

MR. SHAH: I think we have Mr. Aubin here. You have been kind enough to take him.

ARBITRATOR KHEEL: Yes, we will bring in a new witness. And he is live?

MR. BRICKMAN: If we could just take a quick break because we have some physical readjustment to do.

ARBITRATOR KHEEL: Off the record.

(Discussion off the record.)

(Recess taken.)

ARBITRATOR KHEEL: We are back on the record. Mr. Brickman will begin examination of Mr. Aubin.

Could the court reporter please swear him in.

J E A N P I E R R E A U B I N , called as a witness, having been duly sworn by a Notary Public,



Direct - Aubin

expensive.

So when we look for a license, it's something we think twice, even more times, because it's just for one person. But we did it for Elise Choukroun because I think she was living in Singapore at the time, to my recollection, and she wanted to be based then obviously in Singapore.

But we couldn't offer her a job until we had the license, and obviously the license is not automatically approved. You have to get the capacity to absorb that new business. Hong Kong; we have the capacity because we have the listed products in Hong Kong. We never had listed products in Singapore.

Q. So did you offer Elise the opportunity to work in Hong Kong while you obtained the Singapore license?

A. Correct.

Q. And in two months, which would bring us to April and May, did you obtain the Singapore license?

A. No, but it was -- she declined to move to Hong Kong.

Q. I understand. I am asking you a

Direct - Aubin

different question.

MR. SHAH: You cannot interrupt the witness.

Q. Mr. Aubin --

MR. SHAH: Hold on.

Was the witness finished with your answer, sir?

A. Yes.

Q. Mr. Aubin, when did BGC obtain the Singapore license?

A. I think we still don't have that futures Singapore license.

Q. One of the solutions to this was that Elise would work out of the London office, correct?

A. Well, on a second step in order to find a solution to accommodate, I think we offered, yes, for her to work in London since she worked in London in the past and to commute.

Obviously the commute from Singapore to London is not the best one, but that was the only thing we could offer.

Q. And in connection with that offer, you tendered her a contract?

A. I remember a CRF. Another CRF. A

Direct - Aubin

contract; I don't know.

You know, the way it is, that that's the BGC -- the way we function.

So the manager, like me, for example, we write on the contract.

When it's signed by -- when in Singapore, the head of listed products and the head of the region, then it goes to HR.

HR check with compliance.

And if it works with our licensees in the country, they issue a contract.

So it came from HR.

Q. Did HR ever issue a contract in accordance with this CRF, the one that you and Mr. Webster signed?

A. I don't know, sir. I don't remember, at least.

Q. Do you know if whether or not Ms. Choukroun was offered a London contract?

A. I don't remember.

Q. Do you know?

A. But again, if I may.

To my recollection, again, she declined to go to Hong Kong, and she also declined to go to

Direct - Aubin

London. So I don't know if the contract was issued, but my recollection is she declined both.

Q. Is it a normal procedure for -- in connection with a contract, for you to also issue a side letter?

A. What do you mean by "side," if I may?

Q. Side letter.

A. About what?

Q. About the terms of someone's employment.

A. When we offer a contract, there is a terms of conditions.

That's what you are talking about?

Q. No, I am talking about a side letter.

A. I don't know. Side letter could be everything.

Q. Yes.

A. What's in a side letter?

Q. Well, turn to Exhibit 92.

If you look at Ms. Choukroun --

MR. SHAH: Why don't you give him a second?

MR. BRICKMAN: I want to draw his attention to a particular, first.

A. Which page?



Direct - Aubin

A. Correct.

Q. And he has actually -- you are asking him how it is incorrect?

A. Correct.

Q. And he says in his 1/6/19 e-mail to you -- are you there?

A. Yes.

Q. "That the paper rebate against client order and matched business, these need to be recorded correctly to show the correct revenue streams."

Do you see that?

A. Yes.

Q. And he wonders if it could be a tax issue. Correct?

A. Yes, he says it's an issue from a tax perspective.

Q. "In addition, this will have an effect on the financial statement that we produced as it could be seen as revenue manipulation."

Do you see that?

A. Yes.

Q. "I don't know the answer," he writes, "but I am flagging this procedure."

Direct - Aubin

Do you see that?

A. Yes.

Q. Did you regard that e-mail to you as inappropriate?

A. I view -- I am taking it as wrong.

Q. Well, we just talked about conduct being inappropriate, unprofessional and insubordinate.

Does this e-mail constitute, in your view, inappropriate or unprofessional conduct?

A. Yes.

Q. And does this e-mail -- do you consider this e-mail to be -- constitute insubordinate conduct?

A. In some way, yes.

Q. You then respond to it and say, "It is manipulation nor an issue re: tax, Simon. It has already been answered by Mike Sulfaro."

When did Mr. Sulfaro answer this? What did Mr. Sulfaro answer?

A. It's -- Mr. Sulfaro told him, that we all told him to -- that's why I consider it is an unprofessional and insubordination because Mr. Andriesz asked multiple times the same questions. He had multiple times the same answer

Direct - Aubin

by me and others. But he continues to ask the same question, and considers that it's tax issue or whatever when it's not.

You know, it's part -- these points, it's part of his contract. It's black and white on his contract.

Q. You then write, "We can have discussion, but it's about analytics treatment of the revenue, not accounting."

A. Correct.

Q. What is analytics treatment of the revenue?

A. Well, if I can consider -- because obviously, as you mentioned previously, sir, you questioned me earlier today about: Are rebates or market makers are revenues? So yes, they are.

So analytically, I can treat them as revenue.

But accounting way; it's not part of Simon Andriesz's desk as per his contract. That's different between accounting. So in accounting way, it's not with Simon Andriesz, it is with others. As per his contract.

But analytically way, when a manager you

Direct - Aubin

look at a picture, you can consider a continuously different analytics.

Q. If you look at the front page of this exhibit.

You say, "Okay, this --"

MR. SHAH: This is Simon talking.

MR. BRICKMAN: Yes.

MR. SHAH: You say, "You say."

Q. Okay. Simon says, "Okay. That depends if Aldric is declaring a loss of 500 K U.S. dollars for 2015. If you are confident this okay, I will sign off."

Do you see that?

A. Yes.

Q. Is that e-mail -- do you consider that e-mail to be inappropriate or unprofessional conduct?

A. No.

Q. Do you consider that e-mail to be conduct that is insubordinate?

A. No.

Q. Then you write back, "There is no loss of 500. Just spoke to Aldric. Please call me now. I am going to be in a meeting for the next hours."

