**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SIMON D. ANDRIESZ,

        Petitioner,

For an Order Pursuant to 9 U.S.C.A. § 1 *et seq.* and CPLR § 7551 Vacating or Amending an Arbitration Award

      -against-

BGC FINANCIAL, L.P.,

        Respondent.

---

Case No. 1:24-cv-07004-LJL

**Hon. Lewis J. Liman**

**RESPONDENT'S ANSWER AND AFFIRMATIVE DEFENSES TO PETITION**

---

Respondent BGC Financial, L.P. ("Respondent," or "BGC") hereby answers the Petition (the "Petition", *see* ECF No. 9) filed by Petitioner Simon D. Andriesz ("Petitioner," or "Andriesz") and asserts the following Affirmative Defenses as follows:

### Nature of Petition

1.     Paragraph 1 asserts legal conclusions for which no response is required. To the extent a response is required, BGC denies the allegations contained in this paragraph.

### Parties

2.     BGC admits that Andriesz lived and worked in London during the time that he worked for BGC Brokers and that Andriesz lived in New York, NY from late 2014 to early 2017 as he worked for BGC.  The remainder of Paragraph 2 is denied for lack of sufficient information or knowledge to form a belief therein.

3.     BGC admits all of the allegations contained in Paragraph 3 except that BGC denies that it employed Andriesz beginning in "November 2014" and that BGC was "spun off from Cantor Fitzgerald" in "2008."

## Procedural Background

4.      BGC admits that it terminated Andriesz's employment, that Andriesz filed FINRA Arbitration No. 19-01751, and that the hearings in that matter were adjourned multiple times.  BGC denies that Andriesz's employment was "improperly" terminated.  The remainder of Paragraph 4 is denied for lack of sufficient information or knowledge to form a belief therein.

5.      BGC admits that on July 27, 2022, Andriesz requested that the arbitration hearings be adjourned and that the Panel dismissed the arbitration without prejudice under FINRA Rule 13601(c).  The remainder of Paragraph 5 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies those allegations.

6.      BGC admits that Andriesz re-filed his claims as FINRA Arbitration No. 22-02539 on or about November 8, 2022.  The remainder of Paragraph 6 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies those allegations.

7.      BGC admits the allegations contained in Paragraph 7.  Answering further, a hearing also occurred before the Panel on May 15, 2024.

8.      BGC admits that by the close of the arbitration hearings, Andriesz had withdrawn certain claims, dismissed certain individual respondents from the action, and continued to allege each of the claims stated in Paragraph 8 against at least one remaining arbitration respondent.  BGC otherwise denies the allegations of this paragraph, including any implication that any claim had merit or was colorable.

9.      BGC admits that the Panel directed that the parties submit post-hearing briefs and appear for a closing argument, and otherwise denies the allegations contained in Paragraph 9.

10.      BGC admits the allegations in Paragraph 10.

11.      BGC admits that closing argument was held on May 15, 2024, and denies the remainder of Paragraph 11 for lack of sufficient information or knowledge to form a belief therein.

12.    BGC admits the allegations contained in Paragraph 12.

13.    BGC admits that after receiving the Award, Andriesz requested that the Panel provide an explained decision in a manner that was impermissibly late and non-compliant with FINRA rules, and otherwise denies the allegations alleged in Paragraph 13.

14.    BGC admits that the Panel refused to consider Andriesz's impermissibly late and non-compliant request for an explained decision, but denies that it refused to make payment of the required award and that the matter "had not been closed" at the time of Andriesz's request.  The remainder of Paragraph 14 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies those allegations.

**Relevant Background Facts**

15.    BGC admits that Andriesz worked as a broker at multiple financial institutions before joining BGC Brokers on or about May 28, 2012, and denies the remainder of the allegations contained in Paragraph 15 for lack of sufficient information or knowledge to form a belief therein.

16.    BGC admits the allegations contained in Paragraph 16.

17.    BGC admits the allegations contained in Paragraph 17.

18.    Paragraph 18 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies the allegations in this paragraph.

19.    BGC admits that it is not aware of any customer complaints, regulatory or supervisory issues, or human resources concerns stemming from the two and a half years that Andriesz worked under his May 28, 2012 contract, and that brokers on the London Futures and Options Desk (the "London Desk") supervised by Andriesz received production bonuses during each of the 2012, 2013, and 2014 years.  BGC denies that Andriesz's "performance and production were exemplary," and answers further that Andriesz forfeited an award of partnership units in BGC's affiliated partnership because the London Desk failed to attain the revenue targets over this

time period that the grant agreement required in order for Andriesz to retain the awarded units. BGC denies the remainder of Paragraph 19 for lack of sufficient information or knowledge to form a belief therein.

