**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SIMON D. ANDRIESZ, | Case No. 1:24-cv-07004-LJL |
| Petitioner, | **Hon. Lewis J. Liman** |
| For an Order Pursuant to 9 U.S.C.A. § 1 *et seq.* and CPLR § 7551 Vacating or Amending an Arbitration Award | |
| -against- | |
| BGC FINANCIAL, L.P., | |
| Respondent. | |

### RESPONDENT'S MEMORANDUM OF LAW IN OPPOSITION TO PETITION AND MOTION TO VACATE OR MODIFY ARBITRATION AWARD

Nirav S. Shah, Assistant General Counsel (NS1229)
CANTOR FITZGERALD SECURITIES
110 E. 59th Street, 7th Floor
New York, New York 10022
(212) 294-7873 (NSS)
nirav.shah@cantor.com

*Attorney for Respondent BGC Financial, L.P.,*

December 6, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iv

PRELIMINARY STATEMENT ............................................................................................... 1

FACTUAL BACKGROUND ...................................................................................................... 2

I.    Andriesz's Tenure with BGC ......................................................................................... 2

II.   The Previous Arbitration Between the Parties ................................................................ 4

III.  The Final Arbitration Between the Parties ...................................................................... 4

IV.  The Evidence and Argumentation Presented to the Panel .............................................. 5

     A.   Andriesz's Credibility Was Fully Undermined .................................................. 6

     B.   BGC Did Not Owe Andriesz More Money Than He Received ................................ 7

     C.   BGC Had Cause to Terminate Andriesz's Employment ........................................ 10

     D.   Andriesz's Dodd-Frank Claim Was Meritless ...................................................... 12

     E.   Andriesz Was Not Entitled to Damages ............................................................... 14

V.   The Award ................................................................................................................... 17

CHOICE OF LAW ................................................................................................................... 18

STANDARD OF REVIEW ....................................................................................................... 19

I.    Vacatur of Arbitration Awards Under Section 10 of the FAA ....................................... 19

II.   Modification of Arbitration Awards Under Section 11 of the FAA ................................ 21

ARGUMENT ........................................................................................................................... 22

I.    The Petition Should Be Rejected as Untimely .............................................................. 22

II.   The Panel Did Not Manifestly Disregard the Law Because There Was Colorable Justification for Its Decisions on Both Andriesz's Dodd-Frank and Breach of Contract Claims .......................................................................................................... 23

     A.   BGC Presented the Panel with Colorable Grounds for its Ruling on Andriesz's Claim for Breach of Contract ............................................................................... 24

B.    BGC Presented the Panel with Colorable Grounds for Its Denial of Andriesz's Dodd-Frank Claim (as Andriesz Has Separately Admitted) ................................... 26

III.    The Petition Does Not Assert a Valid Basis to Modify the Award ................................. 27

IV.    There Is No Basis to Vacate or Remand the Matter Due to the Amount of Damages Awarded ........................................................................................................................ 28

CONCLUSION ........................................................................................................................ 31

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allied-Bruce Terminix Companies v. Dobson*,
   513 U.S. 265 (1995)......................................................................................................18

*Alston v. Microsoft Corp.*,
   851 F. Supp. 2d 725 (S.D.N.Y. 2012)..........................................................................12

*Banc Of Am. Sec. v. Knight*,
   787 N.Y.S.2d 676 (Sup. Ct. 2004)................................................................................24

*Barbier v. Shearson Lehman Hutton, Inc.*,
   948 F.2d 117 (2d Cir. 1991)..........................................................................................28

*Companhia de Navegacao Maritima Netumar v. Armada Parcel Serv., Ltd.*,
   No. 96 Civ. 6441, 2000 WL 60200 (S.D.N.Y. Jan. 25, 2000)..........................21, 22

*D.H. Blair & Co. v. Gottdiener*,
   462 F.3d 95 (2d Cir. 2006)............................................................................................28

*Diamond Waterproofing Sys., Inc. v. 55 Liberty Owners Corp.*,
   793 N.Y.S.2d 831 (2005)..............................................................................................18

*Elwell v. Raymond James Fin. Servs., Inc.*,
   686 F. Supp. 3d 281 (S.D.N.Y. 2023).....................................................................29, 30

*Fairchild Corp. v. Alcoa, Inc.*,
   510 F. Supp. 2d 280 (S.D.N.Y. 2007)...........................................................................21

*Fellus v. Sterne, Agee & Leach, Inc.*,
   783 F. Supp. 2d 612 (S.D.N.Y. 2011).................................................21, 22, 27, 28

*Halligan v. Piper Jaffray, Inc.*,
   148 F.3d 197 (2d Cir. 1998).........................................................................................21

*Hamilton v. Navient Solutions, LLC*,
   No. 18-cv-5432 (PAC), 2019 WL 633066 (S.D.N.Y. Feb. 14, 2019) ..............................22, 23

*Lava Trading, Inc. v. Hartford Fire Ins. Co.*,
   No. 03 Civ. 7037, 2005 WL 4684238 (S.D.N.Y. Apr. 11, 2005)............................16

*LGC Holdings, Inc. v. Julius Klein Diamonds, LLC*,
   238 F. Supp. 3d 452 (S.D.N.Y. 2017)....................................................................18, 24

*LLT Int'l, Inc. v. MCI Telecommunications Corp.*,
   69 F. Supp.2d 510 (S.D.N.Y. 1999) ..........................................................................21, 27, 28

*Motor Vehicle Acc. Indemnification Corp. v. Aetna Cas. & Sur. Co.*,
   89 N.Y.2d 214 (1996) ...................................................................................................24

*Ne. Sec., Inv. v. Quest Cap. Strategies, Inc.*,
   No. 03 CIV.2056 RWS, 2003 WL 22535093 (S.D.N.Y. Nov. 7, 2003) ..............................23

*Peckerman v. D & D Assocs.*,
   165 A.D.2d 289 (1st Dep't 1991) .................................................................................23

*Penrod Mgmt. Grp. v. Stewart's Mobile Concepts, Ltd.*,
   No. 07 CIV. 10649 (JGK), 2008 WL 463720 (S.D.N.Y. Feb. 19, 2008) ........................18, 19

*Rabinowitz v. Kelman*,
   No. 21-CV-03167 (NSR), 2024 WL 1700037 (S.D.N.Y. Apr. 19, 2024) .............................18

*Schwartz v. Merrill Lynch & Co.*,
   665 F.3d 444 (2d Cir. 2011) .........................................................................................19

*Seneca Nation of Indians v. New York*,
   988 F.3d 618 (2d Cir. 2021) .........................................................................................19

*Siegel v. Titan Indus. Corp.*,
   779 F.2d 891 (2d Cir. 1985) .........................................................................................20

*Singh v. Raymond James Fin. Servs., Inc.*,
   No. 13-cv-1323, 2014 WL 11370123 (S.D.N.Y. Mar. 28, 2014) ......................................29

*Smarter Tools Inc. v. Chongqing SENCI Imp. & Exp. Trade Co.*,
   57 F.4th 372 (2d Cir. 2023) .........................................................................................25

*Smith v. Jenkins*,
   732 F.3d 51 (1st Cir. 2013) .........................................................................................17

*Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
   559 U.S. 662 (2010) ...................................................................................................20

*Success Sys., Inc. v. Maddy Petroleum Equip., Inc.*,
   316 F.Supp.2d 93 (D. Conn. 2004) ...............................................................................21

*T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*,
   592 F.3d 329 (2d Cir. 2010) .....................................................................................20, 24

*Tarulli v. Ameriprise Fin. Servs., Inc.*,
   No. 19CV2039LJLOTW, 2020 WL 9219110 (S.D.N.Y. Apr. 14, 2020) ........................22, 23

*Wallace v. Buttar*,
  378 F.3d 182 (2d Cir. 2004) .............................................................................20, 21

*Westerbeke Corp. v. Daihatsu Motor Co.*,
  304 F.3d 200 (2d Cir. 2002) .............................................................................19, 20

*Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*,
  103 F.3d 9 (2d Cir. 1997) ..................................................................................20, 28

**Statutes**

9 U.S.C. §§ 1-16 (Federal Arbitration Act) ........................................................ *passim*

15 U.S.C. § 78u-6 (Dodd-Frank Act) ...................................................................12

18 U.S.C. § 1962 (RICO) .......................................................................................4

42 U.S.C. § 12112(d)(4) (Americans with Disabilities Act) ...............................12

**Other Authorities**

CPLR § 7511.............................................................................................................23

FINRA Rule 13514(d) ..............................................................................................28

FINRA Rule 13601(c)................................................................................................4

Respondent BGC Financial, L.P. ("BGC," or "Respondent"), by and though its undersigned counsel of record, hereby submits this memorandum of law, together with the accompanying Declaration of Nirav Shah ("Shah Decl.") and attached exhibits, in opposition to Petitioner Simon D. Andriesz's ("Petitioner," or "Andriesz," and together with BGC, the "Parties") Petition (the "Petition," *see* ECF No. 9) and corresponding motion (the "Motion," *see* ECF No. 4) to vacate or modify the June 17, 2024 FINRA arbitration award (the "Award") that resolved a recent arbitration between the Parties before a three-arbitrator panel (the "Panel") of FINRA Dispute Resolution Services.

