# Exhibit 5

```
 1              ARBITRATION DAY IV - CONFIDENTIAL
 2        Q.    You're not contending it was reasonably
 3   certain that Mr. Andriesz would have stayed at BGC past
 4   2019, are you?
 5        A.    I leave that to the trier of fact.            11:00:29
 6              (Pause.)
 7   BY MR. NADKARNI:
 8        Q.    Do you have any specific understanding as to
 9   what -- as to what your damages for periods beyond 2019
10   relate to?                                               11:00:44
11        A.    I'm sorry.  Could you say that again?
12        Q.    Sure.  So aside from the contract, do you
13   have any understanding as to what actions by BGC your
14   damages for periods beyond 2019 relate to?
15        A.    I'm not here to show her or him my damages to 11:01:03
16   claims, by Mr. Andriesz -- you know, was hired to
17   perform as well as he had in the past.  That doesn't
18   mean he couldn't have worked for other companies in the
19   future.  He claims his reputation is damaged and he
20   can't find positions.                                    11:01:19
21        Q.    So it's possible -- it's possible --
22              (Indistinguishable crosstalk.)
23              THE WITNESS:  Excuse.  Me, can I just
24         finish?
25
```



```
 1              ARBITRATION DAY IV - CONFIDENTIAL
 2     BY MR. NADKARNI:
 3          Q.    Sure.
 4          A.    He's unable to find positions and be retained
 5     as he might have been but for what he claims is a stain      11:01:31
 6     and a reputation damage, so it's not that he necessarily
 7     would have had to stay at BGC.  It's just that he had
 8     the opportunity to earn the earnings he had been
 9     expected to earn at BGC and could have perhaps been
10     expected to earn another at other comparable companies.      11:01:50
11     BGC is not the sole employer of someone who has shown
12     clearly significant talents as Mr. Andriesz.
13          So it's not just that he didn't earn this at BGC.
14     He believes he's denied being able to earn this
15     elsewhere also.                                              11:02:09
16          Q.    So would it be -- would it be accurate to
17     state that you're -- based on your conversations with
18     Mr. Andriesz, you understand the damages from beyond the
19     contract period to relate to harms for defamation?
20          A.    Well, I do know that people's career stains      11:02:28
21     extend to other employers beyond the employer that they
22     had been working for, yes.  Again, I think those are
23     matters for the arb -- the arbitrators to ultimately
24     come to a conclusion.
25          I've seen it happen.  I know it happens.  I have a      11:02:47
```



```
 1          ARBITRATION DAY IV - CONFIDENTIAL
 2    Ph.D. in labor economics.  I analyze these careers and
 3    these career stains and damaged reputations all the
 4    time.  It is entirely reasonable to me.  But there are
 5    specific facts in this case that I leave to the           11:03:06
 6    arbitrators to determine.
 7         Q.   As you discussed, each of your three
 8    scenarios calculates Mr. Andriesz's lost earnings
 9    through age 65, right?
10         A.   Yes.                                             11:03:20
11         Q.   And, in fact, your scenarios assume that not
12    only would he work until age 65 but that he would earn
