# **<u>Exhibit 6</u>**

ARBITRATION Vol. VIII Conf.　　　　　　　　　　　　　January 24, 2024
ANDRIESZ V. BCG FINANCIAL, L.P.　　　　　　　　　　　　　　　　2232

```
 1                        B. Velez
 2       Q.   All right.  Looking, if we can, at
 3   Exhibit 427.
 4            Did I skip one -- I'm sorry.  Before we go
 5   there, 426 I'm on.  Did I do 424?  426.
 6            This is in April of 2021, you sent this
 7   email, did you not, to sarahsiverson@the
 8   nfafutures.org.
 9            Do you see that?
10       A.   This is a note submission that Simon and I
11   worked on together to help support his claims.  Yes,
12   sir.
13       Q.   "I would like to submit information
14   regarding BGC, Cantor-Fitzgerald, in support of
15   whistleblower Simon Andriesz, who was my supervisor.
16   I have been providing information to this
17   whistleblower and would like to officially submit my
18   concerns regarding BGC, Cantor-Fitzgerald."
19            Do you see that?
20       A.   Correction, sir.  At the time we wrote
21   this together, he said he was actually my supervisor
22   because he held a license.  But, in essence, he was
23   not my supervisor at BGC.
24       Q.   You're familiar with the duties of an NFA
25   license 30?
```



800.211.DEPO (3376)
EsquireSolutions.com

```
ARBITRATION  Vol. VIII Conf.                         January 24, 2024
ANDRIESZ V. BCG FINANCIAL, L.P.                                  2233
```

1                           B. Velez
2        A.    No, because I only have to report to 24.
3        Q.    You deal in equities only, not futures,
4   correct?
5        A.    I don't touch futures, correct, sir.
6        Q.    Does NFA have any regulatory authority
7   over equities?
8        A.    I believe FINRA is over equity
9   derivatives.  I don't believe I --
10       Q.    I just want to make sure --
11       A.    Let's put it this way, sir:  I was never
12  supervised in any trading or any activities at work
13  by Simon.
14       Q.    Just so I'm clear, what you send to the
15  NFA is the same document that you had already sent
16  to the SEC and the FCA?
17       A.    It's the same document Simon and I wrote,
18  correct.
19       Q.    But it's the same document that you
20  submitted to the SEC and the FCA, correct?
21       A.    It's the same document that Simon and I
22  wrote that he pressured me to send to regulators,
23  correct.  Yes.
24       Q.    My question was, it's the same document
25  that you, Bob Velez, had previously submitted to the



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                        B. Velez
 2    SEC and the FCA, correct?
 3         A.   It's the same document that Simon and I
 4    co-wrote that I sent to the FTC and the FCA and all
 5    the regulators, correct.
 6         Q.   And now you're sending it to the NFA?
 7         A.   He had me send them to everyone, correct.
 8    He had me send to million people, yes.
 9              CHAIRMAN KHEEL:  Mr. Brickman, can I
10         interject a question?  We've been going a
11         little over two hours.  We want you to --
12              MR. BRICKMAN:  I'm really in the home
13         stretch.
14              CHAIRMAN KHEEL:  That's all I wanted to
15         know.  We'll proceed then.
16    BY MR. BRICKMAN:
17         Q.   If we could turn to Exhibit 427.
18              It's a very simple question, Mr. Velez.
19              Did you send this document to Shannon,
20    Jane, and John at or about April 1 of 2021?
21              That's a "yes" or "no."
22         A.   This is another email Simon had me send,
23    yes.
24         Q.   You sent it though, correct?
25         A.   He gave me the context and told me what to
```



```
 1                     B. Velez
 2   write, and I sent it.  Yes, sir.
 3       Q.    He didn't tell you everything to write?
 4       A.    Yes, he did, sir.  Absolutely.  That's why
 5   we submitted the FCA document as well, because it
 6   didn't have all the information he wanted on it.
 7   Yes, he did, sir.
 8             Can I ask a question?  How come none of
 9   this stuff was ever -- at BGC?
10       Q.    Well --
11       A.    Right?  So, again, sir, I would never have
12   known how to find these contacts.  I had no
13   intention to contact these regulators.  I contacted
14   them because he pressured me to do so, and he helped
15   me write this, and we submitted it.  I had no axe at
16   all and nothing at all to gain other than helping my
17   friend.
18             And it was a mistake, and I regret it.
19   And I was used and manipulate because of my personal
20   circumstances.  And it's only fair that I'm being
21   put on trial, because if there's a case here, it
22   should be based on my information.
23       Q.    Well, just looking at the list of ten we
24   talked about, I heard your testimony correctly that
25   some of those you wrote?
```



