# Exhibit 9

1      J. McLachlan - Direct - Mr. Nadkarni

2    different asset class received those

3    same revenues in their bonus pool?

4    A.     No.

5    Q.     Now, Mr. McLachlan, I'd like to

6    talk a little bit more about the bonus

7    pools in general.

8           At the time you worked for BGC in

9    2015, were you generally familiar with

10   the process of calculating bonus pools

11   for the desks that Mr. Aubin supervised?

12   A.     Yes, I was.

13   Q.     And what was the basis for your

14   familiarity?

15   A.     I prepared the calculations.  An

16   initial draft was sent to me but it was

17   my responsibility to produce those

18   calculations.

19   Q.     And more specifically, were you

20   familiar with the process of calculating

21   the bonus pool for the desks that Mr.

22   Andriesz supervised?

23   A.     Yes, I was.

24   Q.     And can you remind the panel

25   which desks those were?



1     J. McLachlan - Direct - Mr. Nadkarni

2     A.    That was the London futures desk

3     and the New York futures desk.

4     Q.    At the time Mr. Andriesz took

5     over the New York futures desk, do you

6     recall what the performance of that desk

7     was like compared to London?

8     A.    Less good.  Yes, it was less

9     good.  It was, as a whole, it was not,

10    it was not generating bonus.  There were

11    individuals who, because of their deals,

12    were getting paid but overall it was not

13    as good as London.

14    Q.    So when Mr. Andriesz signed the

15    agreement, were you aware of whether

16    there was any understanding as to

17    whether the pool of the New York desk

18    could negative -- would be intended to

19    impact the pool of the London desk

20    beginning immediately?

21    A.    Yes.

22    Q.    And what was your understanding?

23    A.    That it was, that there would be

24    a netting.  So negative, a negative

25    number on New York would be offset



1      J. McLachlan - Direct - Mr. Nadkarni
2    against a positive number in London, for
3    example.
4    Q.    Was the netting intended to begin
5    as soon as Mr. Andriesz began?
6    A.    That was not our intention.
7    Q.    Can you explain why?
8    A.    We said that there would be a
9    period of grace during which Mr.
10   Andriesz could fix the performance of
11   the New York desk.
12   Q.    But what -- you said that -- but
13   just to clarify your testimony.  You
14   said that after a period of grace there
15   was intended to be a netting?
16   A.    Yes, indeed.
17   Q.    From BGC's perspective what was
18   the motivation for that.
19       MR. BRICKMAN:  Object to the
20    question.  This witness has testified
21    that he had left BGC, and so he was
22    not there when Mr. Andriesz signed
23    the US contract.  Unless I'm getting
24    my dates wrong, he signed the US
25    contract, which is Exhibit 38, in



```
 1    J. McLachlan - Direct - Mr. Nadkarni
 2    January of 2016, and the question
 3    he's asking this witness is to
 4    interpret that contract at a time
 5    when he was not even at BGC.  Can we
 6    set this in time?
 7         MR. NADKARNI:  Mr. Chair, I think
 8    opposing counsel is a bit confused as
 9    to the dates here.
10         THE CHAIRMAN:  Mr. Nadkarni,
11    you've got to let Mr. Brickman
12    finish.
13         MR. NADKARNI:  Sure.
14         THE CHAIRMAN:  I assure counsel,
15    as I've done before, I make no
16    rulings without counsel having
17    exhausted their commentary.
18         Mr. Brickman, I apologize for any
19    cut off.  You were telling us?
20         MR. BRICKMAN:  We just need to
21    set the question in terms of time
22    because if he's asking him questions
23    about something that had happened
24    when he was not at the firm, this,
25    this witness is not competent to
```



1    J. McLachlan - Direct - Mr. Nadkarni

2       opine as to the interpretation of a

3       contract that was entered into when

4       he wasn't there.

5            And maybe I'm getting my dates

6       wrong, but I heard the witness

7       testify he left in mid 2015 and was

8       not there in 2015 and 2016.

9            MR. NADKARNI:  Mr. Chair, can I

10      lay a foundation?

11           THE CHAIRMAN:  That was what I

12      was going to ask you to do.

13           MR. BRICKMAN:  That's all I'm

14      asking for.

15   Q.    Okay, Mr. McLachlan, I'd like to

16   show you Exhibit 38 which is already in

17   evidence.

18           Can you review this and tell me

19   what it appears to be?

20   A.    Okay, so that appears to be an

21   employment contract between BGC

22   Financial, LP and Simon Andriesz.

23   Q.    Can you remind the panel of what

24   the date of it is?