20.    BGC admits that Michael Riffice, who was then the head of BGC's New York Futures and Options Desk (the "New York Desk"), was terminated for insubordination in October 2014, that the New York Desk was not profitable, and that Mr. Riffice had demanded before his termination to be paid more money than his contract entitled him to receive, as well as complained about what he perceived to be insufficient internal controls and supervisory procedures.  The remainder of Paragraph 20 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies those allegations.

21.    BGC denies the allegations contained in Paragraph 21.

22.    BGC admits the allegations contained in Paragraph 22.

23.    BGC denies the allegations contained in Paragraph 23.

24.    BGC admits the allegations contained in Paragraph 24.

25.    BGC admits that from early December 2014 through early May 2015, Andriesz continued to work for BGC and generated revenue for the London and New York desks, and otherwise denies the allegations in Paragraph 25.

26.    BGC denies the allegations contained in Paragraph 26.

27.    BGC admits that during the period when Andriesz was under contract with BGC Brokers and BGC Services (Holdings), it is not aware of any performance or regulatory warnings regarding Andriesz, and denies that he was regarded as a "stellar employee" before he raised complaints regarding what he alleged to be "accounting irregularities and supervisory concerns." BGC denies the remainder of the allegations in Paragraph 27 for lack of sufficient information or knowledge to form a belief therein.

28.    BGC denies the allegations contained in Paragraph 28.

29.    BGC denies the allegations contained in Paragraph 29.

30.    BGC admits that prior to Mr. Marinos becoming Mr. Aubin's business manager, the New York and London Desks' bonus pools were not aggregated, and answers further that the New York and London Desks' bonus pools were never aggregated at any time that Andriesz was the head of both desks.  BGC denies the remaining allegations in Paragraph 30.

31.    BGC denies the allegations contained in Paragraph 31.

32.    BGC denies the allegations contained in Paragraph 32.

33.    BGC denies the allegations contained in Paragraph 33.

34.    BGC admits that Andriesz complained about a critical email sent to him by Mr. Webster on or around September 17, 2015, and answers further that Mr. Webster sent this email after Andriesz repeatedly ignored the clear instructions of BGC's management for more than half a year that he could not hire Ms. Choukroun to broker futures in Singapore because BGC's Singapore affiliate did not have a futures license in Singapore, misled Ms. Choukroun and BGC's human resources officers in Singapore into believing that management had signed off on her immediate hire to work from the Singapore office, and consequently jeopardized a client relationship.  BGC denies the remaining allegations of Paragraph 34.

35.    BGC admits that on or about November 18, 2015, BGC's affiliate,  BGC Partners (Singapore) Ltd. ("BGC Singapore") hired Ms. Choukroun to work from its Singapore office, and further answers that this hire was with the explicit understanding that Ms. Choukroun would not be allowed to begin brokering activity (and would not be given access to the technology necessary to do so) until BGC Singapore obtained a license to broker futures in Singapore, and also admits that BGC Singapore terminated Choukroun's employment in early 2016. BGC denies that "did not

have a license to do business in Singapore" and "has never obtained that license." BGC denies the remainder of Paragraph 35 for lack of sufficient information or knowledge to form a belief therein.

36.     BGC admits that in or about July 2015, Andriesz suffered a heart attack, and denies the remainder of the allegations in Paragraph 36 for lack of sufficient information or knowledge to form a belief therein.

37.     BGC denies the allegations contained in Paragraph 37.

38.     BGC denies the allegations contained in Paragraph 38.

39.     BGC denies the allegations contained in Paragraph 39.

40.     BGC denies the allegations contained in Paragraph 40.

41.     BGC denies the allegations contained in Paragraph 41.

42.     BGC denies the allegations contained in Paragraph 42.

43.     BGC denies the allegations contained in Paragraph 43.

44.     BGC denies the allegations contained in Paragraph 44.

45.     BGC denies the allegations contained in Paragraph 45.

46.     BGC admits that Mr. Velez volunteered that BGC could attribute a portion of the expenses incurred by BGC to settle a lawsuit concerning allegations of misconduct by the previous head of BGC's Equity Derivatives Desk, including sexual harassment, as costs to the desk when determining the amount of money in the desk's bonus pool. BGC also admits that Mr. Aubin was named as a defendant in this lawsuit and further answers that the lawsuit was settled without admission of liability. BGC denies the remainder of the allegations in Paragraph 46 for lack of sufficient information or knowledge to form a belief therein.