## **PRELIMINARY STATEMENT**

After twelve days of hearings at which ten witnesses testified and hundreds of exhibits were submitted, the FINRA Panel adjudicating this dispute determined that Petitioner Simon Andriesz's demand for over $38 million in damages was unsupported by the facts or the law. Petitioner offers no basis to question that determination, which is entitled to this Court's deference under the exacting standard established by the Federal Arbitration Act.

The Court should deny the Motion and dismiss the Petition, for at least two reasons. First, under binding precedent, the Petition is untimely, having been served more than 90 days after FINRA issued its award. Second, the Panel had a firm basis in both fact and law to reject Petitioner's Dodd-Frank and breach of contract claims, easily exceeding the "barely colorable justification" required to show that the Panel did not manifestly disregard the law. The evidence at hearing supported a finding that BGC did not breach its contractual obligations to Petitioner and never retaliated against him. To the extent Petitioner argues otherwise, he is asking this Court to overrule factual and credibility determinations that are the exclusive province of the Panel. Furthermore, Petitioner's principal complaint that he cannot ascertain why the Panel chose the amount of damages it ultimately awarded him is not basis to vacate the award. This is

particularly so given that any such uncertainty is the product of strategic choices he and his counsel made.  Petitioner admits (*see* ECF No. 20) that he never properly requested an explained decision that would have clarified the basis for the award amount.  It was the choice of the Petitioner to burden the Panel with nineteen grandiose and ill-supported causes of action against eight separate parties, many of whom had little if anything to do with the conduct at issue.  And it was Petitioner who chose to shoot for the moon with a fantastical damages number that left to the arbitrators the task of sifting through the evidence if they wanted to award a lesser amount.

The evidentiary record at hearing provided ample support for the Panel's refusal to grant Petitioner a windfall in this case.  BGC's personnel did their best to handle Petitioner's extraordinarily challenging tenure at the Company, and the many years of harassment that followed it.  They respectfully request that the Court grant the parties some measure of finality by denying the Motion and dismissing the Petition.

## FACTUAL BACKGROUND

I.    **Andriesz's Tenure with BGC**

Respondent BGC Financial, L.P. is a FINRA-member brokerage firm that is part of a global family of affiliated companies under the banner of the publicly traded BGC Group, Inc. (formerly BGC Partners, Inc.)

Andriesz arrived at non-party BGC Brokers, L.P. ("BGC Brokers") – Respondent's UK-based affiliate – to head its London futures desk in 2012.  (Shah Decl.[1] Ex. 14.)  He had previously worked for MF Global, after which he joined Nomura.  (Shah Decl. Ex. 2, 133:12-136:18.)  Although Andriesz earned over $2 million per year in his last four years at MF Global, he had not come close to replicating this success since; he made just under $720,000 in 2011 and just under

---

[1]  All references to the "Shah Decl." are to the Declaration of Nirav S. Shah in Support of Respondent's Opposition to the Petition and Motion, filed in connection with this memorandum.

$550,000 in 2012.  (ECF No. 8-58 at Andriesz004328.)  In his first two years as head of BGC's London desk, Andriesz's income dipped further; according to him, he earned £330,112 from April 2012-April 2013 (*id.*) and only £155,485 from April 2013-April 2014.  (Shah Decl. Ex. 34 at Andriesz003496.)  In late 2014, BGC began discussing with Andriesz the opportunity to lead both the New York and London desks after the departure of the prior New York desk head.  (Shah Decl. Ex. 9, 163:18-164:24.)  On or around January 21, 2015, he signed a four-year contract with BGC Financial that formalized his promotion.  (ECF No. 7-19 at Andriesz003326.).

Andriesz's tenure in his new position was tumultuous.  On several occasions, he threatened to resign from the firm, or even announced that he was doing so, before reneging.  (*See* Shah Decl. Exs. 15, 16, 19.)  He bullied BGC's human resources staff and repeatedly made veiled threats against his manager.  (*See* Shah Decl. Exs. 21, 22; ECF Nos. 7-26, 8-40, 8-42.)  In November 2016, Andriesz refused outright to interact with his direct supervisor and complained that interacting with his manager about ordinary business matters such as desk staffing would "caus[e] further panic attacks and anxiety" as well as "chest pains and shortness of breath."  (*See* ECF No. 8-43 at BGC00007018-19.)  Invoking an unidentified "disability," he asked "to be allowed to change [his] reporting lines away from Aubin."  (Shah Decl. Ex. 28.)  BGC took Andriesz's health complaints seriously.  In early December, in part due to his concerning emails about the effect of his job on his health, BGC placed Andriesz on paid administrative leave and scheduled appointments with two physicians for medical exams so that the company could determine what reasonable accommodations (if any) could be made that would allow Andriesz to safely fulfill the essential functions of his job (including, for example, reporting to his manager).  (*See* ECF No. 8-7.)  After Andriesz repeatedly blew off these exams and asserted to BGC that he would never attend them, BGC terminated his employment.  (*See* ECF No. 8-8.)

3

## II.    The Previous Arbitration Between the Parties

On June 19, 2019, Andriesz filed a Statement of Claim with FINRA Dispute Resolution against BGC, Cantor Fitzgerald & Co. ("CF&Co.") (an investment banking affiliate of BGC that Andriesz did not even attempt to show he ever worked for or contracted with) (*see* Shah Decl. Ex. 10 (hereinafter, "Post-Hearing Br.") at 34-35), ten executives at BGC or its affiliates (including several he had never met), and an unaffiliated market maker named Ronin Capital, along with its CEO. (*See* Shah Decl. Ex. 1, at 1-2.) On June 22, 2020, Andriesz amended his Statement of Claim to remove Ronin and its CEO as Respondents as well as four of BGC's executives, leaving BGC, CF&Co., and Jean-Pierre Aubin, Michael Sulfaro, Paul Pion, William Shields, Shawn McLoughlin, and Mark Webster (who were all employees of BGC or its affiliates) as the Respondents.  (*Id.* at 2-3.)

On July 27, 2022 – after the parties had already agreed to three postponements of the final hearing in this matter, Andriesz made a request to postpone the hearing a fourth time.  (*Id.* at 4.) On August 8, 2022, the Arbitration Panel dismissed the case without prejudice under FINRA Rule 13601(c) (*see id.*), which provides that "the panel may dismiss the arbitration without prejudice" if "all parties jointly request, or agree to, more than two postponements."  FINRA, Code of Arbitration Procedure for Industry Disputes, Rule 13601(c) (2024).

## III.    The Final Arbitration Between the Parties

Andriesz filed a Renewed Statement of Claim on or about November 8, 2022, against the same respondents as in his June 22, 2020 Amended Statement of Claim from the prior arbitration. (ECF No. 7-1 at 1.)  He asserted nineteen different causes of action in total, several of which (*e.g.*, "failure to supervise," "conflicts of interest in violation of FINRA rules") are not recognized civil causes of action, and others (*e.g.*, RICO, prima facie tort, conversion, civil conspiracy) that were, to put it charitably, stretches.  (*Id.* at 2.)  After limited additional discovery, the arbitration hearings

4

commenced in January 2024.  (*Id.* at 5).  The Parties were afforded ample time and opportunity to propound evidence in support of their case before the Panel and to then present an application of the relevant law to the evidence in post-hearing submissions to the Panel.  There were twelve total days of hearings, with evidentiary hearings (during which ten witnesses testified) on January 9-12, January 16-18, January 24-25, and February 8-9 of 2024, as well as closing arguments on May 15, 2024.  (*Id.*; Shah Decl. ¶ 6.)