13    over $2 million every year from 2025 until 2033,
14    correct?
15         A.   Yes.                                             11:03:34
16         Q.   And -- am I accurate saying it's your opinion
17    that Mr. Andriesz was reasonably certain to work to age
18    65?
19         A.   I see no reason why he didn't have the same
20    capacity to work in the future and earn in the future as  11:03:52
21    he had in the past.  It's my understanding it was
22    appreciation for his past capacity that BGC filed and
23    brought him here was to prove because they believed he
24    could.
25         Q.   Is that a "yes"?                                 11:04:09
```



```
1              ARBITRATION DAY IV - CONFIDENTIAL
2        A.    I think so.
3        Q.    And your report, Dr. Smith, doesn't indicate
4   that you reviewed any data regarding the typical
5   retirement age of a futures broker, correct?              11:04:23
6        A.    Correct, because what's typical doesn't
7   matter.  It's what said he would do.  He said he would
8   worked till 65, perhaps beyond, he indicated -- not that
9   many do.  He might, he might not.  Nobody can say early
10  on when they're going to retire.                          11:04:43
11       But I say 65 is a likelihood.  I leave it to the
12  trier of fact.  If they want to choose 64 or 63, they
13  can take a scissors and cut off the table.  If they want
14  to go beyond age 65 -- it's not my determination.
15       Q.    So you're stating that you -- you chose this   11:04:57
16  number not based on data regarding the typical futures
17  broker but regarding what Mr. Andriesz told you he would
18  do?
19       A.    In part from what I see people who are at
20  that level of success including financial management      11:05:10
21  frequently do.  I'm not claiming that that's -- that
22  they have to adopt that year.  That's why I give the
23  tables showing earlier years and later years.
24       Q.    Do you have any understanding of how typical
25  it is for a futures broker to continue to work at a high  11:05:25
```



```
 1              ARBITRATION DAY IV - CONFIDENTIAL
 2    fact.
 3         Q.    So all of -- all of those numbers in -- in
 4    that paragraph of page 8 of your report -- those involve
 5    periods in which he was working at other futures            11:19:49
 6    brokers, correct?
 7         A.    Yes.
 8         Q.    Involved a period in which he worked at
 9    Square from 2017 to 2018?
10         A.    Yes.                                              11:19:57
11         Q.    It involved a period in which he worked as a
12    futures desk head at Tradition from 2018 to 2021?
13         A.    Yes.
14         Q.    And it involves a period in which he, through
15    his own company, worked with Kyte since 2022, right?       11:20:08
16         A.    Yes.
17         Q.    And it appears for all these years, his
18    earnings are actually lower than they were at BGC in
19    2015 to 2016, correct?
20         A.    Yes.                                              11:20:21
21         Q.    Despite having worked for -- for three other
22    brokerages, he is -- he is still earning less than he
23    did at BGC and less than he did from 2007 to '12,
24    correct?
25         A.    Yes.                                              11:20:38
```