```
ARBITRATION  Vol. VIII Conf.                    January 24, 2024
ANDRIESZ V. BCG FINANCIAL, L.P.                            2236
```

1  B. Velez
2  A.   Oh, I had some issues with BGC.  Of course
3  I did.  That's why I left.  None of them were any
4  reason to be a whistleblower.  I was never a
5  whistleblower from the time I left to when BGC
6  needed my help -- sorry -- when Simon needed my
7  help.  None of these issues were ever put into my
8  complaints.
9        (To Mr. Andriesz) I'm so upset that I sent
10 you an email that I shouldn't have even sent because
11 of an inappropriate relationship.  He still had
12 me --  ███████████████████████████████████
13 ████
14       So I am a little upset with you, sir.
15 Q.   If we're going to talk about
16 conversations, back in April of 2022, we had our
17 first conversation, correct?
18 A.   Yes.  And why?  Because Simon asked me to
19 have a conversation with you.
20 Q.   In that conversation, you advised us, did
21 you not, that BGC runs its organization like a
22 criminal enterprise?
23       Do you remember telling us that?
24 A.   I don't remember if I said that, sir.
25 Q.   You don't remember?



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                    B. Velez
 2   you face any adverse consequences from BGC?
 3        A.   No.  I did get scolded for kind of barging
 4   into Theo's office and screaming at him, but I
 5   didn't get any problems.  I got promoted after that;
 6   so no.
 7        Q.   Similar question I asked you about
 8   Mr. Jridi.  Did this issue from with Tropeano --
 9   from your perspective, did it have anything
10   whatsoever to do with the Claimant in this case,
11   Simon Andriesz?
12        A.   Absolutely not.
13        Q.   Did he raise any issues about Ms. Tropeano
14   during his employment to your knowledge?
15        A.   I don't think she was employed at the time
16   that's -- but no, not that I know of.  No.
17        Q.   This whole issue predated his time in
18   New York; is that right?
19        A.   I believe so, yes, sir.
20        Q.   There was mention of a gentleman named
21   Charles de Chabeneix.  First time I'm hearing that
22   name, so I'll just ask you, similarly, whatever the
23   issue was with Charles de Chabeneix -- I don't know
24   what it was, to be honest -- did Mr. Andriesz have
25   anything to do with that?
```



```
 1                         B. Velez
 2       A.   No, sir.
 3       Q.   You made mention -- I'm not going to have
 4  it pulled up, but we looked at Exhibit 389, in which
 5  you said something like "They are capable of
 6  anything," with respect to BGC.  And I believe your
 7  testimony was you had heard something from
 8  Mr. Andriesz.
 9            In the time period after Mr. Andriesz left
10  BGC, what kind of things did you learn from him or
11  did you hear from him about his beliefs about what
12  BGC was capable of?
13            Describe to me the conversations.
14       A.   All sorts of things, from rigged doctors'
15  appointments to money laundering -- I mean, we spent
16  hundreds of hours on charts, these apparent papers,
17  and all sorts of stories from him -- from charity
18  and charity manipulation.
19            I mean, it was very wide, from
20  manipulating charity funds to, you know, money
21  laundering to mafia associations with doctors and
22  all sorts of -- I mean, a lot -- a lot of
23  conspiracies.  A whole bunch of stuff, yeah.
24       Q.   So to use your word, did you come to a
25  view as to whether the conspiracies that
```



```
ARBITRATION  Vol. VIII Conf.                    January 24, 2024
ANDRIESZ V. BCG FINANCIAL, L.P.                            2257
```

1                       B. Velez
2  Mr. Andriesz was describing were credible?
3       A.   Some are farfetched, but if they were, I
4  mean, you know, then we were at some sort of Bernie
5  Madoff, someone in the mafia.  But no, not to the
6  point -- it became a bit wild.
7       Q.   Okay.  There's an email that you looked at
8  with Mr. Brickman that relates to a transaction
9  called "E-speed."
10           Do you have new personal knowledge as to
11 the accounting or tax treatment of the E-speed
12 transaction?
13      A.   No.  It was just speculations of things
14 that we were talking about and trying to deduct.
15 But no, I have no inside -- I was just a broker, a
16 manager/broker.  I had nothing to do with that.
17      Q.   Based on your discussions with
18 Mr. Andriesz, did you have an understanding whether
19 he had any direct knowledge?
20      A.   No.  Absolutely not.  No, no.
21      Q.   Okay.  You had looked at what looked to me
22 like an outline that was described as a letter to a
23 lot of different regulators, the CFTC, I guess -- I
24 didn't see that one -- by the NFA, the FCC, the FCA.
25 And I just want you to give -- I want to give you