25   A.    21st of January, 2015.



```
1      J. McLachlan - Direct - Mr. Nadkarni
2   Q.    Were you working at BGC then?
3   A.    Yes, I was.
4   Q.    Were you working for Mr. Aubin?
5   A.    Yes, I was.
6   Q.    And were you familiar with the
7   company's understanding of how this
8   contract operated at the time?
9   A.    Yes.
10       MR. BRICKMAN:  Objection.  This
11    witness is not competent to talk
12    about the company's understanding of
13    the contract.  He can have his
14    understanding.  But how can he
15    testify as to the company's
16    understanding of a contract?
17    Objection.
18       MR. NADKARNI:  Mr. Chair, this
19    began with Mr. Brickman asserting
20    this contract was dated in 2016.  I'm
21    simply trying to establish that Mr.
22    McLachlan was in fact familiar.
23       THE CHAIRMAN:  Then the only
24    portion of the objection that's
25    relevant here is that the form of
```



1    J. McLachlan - Direct - Mr. Nadkarni

2    that question is to address whether

3    the company had an understanding.

4    And Mr. Brickman correctly points out

5    that there are 2,000, 5,000

6    employees.  And so if you could ask

7    what Mr. McLachlan's understanding is

8    or if he has an understanding of what

9    Mr. Aubin understood based on

10   conversations with him, that would be

11   an acceptable question from what I

12   understand.

13        MR. BRICKMAN:  Agreed,

14   Mr. Chairman.

15   Q.    Mr. McLachlan, did you speak to

16   Mr. Aubin about his understanding of

17   this contract?

18   A.    Yes, I did.

19   Q.    And did you speak to Mr. Andriesz

20   about Mr. Aubin's understanding of this

21   contract?

22   A.    Yes, I did.

23   Q.    Okay.  So just to go back to the

24   question I was trying to ask about three

25   minutes ago.



1      J. McLachlan - Direct - Mr. Nadkarni

2          You said that the intention was

3    that after a grace period they would --

4    after the grace period there would be a

5    netting.  What was Mr. Aubin's view as,

6    or what was his view as to why there

7    should eventually be a netting?

8    A.     Because, because that's, that's

9    the deal we did.

10   Q.     Now at the time periods in which

11   you worked for Mr. Aubin, are you aware

12   of the bonus pool for New York ever

13   being netted against the bonus pool for

14   London?

15   A.     Can you repeat, please?

16   Q.     Sure.  During the time period

17   that you worked for Mr. Aubin in 2015

18   and you were involved in calculating Mr.

19   Andriesz' bonus pool, are you aware of

20   the pool's ever being netted at that

21   time?

22   A.     No.  This was not done.

23   Q.     Now, Mr. Aubin -- sorry, Mr.

24   McLachlan, if I can take you to another

25   exhibit, this is Exhibit 65.



1    J. McLachlan - Direct - Mr. Nadkarni

2         THE CHAIRMAN:  I missed it.  I

3    didn't write it down.

4         MR. NADKARNI:  This is Exhibit

5    65.

6         THE CHAIRMAN:  Thank you.

7    Q.    And we will -- there's a few

8    parts of this exhibit so I think we'll

9    go one by one I think so it's most

10   instructive to the panel.

11        Can you explain what this email

12   is?

13   A.    So this is me sending to Mr.

14   Andriesz and Tommy Attrill the bonus

15   calculations for the London futures desk

16   and the New York futures desk for

17   quarter 1 of 2015.

18   Q.    And, Mr. McLachlan, can you

19   explain to the panel the typical process

20   in which the calculations would be

21   finalized?  I'd like you to begin with

22   maybe when you would send this email and

23   then take the panel through what the

24   process was until the payments were

25   actually made on bonuses.



```
 1      J. McLachlan - Direct - Mr. Nadkarni
 2    A.    Okay.  So the last trade captured
 3    and last cost incurred captured by these
 4    calculations would have been -- would
 5    have been -- where are we?  The 31st of
 6    March, 2015 and we need to make payment
 7    by 31st of -- by 30th of June 2015.
 8          And so at some point early on in
 9    that following quarter, Q2, bonus
10    calculations would have been produced in
11    draft and given to myself.  I would have
12    reviewed them and finalized them and
13    then sent them to the desk head, in this
14    case the desk head and the business
15    manager of the desk.
16          They would have reviewed the
17    calculations.  Then any questions they
18    had answered.  Then they would have
19    provided me what they call the splits,
20    which is how the pool would be split
21    amongst the individuals on the desk.
22          And in time, for those to be
23    loaded into the approval system,
24    approved by BGC management and given to
25    payroll in time to make the payroll.
```