47.     BGC admits that Andriesz made written complaints to human resources officers including Ms. Carmichael and Ms. Rosado in January and February 2016 in which he demanded

that his bonus pool be calculated in a manner different from what had been agreed to in his contract. BGC otherwise denies the allegations contained in Paragraph 47.

48.    BGC denies the allegations contained in Paragraph 48.

49.    BGC denies the allegations contained in Paragraph 49.

50.    BGC admits that in early February 2016, Andriesz communicated to Ms. Rosado and Ms. Dreste a number of his purported grievances with Mr. Aubin's management of the business – none of which implicated any genuine legal or regulatory concerns – and that Andriesz baselessly claimed to coworkers at BGC, including Ms. Rosado and Mr. Sulfaro, that if BGC did not change the contractual formula for calculating his bonus pool so as to pay him significantly greater compensation, it would violate BGC's regulatory obligations to the NFA. BGC answers further that Andriesz did not ever identify what rule or regulation he believed BGC might be violating. BGC denies the remaining allegations of Paragraph 50.

51.    BGC admits that on or about February 5, 2016, Andriesz requested to Ms. Rosado and Ms. Dreste that HR investigate a number of his purported grievances with Mr. Aubin's management of the business – none of which implicated any genuine legal or regulatory concerns – and denies the remainder of Paragraph 51 for lack of sufficient information or knowledge to form a belief therein.

52.    BGC admits that on or about February 8, 2016, Andriesz communicated certain grievances with Mr. Aubin's management of the business – none of which implicated any genuine legal or regulatory concerns – to Mr. Skitt (BGC's head of human resources in the UK), and admits that on or about the same day, BGC placed Andriesz on paid administrative leave, in accordance with the terms of his employment agreement, due to a series of unprofessional actions, including disrespectful and aggressive communications to his manager, and unilaterally announcing to his subordinates, in violation of the terms of his contract, that he was resigning as head of the New

York Desk.  BGC otherwise denies the remaining allegations of Paragraph 52, including the allegations that Andriesz's suspension had any relation to his communication to Mr. Skitt or that BGC's human resources officers did not adequately investigate and address his complaints.

53.    BGC denies the allegations contained in Paragraph 53.

54.    BGC admits that Ms. Dreste testified that Andriesz was suspended for his unprofessional conduct, that it was not improper for Andriesz to raise complaints regarding the management of his desk with Mr. Loughlin and HR, that it was inappropriate for Andriesz to discuss these complaints with his subordinates, and that Andriesz was not asked "another question" in connection with the investigation following his suspension, and answers further that Ms. Dreste's testimony reflects that the interviews of Andriesz in connection with the investigation had occurred prior to his suspension.  BGC denies the remaining allegations of Paragraph 54.

55.    BGC admits the allegations of Paragraph 55, except that BGC denies that Andriesz's written warning for his unapproved payment arrangements with subordinates "threatened Andriesz with further discipline up to and including termination," as the warning limited that consequence to "[a]ny further breach of company policy."

56.    BGC admits that Andriesz provided HR with a copy of correspondence indicating that he had been directed to make a bonus payment to Ms. Haas in 2015, and denies the remaining allegations of Paragraph 56, including any implication that this payment was "similar" to the unauthorized payment arrangements for which he received a written warning.

57.    BGC admits that Andriesz asked for explanations for his suspension, that BGC provided information to Andriesz to explain the basis for his discipline, that Andriesz demanded that his file be cleared of any record of disciplinary action for his prior infractions, and that BGC withdrew Andriesz's February 23, 2016 written warning. BGC denies the remaining allegations contained in Paragraph 57.

58.    BGC denies the allegations contained in Paragraph 58.

59.    BGC admits that in 2016, Andriesz demanded that $1,823,844.14, which he claimed (without further documentation) was revenue from crossed trades by market makers and from pit rebates, be added to the New York Desk's bonus pool for 2015. BGC otherwise denies the allegations of Paragraph 59, including any implication that this revenue was "wrongfully withheld" from the New York Desk's bonus pool or that this revenue had been generated entirely by Andriesz's desks.

60.    BGC admits that on March 21, 2016, Andriesz emailed Mr. Aubin a list of demands regarding Andriesz's compensation and the management of the business, and denies the remaining allegations contained in Paragraph 60.