Andriesz made several modifications to his claims during the hearings, in tacit recognition that many of these claims lacked any legal or evidentiary basis.  On January 19, 2024, he voluntarily dismissed all claims against Mr. McLoughlin.  (ECF No. 7-1 at 3.)  That same day, he withdrew his claims for accounting, failure to supervise, conflicts of interest, and prima facie tort. (*Id.* at 4.)  On January 30, 2024, he voluntarily dismissed all claims against Mr. Sulfaro after Mr. Sulfaro provided credible testimony that refuted any basis for liability against him.  (*Id.*)

Between the close of the record and closing arguments, the Parties submitted post-hearing briefing on April 12, 2024, as well as supplemental written submissions at the request of the Panel on May 10, 2024.  (Shah Decl. ¶ 15.)

**IV.    The Evidence and Argumentation Presented to the Panel**

The evidence adduced at the hearings, combined with BGC's marshaling of that evidence to refute Andriesz's claims in post-hearing briefing and closing arguments, gave the Panel ample justification for rejecting Andriesz's theories of liability and damages.  Below, BGC highlights the key evidence and argumentation supporting its case, and the Panel's ultimate rejection of most of the damages sought by Andriesz.

**A. Andriesz's Credibility Was Fully Undermined**

Because virtually all of the evidence Andriesz offered to support his allegations was through live testimony unsupported by documentation, the principal question for the Panel as the trier of fact was whether, and to what degree, to believe Andriesz's testimony.

The Panel had good reason to doubt Andriesz's veracity and to view him as willing to lie in order to exact revenge on others. For example, BGC introduced into evidence an audio recording (along with an accompanying transcription) of Andriesz stating that Andriesz was willing to "defam[e]" Respondent Aubin "deliberately to try and destroy [his] life." (Shah Decl. Ex. 12, 17:14-18:13.) Similarly, record evidence showed that in another proceeding (Andriesz' divorce), Andriesz committed to "spend every penny I have destroying" his wife's lawyers. (Shah Decl. Ex. 18.)

Similarly damning, a BGC employee and friend of Andriesz's who had previously sent communications to regulators corroborating Andriesz's baseless claims of fraud, money laundering, and racketeering testified under oath that his prior conduct had been motivated by the fact that he was destitute at the time and that Andriesz had offered to pay him (a fact witness) out of any amounts Andriesz recovered from BGC. (Shah Decl. Ex. 6, 2266:7-16.) The witness added that his submissions to regulators were the product of Andriesz "pressur[ing] [him] to do so" and telling him "everything to write" in those communications. (*Id.* at 2233:14-2235:22.) The witness testified that Andriesz's pressure campaign was so overt that Andriesz spent "hundreds of hours" talking to him and asking him to back up his "wild" and "farfetched" conspiracy theories of which the witness had no personal knowledge. (*Id.* at 2256:3-2258:19.)

Andriesz's willingness to distort reality was on full display in his testimony, during which much of the testimony intended to engender sympathy was exposed as fabricated. For example, after Andriesz alleged in his Statement of Claim (and originally in his testimony) that he suffered

a heart attack from the stress of receiving harshly worded criticism from Mr. Webster after he botched an effort to recruit a broker (Shah Decl. Ex. 3, 1321:21-1322:13), Andriesz admitted that (i) at the time, he blamed his wife's divorce lawyers, not BGC, for his heart attack (*see* Shah Decl. Ex. 17) and (ii) it would have been impossible for Mr. Webster's communication to cause his heart attack, given that it was sent two months after Andriesz's heart attack (Shah Decl. Ex. 3, 1322:14-19, 1324:15-19).  Likewise, Andriesz testified that the reason BGC placed him on administrative leave in February 2016 was so that he would be absent during a National Futures Association ("NFA") audit, darkly implying that BGC was trying to hide information from its regulator.  (Shah Decl. Ex. 4, 43:4-47:9.)  But Andriesz's own emails, and the testimony of BGC's chief compliance officer, refuted this falsehood: not only did the NFA exam begin *after* Andriesz returned from leave, but Andriesz was directly asked to participate in the audit and farmed the task out to a subordinate.  (Shah Decl. Ex. 7, 264:11-266:10, Ex. 35.)

### B. BGC Did Not Owe Andriesz More Money Than He Received

One of Andriesz's principal claims in the arbitration was that he was underpaid under the complex calculation of his bonus set forth in his Employment Agreement.  (*See* Petition, ¶¶ 110-117.)  Despite hiring a damages expert for other purposes, Andriesz's counsel made the strategic decision not to quantify in any way the amounts allegedly owed under that formula, leaving to the Panel the task of sifting through the voluminous data in the hearing record if they were to agree with their position.  BGC's position relied on its contemporaneous internal accountings (many of which were shared with Andriesz at the time), all of which showed that Andriesz was paid more than his contract required.

The evidence contradicted Andriesz's primary claim that certain revenues earned by BGC's Chicago Desk should have been allocated to his bonus pool.  Andriesz' Employment

Agreement specifically stated that bonus calculations would be made pursuant to BGC policy and practices.

Jonathan McLachlan, the BGC executive who had worked with Andriesz from the outset of his role as dual head of the New York and London futures desks, testified at length to refute Andriesz's claims.  First, as Mr. McLachlan testified, BGC's "'well established' and 'well known' policy" was that "individual desk bonus pools would not be credited with certain revenues generated by trading activity," including "volume rebates provided by the Chicago Mercantile Exchange," "rebates paid directly by brokers in the CME pit, . . . and the revenues from the leg of a trade on the exchange floor involving market-makers, which were booked to the Chicago Desk" (hereinafter, the "Chicago Revenues"), as Andriesz began demanding in 2016 and later sought in the arbitration.  (Shah Decl. Ex. 9, 70:4-72:2, 72:17-73:25.)  Mr. McLachlan also confirmed that not only was Andriesz aware of this policy, but he *ratified* it: Before finalizing bonuses each quarter, BGC would show Andriesz its preliminary calculations of his pool, including which revenues were included and excluded, and he (including by Andriesz's own admission) never raised any concerns about BGC's exclusion of the Chicago Revenues.  (*Id.* at 67:18-68:25, 69:2-70:12, 82:7-84:12; Shah Decl. Ex. 20.)  The soundness of this policy was reinforced by the plain text of Andriesz's employment agreement, which expressly excluded from this bonus pool any revenue attributable to the "Chicago Futures Execution Desk."  (ECF No. 7-19, § 3(b).)

Second, contrary to Andriesz's claim that BGC improperly communicated an intent to "net" the revenues of the more profitable London desk against the revenues of the less profitable New York desk, Mr. McLachlan testified that BGC had "explained" to Andriesz that his contractual bonus pool entailed a combined pool for the New York and London desks, but that because of the time that Andriesz would require, as desk head, to help the struggling New York desk achieve profitability, BGC, at its discretion, would abstain from applying the offset during a

"grace period." (Shah Decl. Ex. 9, 60:14-61:16; 65:5-66:9.)  The issue of "netting" was not relevant to damages, as the record made clear that an offset between New York losses and London gains never happened while Andriesz worked at BGC – quarter after quarter, BGC generously extended the grace period.

At hearing, perhaps sensing that his pleaded claims were failing, Andriesz invented a new claim, arguing that, irrespective of the terms of his written agreement, a BGC executive had promised him $1.8 million in a conversation, and that this undocumented conversation constituted an oral contract.  BGC's counsel noted in its closing argument that Andriesz had not pleaded this claim, or otherwise raised it, until his post-hearing brief, and even then, cited no support for it other than his own, self-serving, uncredible testimony. (See Shah Decl. Ex. 12, 7:5-10; 76:23-77:4.) BGC's also noted the substantial evidence contradicting this claim.  (*Id.* at 77:19-78:5.)  BGC also argued that because Andriesz's "employment agreement says it can't be orally modified" (*see* ECF No. 7-19, § 10(a)), there could be no claim for compensation under an "oral contract." (*Id.* at 77:23-78:2.) At closing argument, Petitioner's counsel even acknowledged this argument and pointed only to Andriesz's testimony in response. (*Id.* at 122:23-25.) The Panel communicated its skepticism of the newly manufactured oral contract claim, noting that they had "issues with oral agreements that are not at least contemporaneously reflected in some writing," especially since Andriesz's employment agreement required any modifications to be in writing. (*Id.* at 208:7-212:19.)