| | |
|---|---|
| 1 | ARBITRATION DAY IV - CONFIDENTIAL |
| 2 | Q.    You haven't reviewed any documents from his |
| 3 | time at these brokerages other than just his employment |
| 4 | contracts and tax filings? |
| 5 | A.    Correct.                                        11:20:52 |
| 6 | Q.    You haven't reviewed any communications with |
| 7 | his clients at these brokerages? |
| 8 | A.    Correct. |
| 9 | Q.    You haven't reviewed any documents that |
| 10 | reflect his production reports?                        11:20:56 |
| 11 | A.    Correct. |
| 12 | Q.    Have you interviewed anyone from Square, |
| 13 | Tradition, or Kyte? |
| 14 | A.    No. |
| 15 | MR. BRICKMAN:  You have to speak up,   11:21:08 |
| 16 | Mr. Smith. |
| 17 | (Thereupon, an informal discussion was |
| 18 | held off the record.) |
| 19 | BY MR. NADKARNI: |
| 20 | Q.    You haven't reviewed his trading volumes over   11:21:58 |
| 21 | that year, correct? |
| 22 | A.    Correct. |
| 23 | Q.    Have you reviewed any futures trading volumes |
| 24 | in the market during any of -- any of the years during |
| 25 | which Mr. Andriesz was employed?                       11:22:12 |



```
 1            ARBITRATION DAY IV - CONFIDENTIAL
 2       A.    You've asked like four or five questions
 3  about what I've reviewed.  I showed you the 19 sets of
 4  documents that I have reviewed.  Anything you mention
 5  that's not in that 19, including the last five things    11:22:25
 6  that you know are not there, you know the answer.  If
 7  it's not in the first 19, you know I've not reviewed it.
 8       Q.    Sure.
 9       A.    I am confirming.  I'm not damning you.  I'm
10  just saying we've seen what I've reviewed.  Everything   11:22:39
11  you've mentioned is not on that list.  Therefore, I've
12  not reviewed it.
13       Q.    Sure.
14       A.    Not that, no, metaphorically speaking --
15             (Indistinguishable crosstalk.)              11:22:48
16       Q.    Sure.  So last question --
17       A.    Metaphorically speaking, I have not reviewed
18  the Manhattan phone book.  It wasn't necessary.
19             (Pause.)
20             (Thereupon, an informal discussion was       11:23:02
21        held off the record.)
22  BY MR. NADKARNI:
23       Q.    I want to pick up one thing you said.  You
24  said, "I wouldn't have reviewed the Manhattan phone
25  book.  It wasn't necessary."                             11:23:18
```



```
 1              ARBITRATION DAY IV - CONFIDENTIAL
 2       Is it your testimony that reviewing futures trading
 3   volumes in the market during these time periods was not
 4   necessary either?
 5       A.    Yes.  What was important was for me to see      11:23:27
 6   what he earned, and there's a million documents that
 7   would support how he earned it.  But my bottom-line
 8   consideration was what did that result in?  The million
 9   documents that would prove to how he earned his money
10   show up ultimately in what he earned, and I am concerned   11:23:45
11   with what earned.
12       Q.    But with respect to his time at Tradition,
13   Square, and Kyte, would it be safe to say that you
14   haven't conducted any independent review your own as to
15   whether Mr. Andriesz's limited earnings during this time   11:24:05
16   period compared to his earnings at MF are the -- are the
17   result of actions taken by respondents when he worked at
18   BGC?
19       A.    Again, that's a liability question.  I do not
20   undertake a review of the liability, no.                   11:24:22
21       Q.    So, Dr. Smith, let's change topics.
22       As you discussed earlier -- as we discussed
23   earlier, your report states that in 2015, but for the
24   malfeasance of BGC, Mr. Andriesz would have earned
25   $1 million that year, right?                               11:24:46
```

```
 1            ARBITRATION DAY IV - CONFIDENTIAL
 2       A.    Yes.  Of course, it's alleged malfeasance,
 3   because I'm not asserting that there was malfeasance.
 4       Q.    And similarly, you state that number for 2016
 5   would be 1.5 million, right?                              11:25:00
 6       A.    Yes, that was his belief.  But again, most of
 7   the past statement -- most of the statements he made
 8   about his past earnings have little impact overall.
 9   What matters overall is what he would achieve in the
10   future.                                                  11:25:13
11       Q.    Now -- and I apologize for switching binders,
12   but let me ask you to turn to Mr. Andriesz's employment
13   agreement.  It's Exhibit 38 in Binder 1.
14            MR. BRICKMAN:  It's -- do you see the big
15         stack on top?                                      11:25:31
16            (Thereupon, an informal discussion was
17         held off the record.)
18            (Pause.)
19   BY MR. NADKARNI:
20       Q.    Dr. Smith, are you at that document now?       11:26:13
21       A.    Exhibit 38?
22       Q.    That's correct.
23       So, Dr. Smith, you testified that -- or it's stated
24   in your report, and this is one of the documents you
25   reviewed in connection with your report, correct?       11:26:25
```