1                   B. Velez
2   the opportunity, because I could sense you were
3   trying to describe this.
4           Can you describe how that document was
5   created, what the process was?
6       A.  We worked on it together, you know. We --
7   there was -- as you also saw from the text messages,
8   there was always a pushing, "Call this guy. Call
9   this guy. Here is this guy," you know. I think at
10  one point there was a call where -- I got a call
11  with -- he was on the phone with the IRS, and I hung
12  up.
13          So it was a constant, "Call this; do
14  this." And, again, I wanted to help him. And I
15  did, and I regret it, looking back. But, you know,
16  it was, like, all these names, all of these emails.
17  They were all provided with them. And we worked
18  together, and we went back and forth until we got it
19  satisfactory and was happy to send it.
20      Q.  I want to look at very few, but only a few
21  of the documents that you looked at with
22  Mr. Brickman.
23          The first one I'd ask -- let me know. I'm
24  not sure who is -- are you pulling up documents or
25  is --



```
ARBITRATION  Vol. VIII Conf.                              January 24, 2024
ANDRIESZ V. BCG FINANCIAL, L.P.                                       2259
```

```
 1                      B. Velez
 2           MS. CARDENAS:  Oh, I'm not in the --
 3           MR. BRICKMAN:  I can do it.
 4           (Exhibit 440 was received and marked for
 5      identification, as of this date.)
 6           MR. SHAH:  I'd be grateful if you don't
 7      mind.  Exhibit 440.
 8      BY MR. SHAH:
 9           Q.  If we could go to the first page, 4956.
10      Sorry to be directing you.
11           MR. BRICKMAN:  No, I appreciate your help.
12      BY MR. SHAH:
13           Q.  Do you see in the first column on the
14      left -- I'll just represent to you -- I think you
15      understood this -- the text on the left are yours,
16      and the ones on the right are from Mr. Andriesz.
17           Is that your understanding?
18           A.  It looks like that, yes.
19           Q.  Okay.  So on the left, you're making
20      reference to Carrie Fertig, who was offsite in
21      Miami.  You said "Where we had to fire old people."
22           Do you see that?
23           A.  Yeah.
24           Q.  Was there an offsite where you were
25      instructed to fire old people?
```



```
ARBITRATION  Vol. VIII Conf.                        January 24, 2024
ANDRIESZ V. BCG FINANCIAL, L.P.                                 2265
```

```
 1                         B. Velez
 2            ARBITRATOR ELKIND:  Yeah.  It says
 3      March 22, first page.
 4         A.   So at this point -- I'm getting emotional
 5   again -- ████████████████████████████████
 6   ████  ████████████████████████████████████
 7   ████████████████████████████████████████████
 8   ████  ████████████████████████████████████
 9   ████████████████  ██████████████████████████
10   ██████████████████
11              ██████████████████████████████████
12   ████████████████████████  ████████████████████
13   ████████████████████████████
14   ████████████████████  ██████████████████
15   ██████████████████████████████████████
16            So I was not working.  I was destitute.
17   And, you know, I wasn't ████████████████████
18   ████████  ████████████████████████
19         Q.   Had you borrowed any money from
20   Mr. Andriesz at this point?
21         A.   I had in the point, not at this point.  I
22   was asking for help, but I had borrowed some money
23   while at Square.  And I borrowed some money when --
24   he helped me a lot, man.  That's why I didn't want
25   to be on the stand.
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                      B. Velez
 2            I borrowed some money when ▮▮▮▮▮▮▮▮
 3   ▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
 4   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮
 5   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮     He was helping me
 6   out a lot.
 7       Q.   When Mr. Andriesz said "I'll help you as
 8   much as I can" in the context of this overall
 9   discussion, did you have an understanding of what he
10   was suggesting?
11       A.   From whatever would come out of BGC.
12   There was no formal arrangement, but he just wanted
13   to keep helping me.
14       Q.   Did that motivate you at all to try to
15   assist him with respect to his efforts?
16       A.   I'm ashamed to say, yes.  I was desperate.
17            (Exhibit 441 was received and marked for
18   identification, as of this date.)
19       Q.   If you can go to Exhibit 441.
20            CHAIRMAN KHEEL:  Were --
21            (A discussion was held off the record.)
22            CHAIRMAN KHEEL:  Are we ready to proceed?
23            MR. SHAH:  Yes, sir.
24   BY MR. SHAH:
25       Q.   If you can go to Exhibit 441.
```



ARBITRATION  Vol. VIII Conf.
ANDRIESZ V. BCG FINANCIAL, L.P.
January 24, 2024
2267

```
 1                    B. Velez
 2           We heard testimony from Mr. Andriesz, as
 3   well as from you in this case about a meeting with
 4   Mr. Aubin.  I just want to direct your attention to
 5   Andriesz's 4969.
 6           If you look at the right side of this text
 7   string, there's two columns.  I'm looking at the one
 8   on the left?
 9       A.   Yes.
10       Q.   So the right side of the text is
11   Mr. Andriesz.
12           Mr. Andriesz writes to you "When Aubin
13   threatened me, I was in New York, right?  After I
14   had a heart attack?  So 2015?"
15           And you wrote back "No, you were here in
16   London, in icap office."
17           Do you see that?
18       A.   I just can't see where that -- where is
19   that?  Am I on the wrong page?
20       Q.   Just the top left, sir.  Top left.  "When
21   Aubin threatened me."
22           Do you see that?
23       A.   Yes.  I don't see the words -- oh, okay.
24   That's how it goes.  Okay.  So it's two -- okay.  I
25   got it, yes.  Yes, sir.
```



ESQUIRE
DEPOSITION SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com