1     J. McLachlan - Direct - Mr. Nadkarni
2     Q.    Now during this period, would Mr.
3   Andriesz or Mr. Attrill, his manager,
4   have been given the opportunity to raise
5   any questions they had with you?
6     A.    Yes, that's a key part of the
7   process.
8     Q.    All right.  So let's go to the
9   printout that we've given to the panel
10  and to counsel of the first attachment
11  here which is the one titled Simon
12  Andriesz Bonus Calc Q1 2015.
13          This is the file that is labeled
14  65A and then in parentheses futures
15  options.
16          Mr. McLachlan, can you review
17  this and just tell me what these
18  calculations appear to be?
19    A.    That is the bonus calculation for
20  the London futures desk for Q1 2015.
21    Q.    So the row that says Total
22  Revenue, what is that depicting?
23    A.    That is the revenue that had been
24  done during Q1 of 2015 by the brokers on
25  the futures desk in London.



1     J. McLachlan - Direct - Mr. Nadkarni
2     Q.    Are those the net revenues?
3     A.    Yes, they are.
4     Q.    Do there appear to be any numbers
5     for CME volume rebates or Pit rebates or
6     market maker crosses in these totals?
7     A.    No, there aren't.
8     Q.    Do you recall Mr. Andriesz or Mr.
9     Attrill ever raising any issues with you
10    about such figures not being included in
11    this pool?
12    A.    No.
13    Q.    Putting this away just for a
14    second, did it come as any surprise to
15    you that they didn't raise any
16    questions?
17    A.    No.
18    Q.    Why is that?
19    A.    Because it was well established
20    company policy and a well known fact
21    within the company that rebates were not
22    shown as a credit to net revenue in the
23    bonus calculation.
24    Q.    Okay.  So I'd like to ask not
25    just about rebates but about a few of



1    J. McLachlan - Direct - Mr. Nadkarni

2    the costs.

3          The calculations we looked on

4    that -- we looked at on that exhibit,

5    did they include any execution costs

6    such as, for example, an ABN Amro

7    clearing contract or Fast Fill or TAO?

8    A.    No.

9    Q.    So if they are not in the pool

10   calculations, who is actually paying for

11   those costs?

12   A.    The company pays those costs.

13   Q.    So by the company pays those

14   costs, are you saying that it is outside

15   the pool they pay for the costs?

16   A.    Yes, indeed, yes.

17   Q.    Did the companies use or did the

18   company use any, any revenues to offset

19   the expenses that it was paying outside

20   of the pool?

21   A.    Yes, it did.  So there were

22   rebate revenues received that were

23   reported outside of the pool, and these

24   were used to partially offset the costs

25   of those execution costs that you



1    J. McLachlan - Direct - Mr. Nadkarni

2   referred to.

3    Q.    So would you say there was a

4   benefit to the brokers from this

5   arrangement?

6    A.    Yes, there was.

7    Q.    Can you elaborate on why that

8   would be a benefit to the brokers?

9    A.    So the cost, all those execution

10   costs were, were partially offset by

11   rebate revenue, rebate income and

12   partially offset, a fraction of that

13   residual cost was passed to the brokers

14   in the form of a one and a half cent per

15   contract charge on futures contracts

16   that were executed.

17   Q.    Okay.  Mr. McLachlan, so can you

18   explain, just moving to a similar topic,

19   can you explain at the time if you were

20   familiar with where BGC booked revenues

21   from, say, cross trades with market

22   makers or rebates from Pit brokers?

23   A.    Where they were booked?

24   Q.    Yes.

25   A.    They were booked on the Chicago



1     J. McLachlan - Direct - Mr. Nadkarni

2   futures line.

3   Q.    Now if you could tell the panel

4   at this time how many other futures

5   desks were there in BGC?

6   A.    I'd say ten to twelve.

7   Q.    Can you name some examples let's

8   say outside of New York City, London or

9   Chicago?

10   A.    There was a Mint futures desk in

11   London.  There was the Paris futures

12   desk.  There was a futures desk in Neon,

13   Switzerland, there were Hong Kong

14   futures, Sydney, to name the ones I can

15   remember this instant.

16   Q.    Do you recall whether all of

17   those desks contributed to the volume

18   that generated the Pit rebates and

19   revenue from market maker crosses that

20   were booked to Chicago?