61.    BGC admits the allegations of Paragraph 61, except that BGC denies that the disciplinary actions BGC took against Andriesz were "retaliatory," that his demands constituted "whistleblowing," and that "he had not received any explanation, much less exemplars, of his alleged improper conduct."

62.    BGC admits the allegations of Paragraph 62, except that BGC denies that Andriesz "duly supplied" sufficient documentation to provide a good-faith basis for his "myriad of complaints" in May 2016.

63.    BGC admits that it became aware in or about May 2016 that Mr. O'Leary was sending derogatory emails to Andriesz and denies that Mr. Aubin "provid[ed] him cover and support."   BGC denies the remainder of Paragraph 63 for lack of sufficient information or knowledge to form a belief therein.

64.    BGC admits that Mr. Popok received a letter that Mr. Fleming purported to be a "whistleblower complaint" on behalf of Andriesz on or about May 9, 2016, and refers to that letter as the best evidence of the contents therein. BGC denies the remainder of Paragraph 64, including

any implication that the letter raised valid complaints of "improper accounting," "retaliation," "improper suspension and administrative leave," "improper supervision of traders," trading in violation of "regulatory rules and proper practice," that Andriesz's written warning of "baseless," or that BGC's calculation that the New York Desk had incurred "losses" was incorrect, as well as any implication that "Aubin had instructed Andriesz to come to him before ever speaking to compliance" and that Aubin "offer[ed] to withdraw" Andriesz's warnings "if Andriesz would retract all allegations of retaliation and harassment and sign an NDA."

65.     BGC admits that Ms. Dreste testified that she did not recall ever seeing Mr. Fleming's letter or investigating any of the complaints raised in the letter, and further answers that the investigation of the issues raised in the letter was performed by BGC's legal department, who interviewed Ms. Dreste's HR colleague, Ms. Rosado, as part of the investigation.  BGC further admits that Ms. Dreste testified that she was unaware that Andriesz had been given a whistleblower award by the CFTC, and further answers that Ms. Dreste could not have been aware of such fact during the time Andriesz worked at BGC, because the CFTC did not determine that Andriesz qualified as a whistleblower and merited an award until more than four years after his departure from BGC.  BGC denies that Andriesz's whistleblower award concerned "supervisory issues like the ones [A]ndriesz raised concerning Anthony," and denies the remainder of Paragraph 65 for lack of sufficient information or knowledge to form a belief therein.

66.     BGC denies the allegations contained in Paragraph 66.

67.     BGC denies the allegations contained in Paragraph 67.

68.     BGC denies the allegations contained in Paragraph 68.

69.     BGC denies that it did "nothing to address Andriesz's concerns" and that "Andriesz advised Dreste and Dyanne Rosado" that "he had escalated his unaddressed complaints to the

SEC," and denies the remainder of Paragraph 69 for lack of sufficient information or knowledge to form a belief therein.

70.     BGC denies the allegations contained in Paragraph 70.

71.     BGC admits that Dr. Orsher wrote a note indicating that Andriesz needed 2-3 weeks' medical leave, but BGC lacks sufficient information or knowledge to form a belief as to how Andriesz "understood" the note, and denies the remaining allegations of Paragraph 71.

72.     BGC admits that its HR department in the UK disabled Andriesz's access to the London office on the evening of November 8, 2016, and admits that it had asked Andriesz to submit a note from his doctor indicating that it was safe for Andriesz to work part time, and further answers that BGC had made this request to Andriesz several days before disabling his credentials, and that HR determined to turn off Andriesz's access to the office after he explicitly rejected multiple follow-up requests from HR to provide a new note from his doctor in order to be permitted to continue working.  BGC denies the remaining allegations contained in Paragraph 72.

73.     BGC admits that it re-activated Andriesz's access to the office on November 8, 2016 after Andriesz provided an updated doctor's note, and answers further that this occurred only several hours after BGC disabled Andriesz's access.  BGC denies the allegation that "[t]here had been no complaints" or "allegations of any unprofessional, inappropriate, or insubordinate behavior" by Andriesz between February 23, 2016 and November 8, 2016, and denies the remainder of Paragraph 73 for lack of sufficient information or knowledge to form a belief therein.

74.      BGC admits that Andriesz complained that being denied access to the office caused him "stress" after he rejected multiple requests over several days to provide an updated doctor's note, and admits that he continued to be responsive to Mr. Aubin during this period.  BGC denies the remaining allegations of Paragraph 74, including that Andriesz's conduct was "professional" or that his complaint was justified.