As to the final basis for his claim of underpaid bonuses – the fourth quarter of 2016 bonus – BGC conceded that Andriesz was not paid a production bonus for the fourth quarter of 2016, because BGC noted in its defense that the contract provided that "[i]t is a condition precedent to receiving and earning payment" of the bonus "that [Andriesz] remains employed by BGC . . . at the time payment is made," and bonuses were not required to be remitted until "45 days after" the

quarter end, and that this condition was not met.  (ECF 7-19 at Andriesz003327-28; Shah Decl. Ex. 12, 78:19-79:3.)   BGC also argued that Andriesz failed to provide *any* hypothetical pool calculations for the New York and London desks from this quarter that would have demonstrated why he was due to earn the $250,000 quarterly bonus he alleged he would have received.  (Shah Decl. Ex. 12, 200:8-201:22.)  As BGC's counsel asserted, Andriesz and his counsel picked this number "from the ether," as in post-hearing briefing, they cited nothing to corroborate this figure other than an unsupported assertion in the Statement of Claim – which is not evidence.  (*Id.* at 79:10-17; 200:8.)

### C.  BGC Had Cause to Terminate Andriesz's Employment

Given that Andriesz' four-year contract with BGC was not terminable at will, much of the hearing focused on whether BGC had Cause under the contract to terminate Andriesz's employment.  Ample evidence demonstrated that Cause existed.

The events that led to Andriesz's termination began when Andriesz refused his physicians' and BGC's instructions and was hospitalized twice in the fall of 2016.  After the first incident, Andriesz submitted a doctor's note to BGC recommending that he be placed on medical leave for several weeks.  (ECF No. 8-32.)  BGC obliged to protect Andriesz's health and follow the advice of his physician.  (Shah Decl. Ex. 25, at BGC00011084.)  But Andriesz then berated BGC's HR officers, bizarrely accused the Company of making his health *worse* by placing him on leave, and obtained a new note from his doctor stating that he could safely work part-time, after which BGC reactivated his building pass and allowed him to report to work again.  (*Id.* at BGC00011083-84; ECF No. 8-33; Shah Decl. Ex. 26.)  A few days later, in mid-November 2016, after unilaterally choosing to work hours far in excess of BGC's instructions that he work part-time, he was again hospitalized with ████████████.  (Shah Decl. Ex. 27.)  These events created serious doubt as to whether Andriesz could safely perform his job without injury to his mental and physical health.

Andriesz heightened those concerns when he told others at the company, at the end of November, that he was "seriously ill." (ECF No. 8-43 at BGC00007018.) He added that he feared that timely responding to his manager's requests to videoconference might jeopardize his health. (*Id.*; Shah Decl. Ex. 28, at BGC00007004.) He then asserted that due to his "disability," he needed to change his reporting lines. (*See* Shah Decl. Ex. 28, at BGC00007003.)

On December 2, 2016, BGC placed Andriesz on administrative leave pending the outcome of medical and psychological exams to be attended by Andriesz to determine if any reasonable accommodations could be made that would allow him to perform his job's essential functions. (ECF No. 8-7.) But Andriesz refused to cooperate with BGC in any fashion whatsoever. He failed to attend both his medical exams and – in language that implied that he was in the midst of a paranoid break with reality – stated that BGC's need for these exams were "clearly fabricated" and were an "attempt to deflect from and cover up" the purported "accounting irregularities" he raised with management and HR in early 2016 in an attempt to extract more bonus compensation (a complaint that BGC had extensively investigated and found to be unsupported several months' prior). (*Id.*) BGC's need for some medical advice as to how to handle Andriesz was abundantly clear in the record: at no point in this process did Andriesz ever provide an explanation of what condition he had that meant he could not timely respond to Mr. Aubin, nor did he ever propose an alternative work arrangement that Andriesz believed would protect his health while also maintaining communication with his manager. (Post-Hearing Br. at 42.) In January 2017, Andriesz stated that he would be taking a month-long, unapproved trip to Sri Lanka, making clear that he had no intention to cooperate in the interactive process. (ECF No. 8-54.) On January 31, 2017, BGC terminated Andriesz's employment (ECF No. 8-8; ECF No. 7-19, § 4(a)).

It is important to note that Andriesz never asserted a claim that BGC discriminated against him for a disability or failed to accommodate him (likely because the record so clearly showed that

he had thwarted BGC's numerous efforts to accommodate him). Instead, he claimed that BGC's attempts to accommodate him were retaliatory and pretextual. (*See* Shah Decl. Ex. 11, at 16.) In response, BGC (with extensive citations to case law) explained that its requests that Andriesz see neutral physicians were undertaken out of concern for Andriesz's health and consistent with the Americans with Disabilities Act ("ADA") and its enacting regulations. (*See id.* at 16-26; (citing 42 U.S.C. § 12112(d)(4)).) BGC further cited authority from this Court to argue that its termination of Andriesz's employment was justified after Andriesz refused to cooperate with its efforts. (*Id.* at 23-26 (discussing *Alston v. Microsoft Corp.*, 851 F. Supp. 2d 725, 734 (S.D.N.Y. 2012), *aff'd*, 519 F. App'x 23 (2d Cir. 2013)).)

## D. Andriesz's Dodd-Frank Claim Was Meritless

The evidence at the hearing also provided the Panel with a host of reasons for rejecting Andriesz's whistleblower retaliation claim under the Dodd-Frank Act.

*First*, the evidence supported the conclusion that Andriesz's claim should be denied because he did not qualify as a Dodd-Frank whistleblower at the time he was terminated. As BGC noted to the Panel, Andriesz failed to produce or introduce into evidence any signed and dated TCR submission (as required to qualify as a Dodd-Frank whistleblower) to the SEC from any time before his employment was terminated on January 31, 2017. (Post-Hearing Br. at 36.) Indeed, the only TCR forms submitted to the SEC that he produced were two forms that were signed and dated by his *counsel* in January 2017, but for which Andriesz's required signature and date were missing. (*See* ECF Nos. 8-61, 8-62.) Tellingly, in his January 22, 2020 sworn statement to the CFTC requesting a whistleblower award for his earlier disclosures to them, he reported that "*[s]oon after I was terminated, I immediately filed TCR's with . . . the SEC on 10.02.17.*" (Shah Decl. Ex. 32, at Andriesz004091.) In fact, the only exhibit referring to any complaint to the SEC prior to his termination was an October 28, 2016 email from a private investigator and since-

convicted felon, Daniel Portley-Hanks, to Andriesz, which purported to copy and paste the body of a short email from the SEC Officer of Investor Education and Advocacy – without actually forwarding the SEC email or even attaching the purported written submission.  (ECF No. 8-31.) As BGC argued in its post-hearing briefing, the Panel was not obligated to give any weight to this dubious "evidence," which would be inadmissible in court under the best evidence rule and the rule against hearsay.  (*See* Post-Hearing Br. at 36 n.16.)

*Second*, the evidence indicated that even if Andriesz qualified as a Dodd-Frank whistleblower from October 2016 onward, his placement on administrative leave toward the end of that year, or his termination in January 2017, could not have been causally connected to any protected activity because BGC was never aware of any report.  Indeed, in response to questions from Andriesz's counsel, BGC's head of HR for the Americas, Patricia Dreste, repeatedly stated that she "didn't recall" Andriesz ever communicating to her that he had made a report to the SEC. (Shah Decl. Ex. 8, 99:21-100:1; 168:22-169:15.)

*Third*, the evidence indicated that even if Andriesz made a qualifying complaint with the SEC before BGC placed him on leave or terminated him, he did not have a reasonable belief that the information he provided the SEC (which, as noted above, was never clear because of his failure to ever produce his alleged 2016 complaint) related to a securities law violation, as required by the Dodd-Frank Act's regulations.  Andriesz's attempts at hearing to depict himself as a courageous whistleblower were contradicted by the complaints he raised while at BGC, all of which were simply demands that he be paid more money.

Indeed, as BGC noted in its post-hearing briefing, Andriesz did not, at any point, identify which predicate statute or regulation under Dodd-Frank BGC allegedly violated.  (Post-Hearing Br. at 38.)  Andriesz introduced no testimony (not even his own) or documentation indicating that he had even seen BGC's financial statements, SEC filings, or other public statements to

shareholders during the relevant time period, much less testimony identifying what information in those filings might have been misstated due to the purported "accounting fraud" (i.e., his belief he had been underpaid). (*Id.* at 38-39.) He gave no explanation as to how the preliminary calculations of a bonus pool of only two desks that traded a single product line out of the many at BGC could possibly portend material misstatements in BGC's publicly reported financials (which are reported at the level of the entire company, not individual desks). (*Id.* at 39.)