1          ARBITRATION DAY IV - CONFIDENTIAL

2      A.     Correct.

3      Q.     So let's go to Section 3, Compensation During

4    the Term of Employment.

5      A.     Don't ask me to interpret this agreement.          11:26:40

6      Q.     Not -- not asking for your legal opinion on

7    the agreement.

8      All I want to know is:  Did you do any independent

9    modeling of your own to apply the underlying revenues

10   from the New York and London futures desks in 2015 to     11:27:00

11   the costs and other deductibles from that desk to

12   determine whether there was any scenario under which,

13   per these calculations, BGC might be required to pay

14   Mr. Andriesz $1 million?

15     A.     I did not interpret this agreement to           11:27:18

16   determine whether he was required to be paid even one

17   dollar, no.

18     Q.     So just safe to say in Subsection B here,

19   where it states that "employee shall be entitled to

20   participate in an incentive pool compensation            11:27:37

21   arrangement related to the performance of Indices North

22   American features and options desk, excluding the

23   Chicago futures options desk and the London financial

24   futures and options desk, you did not attempt to build

25   any type of model as to what the pool would have looked   11:27:53



```
 1              ARBITRATION DAY IV - CONFIDENTIAL
 2    like absent any purported malfeasance from BGC, correct?
 3         A.    No, I -- I can't imagine the difficulties it
 4    would take in attempting to do so.
 5         Q.    And same -- and that applies for both the        11:28:11
 6    years 2015 and 2016?
 7         A.    Correct.  Maybe your firm did it.  Do you
 8    have any numbers to show --
 9         Q.    I can represent --
10               (Thereupon, an informal discussion was           11:28:21
11          held off the record.)
12    BY MR. NADKARNI:
13         Q.    I can represent to you we don't have an
14    expert, but I can represent we produced data regarding
15    the revenues and expenses of the desk during this time     11:28:31
16    period.  Did you review that at all?
17         A.    Was that in documents 1 through 19?
18         Q.    It was not.
19         A.    Your side didn't ask me to review your
20    documents.                                                  11:28:47
21         Q.    Were you asked by plaintiff's counsel to read
22    those documents?
23         A.    No.
24         Q.    Now, in your report for both the years 2015
25    and 2016, you don't identify the specific components of    11:29:03
```



ARBITRATION   Vol. IV Conf.                                 January 12, 2024
ANDRIESZ V. BCG FINANCIAL, L.P.                                       1201

```
1              ARBITRATION DAY IV - CONFIDENTIAL
2    this compensation that would sum to the $1 million plus
3    owed by BGC during these time periods, correct?
4         A.    Correct.
5         Q.    Similarly, you haven't identified which        11:29:27
6    portion of Mr. Andriesz's compensation you expect to be
7    paid in cash versus contingent non-cash grants?
8         A.    Correct.
9         Q.    Similarly, you haven't identified any
10   particular number by which you are assuming the net       11:29:49
11   revenues allocated to the pool would increase, correct?
12        A.    Correct.
13              (Pause.)
14   BY MR. NADKARNI:
15        Q.    One thing I do want to confirm here is:  Did    11:30:08
16   you review the section here or the sections of the
17   compensation section making clear that Mr. Andriesz's
18   salary is a product -- his compensation is a product of
19   both a salary and a draw as well as a bonus?
20        A.    I understand that.                              11:30:26
21        Q.    And you were -- when you put your report
22   together, you were aware that Mr. Andriesz's salary and
23   draw alone do not get to one million, correct?
24        A.    Yes.
25        Q.    You're aware that the rest would have to be     11:30:40
```



```
1              ARBITRATION DAY IV - CONFIDENTIAL
2    some form of bonus compensation?
3        A.   It's typical in the financial industry for it
4    to be performance-based, yes.
5        Q.   Sure.  Dr. Smith, if you can turn to Exhibit    11:30:49
6    213.  I believe this is going to be another binder.
7    It's going to be Binder 2.
8               (Thereupon, an informal discussion was
9           held off the record.)
10              MR. NADKARNI:  Exhibit 213.                    11:31:05
11              CHAIRMAN KHEEL:  Exhibit 213?
12              MR. NADKARNI:  Yes.
13              CHAIRMAN KHEEL:  Thank you.
14              MR. NADKARNI:  And I apologize, because I
15          flipped the last two numbers.  231.  Also the    11:31:20
16          same binder.  So it should be an email dated
17          March 29, 2016.
18              MR. BRICKMAN:  Is this the document that
19          Simon Andriesz to Jane McDonah?
20              CHAIRMAN KHEEL:  Mr. Brickman, I didn't       11:31:59
21          hear you, and I'm guessing the reporter didn't
22          hear you.
23              MR. BRICKMAN:  I just asked if this
24          document (indicating), the top email, is from
25          Simon Andriesz to a Jane McDonah, and           11:32:08
```