21   A.    Yes, they did.

22   Q.    Did BGC credit any of those other

23   desks with those revenues into their

24   bonus pool?

25   A.    No, they did not.



1    J. McLachlan - Direct - Mr. Nadkarni

2    Q.    Okay.  So, Mr. McLachlan, I'd

3    like to go to an exhibit that is already

4    in evidence.  This is Exhibit 265, and

5    specifically I'd like to take you to a

6    printout of the first, the first page of

7    the attachment, or to the exhibit.  This

8    is the one that's called 265A rebate in

9    parentheses.

10        I don't want to actually ask you

11   to testify to anything that is -- to the

12   accuracy of anything that is written

13   directly here but just to refresh your

14   recollection.

15        So, Mr. McLachlan, I'd like to

16   direct you to the bottom footnote, to

17   one of the lines in the bottom footnote

18   here, footnote romanette i.

19        MR. BRICKMAN:  Is this 5?

20        MR. NADKARNI:  This is 265A,

21    parentheses, rebate, is the file.

22        MR. BRICKMAN:  Hold on.  Let us

23    just get there.  Now this is a

24    document that was prepared after Mr.

25    McLachlan was no longer at the firm;



1      J. McLachlan - Direct - Mr. Nadkarni

2    Zhao?

3    A.    Ying Zhao was at the time the

4    person in the finance department

5    responsible for preparing the first

6    draft of the bonus and processing the

7    outcome of the bonus review process.

8    Q.    If you can look down to this

9    email, I don't think the attachment

10   necessarily, but if you can review this

11   email beginning from your email to

12   Mr. Zhao and Ms. Turner and then going

13   up to the top, can you -- can you

14   communicate to the panel what you're

15   intending to communicate here to

16   Mr. Zhao?

17   A.    So the intention was to

18   communicate that the company wishes to

19   pay a $12,000 bonus to Mr. Andriesz.

20   Q.    And do you recall whether that

21   was the ultimate bonus amount remitted

22   to Mr. Andriesz for this quarter?

23   A.    Yes, it was.

24   Q.    Before that amount was paid out,

25   do you ever recall Mr. Andriesz or



1      J. McLachlan - Direct - Mr. Nadkarni
2    Mr. Attrill raising any issues with you
3    in which they asserted that there were
4    large sums of revenue missing from the
5    bonus pool?
6     A.    No, they did not.
7     Q.    All right.  Let's go to a similar
8    email but with respect to the other
9    pool.
10          This is Exhibit 75.
11          So, Mr. McLachlan, this is an
12    email you received from Mr. Attrill.
13    Can you just review this and let me
14    first ask, do you recall receiving this
15    email from Mr. Attrill?
16     A.    Yes, I do.
17     Q.    And can you explain what this
18    email is communicating?
19     A.    This is communicating the split
20    of the pool, i.e., who should get paid
21    what, for Q1 of 2015.
22     Q.    Which pool is this?
23     A.    This is the London pool.
24     Q.    So let me ask you, where it says
25    "Simon" here, is that a reference to Mr.



1      J. McLachlan - Direct - Mr. Nadkarni

2    Andriesz?

3     A.    Yes, it is.

4     Q.    And do you recall whether this

5    document reflects, accurately reflects

6    the bonuses that were ultimately

7    remitted by BGC?

8     A.    Yes, it does.

9     Q.    So would this have been a bonus

10   in addition to Mr. Andriesz' previous

11   bonus you referenced?

12    A.    Yes.

13    Q.    Does there appear in this

14   document to be any netting of these

15   amounts based on the performance of a

16   different desk?

17    A.    No, there's not.

18    Q.    Now by pool gross bonus, can you

19   explain what that number is, where

20   Mr. Attrill writes "pool gross bonus

21   ▇▇▇▇▇."

22    A.    That was the amount of pay

23   available to distribute amongst the

24   members of the desk.

25         THE CHAIRMAN:   Is that the London



1    J. McLachlan - Direct - Mr. Nadkarni

2    desk or New York desk or both?

3         THE WITNESS:  That is the London

4    desk only.

5         THE CHAIRMAN:  Thank you.

6    Q.    And, Mr. McLachlan, to clarify,

7    before these amounts were paid out, do

8    you ever recall Mr. Attrill or Mr.

9    Andriesz asserting that there were large

10   quantities of revenue missing from the

11   London pool?

12   A.    No, I did not.

13   Q.    Do you ever recall them telling

14   you that they believed this amount was

15   low because the deficit of a different

16   pool had been deducted from it?