75.     BGC admits the allegations contained in Paragraph 75, except that BGC denies that Andriesz's hospitalizations were "[a]s a result" of "harassment from BGC," that Andriesz informed BGC of his hospitalization "as soon as he was physically able," and that his hospitalizations were due to "heart attack[s]," and answers further that although Andriesz feared he was having a heart attack when he was admitted to the hospital, it was later determined that he was likely suffering panic attacks instead.

76.     BGC denies that "Aubin repeatedly harassed Andriesz," "threaten[ed] his job," and "fallaciously accused of Andriesz of insubordination" during Andriesz's hospitalization, and denies the remainder of Paragraph 76 for lack of sufficient information or knowledge to form a belief therein.

77.     BGC admits that Andriesz was in the office part-time on November 18, 2016, and answers further that Andriesz's communications reflect that he also sent work-related emails on November 15, 16, and 17, 2016 and was transacting work on Bloomberg on November 16 and 17, 2016.  BGC lacks sufficient information or knowledge to form a belief as to Andriesz's allegation that he was "released from the hospital, but still medicated and shaky."  BGC denies the remaining allegations contained in Paragraph 77.

78.     BGC admits the allegations contained in Paragraph 78.

79.     BGC admits that Mr. Aubin sent Andriesz an email on November 21, 2016, and further answers that the correspondence communicated Mr. Aubin's concerns that Andriesz had not responded to any of Mr. Aubin's communications in the previous six days, despite having sent work-related communications to others at BGC on November 15 and 16, 2016 and having been in the office on November 18, 2016.  BGC denies the remaining allegations contained in Paragraph 79, including any implication that the email was "clearly abusive," or that Mr. Aubin "threatened

[Andriesz] with insubordination and discipline in large part due to his missing the Tandberg that had been scheduled for the prior Tuesday."

80.     BGC admits that the email from Mr. Aubin was drafted with the assistance of Ms. Dreste and Ms. Fertig, that BGC did not communicate with or attempt to communicate with Andriesz in connection with writing the email, and that Ms. Dreste did not tell Andriesz that she had assisted in drafting the email.  BGC further admits that Paragraph 80 purports to summarize the contents of an email from Mr. Aubin to Andriesz and refers to that email as the best evidence of the contents therein.  BGC denies the remaining allegations of this paragraph, including any implication that BGC, before sending the email, "clearly kn[ew]" that Andriesz was "in the hospital, highly medicated, and in cardiac distress" at the time of his scheduled Tandberg with Mr. Aubin on November 15, 2016 or "on morphine and in cardiac distress" at the time he received further messages from Mr. Aubin.

81.     BGC admits that Andriesz responded to Mr. Aubin's November 21, 2016 email within an hour of receiving it, that Andriesz claimed to not understand what additional information Mr. Aubin wanted and requested that Mr. Aubin clarify his prior request, and that Andriesz – while admitting that he was logged onto Bloomberg at the time Mr. Aubin attempted to connect with him – claimed to have missed Mr. Aubin's messages because he was under "very strong medication" and suffering from panic attacks and illness while at the hospital for a heart check. BGC denies the remaining allegations contained in Paragraph 81, including any implication that Mr. Aubin's email was "outrageous, harassing, and retaliatory," and further answers that in Andriesz's response, he did not explain why he had not responded to Mr. Aubin since returning to work, and he incorrectly asserted that he "already answered" Mr. Aubin's questions "in detail" and that he "missed"  Mr. Aubin's Bloomberg messages (despite his chatroom activity reflecting that he received the communications).

82.     BGC admits that on November 21, 2016, Andriesz made a complaint to Ms. Fertig regarding Mr. Aubin's email from earlier in the day and requested an investigation from HR, and that Andriesz later escalated his complaint to Mr. Pion.  BGC denies the remaining allegations contained in Paragraph 82, including any implication that Mr. Aubin "harass[ed]" Andriesz, that "HR had actually ghost written" Mr. Aubin's email, that BGC engaged in "a cover-up," and that Mr. Aubin and HR's conduct constituted "further intimidation" or "retaliation" for Andriesz's complaints.

83.     BGC admits the allegations in Paragraph 83, except that BGC denies that it engaged in "recent harassment and aggression" towards Andriesz.