*Fourth*, BGC also noted in its post-hearing brief that under the *McDonnell Douglas* burden-shifting framework that applies to Dodd-Frank whistleblower retaliation claims, BGC had a legitimate, non-retaliatory reason for terminating Andriesz's employment. (*Id.* at 40-41.) That reason was BGC's genuine concerns after Andriesz's late 2016 hospitalizations that he could not perform essential functions of his position, combined with his complete refusal to cooperate in the interactive process after BGC placed him on leave and asked him to attend medical exams. *See* Part IV.C, *supra.*

### E. Andriesz Was Not Entitled to Damages

The evidence adduced at hearing, and marshaled by BGC in its post-hearing briefing, also fatally undermined Andriesz's claim that he was owed millions of dollars in damages from BGC, *even if* the Panel concluded he was wrongfully terminated (which he was not).

*First*, as noted previously, because the evidence overwhelmingly indicated that BGC correctly calculated Andriesz's compensation under the terms of his contract, Andriesz failed to carry his burden of showing any entitlement to additional remuneration stemming from pay periods before his termination. *See* Part IV.B, *supra.*

*Second*, as BGC noted in its post-hearing briefing, Andriesz was not entitled to damages for lost earnings post-termination. Because Andriesz had already given written notice to BGC that he would not be extending his written contract after its January 21, 2019 expiration (*see* Shah Decl.

Ex. 24), he was not legally entitled to receive damages for breach of contract beyond that date. (*See* Post-Hearing Br. at 55.)  Furthermore, Andriesz's own damages expert, Dr. Stan Smith, was unable to identify any basis his client had for seeking damages for lost income *after* the end date of contract term (which constituted more than three-quarters of Andriesz's purported lost earnings) other than Andriesz's frivolous and unsubstantiated defamation claim (*see* Shah Decl. Ex. 5, 1181:16-1182:6), the denial of which is not challenged in the current Petition.  Finally, the evidence indicated that Andriesz found employment with a different brokerage within six months of termination that offered a compensation structure that he admitted "would have been the same o[r] better than BGC." (*See* Shah Decl. Ex. 34 at Andriesz003500.)  Consequently, BGC argued that Andriesz had fully mitigated his damages by this point by finding employment on the same or better terms and was ineligible to receive economic damages post-dating this time.  (Post-Hearing Br. at 55-56.)

*Third*, as BGC also asserted to the Panel, the evidence indicated that Andriesz and his expert had failed to establish any lost earnings with the "reasonable certainty" required by law. (*Id.* at 57-58.)  Dr. Smith's three different earnings scenarios dubiously estimated that Andriesz's earnings would top out at a steady state of $2.21-$3.74 million *per year* until age 65 by cherry-picking the disproportionately large earnings from the four best years of Andriesz's decades-long career at MF Global, several years before the events in question.   (ECF No. 8-58 at Andriesz004329-30, 4345, 4348, 4351.)  BGC noted that courts often refuse to consider expert testimony that relies on cherry-picked data to "produce[] a misleadingly favorable result," and therefore the Panel should treat Dr. Smith's testimony similarly.  (Post-Hearing Br. at 58 (quoting *E.E.O.C. v. Freeman*, 778 F.3d 463, 469–70 (4th Cir. 2015)) (internal quotation marks omitted).) BGC also emphasized that Dr. Smith's lost earnings opinion should be rejected because he did no work of his own to verify the accuracy of Andriesz's self-serving estimate that, absent BGC's

actions, he would have returned to earning income on the level he received at MF Global. (Post-Hearing Br. at 58.) For example, BGC noted that Dr. Smith never presented a hypothetical bonus pool calculation to explain how Andriesz's desk could have generated enough overall revenue to allow Andriesz himself to pocket millions per year after bonuses were calculated. (*Id.*) Dr. Smith also admitted that he never reviewed Andriesz's post-BGC production volume or evaluated the market conditions since Andriesz left BGC to determine if it was likely that Andriesz would generate the trading volume necessary to produce this level of income. (Shah Decl. Ex. 5, 1195:2-13, 1199:8-1200:8, 1204:11-24, 1207:21-1208:21.) As BGC argued, Dr. Smith's reliance on his client's "orally communicated estimates" over "hard data" when determining "essential numbers that would drive [the] ultimate conclusions" bore "none of the hallmarks of a reliable method for measuring lost income," and the Panel would be well served in rejecting his opinion. (Post-Hearing Br. at 58 (quoting *Lava Trading, Inc. v. Hartford Fire Ins. Co.*, No. 03 Civ. 7037, 2005 WL 4684238, at *12-13 (S.D.N.Y. Apr. 11, 2005)) (internal quotation marks omitted).)

*Fourth*, BGC disproved Andriesz's claim that his 38 to 54 million dollars in purported damages (*see* Shah Decl. Ex. 12, 141:2-142:8) included "a minimum of 2.7 million" for "reduction in value of life" since the termination of his employment. BGC emphasized to the Panel that there was no causal connection between BGC's actions and Andriesz's present physical and mental issues. (Post-Hearing Br. at 56.) The evidence indicated that before he joined BGC in 2012, Andriesz ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ During his tenure at BGC, he blamed his ex-wife's attorney for causing his July 2015 heart attack (Shah Decl. Ex. 17), as evidenced by ███████████████████████████████████████████████████████████ █████████████████." (Shah Decl. Ex. 23, at Andriesz002388, 2391.) And after leaving BGC,

16

Andriesz blamed ███████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████ (Shah Decl. Ex. 33, at Andriesz003658-59, 3679, 3688.)  BGC

also stated to the Panel that each of the healthcare professionals whom Andriesz called to testify

at the hearing had not treated him when he was working for BGC and admitted that their only

knowledge of BGC's conduct came from Andriesz's own narration of past events.  Therefore, their

opinions of whether BGC's actions contributed to any of Andriesz's maladies were not reliable.

(Post-Hearing Br. at 58-59.)  To cap things off, BGC also argued that the Panel should reject Dr.

Smith's opinion on the monetary value of Andriesz's "loss of enjoyment of life" due to the

unreliability of his methodology.  BGC pointed out that "the overwhelming majority of courts . . .

have concluded that [Dr. Smith's] 'willingness-to-pay' methodology is either unreliable or not

likely to assist the [factfinder] in valuing hedonic damages, or both." (*Id.* at 57 n.20 (quoting *Smith*

*v. Jenkins*, 732 F.3d 51, 66 (1st Cir. 2013)) (alteration in original).)

## V.  The Award

On June 17, 2024, the Panel issued its Award, which was served upon the Parties that same

day.  (*See* ECF No. 7-1 at 6.)  The Award provided that "Respondent BGC Financial, L.P. is solely

liable for and shall pay to the Claimant the sum of $500,000.00 in compensatory damages," while

"dismiss[ing] in their entirety" "[a]ll other claims remaining" against CF&Co. and Messrs. Aubin,

Webster, Pion, and Shields.  (*Id.*)  The Panel also held that it denied "[a]ny and all claims for relief

not specifically addressed herein." (*Id.*)

On September 16, 2024, Petitioner attempted to file his Petition in the Southern District of

New York through CM/ECF, but the Petition and the civil cover sheet were rejected by the clerk

because Petitioner's attorney of record had failed to sign the documents and had selected the

incorrect event type for his docket entries.  (*See* ECF Nos. 1, 2.)  Petitioner successfully filed his

Petition and civil cover sheet the next day, September 17, 2024.  (ECF Nos. 9, 10.)  Petitioner did

not file a request for issuance of summons to BGC until September 19, 2024.  (ECF No. 11.)  That

same day, Petitioner's counsel emailed counsel for BGC to ask if he would accept service.  (Shah

Decl. Ex. 36.)  On September 20, 2024, the Court issued an electronic summons to BGC.  (ECF

No. 13.)  On September 24, 2024, BGC filed a waiver of service of the summons.  (ECF No. 14.)