ARBITRATION   Vol. IV Conf.                                    January 12, 2024
ANDRIESZ V. BCG FINANCIAL, L.P.                                          1203

```
1              ARBITRATION DAY IV - CONFIDENTIAL
2              Mr. Nadkarni indicated it was.
3                  CHAIRMAN KHEEL:  Are we just
4          confirming --
5                  (Indistinguishable crosstalk.)            11:32:19
6                  MR. BRICKMAN:  That's all I was asking.
7                  CHAIRMAN KHEEL:  Both metaphorically and
8          literally.
9                  MR. BRICKMAN:  Yes.
10   BY MR. NADKARNI:                                        11:32:26
11       Q.   So, Dr. Smith, I want to direct your
12   attention to the email at the bottom of page 1 to the
13   top of page 2 in this document.  This is an email from
14   Simon Andriesz to Jane McDonah and Edward Kirk dated 29
15   March 2016 at 1700 hours and 43 minutes.               11:32:40
16       So at the bottom of page 1, Mr. Andriesz is writing
17   to Ms. McDonah and Mr. Kirk.
18       "The bonuses are not guaranteed, rather than
19   depending on the market conditions and my ability to
20   earn commissions from clients," correct?               11:33:05
21       A.   You've read correctly.
22       Q.   And -- and it appears that he is -- it
23   appears in this document, right, that he is disputing
24   the amount of money he's owed to his ex-wife based on
25   including the salary and bonuses as opposed to just the 11:33:22
```



```
 1              ARBITRATION DAY IV - CONFIDENTIAL
 2    salary, right?
 3         A.    I don't know what you're talking about.  I
 4    don't see ex-wife in here.  That ...
 5    BY MR. NADKARNI:                                          11:33:42
 6         Q.    But just to confirm, you testified that your
 7    opinion as to Mr. Andriesz's compensation in your -- or
 8    his lost earnings in your report is your opinion with
 9    reasonable certainty, correct?
10         A.    Again, based on past track record, yes.       11:33:53
11         Q.    And you -- as we made clear multiple times,
12    you didn't review other documents like this where
13    Mr. Andriesz is stating an opinion as to what portions
14    of his compensation he was certain to earn, correct?
15         A.    Yes.  It's -- it's clear, as you established,  11:34:12
16    part of his compensation is performance-based.  He had
17    past performance.
18                (Thereupon, an informal discussion was
19            held off the record.)
20    BY MR. NADKARNI:                                          11:34:27
21         Q.    So -- but it appears in this document,
22    Mr. Andriesz is acknowledging that the performance-based
23    bonuses are dependent on market conditions, right?
24         A.    We've said this over and over.
25                (Thereupon, an informal discussion was        11:34:56
```



1    ARBITRATION DAY IV - CONFIDENTIAL

2   held off the record.)

3        THE WITNESS:  Do you want to read the

4     question back?

5        (Thereupon, the requested portion of the          11:35:27

6   stenographic record was read back by the

7   shorthand reporter.)

8        THE WITNESS:  Yes, in this email, where

9     presumably he's discussing some issues

10    regarding his marital and postmarital             11:35:33

11    obligations, he's, I think, attempting to say

12    "I'm not guaranteed to earn in the future what

13    I've earned in the past."  That's not an

14    unusual statement for a person to make when

15    trying to dissolve some payments to a spouse.     11:35:47

16        But we've said it over and over again.

17    You said, and I agreed, his draw, his salary

18    are, as is typical in the industry, a modest

19    component and that what people in his business

20    earn typically is primarily based on a           11:36:08

21    performance basis.

22        I think he's arguing to some lawyer,

23    whether it's his lawyer or his wife's lawyer,

24    that nothing is guaranteed in the future.

25    That's simply true.                               11:36:22



1                ARBITRATION DAY IV - CONFIDENTIAL

2    BY MR. NADKARNI:

3        Q.    But in estimating what he was likely to earn

4    in future, how would you know if the market in the

5    future is analogous to the market in the past without        11:36:34

6    doing an analysis of those conditions?

7        A.    We've had great stock market performance in

8    the future.  Since 1926, markets have been ever upward,

9    some years down, but there's been -- you know, terrific

10   markets in the United States since Simon moved here.         11:36:53

11       And all we're saying is that he performed in the

12   past and he's working in the U.S. markets, which are as

13   good as any on the planet, and I see no reason why he

14   couldn't do in the future what he had done in the past.