17   A.    No.

18   Q.    Now specifically I'd like to

19   direct your attention to the sentence

20   that says, or the section that says

21   "Ronin provision payment, ███████."

22        What is that a reference to?

23   A.    This refers to the paying of a

24   bonus on revenues that were held back,

25   the issue we discussed earlier, the



1      J. McLachlan - Direct - Mr. Nadkarni

2   payment for market maker revenue that

3   was later released and this is the

4   company now paying on that late

5   collected revenue.

6   Q.    Where it says "Simon," who is

7   that a reference to?

8   A.    Mr. Andriesz.

9   Q.    And do you recall where it says

10  "10,000" next to him, do you recall

11  whether he was paid on that amount for

12  these collections from Ronin?

13  A.    Yes, he was.

14  Q.    Okay, Mr. McLachlan, we can move

15  on to another document.

16        And I believe we're nearing the

17  end now so this will hopefully just be a

18  few minutes and can take a break.

19        I'd like to show you a document

20  already in evidence.  This is Exhibit

21  200.

22        So, Mr. McLachlan, I just want to

23  direct your attention because I know

24  you're not on this email to a part of

25  this email that Mr. Chiles sends to Mr.



1        J. McLachlan - By The Panel
2    Marine coming into kind of really
3    grab the desk and turn it into a
4    raging success, which he did.  And
5    part of his positive attitude towards
6    starting this, I want to say quite
7    recklessly, he agreed to take that
8    cost on.  He said, I'm going to build
9    your revenue and I'm going to take
10   this problem away from you by taking
11   this cost.
12        ARBITRATOR ELKIND:  And with
13   respect to the payment to ▇▇▇▇
14   ▇▇▇▇   is that -- was that a proper
15   place to lodge that, that cost?
16        THE WITNESS:  No, it was not.
17        ARBITRATOR ELKIND:  And why is
18   that?
19        THE WITNESS:  We didn't make
20   it -- the proper place to have lodged
21   it would have been to wait until the
22   year-end back office bonus cycle and
23   insert it as an incremental amount on
24   top of her normal comp and then make,
25   have the conversation and get it



1        J. McLachlan - By The Panel

2   signed off there.

3        On the basis we had talked to

4   ████████ about getting it earlier but

5   hadn't thought clearly enough about

6   the mechanism as to how we were going

7   to deliver it with the promised

8   timing, we set about trying to

9   fulfill our promise which was done in

10  a, not a great way.

11       And I'll carry that one because I

12  found the solution in adverted

13  commerce, but no, it wasn't the best

14  way to do it.

15       ARBITRATOR ELKIND:  I have no

16  further questions.

17       Mr. Chair.

18       THE CHAIRMAN:  I just have a

19  couple.  Again, I want to thank you

20  for your patience.  I know it is

21  getting late in your neck or side of

22  the pool or whatever.

23       I want to first, just a couple of

24  questions, but focus on to the extent

25  you had conversations with Mr.



```
 1        J. McLachlan - By The Panel
 2   Andriesz at the time you first heard
 3   about the possibility of him working
 4   in New York.
 5        In any of those conversations,
 6   did the subject of who had initiated
 7   that concept?  Was it divine
 8   intervention or some other way that
 9   the concept came up, as you recall?
10        THE WITNESS:  I recall it
11   being -- I recall it being initiated
12   by Simon.
13        THE CHAIRMAN:  Can you elaborate
14   on your recollection beyond that?
15        THE WITNESS:  Yes, my
16   recollection was that the opportunity
17   was there after the departure of
18   Mr. Riffice and Simon was keen to
19   take on the New York responsibility
20   as a way of getting to New York, kind
21   of the center of his, his, center of
22   his kind of life was moving from the
23   UK to the US and it fitted very well
24   with that, that move.
25        THE CHAIRMAN:  Thank you for
```



1          J. McLachlan - By The Panel

2     that.

3          Let me, again in that same time

4     frame, you referenced that there was

5     a plan to have a grace period where

6     the London and New York pools were

7     not, would not be netted or pooled.

8          Can you tell me with whom you had

9     those conversations and whether there

10    was discussion about whether that

11    would be for six months or two years

12    or five years?

13         THE WITNESS:  I had a

14    conversation -- I recall having a

15    conversation with Simon around the

16    time he got his contract to say it's

17    one pool, but obviously you're going

18    to get an opportunity to fix New York

19    before we do any offsets.

20         So there's no fixed time scale.

21    There would have been, for the

22    individuals not making on the desk,

23    we would have had to look at

24    contractual terms and time scales

25    relating to those people and come up