84.     BGC admits the allegations contained in Paragraph 84.

85.     BGC admits that HR assisted Mr. Aubin with his November 22, 2016 response to Andriesz's email from the previous day and denies the remaining allegations in Paragraph 85.

86.     BGC admits that HR "serv[ed] as the intake for Andriesz's complaints," that HR assisted Mr. Aubin with his November 22, 2016 response to Andriesz's email from the previous day, and that Mr. Dreste testified that Mr. Aubin "didn't do anything inappropriate."  BGC denies the remaining allegations in Paragraph 86, including any implication that HR "accept[ed]" Andriesz's belief that "he should not have to speak" to Mr. Aubin, that HR engaged in "harassment," or that Mr. Aubin's response "threaten[ed] Andriesz with insubordination and discipline for maintaining the very approach [HR] appeared to condone."

87.     BGC denies the allegations contained in Paragraph 87.

88.     BGC admits that its main concern at this time was Andriesz's health and that it did not monitor whether Andriesz worked 40 hours per work, and further answers that it is not aware of anyone (including Andriesz) asserting that following Andriesz being placed on this schedule,

his work assignments were making it prohibitively difficult for Andriesz to work no more than 40 hours per work. BGC denies the remaining allegations of Paragraph 88.

89.    BGC denies the allegations contained in Paragraph 89.

90.    BGC admits that Ms. Dreste referred Andriesz's complaint to HR officer Daniel Aiken, who reported to Ms. Dreste, and admits that Andriesz communicated to Mr. Aiken, and further answers that Andriesz's communications were hostile, unprofessional, and unproductive, and had the effect of delaying the investigation due to Andriesz's refusal to sit for an interview with Mr. Aiken (who had been tasked with carrying out the investigation) due to his baseless claim that Mr. Aiken was incapable of conducting the investigation. BGC denies the remainder of the allegations in Paragraph 90, including any implication that HR had already "decided the outcome of the complaint" or that Mr. Aiken's appointment was merely "an attempt to mimic propriety."

91.    BGC admits the allegations of Paragraph 91, except that BGC denies that HR or Mr. Aubin created a "hostile work environment," and BGC further answers that there had been "no direct contact between Aubin and Andriesz for a week" because Andriesz was continuing to avoid Mr. Aubin's requests to videoconference with him, and that "Andriesz never received word back from either Aiken or Pion as to their findings" because, after communicating to Mr. Pion and HR that his job was putting his health in imminent danger, Andriesz was placed on leave within only a few days of communicating with Mr. Aiken and Mr. Pion.

92.    BGC admits that on December 1, 2016, Andriesz participated in a Tandberg videoconference with Mr. Aubin and an HR representative in response to a request from Mr. Aubin, and denies the remainder of the allegations in Paragraph 92.

93.    BGC admits that Andriesz asked for but did not receive a copy of "minutes" from the meeting, and that Andriesz forwarded to Mr. Pion an email he had sent to HR complaining about certain issues discussed in the meeting, and further answers that it is not aware of anyone

indicating to Andriesz that BGC would be recording meeting "minutes."  BGC denies the remainder of the allegations in Paragraph 93.

94.    BGC denies the allegations contained in Paragraph 94.

95.    BGC admits that in a letter from Ms. Dreste dated December 2, 2016, it informed Andriesz that BGC was placing him on leave pending the completion of medical exams by an internal medicine practitioner (who also has a specialization in infectious diseases) and a psychiatrist to help determine if he could perform the essential functions of his position, and further answers that another purpose of the exams was to determine what, if any, reasonable accommodations may be provided to Andriesz to allow him to perform the essential functions of his job.  BGC denies the remaining allegations contained in Paragraph 95, including that Andriesz had "compli[ed] with all of BGC's directives" or that BGC asked him to go to the "East End of Long Island" for any exams.

96.    BGC admits that in Ms. Dreste's letter, she accurately asserted that Andriesz had admitted that he could not perform the essential functions of his job and also admits that Andriesz sent an email to Mr. Pion claiming that this letter constituted "further retaliation."  BGC denies the remaining allegations in Paragraph 96.

97.    BGC denies the allegations contained in Paragraph 97.

98.    BGC admits that Andriesz stated to Ms. Dreste that he believed he did not have to respond to Mr. Aubin's requests to discuss the business because HR was currently investigating, at Andriesz's behest, whether Mr. Aubin's communications to Andriesz constituted harassment or retaliation, and that Ms. Dreste testified that she did not recall looking at Mr. Aubin's communications with Andriesz at the time Andriesz purported to have been hospitalized.  BGC denies the remaining allegations of Paragraph 98, including any implication that Mr. Aubin's communications constituted "harassment" or "retaliation," and that BGC had a "general policy"

of allowing a subordinate to ignore requests by his manager to discuss the business after the subordinate had accused the manager of harassment.