## CHOICE OF LAW

The Federal Arbitration Act ("FAA") applies to disputes affecting interstate commerce,

such as "a dispute between a U.S. citizen who is a resident of New York" and a "non-U.S. citizen"

who resides abroad.  *Rabinowitz v. Kelman*, No. 21-CV-03167 (NSR), 2024 WL 1700037, at *5

(S.D.N.Y. Apr. 19, 2024) (citing *Allied-Bruce Terminix Companies v. Dobson*, 513 U.S. 265, 273-

74 (1995)).  In such disputes, when the contract between parties that have chosen to arbitrate is

"silent as to the choice of arbitral law" and the parties "did not contractually agree to apply New

York's vacatur standards to their arbitration," "courts in this District have applied the FAA" in

evaluating a party's motion to vacate the arbitration award.  *LGC Holdings, Inc. v. Julius Klein*

*Diamonds, LLC*, 238 F. Supp. 3d 452, 466 (S.D.N.Y. 2017).  The FAA applies even when the

agreement in question "includes a choice of law clause which states that the 'Agreement shall be

construed in accordance with New York law,'" so long as the agreement lacks "more critical

language concerning enforcement," such as a provision stating "that New York law shall govern

both the agreement and its enforcement."  *Penrod Mgmt. Grp. v. Stewart's Mobile Concepts, Ltd.*,

No. 07 CIV. 10649 (JGK), 2008 WL 463720, at *2 (S.D.N.Y. Feb. 19, 2008) (quoting *Diamond*

*Waterproofing Sys., Inc. v. 55 Liberty Owners Corp.*, 793 N.Y.S.2d 831, 835 (2005)) (internal

quotation marks omitted).

Here, the FAA – including its bases for vacatur and modification, as well as its time limits

on filing petitions to vacate or modify – governs the adjudication of Andriesz's petition.  Andriesz

was (and is) a citizen and permanent resident of the United Kingdom who, per his employment agreement, was hired by BGC—a New York-based limited partnership—to manage both its New York and London futures desks. There is therefore no question that the dispute affects interstate commerce so as to be within the ambit of the FAA. Second, although Andriesz's agreement states that it "shall be governed by and construed in accordance with the laws of the State of New York" (*see* ECF No. 7-19, § 11(b)), both the contract and the referenced DRPA (*see id.* §§ 9, 10(a); Shah Decl. Ex. 13) are silent as to choice of law for enforcement of the contract (including arbitration). In other words, while Andriesz's employment agreement is explicitly to be *interpreted* according to New York law, the relevant documents are silent as to whether the enforcement mechanisms (such as arbitration) are subject to New York law as opposed to federal law. Consequently, the requirements of the FAA, rather than the New York Civil Practice Law and Rules ("CPLR"), apply to the Petition. *See Penrod*, 2008 WL 463720, at *2.

## STANDARD OF REVIEW

### I.     Vacatur of Arbitration Awards Under Section 10 of the FAA

"Section 10 of the FAA allows a court to vacate an arbitration award in four circumstances, primarily involving fraud, corruption, partiality, misconduct, or imperfect execution or exceeding of arbitral powers." *Seneca Nation of Indians v. New York*, 988 F.3d 618, 625 (2d Cir. 2021) (citing 9 U.S.C. § 10). "[A]n arbitrator's 'manifest disregard' of the law or of the terms of the arbitration agreement 'remains a valid ground for vacating arbitration awards.'" *Id.* (quoting *Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 451–52 (2d Cir. 2011)).

To vacate an arbitration award for manifest disregard of the law, a court must conclude that "the arbitrator knew of the relevant [legal] principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it." *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 217 (2d Cir. 2002); *see also*

*Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010) ("It is only when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice that his decision may be unenforceable" (internal quotation marks and alteration omitted).).  Additionally, this finding requires an objective determination that the disregarded legal principle was "well defined, explicit, and clearly applicable." *Westerbeke Corp.*, 304 F.3d at 209.  Notably, showing merely the "erroneous application of rules of law" or "that an arbitrator erroneously decided the facts" is insufficient to show a "manifest disregard" of the law. *Siegel v. Titan Indus. Corp.*, 779 F.2d 891, 892–93 (2d Cir. 1985); *see also Wallace v. Buttar*, 378 F.3d 182, 190 (2d Cir. 2004) (a "federal court cannot vacate an arbitral award" under the FAA "merely because it is convinced that the arbitration panel made the wrong call on the law").  Rather, an "award should be enforced, despite a court's disagreement with it on the merits, if there is a barely colorable justification for the outcome reached." *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010) (internal quotation marks and citation omitted).  A "barely colorable justification" exists if the arbitrators had reasoning on which they "could have justifiably rested their decision." *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 13–14 (2d Cir. 1997).

Contrary to what Petitioner has asserted (*see* ECF No. 5 (hereinafter, "Petitioner's Br.") at 8-9; ECF No. 20 at 1 (both citing *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197 (2d Cir. 1998)), this Court cannot vacate an arbitration award for "manifest disregard of the evidence."

> [T]he Second Circuit does not recognize manifest disregard of the evidence as proper ground for vacating an arbitrator's award. . . .  A federal court may not conduct a reassessment of the evidentiary record . . . upon the principle that an arbitral award may be vacated when it runs contrary to strong evidence favoring the party bringing the motion to vacate the award.

*Wallace*, 378 F.3d at 193 (quoting *Success Sys., Inc. v. Maddy Petroleum Equip., Inc.*, 316 F.Supp.2d 93, 94 (D. Conn. 2004)) (internal quotation marks omitted); *see also Fairchild Corp. v. Alcoa, Inc.*, 510 F. Supp. 2d 280, 289 (S.D.N.Y. 2007) (noting that "[t]he case law makes clear" that "an arbitration award cannot be overturned solely on the ground of manifest disregard of evidence"). In fact, the Second Circuit has explicitly asserted that "*Halligan*'s suggestion that arbitral awards may be vacated on the ground of manifest disregard of evidence" was "dicta" and that "*Halligan* does not stand for the proposition that factual findings put on the record by the arbitrator are subject to an independent judicial review." *Wallace*, 378 F.3d at 192 (quoting *Westerbeke Corp.*, 304 F.3d at 213 n.9) (internal quotation marks omitted).

## II.    Modification of Arbitration Awards Under Section 11 of the FAA

"A court's power to modify an arbitrator's award is severely limited under the Federal Arbitration Act." *LLT Int'l, Inc. v. MCI Telecommunications Corp.*, 69 F. Supp. 2d 510, 517 (S.D.N.Y. 1999) (internal quotation marks omitted). Section 11 of the FAA provides that a district court "may make an order modifying or correcting the award upon the application of any party to the arbitration" in only three scenarios: a) "Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award"; b) "Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted"; and c) "Where the award is imperfect in matter of form not affecting the merits of the controversy." 9 U.S.C.A. § 11. "Modification based on evident material miscalculation is generally limited to patently obvious mistakes on the face of the award," and "Section 11(a) does not permit modification where the award is 'not the result of some careless or obvious mathematical mistake, but rather the disposition of a substantive dispute that lays at the heart of the arbitration.'" *Fellus v. Sterne, Agee & Leach, Inc.*, 783 F. Supp. 2d 612, 619 (S.D.N.Y. 2011) (quoting *Companhia de*

*Navegacao Maritima Netumar v. Armada Parcel Serv., Ltd.*, No. 96 Civ. 6441, 2000 WL 60200, at *6–*7 (S.D.N.Y. Jan. 25, 2000)).  In evaluating whether to modify an award, "[i]t is improper for a court to review the arbitrators' decision on the merits."  *Fellus*, 783 F. Supp. 2d at 622.

<u>**ARGUMENT**</u>

**I.      The Petition Should Be Rejected as Untimely**

Under Section 12 of the FAA, "[n]otice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered."  9 U.S.C.A. § 12.  "Courts in this circuit have found that this three-month limitation is a statute of limitations and the failure to bring a timely motion is an absolute bar to an application seeking vacatur or modification."  *Tarulli v. Ameriprise Fin. Servs., Inc.*, No. 19CV2039LJLOTW, 2020 WL 9219110, at *2 (S.D.N.Y. Apr. 14, 2020) (quoting *Hamilton v. Navient Solutions, LLC*, No. 18-cv-5432 (PAC), 2019 WL 633066, at *4 (S.D.N.Y. Feb. 14, 2019)) (internal quotation marks omitted), *report and recommendation adopted sub nom. Tarulli v. Ameriprise Fin. Servs.*, No. 19-CV-2039 (LJL), 2020 WL 13562062 (S.D.N.Y. Sept. 24, 2020) (Liman, J.).