15   Anybody who's been fortunate enough to just put a dollar     11:37:15

16   into the U.S. stock market has done wonderfully over the

17   course of time, and he proved that he could be a good

18   trader, asset manager, whatever -- whatever the specific

19   skill set he had in the past, and there's no reason why

20   I don't see he would not have continued that excellent        11:37:36

21   performance in the future to varying different degrees.

22       Q.    But just a few follow-up questions,

23   Mr. Smith.

24       You're aware that his -- Mr. Andriesz's

25   compensation is not based on the stock market, correct?       11:37:49



ARBITRATION   Vol. IV Conf.                                    January 12, 2024
ANDRIESZ V. BCG FINANCIAL, L.P.                                      1207

1              ARBITRATION DAY IV - CONFIDENTIAL

2      A.   It's based on his capacity to perform, yes,

3  but the overall performance of the stock market is what

4  gives rise to the entire industry.

5      Q.   But in the -- in the documents that you          11:38:04

6  have -- or in the figures that you have produced in your

7  report, you indicate that some of Mr. Andriesz's biggest

8  performances were in 2008 to 2010, don't you?

9      A.   I have to look back.  Let me just look.  I

10 think 2007 was his best year.                             11:38:19

11     Some people, by the way, make a lot of money in

12 markets based on volatility, not necessarily the overall

13 performance in the market, so he had -- if I look at

14 earnings ...

15             (Pause.)                                      11:38:40

16             THE WITNESS:  He had excellent

17         performance throughout, before the so-called

18         crash as well as subsequent through 2011, when

19         he was at Global UK.

20 BY MR. NADKARNI:                                          11:39:10

21     Q.   You just testified that sometimes it's a

22 product of volatility rather than -- you know, for

23 example, the absolute [unintelligible] but you haven't

24 done any analysis as to volatility, have you?

25     A.   Well, variations in market volatility -- I       11:39:27



1              ARBITRATION DAY IV - CONFIDENTIAL
2    didn't examine the specific ways in which Simon earned
3    money.  I know the general -- you know, career he's in,
4    but how he -- his particular strategies and his methods
5    of execution, etc., I can't get into the weeds of that.    11:39:42
6    It's not my expertise to be able to say this kind of
7    trade, that kind of execution would make money.  This
8    kind of trade would make less money.  I just did not get
9    down in the weeds.  I looked at his overall performance
10   for the thousands of ways in which his skill set led to    11:40:01
11   his success.  I only looked at what was the bottom line.
12        Q.   Dr. Smith, you recall the portion of his
13   contract that states that the net revenues in his bonus
14   pool are dependent on revenues generated with respect to
15   voice brokering transactions, correct?                     11:40:24
16        A.   Yes.
17        Q.   You didn't review any -- any articles or
18   secondary sources evaluating to what extent the adoption
19   of algorithmic or electronic trading would affect
20   volumes for voice brokering transactions?                  11:40:39
21        A.   Correct.
22             (Pause.)
23   BY MR. NADKARNI:
24        Q.   Let's move on to a slightly different topic,
25   and I want to talk specifically about a part of page 5     11:41:09



```
1            ARBITRATION DAY IV - CONFIDENTIAL
2    of your report.  Exhibit 459, still for those still
3    searching.
4        So I'm not going to purport to summarize the whole
5    part, but, Dr. Smith, is it safe to say your            11:41:42
6    conversations with Mr. Andriesz included asking him
7    about issues he was having at BGC that he purports
8    affected his compensation?
9        A.    He did relate some of those issues, yes.
10       Q.    So I want to direct your attention to a        11:42:03
11   sentence here in page 5 of the report, paragraph 2.  It
12   is the second sentence of the second paragraph.  It
13   states:
14       "He states that he was paying himself less than he
15   was due and did not take a bonus in order to pay his    11:42:23
16   team what they were owed."
17       Do you see that?
18       A.    That's what he said, yes.
19       Q.    You didn't conduct any review of your own to
20   see whether Mr. Andriesz's statement was, in fact,      11:42:34
21   accurate?
22       A.    I didn't [unintelligible] my losses on that
23   statement and so therefore not needed and did not.
24       Q.    Sure.  Dr. Smith, if you can turn to Exhibit
25   95.  This is in Binder 1.                               11:42:47
```