99.    BGC admits that Ms. Dreste's letter directed that Andriesz attend medical exams with Dr. Solomon, who was based two hours outside New York City, and Dr. Busillo, who (in addition to being a general practitioner) specialized in infectious diseases, that Ms. Dreste had not worked with either doctor before, and that Ms. Dreste subsequently used Dr. Solomon for a matter in which he concluded that the employee he examined was not fit to fulfill the essential functions of his job.  BGC lacks sufficient information or knowledge to form a belief as to Andriesz's accusation that Dr. Solomon was "a hired gun for school boards and districts" or that Dr. Busillo "was involved in a suit with a patient who had been misdiagnosed with aids," and on that basis denies those allegations.  BGC denies the remainder of the allegations in Paragraph 99.

100.    BGC lacks sufficient information or knowledge to form a belief as to whether "Andriesz medically could speak and interact with Aubin" and whether Drs. Solomon and Busillo "had no particular knowledge of the financial industry whatsoever," and on that basis denies those allegations.  BGC denies the remaining allegations in Paragraph 100.

101.    BGC admits that on December 7, 2016, Andriesz wrote to Ms. Dreste to dispute BGC's basis for placing him on leave and to request clarification of the statements in Ms. Dreste's letter, and denies the remaining allegations in Paragraph 101.

102.    BGC admits that on December 21, 2016, Andriesz told Ms. Dreste that he would be skipping the exam BGC had booked for him with Dr. Solomon that day, and further answers that this was the first time Andriesz had communicated this news to Ms. Dreste.  BGC further admits that Andriesz wrote to Ms. Dreste on January 3, 2017, and that Ms. Dreste did not respond to this email, and further answers that in this email, Andriesz falsely claimed that "BGC has provided no reasonable basis" for the medical exams, asserted that he would never attend the

exams, and reiterated a number of allegations of misconduct against BGC that he had previously raised, which BGC had already investigated and found meritless. BGC denies the remainder of the allegations in Paragraph 102, including any implication that it had not provided "any response to [Andriesz's] queries of December 7, 2016," or that Andriesz's January 3, 2017 email sought "a resolution" to the questions of whether he was capable of performing the essential functions of his job and whether he required a reasonable accommodation.

103.    BGC denies the allegations contained in Paragraph 103.

104.    Paragraph 104 asserts legal conclusions for which no response is required. To the extent a response is required, BGC denies the allegations of this paragraph.

105.    BGC admits that Paragraph 105 purports to summarize the contents of a written submission to the CFTC and refers to that document as the best evidence of the contents therein. The remainder of this paragraph is denied for lack of sufficient information or knowledge to form a belief therein.

106.    BGC admits that on or about November 22, 2021, Andriesz received a whistleblower award of over $400,000 from the CFTC for providing information relevant to an investigation that the CFTC, in its award determination, stated it had already opened due to communications from a different individual and which related to separate issues from those he had raised internally at BGC, and denies the remaining allegations of Paragraph 106.

107.    BGC admits that Mr. Velez testified that he never lied to his manager and denies the remaining allegations of Paragraph 107.

108.    BGC denies the allegations contained in Paragraph 108.

109.    Paragraph 109 contains legal conclusions for which no response is required. To the extent a response is required, BGC denies the allegations of this paragraph.

110.    BGC denies the allegation that "[t]he clear and unrefuted testimony also demonstrated an oral contract by and between Andriesz and BGC's co-President McLoughlin." The remainder of Paragraph 110 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies those allegations.

111.    BGC admits that Paragraph 111 purports to describe Andriesz's January 21, 2015 employment agreement with BGC, and denies any allegations inconsistent with the terms of the agreement.

112.    BGC admits that Paragraph 112 purports to describe Andriesz's January 21, 2015 employment agreement with BGC, and denies any allegations inconsistent with the terms of the agreement.

113.    BGC denies the allegation that Ms. Fong told Andriesz that "any contrary policy would be improper or illegal."  The remainder of Paragraph 113 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies those allegations.

114.    BGC denies that "BGC's practice and policy" did not "provide for any netting of the losses from one desk against the profits of another desk."  BGC admits that the remainder of Paragraph 114 purports to describe Andriesz's January 21, 2015 employment agreement with BGC, and denies any allegations inconsistent with the terms of the agreement.