In determining the timeliness of a motion to vacate, the relevant date is when the motion was *served* upon the adverse party, regardless of when the motion was filed.  For example, in *Hamilton*, "[t]he arbitration panel issued a final award on March 19, 2018."  *Hamilton*, 2019 WL 633066, at *3.  After one failed filing attempt, the petitioner "refiled the requested documents without error" on June 18, 2018, an electronic summons was issued to the respondent the next day, "and on June 20, 2018 (one day late), service of the petition was completed" on the respondent. *Id.* at *4.  The court's disposition of the case was straightforward:  It reasoned that "Hamilton could have emailed her application for vacatur to Navient or otherwise provided notice on time," but "service was not completed until one day after a deadline for which there are no exceptions," and therefore "Hamilton's motion is time-barred."  *Id.*

The same facts are present here – the Award was issued and delivered to the Parties on June 17, 2024.[2] Although the Petition was *filed* exactly three months thereafter – September 17, 2024 – it was not *served* on BGC until days later. Petitioner's counsel did not email BGC's counsel to ask if he would accept service until September 19, 2024 (two days after the three-month statute of limitations expired), and BGC did not file its waiver of service until September 24, 2024. Thus, this Court should dismiss the Petition as untimely, regardless of whether it was filed before the three-month window expired. *See Hamilton*, 2019 WL 633066, at *4; *Tarulli*, 2020 WL 9219110, at *1-3 (holding that petition to vacate September 21, 2018 arbitration award was untimely because the petition was not served on respondent until February 13, 2019, despite having been filed on October 19, 2018).

## II. The Panel Did Not Manifestly Disregard the Law Because There Was Colorable Justification for Its Decisions on Both Andriesz's Dodd-Frank and Breach of Contract Claims

The persuasive evidence and argumentation that BGC presented to the Panel makes clear that Petitioner cannot show that the Panel acted in "manifest disregard of the law" in its rulings on his breach of contract and Dodd-Frank claims. There is therefore no basis for this Court to vacate the Award under the FAA.[3]

---

[2] The fact that Petitioner's counsel attempted to contact the Panel and FINRA administrators to request an explained decision during the first two weeks of July does not toll the statute of limitations. Courts within the Southern District have held that "a 'final' arbitration award within the meaning of the FAA" is the ruling that "finally and definitively dispose[s] of all . . . claims in the Arbitration," and the statute of limitations begins running, without pause, from that day forward. *See Ne. Sec., Inv. v. Quest Cap. Strategies, Inc.*, No. 03 CIV.2056 RWS, 2003 WL 22535093, at *1 (S.D.N.Y. Nov. 7, 2003)

[3] Petitioner also appears to contend that CPLR § 7511 applies to this Petition and that the Court may vacate the Award if it concludes the Award was "irrational." (*See* Petition, ¶¶ 138, 140.) Even if this Petition was governed by Article 75 of the CPLR, the same outcome would be warranted. New York courts have held that a petitioner seeking to vacate an award on grounds of irrationality must show that "there is no proof whatever to justify the award." *Peckerman v. D & D Assocs.*, 165 A.D.2d 289, 296 (1st Dep't 1991). Under the CPLR "[a]n arbitration award made after all parties have participated . . . will not be overturned merely because the arbitrator

23

A.  **BGC Presented the Panel with Colorable Grounds for its Ruling on Andriesz's Claim for Breach of Contract**

"Deference to the arbitrators' interpretation of contracts is especially strong. Indeed, as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, a court's conviction that the arbitrator has committed serious error in resolving the disputed issue does not suffice to overturn his decision." *LGC Holdings, Inc. v. Julius Klein Diamonds, LLC*, 238 F. Supp. 3d 452, 467 (S.D.N.Y. 2017) (quoting *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat. Life Co.*, 564 F.3d 81, 86 (2d Cir. 2009)) (internal quotation marks omitted).  As the Second Circuit has reasoned, the "manifest disregard" standard "essentially bars review of whether an arbitrator misconstrued a contract." *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010).

Petitioner does not come close to meeting the burden required to vacate the Panel's ruling on his contract claim.  At no point in his brief or his Petition does he identify any evidence that the Panel intentionally chose to disregard a provision of his employment agreement that it acknowledged was applicable to the dispute.  Instead, Petitioner appears to largely take issue with Panel's *interpretation* of his agreement, in particular the sections setting forth the calculation of his bonus pool and the potential causes for termination.  (*See* Petition, ¶¶ 110-120.)  But as the above authority illustrates, that is not a basis for vacating an arbitration award.

Similarly, Petitioner also appears to assert that the award should be vacated because "the overwhelming evidence" at the hearing indicates that BGC breached his contract.  (Petitioner's Br. at 1, 12-17.)  As has been noted, this argument is also legally insufficient, as the Second Circuit

---

committed an error of fact or of law." *Motor Vehicle Acc. Indemnification Corp. v. Aetna Cas. & Sur. Co.*, 89 N.Y.2d 214, 223 (1996).  Indeed, New York courts have reasoned that standard for showing "irrationality" is "roughly similar" to the standard for showing "manifest disregard of law" under the FAA.  *Banc Of Am. Sec. v. Knight*, 787 N.Y.S.2d 676 (Sup. Ct. 2004).

has made clear that "manifest disregard of the evidence" is not a basis for vacatur.  (*See* Standard of Review, Part I, *supra*.)  But even if this Court were to apply that standard, the Petition would still fall short.  Despite Petitioner's repeated misstatements to the contrary (*see, e.g.*, Petition at 32 n.10 (claiming "clear and unrefuted testimony" demonstrating an oral contract), ¶ 117 (claiming "unequivocal" testimony and evidence supported Andriesz's interpretation of the contract)), the Panel was presented with abundant evidence to conclude that Andriesz was not undercompensated and that BGC had cause to terminate his employment.

As previously noted, BGC introduced numerous emails (including Andriesz's own emails signing off on bonus pool calculations that did not include such revenues), presented the extensive testimony of Jonathan McLachlan, and also articulated for the Panel an interpretation of the plain text of Andriesz's contract, each of which made clear that BGC calculated Andriesz's bonus pool appropriately.  (*See* Factual Background, Part IV.B, *supra*.)  BGC also devoted extensive space to contesting this argument, and highlighting all supporting evidence, in its Post-Hearing Brief.  (*See* Post-Hearing Br. at 3-6, 41-45.)  The Panel thus had colorable justification for rejecting Andriesz's claim that BGC breached his contract in its calculation of Andriesz's bonus.  Similarly, Andriesz's claim that Mr. McLoughlin agreed to an "oral contract" to pay $1.823 million (*see* Petition at 32 n.10) was contradicted by evidence that BGC had extensively investigated whether Andriesz was owed further compensation and determined that he was not.  (*See* Factual Background, Part IV.B, *supra*.)  And, as the arbitrators stated, the claim was separately problematic because a provision in Andriesz's contract prohibited oral modifications.  (*Id.*)  Their proper determination that no "oral contract" existed is thus not a basis for vacatur.  *See Smarter Tools Inc. v. Chongqing SENCI Imp. & Exp. Trade Co.*, 57 F.4th 372, 383 (2d Cir. 2023) ("As the district court aptly concluded, the arbitrator was free to determine that STI's evidence of an oral contract was not credible.").

Likewise – despite Petitioner's incorrect assertion that it was "not disputed" that he "continued to complete all of his essential job functions . . . with no complaint" before he was placed on leave, that he communicated with his manager, Mr. Aubin, "repeatedly and regularly," and that he "did not request an accommodation" and "posed no danger to himself or others" (Petitioner's Br. at 12-14) – there was ample evidence that BGC had cause to terminate his employment.  After returning to work from a hospitalization (which itself appeared to have been caused by Andriesz's refusal to comply with his doctor's and BGC's mandate that he only work part-time), Andriesz repeatedly ignored his manager's requests to videoconference, claiming that his health permitted him to work whatever hours he chose, but not to interact with his manager. (*See* Factual Background, Part I and IV.C, *supra*.)    Andriesz responded to BGC's good-faith requests for actual medical support for his demands but refusing to attend neutral medical and psychological exams and bizarrely alleging that that BGC had "fabricated" the basis for its request. (*See* Factual Background, Part IV.C, *supra*.)    As with Andriesz's claim that he was undercompensated, BGC devoted numerous pages in post-hearing briefing to demonstrate that it had reasonable concerns that Andriesz could not perform essential parts of his job without endangering his health and that Andriesz's refusal to do his job and to cooperate with BGC's attempts to accommodate him constituted Cause for termination (*See id.*)

In short, there is no basis to vacate the Award with respect to Andriesz's contract claim.