115.    Paragraph 115 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies the allegations of this paragraph.

116.    BGC denies that "these types of revenue were always included by BGC in the 'Net Revenue' figure before Marinos became business manager and after 2015."  BGC admits that the remainder of Paragraph 116 purports to describe Andriesz's May 28, 2012 employment agreement with BGC Brokers and his January 21, 2015 employment agreement with BGC, and denies any allegations inconsistent with the terms of those agreements.

117.    BGC denies the allegations contained in Paragraph 117.

118.    BGC admits that Paragraph 118 purports to describe Andriesz's January 21, 2015 employment agreement with BGC, and denies any allegations inconsistent with the terms of the agreement.

119.    BGC denies the allegations contained in Paragraph 119.

120.    BGC denies the allegations contained in Paragraph 120.

121.    Paragraph 121 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies the allegations of this paragraph.

122.    Paragraph 122 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies the allegations of this paragraph.

123.    Paragraph 123 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies the allegations of this paragraph.

124.    BGC admits that it was "undisputed that for 2016 Andriesz earned $734,756 from BGC."  The remainder of Paragraph 124 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies those allegations.

125.    Paragraph 125 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies the allegations of this paragraph.

126.    Paragraph 126 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies the allegations of this paragraph.

127.    Paragraph 127 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies the allegations of this paragraph.

128.    BGC admits that during the arbitration, it provided an exhibit setting forth the requirements for asserting a colorable Dodd-Frank claim and refers to that document as the best

evidence of the contents therein.  The remainder of Paragraph 128 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies those allegations.

129.    BGC denies the allegations contained in Paragraph 129.

130.    BGC denies the allegations contained in Paragraph 130.

131.    BGC denies the allegations contained in Paragraph 131.

132.    BGC denies the allegations contained in Paragraph 132.

133.    BGC denies the allegations contained in Paragraph 133.

134.    Paragraph 134 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies the allegations of this paragraph.

135.    BGC denies the allegations contained in Paragraph 135.

136.    Paragraph 136 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies the allegations of this paragraph.

137.    Paragraph 137 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies the allegations of this paragraph.

138.    Paragraph 138 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies the allegations of this paragraph.

139.    Paragraph 139 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies the allegations of this paragraph.

140.    Paragraph 140 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies the allegations of this paragraph.

141.    Paragraph 141 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies the allegations of this paragraph.

142.    Paragraph 142 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies the allegations of this paragraph.

143.    Paragraph 143 contains legal conclusions for which no response is required.  To the extent a response is required, BGC denies the allegations of this paragraph.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

### (Statute of Limitations Under Federal Arbitration Act)

144.    The Petition is barred, in whole or part, because Petitioner failed to serve notice on BGC of his Petition and motion to vacate or modify the arbitration award within three months after the award was filed or delivered, as required by 9 U.S.C. § 12.

### SECOND AFFIRMATIVE DEFENSE

### (Statute of Limitations Under New York Civil Practice Law and Procedure)

145.    The Petition is barred, in whole or part, because Petitioner failed to file his Petition and motion to vacate or modify the arbitration award within 90 days after its delivery to him, as required by N.Y. C.P.L.R. § 7511.

### THIRD AFFIRMATIVE DEFENSE

### (Fed. R. Civ. P. 12(b)(5))

146.    The Petition is barred, in whole or part, due to insufficient service of process.

### FOURTH AFFIRMATIVE DEFENSE

### (Fed. R. Civ. P. 12(b)(6))

147.    The Petition is barred, in whole or part, due to failure to state a claim upon which relief can be granted.

## PRAYER

WHEREFORE, Respondent BGC Financial, L.P. respectfully requests judgment to be made and entered against Petitioner and in favor of Respondent as follows:

a.  Denying the Petition and corresponding Motion to Vacate in its entirety; and

    b.  Granting such other and further relief that the Court deems just and proper.

Dated:  December 6, 2024
            New York, New
            York

                                          */s/ Nirav S. Shah*

                                    Nirav S. Shah, Assistant General Counsel
                                    (NS1229)
                                    CANTOR FITZGERALD SECURITIES
                                    110 E. 59th Street, 7th Floor
                                    New York, New York 10022
                                    (212) 294-7873 (NSS)
                                    nirav.shah@cantor.com

                                    *Attorney for Respondent BGC Financial, L.P.*