## B.  BGC Presented the Panel with Colorable Grounds for Its Denial of Andriesz's Dodd-Frank Claim (as Andriesz Has Separately Admitted)

Petitioner has now acknowledged that the Panel had sufficient basis to deny his Dodd-Frank claim in total (*see* ECF No. 20, at 1), contradicting the allegations in the Petition that "[t]he evidence overwhelmingly supports the notion that Andriesz satisfied" the requirements of a meritorious Dodd-Frank claim."

The evidence adduced at the hearing, and BGC's application of the relevant law to that evidence in its post-hearing briefing supports this concession. BGC presented the Panel with at least *four* grounds on which it could have denied the claim: 1) Andriesz did not meet his evidentiary burden of proving that he made a written complaint to the SEC before his termination, so as to qualify as a whistleblower; 2) BGC's placement of Andriesz on leave, and its subsequent termination of his employment, were not causally related to any protected activity; 3) Andriesz did not have a reasonable belief of having discovered a violation of any securities laws; and 4) BGC had a legitimate, non-retaliatory reason for its actions. *See* Factual Background, Part IV.D, *supra*.

## III. The Petition Does Not Assert a Valid Basis to Modify the Award

In seeking (in the alternative) modification of the award, Petitioner asserts only that "the Award should be amended to provide for the legally required and proved damages for the clearly demonstrated causes of action for breach of contract and for retaliation in contravention of the protections of Dodd-Frank." (Petitioner's Br. at 24.) This is no basis for modification at all. At no point in his moving papers does Petitioner assert that there was an evident material miscalculation or material mistake in the description of any person, thing or property in the Award, that the Panel awarded upon a matter that was not submitted, or that the Award was otherwise imperfect in matter of form unrelated to the merits – which are the only bases for modification under Section 11 of the FAA.

Instead, Petitioner apparently seeks modification of the Award to obtain the holding on his breach of contract and Dodd-Frank claims, along with his sought-after damages, that the Panel rejected. In short, Petitioner asks this Court to "reconsider[] the merits of the arbitrated dispute, which is improper." *Fellus*, 783 F. Supp. 2d at 622. A claim of this nature, which seeks "to have the [C]ourt substitute its own judgment for that of the Panel, . . . falls outside the Court's limited power to modify under Section 11." *LLT Int'l*, 69 F. Supp. 2d at 517. This Court should join

others in the Southern District that have rejected requests to modify on these grounds. *See id.* (rejecting request for "a modification of the Second Award to grant LLT its unpaid invoices, attorneys fees and arbitration expenses"); *Fellus*, 783 F. Supp. 2d at 622 (reasoning that the petitioner "does not point to any patently obvious miscalculation on the face of the award, nor can it do so, for the award does not explain the arbitrators' rationale in reaching their decision or reference any numbers other than the total damages awarded").

## IV.  There Is No Basis to Vacate or Remand the Matter Due to the Amount of Damages Awarded

Finally, claiming that the Panel's award of $500,000 to Andriesz "bears no relationship to any damage figure presented by either party at the hearing" (ECF No. 20 at 2), Petitioner appears to suggest that the Court either remand[4] the award (*see* Petitioner's Br. at 24) or vacate the award for being "legally and factually inexplicable" (ECF No. 20 at 2.)  This argument is unavailing.

"The arbitrator's rationale for an award need not be explained, and the award should be confirmed if a ground for the arbitrator's decision can be inferred from the facts of the case." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (quoting *Barbier v. Shearson Lehman Hutton, Inc.*, 948 F.2d 117, 121 (2d Cir. 1991)) (internal quotation marks omitted); *see also Standard Microsystems Corp.*, 103 F.3d at 12 (arbitrators "are not required to provide an explanation for their decision").  In this instance, moreover, Petitioner cannot fault the Panel for not explaining its damage calculation.  FINRA Rule 13514(d) requires that any explained decision request must be a "joint request" from the parties that is "file[d] with the Director" "[a]t least 20 days before" the hearing.  FINRA, Code of Arbitration Procedure for Industry Disputes, Rule

---

[4] As an initial matter, Petitioner does not explain how "remand" would be possible or what the mechanics would be, given that FINRA has closed this matter.  (*See* ECF No. 7-5.)

13514 (2024).  And Petitioner now acknowledges that he "did not properly" request an explained decision "pursuant to the applicable FINRA arbitration rules." (*See* ECF No. 20.)

Furthermore, there is "no authority that limits the calculation of awards to theories proposed by the parties. To the contrary, arbitrators may award the damages they believe are due based on the evidence before them." *Elwell v. Raymond James Fin. Servs., Inc.*, 686 F. Supp. 3d 281, 293 (S.D.N.Y. 2023).  This principle applies "particularly when the award granted is less than the amount requested." *Id.* (quoting *Singh v. Raymond James Fin. Servs., Inc.*, No. 13-cv-1323, 2014 WL 11370123, at *3 (S.D.N.Y. Mar. 28, 2014)) (internal quotation marks omitted).

For example, in *Elwell*, the petitioners in a FINRA arbitration requested compensatory damages in the approximate range of 34 to 37 million dollars, but received an award of only $67,917, plus pre-judgment interest running from a seemingly arbitrary date.  *Elwell*, 686 F. Supp. 3d at 286-87 (internal quotation marks omitted).  Petitioners argued that the award was "irrational and without colorable basis in the record," noting that the arbitrators "did not explain how the $67,917 figure was calculated," and, as part of their motion to vacate, moved to vacate a FINRA arbitration award, asked the court to "remand the matter to FINRA for further proceedings." *Id.* at 287.  Judge Koeltl rejected this argument, reasoning that "it is not for the [c]ourt to reconstruct how exactly the arbitrators reached their conclusion." *Id.* at 294.  Furthermore, the court reasoned "[t]hat the arbitrators chose to award only a small amount of the damages sought by the Elwells does not indicate at all that the arbitrators manifestly disregarded the law." *Id.*  Rather, the court concluded that "the damages award can be inferred from the evidence" because it was plausible that out of "hundreds of investments" by the petitioners, the panel could have "award[ed] a much smaller amount" than what petitioners sought "based on select investments the panel deemed to be unsuitable." *Id.* at 293-94.  The court therefore denied the motion to vacate. *Id.* at 294.

The same outcome is warranted here.  As stated in *Elwell*, the arbitrators do not manifestly disregard the law merely by choosing a different damages number than one suggested by either party.  Petitioner cites no countervailing authority.  Here, Andriesz made a strategic decision to shoot for the moon (demanding more than $11 million in damages for termination of a contract that had, at most, two years of term remaining (*see* Shah Decl. Ex. 12, 141:2-18) and further decided not to quantify (i) the amounts he claimed he was owed under his contractual bonus provision or (ii) the amount of his unpaid fourth quarter bonus.

Having posited these theories of recovery and then abandoned any attempt to quantify them, Andriesz cannot complain that the Panel performed its own calculation based on the voluminous body of financial data in the arbitration record.  For example, the Panel could have concluded that while BGC did not violate Dodd-Frank, and had legitimate cause for terminating Andriesz's employment, it nonetheless owed him some amount of damages for his fourth quarter 2016 production bonus that he did not receive when he was fired before his desks' final bonuses were calculated and distributed.  The parties litigated this very argument in closing, with BGC acknowledging that Andriesz did not receive a bonus while also noting that he failed to provide any evidence or calculations of what this number would have amounted to. (*See* Factual Background, Part IV.B, *supra*.)  Given Andriesz's failure to provide this information, the $500,000 awarded may reflect the Panel's good-faith estimate of the approximate additional bonus Andriesz did not receive, combined with interest to account for the passage of time.  Thus, because "[t]he record indicates a colorable justification for the panel's award," there is no basis for vacatur.  *See Elwell*, 686 F. Supp. 3d at 294.

Of course, it is possible that the Panel, with limited grounds on which to find for Andriesz, took sympathy on a Claimant who testified for days on end about his medical and psychological

ailments.  Their decision to award Andriesz $500,000 when they also had a basis to deny his claims in full cannot support a claim by Andriesz that he is owed more still.

## **CONCLUSION**

For the above reasons, BGC respectfully requests that the Court deny the Petition and the corresponding Motion.

Dated:  December 6, 2024
      New York, NY               */s/ Nirav S. Shah*
                                     Nirav S. Shah
                                     110 East 59th Street, 7th Floor
                                     New York, NY 10022
                                     (212) 294-7873
                                     nirav.shah@cantor.com

                                   *Attorney for Respondent BGC Financial, L.P.*