# **Exhibit 10**

OFFICE OF DISPUTE RESOLUTION
FINANCIAL INDUSTRY REGULATORY AUTHORITY
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| SIMON D. ANDRIESZ, | : | |
| | : | |
| | : | |
| Claimant, | : | FINRA Case No. 22-02539 |
| | : | |
| - against - | : | |
| | : | |
| | : | |
| BGC FINANCIAL, L.P., CANTOR FITZGERALD & | : | |
| CO., JEAN-PIERRE AUBIN, MARK WEBSTER, PAUL | : | |
| M. PION, and WILLIAM M. SHIELDS. | : | |
| | : | |
| Respondents. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## POST-HEARING BRIEF OF RESPONDENTS BGC FINANCIAL, L.P., CANTOR FITZGERALD & CO., JEAN-PIERRE AUBIN, MARK WEBSTER, PAUL M. PION, AND WILLIAM M. SHIELDS

Nirav S. Shah, Assistant General Counsel
Virginia J. Cardenas, Assistant General Counsel
Sid Nadkarni, Assistant General Counsel
110 E. 59th Street, 7th Floor
New York, New York 10022

*Attorneys for Respondents BGC Financial, L.P., Cantor Fitzgerald & Co., Jean-Pierre Aubin, Mark Webster, Paul M. Pion, and William M. Shields.*

April 12, 2024

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

PRELIMINARY STATEMENT ......................................................................................... 1

THE FACTS PROVEN IN THE HEARING ...................................................................... 3

    I.    Andriesz Arrives at BGC Brokers in London in 2012 ....................................... 3

    II.   Andriesz Relocates to New York and Signs a New Contract. ........................... 3

    III.  Andriesz Litigates an Acrimonious Divorce and Takes Actions that Fully
          Contradict His Allegations in this Proceeding. ................................................ 6

    IV.  Andriesz's Mismanagement Causes a Hiring Fiasco ....................................... 8

    V.   In 2015, Andriesz Receives More Money from BGC than He Was Entitled to. ........... 12

    VI.  Andriesz Goes to War with BGC in 2016. ..................................................... 14

    VII.  Andriesz Returns to Work and Gets His Requested Bonus Pool Adjustments. ........... 18

    VIII. Attrill Walks Out the Door in March 2016 When Andriesz Fails to Retain Him. ........ 22

    IX.  Andriesz Added No Value with Respect to Jridi and Anthony. .................................. 23

    X.   The O'Leary Side Show in Mid-2016. ............................................................ 26

    XI.  Andriesz Self-Destructs in the Fourth Quarter of 2016. ............................... 26

    XII.  2017 to Present:  Andriesz Seeks Revenge. ................................................... 32

ARGUMENT ...................................................................................................................... 34

    I.    All Claims Against CF&Co. Must be Dismissed. .......................................... 34

    II.   Andriesz's Whistleblower Claims Under Dodd-Frank Fail ........................... 35

         A.  Andriesz Was Not a Dodd-Frank "Whistleblower" at the Time of
             Termination. ............................................................................................ 35

         B.  Andriesz Cannot Make a Prima Facie Case of Retaliation Regarding Any
             Complaints Related to Other Brokers. ................................................... 36

         C.  Andriesz Had No Reasonable Belief of Having Exposed Securities Law
             Violations Before His Departure from BGC. ........................................ 37

         D.  BGC Had a Legitimate, Non-retaliatory Reason for Terminating
             Andriesz's Employment. ........................................................................ 40

III.    Andriesz's Contract-Based Claims Fail............................................................ 41

A.    BGC Did Not Breach Contract in Terminating Andriesz's Employment..................... 41

B.    BGC Did Not Breach with Respect to Andriesz's Non-Cash Equity
Compensation. .................................................................................................. 42

C.    BGC Did Not Breach Contract in Its Calculation of Andriesz' Bonus Pool.............. 43

IV.    Andriesz's New York Labor Law Claim Fails. ............................................... 45

V.    Andriesz's Implied Covenant Claim fails....................................................... 45

VI.    Andriesz's Conversion and Unjust Enrichment Claims Fail. ....................... 46

VII.    Andriesz's Defamation Claim Fails............................................................... 47

VIII. Andriesz's IIED Claim Fails........................................................................... 48

IX.    Andriesz's Tortious Interference Claim Fails............................................... 49

X.    Andriesz's Fraud Claims Fail. ...................................................................... 49

A.    Andriesz's Reliance on Any False Oral Statements Regarding His Equity
Compensation Would Be Unreasonable ................................................... 50

B.    Andriesz's Fraud Claims Relating to His Compensation and Contractual
Duties Fail.................................................................................................. 50

C.    Andriesz Produced No Evidence of Any Other Fraudulent Statements. .............. 51

XI.    Andriesz's Fiduciary Duty Claim Fails. ........................................................ 51

XII.    Andriesz's RICO Claim Fails. ....................................................................... 52

XIII. Andriesz's Civil Conspiracy Claim Fails. .................................................... 53

XIV. Andriesz Has No Case for Damages............................................................... 53

A.    Andriesz Suffered No Actionable Damages. ........................................... 54

B.    Andriesz Cannot Prove Any Lost Earnings with Reasonable Certainty.............. 57

C.    Andriesz Is Not Entitled to Punitive Damages. ...................................... 58

CONCLUSION.................................................................................................... 59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*380544 Canada, Inc. v. Aspen Tech., Inc.*,
   544 F. Supp. 2d 199 (S.D.N.Y. 2008)....................................................................50

*AdiPar Ltd. v. PLD Int'l Corp.*,
   No. 01 CIV. 0765 (MBM), 2002 WL 31740622 (S.D.N.Y. Dec. 6, 2002) ............47

*AM Cosms., Inc. v. Solomon*,
   67 F. Supp. 2d 312 (S.D.N.Y. 1999)......................................................................42

*Andrews v. Sotheby Int'l Realty, Inc.*,
   586 F. App'x 76 (2d Cir. 2014) .............................................................................56

*Apple Mortg. Corp. v. Barenblatt*,
   162 F. Supp. 3d 270 (S.D.N.Y. 2016)....................................................................46

*Bates v. Long Island R. Co.*,
   997 F.2d 1028 (2d Cir. 1993)................................................................................41

*Beck v. Univ. of Wis. Bd. of Regents*,
   75 F.3d 1130 (7th Cir. 1996) ................................................................................41

*Berger v. New York City Police Dep't*,
   304 F. Supp. 3d 360 (S.D.N.Y. 2018)....................................................................41

*Black v. Ganieva*,
   619 F. Supp. 3d 309 (S.D.N.Y. 2022)..............................................................53, 54

*Boucher v. U.S. Suzuki Motor Corp.*,
   73 F.3d 18 (2d Cir. 1996) .....................................................................................59

*Brown v. E.F. Hutton Grp.*,
   991 F.2d 1020 (2d Cir. 1993)................................................................................51

*Carvel Corp. v. Noonan*,
   3 N.Y.3d 182 (2004) .............................................................................................50

*Command Cinema Corp. v. VCA Labs, Inc.*,
   464 F. Supp. 2d 191 (S.D.N.Y. 2006)....................................................................47

*Cruz v. FXDirectDealer, LLC*,
   720 F.3d 115 (2d Cir. 2013)..................................................................................53

*Dale v. Chicago Trib. Co.*,
   797 F.2d 458 (7th Cir. 1986) ................................................................................43

*DCMR v. Trident Precision Mfg.*,
   317 F. Supp. 2d 220 (W.D.N.Y. 2004) .................................................................46, 47

*Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*,
   924 F. Supp. 449 (S.D.N.Y. 1996) .............................................................................54

*Digital Realty Tr., Inc. v. Somers*,
   583 U.S. 149 (2018) ..................................................................................................36

*E.E.O.C. v. Freeman*,
   778 F.3d 463 (4th Cir. 2015) ....................................................................................59

*Espire Ads LLC v. TAPP Influencers Corp.*,
   655 F. Supp. 3d 223 (S.D.N.Y. 2023) ......................................................................53

*ExamWorks, Inc. v. Soltys*,
   No. 17-CV-0080-LJV-MJR, 2017 WL 4712206 (W.D.N.Y. Aug. 10, 2017) .......................48

*Faulkner v. Nat'l Geographic Soc.*,
   452 F. Supp. 2d 369 (S.D.N.Y. 2006) ......................................................................45

*Ford Motor Co. v. E.E.O.C.*,
   458 U.S. 219 (1982) ..................................................................................................56

*Ghaly v. Mardiros*,
   204 A.D.2d 272 (2d Dep't 1994) ...............................................................................49

*Hall v. Teva Pharm. USA, Inc.*,
   214 F. Supp. 3d 1281 (S.D. Fla. 2016) ................................................................37, 40

*Hansen v. Musk*,
   3:19-cv-00413-LRH-CSD (Aug. 15, 2022) ...............................................................39

*Hunt v. Enzo Biochem, Inc.*,
   530 F. Supp. 2d 580 (S.D.N.Y. 2008) ......................................................................50

*Hunter v. Deutsche Bank AG, N.Y. Branch*,
   56 A.D.3d 274 (1st Dep't 2008) ...............................................................................47

*Kerman v. City of New York*,
   374 F.3d 93 (2d Cir. 2004) ........................................................................................58

*Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp.*,
   28 F. Supp. 2d 126 (S.D.N.Y. 1998) ........................................................................58

*Kirch v. Liberty Media Corp.*,
   449 F.3d 388 (2d Cir. 2006) ......................................................................................54

*Lava Trading, Inc. v. Hartford Fire Ins. Co.*,
No. 03 Civ. 7037, 2005 WL 4684238 (S.D.N.Y. Apr. 11, 2005) ............................................. 59

*Lawrence v. Int'l Bus. Mach. Corp.*,
No. 12CV8433(DLC), 2017 WL 3278917 (S.D.N.Y. Aug. 1, 2017) ................................. 39, 40

*Leibowitz v. Bank Leumi Tr. Co. of N.Y.*,
152 A.D.2d 169 (2d Dep't 1989) ............................................................................................ 49

*Marom v. Pierot*,
No. 18CIV12094VBJCM, 2020 WL 1862974 (S.D.N.Y. Jan. 16, 2020) .............................. 48

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) ........................................................................................................... 40, 41

*McKernin v. Fanny Farmer Candy Shops, Inc.*,
176 A.D.2d 233 (2d Dep't 1991) ............................................................................................ 52

*Miller v. Mount Sinai Med. Ctr.*,
288 A.D.2d 72 (1st Dep't 2001) ............................................................................................. 50

*Moniodes v. Autonomy Cap. (Jersey) LP*,
No. 1:20-CV-5648-GHW, 2021 WL 3605385 (S.D.N.Y. Aug. 11, 2021) ........................ 36, 37

*Moraetis v. Evans*,
150 A.D.3d 403 (1st Dep't 2017) ............................................................................................ 35

*Nazif v. Computer Scis. Corp.*,
No. C-13-5498 EMC, 2015 WL 3776892 (N.D. Cal. June 17, 2015) ..................................... 40

*New York Univ. v. Cont'l Ins. Co.*,
87 N.Y.2d 308 (1995) ............................................................................................................. 60

*Payne v. Mount Hope Hous. Co.*,
No. 04 CV 2897 JG, 2007 WL 900034 (E.D.N.Y. Mar. 25, 2007) ........................................ 49

*Prozeralik v. Cap. Cities Commc'ns, Inc.*,
82 N.Y.2d 466 (1993) ............................................................................................................. 60

*Raedle v. Credit Agricole Indosuez*,
670 F.3d 411 (2d Cir. 2012) .................................................................................................... 50

*Rather v. CBS Corp.*,
68 A.D.3d 49 (1st Dep't 2009) ............................................................................................... 52

*Reilly v. Polychrome Corp.*,
872 F. Supp. 1265 (S.D.N.Y.) ................................................................................................. 42

vi

*Rosenblum v. Thomson Reuters (Markets) LLC,*
    984 F. Supp. 2d 141 (S.D.N.Y. 2013)........................................................59

*Rudman v. Cowles Commc'ns, Inc.,*
    35 A.D.2d 213 (1st Dep't 1970) ..............................................................42

*Santana v. State,*
    91 A.D.3d 937 (2d Dep't 2012)................................................................57

*Schenkman v. N.Y. Coll. Of Health Prof'ls,*
    29 A.D.3d 671 (2d Dep't 2006) ...............................................................52

*Shinn v. Williamson,*
    225 A.D.2d. 605 (2d Dep't 1996) .............................................................52

*Smith v. Jenkins,*
    732 F.3d 51 (1st Cir. 2013)......................................................................58

*Smulyan v. New York Liquidation Bureau,*
    158 A.D.3d 456 (1st Dep't 2018) .............................................................48

*Superior Vending Servs., Inc. v. Workmen's Circle Home & Infirmary Found. for*
    *Aged,*
    148 A.D.3d 960 (2d Dep't 2017) .............................................................58

*Toscarelli v. Purdy,*
    217 A.D.2d 815 (3d Dep't 1995) .............................................................58

*Tsinias Enterprises Ltd. v. Taza Grocery, Inc.,*
    172 A.D.3d 1271 (2d Dep't 2019) ...........................................................50

*W.W.W. Assocs., Inc. v. Giancontieri,*
    77 N.Y.2d 157 (1990) ..............................................................................44

*Wagner v. JP Morgan Chase Bank,*
    No. 06 CIV. 3126 RJS, 2011 WL 856262 (S.D.N.Y. Mar. 9, 2011).......46

*Wiener v. Lawrence-Picaso, Inc.,*
    295 A.D.2d 273 (1st Dep't 2002) .............................................................56

*Zendler Const. Co. v. First Adjustment Grp.,*
    59 A.D.3d 439 (2d Dep't 2009) ...............................................................56

## Other Authorities

15 U.S.C. § 78u-6 ............................................................................................36

18 U.S.C. § 1962.......................................................................................53, 54

17 C.F.R. § 240.21F-2 ...................................................................................................36, 38

17 C.F.R. § 240.21F-9 .........................................................................................................37

76 FR 34300 (June 13, 2011) (codified at 17 C.F.R. pt. 240) ....................................36, 38, 40, 41

N.Y. Lab. Law § 198 ...........................................................................................................46

FED. R. EVID. 1002 ...............................................................................................................37

New York Evidence Rule 10.03 ..........................................................................................37

**PRELIMINARY STATEMENT**[1]

For seven years, the professionals at BGC who navigated the maelstrom that was Claimant Simon Andriesz's ("Claimant," or "Andriesz") short tenure as New York and London futures desk head have endured a torrent of lies intended to, in Andriesz' own words, "deliberately try and destroy their life." (JX 439.) Andriesz's arbitration claims were an extension of those efforts: full of fantastical stories packaged with little discipline or coherence in hundreds of paragraphs, multiplied into hundreds of claims, all of them frivolous. Unlike Andriesz, who has lobbed false attacks against BGC and its executives in the press and with every regulator in the UK and US, Respondents have moved on, steered clear of Claimant, and put their faith in this arbitration for the truth to fully emerge. It did. Over eleven days of testimony, Andriesz's lies were methodically debunked by people who, unlike him, are willing and able to distinguish truth from fiction.

The Panel may be surprised after a review of the record by how fully Andriesz's case was eviscerated. Respondents Michael Sulfaro and Shawn McLoughlin saw the claims against them dismissed without explanation or apology before the hearing ended. Respondents Paul Pion, William Shields, and Mark Webster stood ready to testify but – despite being accused of participating in a criminal enterprise – were not even called by the claimant. Tommy Attrill, the former colleague of Andriesz who Claimant alleges "uncovered a fraud" and was fired was a no-show, though the documents on which he appears show that the above allegation is completely fabricated. Roberto Velez, the expected star witness, provided testimony that was utterly damning to Claimant: he testified under oath he had lied to regulators at Claimant's urging, and that he – a fact witness – had been improperly offered a cut of the proceeds to assist in this arbitration. But Velez asserted that he had ultimately chosen the path that claimant had steadfastly refused: to move on with his life instead of obsessing on the past.

Then there was Claimant. In a case where so many of the allegations rise and fall on Andriesz's say-so, Claimant's testimony was critical (and ultimately fatal) to his case. Though his

---

[1] Respondents attach, as a companion to this brief, appendices of excerpts of the cited hearing transcripts (Appendix A) as well as the cited case / statutory authorities (Appendix B).

testimony spanned *six days*, Andriesz barely provided any responsive testimony at all.  Instead, he could not be restrained from his desired role as prosecutor, replacing his faulty and gap-riddled memory with arguments that have been concocted years spent diving through unproven claims in old lawsuits and charts in internet databases like the Panama Papers to craft a counter-history of BGC and its affiliates.  Nobody – not even his counsel or the Panel – could get a straight answer out of Andriesz. His testimony revealed little about the true state of facts, other than demonstrating what it must have been like to deal with his anger and evasion when he worked at BGC.

In this post-hearing brief, Respondents BGC Financial, L.P. ("BGC"), Cantor Fitzgerald & Co. ("CF&Co."), and the remaining Individual Respondents – Jean-Pierre Aubin, Mark Webster, Paul Pion, and William Shields (collectively, "Respondents") – seek to walk the Panel through a chronology demonstrated by the voluminous record and to demonstrate how the established facts discredit every one of Andriesz's causes of action.  This record shows the degree to which every material allegation presented by Andriesz and his counsel was false or, at best, highly misleading, and makes clear that (i) Andriesz never raised a credible compliance concern while at BGC, (ii) Andriesz never raised a serious allegation of accounting impropriety in his demands for more compensation, and (iii) BGC's executives and professionals – from HR to compliance to finance to senior management – were incredibly patient and indulgent as Andriesz became increasingly erratic and malicious in his dealings with them and certainly never retaliated against him for any protected conduct.  BGC's ultimate decision to terminate Andriesz's employment – a job Andriesz himself declared was destroying his health – was a responsible decision to protect the firm and an employee who refused to cooperate when BGC attempted to address his health issues, which had led to repeated medical emergencies on the job.  Each of the overwritten, undersupported claims that remains in this case should be denied and an award issued in favor of each of the Respondents, with all hearing fees and costs charged to the Claimant, whose conduct in this arbitration has been harassing, vexatious, and deliberately wasteful.

## THE FACTS PROVEN IN THE HEARING

### I. Andriesz Arrives at BGC Brokers in London in 2012.

Simon Andriesz arrived at BGC Brokers, L.P. ("BGC Brokers") – the UK-based affiliate of BGC – to head its London futures desk in 2012. (JX 7.) Andriesz previously worked at MF Global, the firm that collapsed due to financial impropriety and risk in 2011, after which he joined Nomura. (Tr. 1/9 SA[2] 133:12-136:18.) Although Andriesz earned over $2 million per year in his last four years at MF Global, he did not replicate this success at Nomura, where he made approximately $720,000 from April 2011-April 2012. (JX 468.)

Andriesz had significant, undisclosed (and in some cases undiagnosed) mental and physical health issues at the time of his arrival. (*See* Tr. 1/24 SA 2038:4-2039:4.)



In his two years in London working for non-party BGC Brokers (and then non-party BGC Services Holdings, LLP), Andriesz was a productive broker on the London futures desk, although he did not come closer to replicating his earnings before he left MF Global. He reported earning £330,112 from April 2012-April 2013, and only £155,485 from April 2013-April 2014. (JX 467.)

### II. Andriesz Relocates to New York and Signs a New Contract.

In late 2014, BGC began discussing with Andriesz the opportunity to lead both the New York and London desks after the prior New York desk head was fired. Per McLachlan, Andriesz was keen on relocating to New York (Tr. 2/9 JM 164:10-24) and moved to the city "within ten days" of the first conversation, before any formal arrangements had been made, to the surprise of

---

[2] Respondents include initials in connection with transcript citations to clarify the witness giving the cited testimony. "SA" refers to Simon Andriesz, "SS" refers to Stan Smith, "WK" refers to Wayne Kampers, "PP" refers to Paula Pomponi, "JPA" refers to Jean-Pierre Aubin, "RV" refers to Roberto Velez, "MS" refers to Michael Sulfaro, "PD" refers to Patricia Dreste, and "JM" refers to Jonathan McLachlan.

both McLachlan and Aubin.  (*Id.* 21:6-22:4, 23:14-24:4; 1/18 JPA 1768:7-1769:4.)  Despite claiming at the hearing that he was forced to sign his BGC Financial contract without having adequate time to review it (Tr. 1/9 SA 165:20-166:6), he separately admitted receiving the draft of the agreement – which was executed on January 21, 2015 – when "[he] arrived in New York," months earlier.  (Tr. 1/9 SA 165:20-166:6; Tr. 1/11 SA 942:12-16.)  Because Andriesz had relocated before he had obtained a Social Security number (which he did not receive for some time due to errors in his submission, Andriesz could not be paid out of US payroll initially.  (JX 488)

Prior to executing the contract, BGC explained that Andriesz's contractual bonus pool would entail a combined pool for the New York and London desks, in which one desk's net losses could be offset by the other desk's gains.  (Tr. 2/9 JM 60:22-61:11, 65:15-66:9.)  However, because of the time it would Andriesz to transition into the role and help the struggling New York desk achieve profitability, the company, at its discretion, would abstain from applying the offset during a "grace period."  (Tr. 2/9 JM 60:14-61:16.)  This approach mirrors the purpose of the Employment Agreement, in which BGC intended to incentivize Andriesz to work to maximize profitability of both Desks, not just the London Desk.  (*Id.* 60:4-13, 76:21-78:5.)

Under the Employment Agreement, Andriesz received a salary and draw of a combined $400,000, which could be reduced only if Andriesz's production dipped below a certain threshold.  (JX 38 § 3(a).)   The Employment Agreement's bonus pool provisions reflected the discussions between McLachlan and Andriesz about a combined pool across desks.  (*See* Tr. 2/9 JM 60:14-61:3.)  Section 3(b) refers to a single "Pool" (*not* multiple pools) that includes the revenues and expenses from two Desks, London and New York.  (JX 38 § 3(b).)  The Pool calculation expressly excludes from the Pool revenue attributable to the "Chicago Futures Execution Desk."  (*Id.*)  In brief, the contract provided for the Pool to be calculated based on 50% of the New York and London desks' "Net Revenues" (which were the collected brokerage commissions attributed to the New York and London Desks minus certain specified costs, such as per-contract clearing charges), less compensation expenses, Bloomberg and market data costs, and travel and entertainment.  (*Id.*)

Importantly, this same provision also provided that Net Revenues were to be "determined in accordance with BGC's policies and practices currently in effect at the time such Net Revenues are determined." (*Id.*) During this time, BGC had a "well established" and "well known" policy that individual desk bonus pools would not be credited with certain revenues generated by trading activity. (Tr. 2/9 JM 70:4-23.) These included volume rebates provided by the Chicago Mercantile Exchange ("CME") for BGC's global activity on the exchange ("CME Volume Rebates") that would, instead, be used to offset the significant clearing and execution expenses of BGC's worldwide futures business and thereby *reduce* the costs passed on to futures desks to "a fraction" of the total costs the company incurred. (*Id.* 70:4-72:2.) Other such revenues not attributed to individual desk bonus pools included rebates paid directly by brokers in the CME pit ("Pit Rebates") and the revenues from the leg of a trade on the exchange floor involving market-makers ("MM Crossing Revenue"), which were booked to the Chicago Desk. (*Id.* 72:17-73:2.)[3] This well-known practice applied to *all* of BGC's "ten to twelve" other futures desks, *all* of which generated business that contributed to the Chicago Revenue. (*Id.* 73:3-25.)

Andriesz's agreement also provided that "ten percent" of his "aggregate compensation-related amount" may "consist of . . . a contingent non-cash grant, subject to the terms of the grant documents under which such non-cash grant was awarded." (JX 38, § 3(f) (emphasis added).) He also represented that he "underst[ood] that such non-cash grant may consist of" various types of equity units "as those terms are defined in the BGC Holdings, L.P. Agreement of Limited Partnership, as Amended and Restated" (the "Partnership Agreement"). (*Id.*) This provision was nearly identical to a similar provision in his previous BGC Brokers contract, which he had signed in 2012, and under which he had already received grants of partnership units. (JX 6 § 3(d).) In connection with those past grants, Andriesz had signed the Partnership Agreement and the Participation Plan award certificates, agreed that his awards would be governed by the restrictions

_____

[3] Revenues from CME Volume Rebates, Pit Rebates, and MM Crossing Revenue are hereinafter referred to, collectively, as the "Chicago Revenue."

contained in such documents, and confirmed that his units would be non-exchangeable (*i.e.*, not vested, not freely tradeable) absent the discretion of company management.  (JX 8, 16.)

The Employment Agreement contains certain other provisions relevant to this dispute:

- The parties agreed that BGC "shall have the right to assign or reassign all employees of the Desk after consultation with Employee."  (JX 38, § 3(b).)

- In addition to the Salary and the Pool, Andriesz would be eligible to receive a discretionary bonus at BGC's sole and exclusive discretion.  (*Id*. § 3(e).)

- Andriesz agreed that "Employee's allocation [from the Pool] is payable within 45 days after the last day of the Calculation Period" and that "[i]t is a condition precedent to receiving and earning payment of the Commission . . . that Employee remains employed by BGC (or any Affiliate) at the time payment is made."  (*Id*. § 3(b).)

- The parties agreed to a four-year employment term, which could be terminated by BGC for Cause, defined to include "(i) dishonesty, disloyalty, insubordination, unsatisfactory performance or attendance, or failure to follow BGC's policies, rules, codes of conduct, or procedures, (ii) nonperformance or breach by Employee of any of the provisions of this Agreement (including inaccuracy of representations), . . . (vi) failure to perform Employee's duties hereunder . . .".  *Id*. at § 4(a).

- The parties agreed that they would not, and could note, amend their obligations by any course of conduct or oral discussion:  "Neither party is relying upon any promises, representations or inducements, written, oral or otherwise, which are not set forth in this agreement, and no modification or waiver of any provision hereof will be binding upon any party unless in writing and signed by the parties hereto."  § 10(a).

## III.    Andriesz Litigates an Acrimonious Divorce and Takes Actions that Fully Contradict His Allegations in this Proceeding.

Andriesz's wild allegations include claims that BGC committed securities fraud by telling him that he would "never have a problem selling" his awarded partnership units (Tr. 1/12 SA 1340:22-1341:7, 1344:8-20), that Aubin illegally ████████████████████████████████ ████████████████████████ (JX 448 ¶¶ 56-59; Tr. 1/9 SA 26:24-27:10), resulting in an improper "denial of bonuses" at Christmastime, and that BGC "caused [him] to have a heart attack" in 2015 (*id.* ¶ 136).  However, his statements and actions in the contentious divorce proceeding he litigated against his then-wife while he was at BGC fully discredit these claims.

In presenting to the matrimonial court what his assets and his earnings from his employer were, Andriesz made clear that he understood exactly how, and when, he and BGC (and its

affiliates) had intended that he would be remunerated for his work. For example, in May 2014, when he was explaining "his remuneration from BGC," he represented that "the present value of his partnership "units [was] zero" because they "ha[d] no vesting schedule and may only become exchangeable" for shares of BGC Partners, Inc. stock "at the sole and absolute discretion of the Managing General Partner." (JX 30 at 11270.) He also explained that he would likely "need to repay some if not all of the units" he received as a sign-on award from BGC Holdings, L.P. in 2012 because they would be forfeited "if [his] desk ha[d] not generated sufficient net revenue during 12 months in a period of 2 years up to October 2014," and he noted that "it is very unlikely that [his] desk w[ould] meet the necessary hurdles." (*Id.* at 11269-70.)

Likewise, in March 2015, he told his lawyer that BGC had "difficulty . . . in collecting commission[s] the past two quarters" and that he would only receive bonus payments on these commissions "*in the event that it is recovered*." (JX 46 at 12696.) He then asked McLachlan to help him elaborate on that statement. McLachlan confirmed that clients of Andriesz's desk owed nearly $600,000 in unpaid commissions as of the end of September 2014, resulting Andriesz "not be[ing] paid out on the commissions until . . . they had been collected." McLachlan added that because most of that money had since been collected, there would be "additional bonus payable to the desk," as well as further bonuses once more outstanding payments came in. (*Id.* at 12694-95.) Indeed, this arrangement was fully consistent with Andriesz's London contract in effect in 2014, which made clear that the *only* revenues eligible to be credited to his bonus pool were those revenues actually "collected" by BGC. (JX 7 § 3(c)(ii).)

Andriesz's claims against his adversaries in his divorce proceeding similarly contradict his current claim that BGC's conduct had anything to do with his July 2015 heart attack. There is no evidence anywhere in the record that he sought any kind of accommodation after he returned to work, requested a meeting to address work conditions following his emergency, or that BGC was anything other than flexible with respect to Andriesz' return to work. There is similarly no contemporaneous evidence indicating that the conditions of work at BGC were the cause.

7

Conversely, Andriesz placed the blame *entirely* on his highly stressful divorce proceedings, in which his ex-wife's counsel used confessions in his personal diary entries as a basis to require him to undergo continued drug testing in order to see his son. (JX 119.)  This enraged Andriesz, and following his heart attack, he told numerous others that the lawyers' conduct caused it.  (*See, e.g.*, JX 119 ("I have just had a heart attack and you caused this through blackmail and the dissemination of my private information which caused severe anxiety and depression."), 140 ("I had a heart attack as a result of the anxiety caused.").)

Andriesz' communications underscore the stress of his divorce proceedings and the degree Andriesz' own vengeful response compounded that stress.  He sent emails referring to his wife's lawyers as "animals" (JX 119) and vowed to "spend every penny I have destroying this person as they have destroyed my life" (JX 126).  He incurred £15,000 in legal expenses trying to get the lawyer disbarred.  (JX 140 at 11649.)  Andriesz's preoccupation with this grievance continued throughout 2016.  In June 2016, his own physician distinguished the "*normal* stress that would be expected in his world of finance" from the "*undue* stress that he is describing from his ex-wife and her attorney . . . using confidential and private medical information against him, and claiming that he had been an unfit father and had to comply to rather strict standards in order to be with his son." (JX 256 at 2391 (emphasis added).)  By August 2016, Andriesz's obsession with antagonizing his ex-wife's counsel was so great that he seriously solicited advice from his counsel about harassing the lawyers outside the courts in London with an inflatable rat.  (JX 271.)

## IV.    Andriesz's Mismanagement Causes a Hiring Fiasco.

In September 2015, Andriesz had a contentious interaction with BGC's head for Asia, Respondent Mark Webster, concerning Andriesz's recruitment of Elise Choukroun to join BGC in Singapore.  It is unclear what relevance this recruitment effort has to any claim or defense in this case, but the Statement of Claim advances the following contentions:

1.  BGC asked Andriesz to recruit Choukroun.  SOC ¶ 132.

2.  BGC failed to disclose its lack of a license in connection with the recruitment, which was only "brought . . . to light" by Choukroun after her arrival in Singapore.  ¶ 134

3.   Mark Webster sent an email that caused Andriesz to have a heart attack.   ¶ 136.

All of these accusations – submitted to this Panel in a pleading signed by Andriesz's counsel – were easily debunked.

In reality, Andriesz had been demanding that Aubin permit him to hire Choukroun as early as November 2014.   (JX 31.)     Andriesz took credit for this recruitment effort and became Choukroun's primary point of contact at BGC thereafter.   (*See* JX 42 (asking Aubin "If there is an issue with hiring Elise, please can you let me know . . .   so I can tell her to go somewhere else."), 98 at 7547-A ("[S]hall I tell Elise you will not be calling her? Don't want to pursue this anymore. I'm just trying to be proactive and secure us more business.").)   From the outset, BGC disclosed to Andriesz that it had no futures license in Singapore and thus, due to the regulatory risks, Choukroun could not work out of that office until such license was obtained.   (*See* JX 35 (notifying Andriesz of potential "regulatory issues" because "BGC does not current[ly] have any futures business done out of Singapore"), 42 ("she wants to be in Singapore where we . . . have half of the license"), 45 (authorizing Choukroun to be hired for work only in the "Hong Kong office . . . whilst obtaining futures license in Singapore").)

But Andriesz refused to heed BGC's advice.   He endlessly attempted to hire Choukroun to work immediately out of Singapore, rather than another BGC office, even to the point of trying to mislead BGC employees into processing the hire.   For example, in mid-August 2015, after Webster had told him *days earlier* that Choukroun "absolutely cannot execute or introduce" in Singapore "until [BGC] get[s] a license in place," which would take "months" (JX 83), Andriesz "confirmed" to HR personnel in the Singapore office "that Elise [Choukroun] is to start with BGC Singapore this week" (JX 85 at 11542).   When this communication was brought to Webster's attention, he told Andriesz that he was "confused" because Choukroun could not come aboard "until [BGC] get[s] the license."   (*Id.* at 11541.)   Andriesz replied that a Compliance officer named Annette Fong in Compliance had approved Choukroun starting in Singapore as long as she did not execute or advise on futures.   (*Id.*)   When Webster resisted and Andriesz contacted Ms. Fong, she pointed

out that she "*clearly did not say* that [Choukroun] can work" and that "[t]here doesn't appear to be any options that will allow [her] to work."[4]

Just as egregiously, Andriesz misled Choukroun into believing that she could begin promptly in the Singapore office.  For example, after BGC offered her a London contract in early September due to being unable to hire her immediately in Singapore, Choukroun emailed Andriesz to express "concern[] . . . that it doesn't mention at all [S]ingapore."  (JX 92.)  He responded by plainly (and wrongly) reassuring her that "[w]e have already sorted this issue with Mark [Webster]."  (*Id.*)  He then, remarkably, drafted for Choukroun a note to be relied upon by a mortgage lender stating that she had "been hired by the Group BGC as a Senior Broker" (JX 94), even though his communications to Aubin only days later made clear his understanding that he had been "unable to hire" Choukroun as of that point.  (JX 96; Tr. 1/12 SA 1278:16-1279:20.)  Aubin took pains to "write . . . carefully" for Andriesz, so that there would be "no misunderstanding," that BGC's offer was to "employ [Choukroun] in London only," astutely reminding Andriesz that "you have to follow what I say otherwise you put me and you in a bad situation and then I can't help you when needed."  (JX 96.)

Yet, one day later, on September 17, 2015, Andriesz was *still* attempting to convince Webster to change course.  He stated that Choukroun "has her family in Singapore and that's where she wants to live," and that if Webster did not call Choukroun to confirm that she could work in Singapore, Andriesz would "tell her she can only work in London if at all."  (JX 98.)  He warned that "[t]here will be an issue" with BGC's broader relationship with a customer, Bluecrest, if he could not hire Choukroun, and refused to accept any responsibility for misleading Choukroun as to the nature of BGC's offer.  (*Id.*)  Understandably angry at the position Andriesz put him in,

---

[4] This would not be the last time Andriesz mischaracterized Fong's advice to him.  In the hearing and in his Statement of Claim (¶ 154), Andriesz invented a conversation in which Fong told him that offsetting bonus pools between London and New York is a violation of some (now unknown and uncited) regulation or statute.  (*See* Tr. 1/11 SA 967:18-968:7.)  There is no evidence Fong ever said anything of the sort and, to this date, Claimant – a purported accounting whistleblower – has never cited a single statute, rule, or regulation that a combined bonus pool would violate.

Webster responded with offensive language (*id.*), resulting in a reprimand from Aubin.  (Tr. 1/18 JPA 1799:10-1800:11.)   Nonetheless, as Aubin testified, Webster's underlying concern was justified.  (*Id.* 1800:12-1801:9.)  At hearing, Andriesz conceded "that this whole email exchange took place *after* [he] had his heart attack" in July 2015.  (Tr. 1/12 SA 1294:13-15, 1322:14-19.)

Andriesz's past lies about this affair gave rise to new lies at the hearing.  On the stand, Andriesz attempted to fabricate a new excuse for his actions, claiming that the debacle leading to his acrimonious exchange with Webster occurred because after "BGC gave [Choukroun] a Singapore contract," Aubin, purportedly driving the recruitment effort, "overrul[ed] Webster" by demanding Choukroun work in London so as to "circumvent[] the regulator."  (Tr. 1/12 SA 1252:3-17, 1280:11-1281:3.)  Andriesz added that "Mr. Aubin [was] the *only one* speaking to" Choukroun at this time, and that Aubin had previously told Choukroun that she could start in Singapore.  (*Id.* 1253:11-1254:13, 1281:4-10.)  Literally everything about this story is refuted by the record.  As indicated previously, Andriesz took credit for organizing Choukroun's recruitment and lobbied Aubin to assist him (JX 96).  Unlike Aubin and Webster, Andriesz was exchanging direct emails with Choukroun at this time.  (JX 92.)  Those communications made clear that Choukroun had not been offered any contract to begin immediately in Singapore (to her surprise).  (*Id.*)  Andriesz conceded Aubin's minimal role in Choukroun's recruitment, as he wrote days later that "[s]ince JP was no longer managing Asia, I was rightly instructed to deal directly with Mark Webster."  (JX 102.)  And Andriesz, in his exchange with Webster, opined that there would be nothing wrong with Choukroun working in London because she "has clients in London" and would "not [be] faking anything."  (JX 98 at 7545-A.)

Ironically, the proffer submitted on behalf of Ms. Choukroun (*see* JX 473) – to purportedly support Andriesz's fiction referenced above – only reinforces that Andriesz was not truthful with the Panel during his testimony.  In the document, Choukroun states that she was contacted by Aubin on "*October 2, 2015*" and that "*thereafter*," he became her "point of contact at BGC."  (*Id.* (emphasis added).)  The proffer identifies no direct contact with Aubin before October 2015, much

11

less before Andriesz's September 17, 2015 exchange with Webster.  Similarly, Choukroun states that she did not receive "a new contract" to be employed by "BGC Partners (Singapore) Limited" until *November 12, 2015*, after she had "made it clear that [she] could not work in the UK."  (*Id.*) The proffer thus confirms that Choukroun never received a written Singapore offer prior to Andriesz's acrimonious September 17, 2015 email with Webster.

At the hearing, Andriesz provided inflammatory testimony about an in-person meeting around this time in which Aubin purportedly threatened to "ruin" him after Aubin "messed up" Choukroun's recruitment, leading to Webster's angry email.  (1/10 Tr. SA 367:15-369:20.) But text messages between Andriesz and Roberto Velez from 2022 indicate that Andriesz had no actual memory of this meeting:  on the eve of the prior arbitration, Andriesz could not recall where the meeting even took place, let alone what was said.  (*See* JX 441 at 4969 (text from Andriesz asking Velez "when [A]ubin threatened me I was in New York right" and response from Velez stating "*no you were here in London*" (emphasis added)).)   And the documentary record eviscerates Andriesz's claim that Aubin threatened his position.  Instead, Andriesz *himself* threatened to resign, stating that he was "not willing to continue anymore" after Webster dressed him down, but informing Aubin, "I appreciate the support you have given me and really enjoyed working with you." (JX 99.)  Andriesz communicated these same wishes to resign (with three years remaining on his contract) to HR officer Dyanne Rosado as well as BGC's president Shaun Lynn (*see* JX 101, 106), but his resignation was not accepted.

## V.    In 2015, Andriesz Receives More Money from BGC than He Was Entitled to.

In 2015, BGC also witnessed for the first time what would become a recurring *modus operandi* for Andriesz over the remainder of his tenure: his belittlement of his coworkers, combined with a threatened resignation from his position in New York, in an attempt to re-trade his compensation package under his Employment Agreement.  In May, he unilaterally announced to Ms. Rosado that he would be resigning his post as head of the New York desk and "return[ing] to the UK" because he purported that he was not being paid what he was due.  (JX 69 at 12098.)

To justify this decision, he volunteered a series of highly dubious statements as to his purported financial predicament that were received with instant skepticism from McLachlan – who, due to his role as Aubin's business manager, was a frequent sounding board for Andriesz's complaints. (Tr. 2/9 JM 35:22-38:9.)  These included Andriesz's claim that his position was forcing him to spend a massive "50% of [his] time" performing managerial tasks instead of broking as well as a claim that his business manager, Attrill, came at a "personal cost" to Andriesz of $75,000.  (*See* JX 69; Tr. 2/9 JM 42:10-44:17.)  Andriesz also announced that he refused to accept a discretionary bonus from BGC that he found "humiliating" (JX 69 at 12097) – a statement McLachlan found "disrespectful" and "strange." (Tr. 2/9 JM 47:24-48:12.)  Indeed, Andriesz had received everything he was entitled to get under his contract and had directly admitted to McLachlan that he wanted to "re-write his deal."  (JX 69 at 12097; Tr. 2/9 JM 48:13-49:4.)

Nonetheless, BGC made good faith attempts to accommodate Andriesz, despite no obligation to do so.  For example, in an August 2015 amendment to his Employment Agreement, BGC agreed to pay Andriesz up to an additional $5,000 per month (or up to $60,000 per year) to directly cover rent for the duration of the contract and to reimburse Andriesz for all rent previously paid in connection with his relocation to New York.  (JX 80.)  BGC also awarded Andriesz, over multiple quarters, discretionary bonuses for his management of the still-unprofitable New York desk.  (See, e.g., JX 69 (5/15/15 McLachlan email noting that Andriesz received a "$12K" bonus for Q1 2015 in the US when "[t]he contractual payment is zero"), 265 (summary sheet attached to email noting that Andriesz received $38,913 in "bonus overrides" for "Q1 and Q2 2015 in the US").  As another concession to Andriesz, Aubin agreed to exclude the compensation costs of certain brokers from the calculations of the New York desk's bonus pool for certain quarters in 2015.  (See, e.g., JX 95 at 7512-13 (adding back costs for amounts paid to Cortes, Nangle, and Portincaso).)

Throughout 2015, BGC also refrained from offsetting the profits of the London desk with the losses of the New York desk, consistent with his discussions with management when his

contract was executed in early 2015.[5]  Before finalizing bonuses each quarter, BGC would show

Andriesz its preliminary calculations of his pool, including which revenues were included and

excluded.  (Tr. 2/9 JM 67:18-68:25, 82:7-84:4, JX 65, 75.)  BGC indicated to Andriesz that he was

welcome to return feedback.  But he never raised any concerns about BGC's exclusion of the

Chicago Revenues.  (*Id.* 69:2-70:12, 84:6-12.)  For the year, Andriesz made over $547,000 in gross

pay, most of it comprised of the $400,000 in Salary and Draw he was paid for managing the New

York and London desks, and with most of the additional amount related to bonus payments for

which, Andriesz assented to the underlying calculations.  (JX 132.)

## VI.    Andriesz Goes to War with BGC in 2016.

In September 2015, McLachlan left BGC (and Aldric Marinos, a certified public

accountant with past experience at Deloitte & Touche and as a private company CFO, took over

the role of business manager for listed products, including responsibilities concerning the desks

Andriesz managed (Tr. 1/18 JPA 1781:7-1782:20).  His communications to Andriesz reflected that

Marinos was engaged and open to feedback.  For example, in an email to Marinos early in Marinos'

tenure, Andriesz informed Marinos that BGC had been booking all of his trades to the London

desk, which would cause the US pool [to] show less revenue and London will be credited." (JX

107.)  Andriesz noted, though, "since I am manag[ing] the US and London pools it doesn't make

a huge amount of difference."  (*Id.*)  A few months later – with New York's numbers showing a

significant deficit – Andriesz revisited the point and suggested that compensation costs that had

been applied to the New York pool be moved to London, where Andriesz' revenue was already

being booked (irrespective of where he was executing trades).  (JX 134.)  Marinos – who had

initially suggested the idea – responded, "This is exactly what I am working on." (*Id.*)  In later

emails, Marinos confirmed that Andriesz' representations left the impression that Andriesz was

supportive of consolidating the performance of the New York and London desks together in one

---

[5] The record lacks any evidence or other indication that, during this time, BGC agreed that it would refrain from imposing an offset even after Andriesz had sufficient time to transition the New York desk.  As discussed above, the parties' agreement specifically says that BGC could only waive its rights under the agreement with a signed writing. Employment Agreement § 10(a).

pool.  (JX 160: "When you did not want to help book your revenues in the US you said it doesn't make any difference as it is a pool.  And from a management accounting perspective you are right.")

Andriesz' war with BGC over the Pool began in January 2016, when Andriesz was eager to pay a $35,000 discretionary bonus to certain members of his desk, but encountered resistance.  (JX 134.)  Marinos responded that he had begun preparing a "analytical P&L of your activity currently" and informed Andriesz that "this is creating a knock-on effect on the bonus process (that hasn't started yet for Q4)."  (*Id*.)  Two weeks later, Marinos sent Andriesz an email asking him to help explain the reasons for a $1.3 million decrease in revenues in the US futures business in 2015.  (JX 139.)  Andriesz explained that the desk's poor performance on his watch was based on a combination of "tough market conditions," "BGC's current hiring policy," and a number of producers who had left the firm.  (*Id*.)

Two days later, on January 22, Andriesz for the first time, raised concerns about certain revenue that "does not hit my pool in any way," including dollar options trades "matched with market makers in the pit," which he acknowledged "goes to BGC, not me."  (JX 144.)  Andriesz suggested that, as to the Chicago Revenue, Andriesz would "let Tommy [Attrill] know and he will compile the real numbers for the revenue being generated" so that these numbers could "be reported to management as a comparison to what [Marinos was] submitting."  (*Id.*)  Marinos' responded that he was "neither an advocate nor an adversary to [Andriesz's] propositions" and would be "happy to consider any request" Andriesz thought was "necessary for the desk and for BGC."  (*Id*.)  He invited Andriesz to provide the amounts of the additional sources of revenue referred to in his email "to reflect all the aspects of the business that may not be captured in the standard group reporting." (*Id*.)  Ultimately, Andriesz took a week to respond with these numbers (which he had relied wholly on Attrill to compile).  (JX 165 at 8251-52.)

In these same communications in which he complained that his desk was not being credited for the Chicago Revenues, Andriesz (who was simultaneously preoccupied with the stress of

pursuing his vendetta against his ex-wife's attorneys (*see* JX 140)) began to assert that he would be better off going "back to the UK" and managing the London desk exclusively (*see* JX 144). He asserted that he was "very happy to step down and just produce with my (London) team." (JX 146.) By January 26, Andriesz' erratic demands had spilled over to HR, as Ms. Rosado emailed her counterpart in London to notify her that "we need to coach Simon to stop telling his staff that he is not returning to NY," as "[t]his [was] the 3rd time in about 12 months that he threaten[ed] to resign," which she found "silly and unprofessional." (JX 147.) That same day, Andriesz emailed Aubin to inform him that he would be "tak[ing] a week off to consider my position at the company" and that he had experienced "some health issues . . . with my heart." (JX 148.) Aubin responded, "Please take care of yourself. We'll talk when you are back in good health." (JX 148.)

But Andriesz did not take a week off. Instead, he escalated his tantrum on January 28 when he made a complaint to HR that Marinos shared the news of the Pool deficit with certain London brokers (without citing any policy or practice that had been violated). (JX 149) He breathlessly accused Marinos of "creat[ing] an extreme situation" and "false accounting the revenue in the US." (*Id.*) Having failed to engage with Marinos in any way, Andriesz stated that "I will not let Aldric destroy my career and my team I have worked over 27 years to build." (*Id.*) That day, Andriesz also forwarded his email with Webster and other communications to John Skitt, head of HR in London. (JX 154, 155.) In a communication to Aubin that same day, Andriesz described Marinos' communication with brokers in London as "serious misconduct and totally unprofessional," falsely stated to Aubin that "both the US and the London [sic] are in large profit," and again described himself as having "reached my limit. Aubin made clear that Andriesz's feedback was welcome: "***I need you to tell [Marinos] where he is wrong if he is wrong***." (JX 151).

As of January 28, Andriesz *still* had not provided Marinos the updated numbers that Marinos indicated Andriesz was welcome to send him. (*See* JX 165 (sending Marinos "the numbers for the US" on January 29).) Nonetheless, he accused Marinos of "refusing to speak after the chaos [he] created." (JX 160.) Marinos asked Andriesz to "please stop these non-constructive

emails," noting that he "already offered you my help to understand the reporting, identify who is contributing negatively to the pool you manage, and create forecasts."  (JX 160.)  Marinos even screen-shotted the portion of Andriesz' contract the company was relying upon for its calculation of a single Pool.  (*Id.*)  There is no record of Andriesz – even up to the date his employment was terminated – ever responding to explain why he believed the contractual language prohibited an offset.  Most damningly for Andriesz, at the same time he was accusing Marinos of "false accounting," he repeatedly conceded that he understood that the Chicago Revenue ***was not part of his Pool***.  For example, Andriesz acknowledged that for the market-maker crosses, "100% goes to BGC ***as this was the model set up when I joined***."  (JX 146, emphasis added.)  As to "pit rebates, CME rebates, and crosses," he admitted that he "ha[dn't] asked for this revenue at all" and noted that "I don't mind [BGC] keeping it, but don't say I'm negative."  (JX 151). In another email, he stated that "***I absolutely accept [this] as revenue for BGC***." (JX 153.)

The following week (the week of February 1, 2016), Andriesz continued his escalation of grievances with Marinos.  He sent HR in New York a barrage of demands to open investigations on an ever-changing number of topics (JX 164, 165, 175, 176, 177, 179, 181, 182) and New York management (JX 166).  He separately approached the finance and brokerage receivables groups to gripe about the deficit and the Chicago Revenue (JX 170).  In these emails and interactions, Andriesz continued his inflammatory accusations of "illegal accounting practices" and false accounting, but he never identified any principle of accounting or law that BGC's accounting practices violated.  (JX 170.)

Andriesz's chaotic response boiled over on February 4, 2016, at a meeting with HR, when he "abruptly left" the meeting before Ms. Rosado and Ms. Dreste were even able to discuss all of his allegations (JX 181).  He then let loose a fusillade against Aubin by email (JX 178).  In the email thread, Aubin had taken time to consider a proposal Andriesz made on January 28 to separate from the London desk and focus his efforts on New York due to a spat he was having with Jeremy Krzystyniak, a senior broker in London.  (*See also* JX 152 ("I am separating out all clients that are

mine . . . . Let's see how your team does without my initiatives.").) Aubin responded by agreeing with each point Andriesz requested, outlining six points of agreement that exactly mirrored Andriesz's demands. (JX 178.) Andriesz responded with a stunningly unhinged non-sequitur:

> *I won't let you destroy my career and a business I have built over 26 years*. This was a private mail between us and not given to HR. . . The NFA are coming in soon to see us and since I have the sign off I will ensure compliance understand what is going on. . . *Aggressive and bullying tactics will not be tolerated by me.*

(*Id.*) Bizarrely, Andriesz claimed that his communication to Aubin about restructuring BGC's futures business was "private" and could not be shared with others at BGC. Andriesz testified that his volcanic overreaction was due to his opinion that his supervisor should have been banned from communicating with him directly during this time. (Tr. 1/11 SA 1087:18-1088:19.) Ultimately, on February 8, 2016, BGC, as it was entitled to do under his Employment Agreement (JX 38, § 2), made the decision to place Andriesz on paid leave, citing his "inappropriate, unprofessional and insubordinate" conduct.

Taking advantage of the calm created by Andriesz's absence, BGC's human resources and compliance groups quickly conducted separate, but partially overlapping, investigations of Andriesz' complaints and drafted internal reports memorializing their findings. (JX 191, 195.) Both found no instances of fraud or false accounting and both recognized what Andriesz himself had communicated in many of his emails: Andriesz was not entitled to the Chicago Revenue under his contract. The Compliance investigation indicated that it would be more appropriate for Andriesz's costs and revenues to be booked in the same geography – the very adjustment that *Marinos* had suggested and Andriesz agreed to months earlier, in January. (JX 134.)  Upon his return from leave, Andriesz met with Dreste and others to discuss the findings of the investigation, which he (characteristically) did not agree with. (Tr. 2/8 PD 244:11-21.)

## VII.     Andriesz Returns to Work and Gets His Requested Bonus Pool Adjustments.

In his Statement of Claim (¶ 11, 166), in his counsel's opening statement (Tr. 1/9 22:10-17), and then repeatedly under oath (Tr. 1/10 SA 400:9-20, 418:14-23; Tr. 1/25 SA 47:5-9, 49:6-12, 49:18-50:14) Andriesz made an incendiary accusation about his suspension:  he claimed that

BGC suspended Andriesz because "they wanted him out of the building when the NFA audit happened."

The truth is that the NFA audit began on March 1, 2016, a week *after* BGC brought him back from his suspension. (Tr. 1/25 MS 264:11-266:10.) Andriesz was not heavily involved in the audit because it focused on BGC's commoditized futures business, not the traditional futures Andriesz brokered. (*Id*. 262:7-263:8.) Andriesz was never kept from the NFA – to the contrary, he was asked to provide information for the NFA in advance of their arrival, which task he initially failed to understand and then farmed out to Attrill (JX 469). Nor was the NFA hidden from him; for the entirety of their on-site visit, they sat in a room conference room at BGC's New York offices with a sign on the door stating, "Reserve for the NFA." (Tr. 1/25 MS 266:12-20.)

When Andriesz returned in February, BGC confronted him with a troubling fact it learned in his absence: Claimant had promised a broker on the London desk, Andy Chiles, a guaranteed percentage of all revenue BGC received from a market-maker, Ronin, and, in doing so, had potentially compromised BGC's right to determine the broker's bonus on a discretionary basis. (JX 186, 200.) The revelation explains some (but certainly not all) of Andriesz' overreaction when BGC put on hold his January request for $35,000 to pay discretionary bonuses (*see, e.g.,* JX 134) pending its review of the desk's profitability; having already promised the bonus to the broker, Andriesz was in a tough spot when BGC did not approve it.

BGC drafted and conveyed to Andriesz a warning for his misjudgment, noting that the payment guarantees Andriesz had offered "were not approved by senior management" and that they threatened to "undermine the Firm's discretionary payment process and created a potential liability for the Firm." (JX 196.)[6] To avoid further inflaming its relationship with Andriesz, BGC later agreed that the written warning would not be placed in Andriesz's personnel file and had been withdrawn. (JX 234.)

---

[6] Though Claimant's counsel spent hours on this issue, BGC's justification for issuing the warning went uncontradicted, aside from Claimant's self-serving speculation that Chiles must have been "desperate" and "lying" when he raised this issue with BGC. (Tr. 1/12 SA 1339:5-1340:3.)

Ironically, Andriesz' weeks-long pre-suspension tantrum about bonus pool accounting took place before the bonus pool calculation process for the fourth quarter of 2016 had even started. Once the process began on March 1, 2016, Aubin quickly agreed to protect Andriesz from his desk's $1.3 million underperformance in New York by accounting for London and New York in separate pools as it had done the first three quarters of 2015, without need for an offset, and with a $117,000 bonus pool payable immediately to the London team (including Andriesz). (JX 201.)[7] This was not, as Andriesz appeared to suggest later on, an admission of fraud or false accounting, but rather a continued accommodation based on Andriesz's complaints about the "mess" he inherited in New York. Aubin also agreed to credit the London pool with market-maker cross revenue going forward, though "for the time being Chicago are keeping 100%." (*Id.*) On March 11, 2016, Andriesz provided proposed bonus splits for the London brokers, under which he awarded himself the largest payout ($35,817). (JX 216.)

Separately, on March 2, 2016, Andriesz requested and immediately received the detailed bonus pool calculation for New York, which showed a pool deficit. (JX 202.) The record indicates that – notwithstanding his self-identification as an accounting whistleblower – Andriesz never analyzed BGC's accounting data, instead relying entirely on Attrill to "check" it. (*Id.*) The following day, Attrill provided Andriesz a response identifying a number of proposed adjustments, such as removal of certain non-producing brokers. (JX 203.) On March 4, Attrill sent Andriesz a more detailed email seeking additional adjustments to the New York pool, with additional support. (JX 207.) Andriesz copied and pasted this email (adding barbs and grievances throughout) to Marinos and Aubin on March 4, a Friday. (JX 208.)

Aubin and Marinos reviewed the request for adjustments in good faith and two business days later, on March 8 (a Tuesday), instructed BGC's accounting department to apply all of them.

---

[7] For the remainder of Andriesz's time at BGC, the company refrained from offsetting the London and New York desks, despite its contractual right to do so. (Tr. 1/18 JPA 1998:10-1999:2.) BGC also gave further extra-contractual benefits to Andriesz later in 2016, such as a $25,000 "[d]iscretionary bonus . . . for Q1-2016 in the US." (JX 265A (sheet titled "Summary of Simon Andriesz Employment Agreement").)

(JX 228 at 8872 ("JP believes Simon is right about the changes he is requesting in the email below. As discussed, could you please have a look at his claims and ask the team to amend the 4 quarters accordingly?")  The adjustment was finalized on or about March 17, 2016 and reduced the New York deficit from ████████████ to a "TOTAL NEW DEFICIT" of ██████ (*Id*. at attachment.)[8]  In contrast to Andriesz's tale of subterfuge and deception painted in the Statement of Claim and elsewhere, the calculation of the New York pool took place with maximum transparency and in the spirit of open-mindedness to the accommodations Andriesz sought.

While BGC's accountants were recalibrating a stand-alone New York bonus pool calculation per Andriesz's requests, Andriesz's tantrum continued, with angry emails from him to HR on both sides of the Atlantic.  (See, e.g., JX 215, 217, 218, 219, 230.)  On March 14, 2016, it was brought to Sulfaro's attention that Andriesz had failed to attest to his supervision of futures trading for the entire month of November 2015, as well as two weeks in January 2016.  (JX 221.)  The missing attestations did not require Andriesz to "sign off" on trades or approve them; they merely required him to "verify the below supervisory functions *were performed*."  (*Id*. at 10732-38.)  In other words, BGC was merely asking Andriesz to confirm that he had done his job during the weeks in question, which would include both reviewing materials and raising any concerns.  *See* JX 221 at 10730 ("This email procedure is how we evidence that you are reviewing trade activity. . ."); JX 223 at 5273 ("If you brought up an accounting issue, that means you are looking at the information, so you should be able to signoff on the trading activity"), *Id*. ("I have no problem with you questioning anything being done on the desk but I need you to work with Mike to give him specific examples which we can then correct if they are deemed to have merit").

---

[8] During his testimony, counsel directed Andriesz through the last page of this spreadsheet, which clearly set forth a "TOTAL NEW DEFICIT" of ██████ and asked him the following highly leading question:  "Does that reflect that they are no longer reporting a deficit for the New York desk and paying you an override instead?  ANDRIESZ:  Correct."  (Tr. 1/10 SA 476:4-477:6.) The testimony confirmed what contemporaneous communications reflect:  though Andriesz cannot read a spreadsheet and has no real understanding of how accounting works, he is willing to say whatever is necessary to claim more money.

The real purpose of Andriesz's refusal to sign off is clear and has little to do regulatory compliance.  At the time he was confronted about failing to sign attestations, Andriesz was not aware that Aubin had already accepted his requested changes to the New York pool calculation; sensing an opportunity, Andriesz used the attestation requirement to squeeze BGC into agreeing to his requested adjustments.  On March 15, in response to Aubin's repeated requests that Andriesz fulfill his supervisory obligations, Andriesz eliminated any doubt as to his ulterior motives, responding:  "Ok that depends if Aldric is declaring a loss of ███ USD for 2015."  (JX 226.)  Aubin – who was aware that there had *never* been a ███ deficit, and that the company had implemented adjustments resulting in much lower deficit – responded by accurately, "There is no loss of ██."  (*Id.*)  Following a phone conversation where Aubin repeated that assurance, Andriesz agreed to sign off on the desk's trading activity.  (JX 225.)

Claimant and his counsel distort these events beyond recognition to argue that (i) BGC forced Andriesz to rubber-stamp its trading activity and (ii) Aubin's email was a vindication of Andriesz's claims and an admission that BGC engaged in illegal activity.[9]  Both claims are absurd and frivolous.  The attestations in question did not require that Andriesz rubber-stamp anything.  Similarly, Aubin's statement that there was "no loss of ██" merely explained that due to the adjustments to the US Desk's bonus pool that Aubin had agreed to implement throughout 2015, the pool's end-of-year deficit (for bonus calculation purposes) was closer to ████ than the ████ deficit in the absence of such adjustments.[10]  BGC made the adjustments to the deficit that Andriesz requested as part of the ordinary bonus pool calculation process.

**VIII.   Attrill Walks Out the Door in March 2016 When Andriesz Fails to Retain Him.**

Andriesz argued at hearing that, around this time, Tommy Attrill was "fired . . . because he helped" Andriesz review BGC's bonus pool accounting (Tr. 1/9 SA 37:6-10) and, when that was

---

[9] *See, e.g.*, JX 371 at 2966, where Andriesz presents this lie to the CFTC, under penalty of perjury, claiming that Aubin's email was an acknowledgment of illegal conduct.

[10] There is no evidence in the record that anyone other than Andriesz mentioned a "$500,000" deficit for the US desk's pool in 2015, as even the original calculations resulted in a deficit that was about $60,000 smaller.

shown to be false, that BGC forced Attrill to leave by refusing to permit Attrill to do his job. (Tr. 1/11 SA 882:2-18). But the undisputed record established that Attrill chose to resign on February 25, 2016 "to pursue [his] personal career and educational goals." (JX 199.) BGC permitted him to continue working for a few additional weeks "even though this is not the usual course of action upon receiving a resignation from anyone employed in a front office capacity." (JX 210 at 8708). On Friday, March 4, 2016, Attrill said his goodbyes and turned in his passes at the end of the workday. (*Id*. At 8707.) Only *after* then did Andriesz (despite originally indicating otherwise to HR) ask Attrill to stay on for longer before leaving. (*Id.*) But, having already said his goodbyes, Attrill was understandably unwilling to return. (*Id*. at 8707.)

In May 2016, after Attrill had joined a BGC competitor, ED&F Man, Andriesz (due to his inability to understand his desk's revenue and expense numbers on his own) continued to use Attrill to review his bonus pool accounting by sending him the bonus pool numbers and asking for him to analyze them. (JX 253.)[11]

## IX.    Andriesz Added No Value with Respect to Jridi and Anthony.

In April and May 2016, Andriesz continued to complain about BGC's response to his complaints, despite having received no offset of one of his desk's profits against the other's and an offer from Aubin to credit a percentage of market maker revenue going forward. He launched emails demanding apologies, insisting on discipline to BGC's back-office personnel, and falsely claiming (without identifying a single rule or regulation BGC had violated) to have been vindicated for his wild and erratic behavior earlier in the year. (JX 234, 236, 237.) For example, after John Skitt – BGC's head of HR in London – explained to Andriesz that BGC's bonus pool calculations "do not . . . constitute fraud, nor accounting irregularities" (JX 230), Andriesz went to *different* employees to falsely claim that Skitt had "acknowledged . . . that the accounting by Mr. Marinos was incorrect and that my actions in response were warranted and justified." (JX 237.) He then

---

[11] Andriesz' careless disclosure of BGC's data was particularly ironic, given that in January 2016, Andriesz eagerly denigrated Marinos for sharing bonus pool figures with members of *BGC's own London Desk* because they were "highly confidential." (*See, e.g.,* JX 156 at 5103.)

raised complaints about HR to the company's whistleblower hotline and demanded to management that the legal fees he incurred during his tantrum be paid by BGC.  (JX 259.)

On May 9, 2016, Andriesz directed his counsel to send a long letter to Michael Popok, BGC's Deputy General Counsel.  (JX 251.)  The letter rehashed many old and fully resolved issues, including false statements about BGC's accounting, a demand for the Chicago Revenue, and an insistence that Andriesz's enemies be "subject to disciplinary action."  The letter also represented the first complaint Andriesz raised concerning Mourad Jridi, a broker who incurred a loss based on a cash equities trade approximately *nine months* before the May 2016 letter.[12]  The only new information Andriesz ever provided about Jridi's activities in this letter was false. Andriesz alleged that Jridi (i) traded from home, (ii) front-ran his client order, (iii) was spared punishment, and (iv) did not have his error revealed to the regulator, resulting in (v) BGC charging other, unrelated desks for the trading loss.  None of those claims is true.  Jridi did not trade from home.  (Tr. 1/17 JPA 1632:15-21.)  He did not front run. (Tr. 1/25 MS 305:9-22).  He was not spared punishment; he was suspended immediately and fired after an investigation.  (JX 487.)  Consistent with its obligations, BGC marked Jridi's U-5 to inform its regulator and future employers that Jridi had been fired for violating firm policy.  (JX 486.)  The loss was never charged to another desk; Jridi's desk was more than capable of absorbing the full loss. (Tr. 1/17 JPA 1634:10-1635:6.)[13]

This narrative – Andriesz claiming to be a whistleblower regarding a trade about which he knew nothing – repeated itself in his testimony about another broker, Richard Anthony.  In April 2015, Compliance approached Andriesz seeking his approval for Anthony to broker the trading of

---

[12] Andriesz claimed in his testimony to have provided some version of a draft, unsigned, undated letter (JX 186) to BGC revoking his sign-off authority due to the Jridi trade, though he could not remember specifically to whom he provided it or when.  The story is not credible:  when Andriesz revoked his sign-off authority in March 2016, it was because he wanted a more favorable Pool accounting, and there were multiple emails discussing *only* that issue.  The unsigned, undated draft letter addressed to a blank recipient was never transmitted to anybody.

[13] Velez testified truthfully when he stated that Andriesz had not have "any involvement whatsoever" with the Jridi trade.  And Velez – who did raise concerns about Jridi's trading activity in the past – testified that he never faced any consequences for raising his concerns about Jridi with the company.

futures under Andriesz's supervision.  Andriesz declined.  Andriesz testified that he understood Compliance's request that he supervise Anthony to be a request to allow Anthony to trade futures *unsupervised* because "they would have kept all of his trading activities away from me." (Tr. 1/9 SA 213:19-216:25.)  Regardless of Andriesz's strained interpretation, there is no evidence anyone at BGC took issue with his disinterest in supervising Anthony.  To the contrary, BGC decided not to permit Anthony to trade futures at all.  (Tr. 1/25 MS 280:4-281:5.)

In October 2015, Anthony supervised the execution of a large VIX options trade on behalf of a client.  Days prior to the trade, recognizing that the trade was significant (and therefore posed significant potential risk), Anthony contacted compliance and worked closely with Michael Sulfaro to ensure that the execution of the trade went smoothly.  The trade took "a couple of days" to put together and was executed on the floor of the CBOE at mid-market pricing.  (*Id.* 277:4-278:3.) Despite Sulfaro's close involvement in the trade, a separate compliance officer, Steven Duchene, nevertheless asked questions when the trade was executed.  (JX 113.)

Andriesz claims that the trade involved (i) unsupervised trading of (ii) futures at (iii) an improper price, about which (iv) Andriesz blew the whistle and (iv) then witnessed Aubin bullying compliance.  (SOC ¶¶ 109-115.)  As with the Jridi trade, the allegation is wrong in *every* respect. The trade was executed by Tyler Jarvis and involved a Series 24 supervisor (Anthony), in addition to close supervision from compliance in advance of execution.  (Tr. 1/25 MS 165:10-166:4.)  The trade was not a futures transaction, and had nothing to do with Andriesz, who "wasn't involved in that trading." (Tr. 1/9 SA 277:9-279:2; 1/25 278:19-25.)  It was traded on the floor of the CBOE at a "mid-market" price.  (Tr. MS 1/25 277:4-278:3.)  Andriesz therefore raised a *triply* false alarm (1) Unsupervised trading of 2) Futures at a 3) Non-market price) to Aubin and when he was offered an opportunity to learn the true facts at a meeting with all the relevant players, he lost interest.  (JX 115.)  Aubin, for his part, did not "bully" anyone; he simply asked if Compliance had a concern and, if so, why someone with no involvement in the trade (Andriesz) would hear about it before he did. (JX 113.)  He received Compliance's prompt response that Andriesz was mistaken.  (*Id.*)

## X.    The O'Leary Side Show in Mid-2016.

In September 2016, the BGC futures desk, including Andriesz, received inappropriate communications from Tim O'Leary, an employee of the market-maker Ronin Capital. O'Leary's spat with Andriesz appears to have started in April, when he complained that Andriesz's desk was not treating Ronin fairly (JX 245) and threatened to reveal to BGC that Andriesz was "going around our market community trying to get a new job." (JX 246.) Andriesz responded with invective of his own, claiming that O'Leary had committed crimes, and calling him a "coward and blackmailer." (*Id*.) The conflict appeared to have subsided after Andriesz raised the issue with Sulfaro (JX 247), but Andriesz again raised the issue with BGC in late August and early September 2016 (JX 273.) In response, BGC's entire senior leadership discussed a strategy to end O'Leary's abusive emails. (*See, e.g.*, JX 275, 276, JX 282, JX 292.)

Andriesz now speculates that O'Leary was "good friends" with Aubin and acted on BGC's orders. (*See, e.g.*, Tr. 1/10 SA 521:5-9; *see also* Tr. 1/9 SA 38:3-8 ("They enlist the aid, the evidence will show, of a market maker named Tim O'Leary who continues to harass, defame, and bad-mouth Simon"); SOC ¶ 13.) The hearing produced zero evidence that Aubin was O'Leary's "friend" or that his actions were done at the request of BGC. To the contrary, Aubin testified that he is not O'Leary's "friend," has never met him in person, and has not spoken to O'Leary since Andriesz left BGC. (Tr. 1/18 JPA 1883:7-1884:4, 1885:16-22.)

## XI.    Andriesz Self-Destructs in the Fourth Quarter of 2016.

On September 20, 2016, Andriesz gave notice that he would not renew the Employment Agreement when it expired in January 2019. (JX 277.) In subsequent emails, he indicated that it was because his heart condition made it unclear whether he would continue as a broker going forward. (JX 331.)

Two weeks later, Andriesz emailed his counsel to express alarm that , describing the request as "very inflammatory." (JX 290.) Aubin had been considering . (Tr. 1/18 JPA 1892:5-1893:19.)

26

That move would have been completely permissible under the Employment Agreement, which stated that "BGC shall have the right to assign or reassign all employees of the Desk after consultation with Employee." (JX 38 § 3(b).) ██████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ (JX 290.)

Around the end of October 2016, Andriesz presented BGC with a note dated October 28 stating that due to "panic attacks" (quotation marks in original), he was "not to return to work for <u>2-3 weeks</u>." (JX 300, underlining in original). Despite his doctor's orders, Andriesz continued to attend the office. On Thursday the following week, Andriesz notified BGC's head of North America, Shawn McLoughlin, that he was signed off work for 3 weeks by his doctor, at which point McLoughlin implored him not to come to work, telling Andriesz, "Simon, if your Doctor told you not to come to work for 3 weeks, DON'T COME TO WORK." (JX 302.) McLoughlin urged Andriesz to "[r]emember our conversation" that "health [comes] first" and "the firm doesn't want you getting sick." (*Id.*) Andriesz responded by insisting that, notwithstanding his doctor's clear instructions, he could work part time. (*Id.*) The following day (Friday, November 4, 2016), Carrie Fertig in BGC human resources emailed Andriesz "suggesting that [he] can't come to work next week." (JX 303.) Andriesz insisted, incorrectly, "[t]hat's not an HR decision to make." (*Id.*) McLoughlin replied on Monday morning reiterating that Andriesz would need a new doctor's note if wanted to continue working. (*Id*. at 5245.)

Andriesz then told McLoughlin on November 6 that he was concerned that BGC's HR department was "worrying" him by "suggesting that I can't come to work next week." (JX 303.) Andriesz insisted, incorrectly, "[t]hat's not an HR decision to make." (*Id*.) McLoughlin replied the next morning that he understood HR had already asked Andriesz to provide a new doctor's note "stating that you can return to work in some capacity." (*Id*. at 5245.)

Despite this clear notice from BGC, Andriesz did *nothing* on Monday November 7 to obtain a new doctor's note.  On Tuesday, the day of the US election, Andriesz was in London evading HR's attempts to meet with him, resulting in HR, out of desperation, cutting off his access from the office in the absence of a doctor's note clearing him.  (*See* JX 305 at 11084-85 ("I have tried to contact you by telephone but it appears you have left for the day. . . From our conversation and your emails to me, I do not believe you intend to follow this instruction, therefore in the interests of your personal health and safety. . . I have suspended your access.").)

Although he had been told five days earlier of BGC's need for a doctor's note, Andriesz confirmed he would get a new note for the first time at 9:11 p.m. on Tuesday, November 8, at which point he demanded that BGC immediately reinstate his access.  (*Id*. at 11084.)  At 10:10 p.m., he provided a note from Dr. Orsher stating that based on "results of his recent testing," Andriesz "may return to work part time, immediately."  (JX 306.)  At 11:16 p.m., London HR responded to confirm Andriesz' access would be reinstated.  (JX 310 at 12389.)

At 4:38 a.m. the following morning, Andriesz sent an email to HR berating them because he had to use a temporary pass to enter the building.  (*Id*.)  Despite refusing to comply with his own doctor's note for a week, and then failing to provide an updated note confirming that he was able to work for five days, Andriesz blamed HR for his stress and sought to "lodge [a] complaint at the handling of this matter."  (*Id*. at 12386.)  In heated testimony, Andriesz called BGC's request for an updated note "extremely retaliatory conduct."  (Tr. 1/24 SA 2104:19-2105:3.)

Andriesz proved in the following days that he had no intention of complying with doctor's note authorizing only part-time work.  For multiple consecutive days, Andriesz worked sixteen hours a day.  (Tr. 1/24 SA 2106:3-16.)  He was then hospitalized after fearing a heart attack on November 12, 2016.  (JX 314.)  Andriesz returned to New York the day after, as he was already scheduled for "his usual cardiology" appointment the following day.  (*Id*. at 11111.)  Over the next few days, he underwent, at his cardiologist's recommendation, more diagnostic tests such as "scans, blood work and stress tests for the heart."  (JX 315.)

Andriesz's medical tests overlapped with a remote meeting he had agreed to have with Aubin on November 15, 2016 on the topic that he found "inflammatory," "unethical," and "intimidating": ███████████████████ (JX 312.)  Andriesz had scheduled the meeting with Aubin on November 11 – before Andriesz was hospitalized – in order to accommodate the heart scan that he was already scheduled to undergo on Monday November 14.  (*Id*.)  At the time of the November 15, meeting, Andriesz was listed as active on Bloomberg, the application brokers use to communicate with clients.  Though Andriesz was able to email others at BGC (*see, e.g.*, JX 315) he did not respond to Aubin's communications at all.  (JX 316.)  The following day, Aubin sent Andriesz additional messages by Bloomberg and email, to which Andriesz did not respond, despite being logged onto Bloomberg again. (JX 316.)

Andriesz returned to work no later than Thursday, November 17, 2016, but still refused to communicate with Aubin.  On November 21, 2016, having still received no communication of any kind from Andriesz, Aubin sent a formal email demanding an explanation of Andriesz's lack of contact, making clear that further refusal to communicate would be "insubordination," and explaining that the two still needed to discuss ████.  (JX 316.)  Andriesz responded by stating that his lack of communication for an entire week – *two days of which were spent in BGC's New York office* – was because for some part of the week, he was "logged on Bloomberg but under very strong medication so I didn't see any messages from you."  (JX 318 at 10808.)[14]  Andriesz then insisted that he did not need to discuss Aubin's plans for ████ any further because Andriesz had "already answered [Aubin's] questions."  (JX 318.)

The next day, November 22, Aubin sent Andriesz an email noting that "since being released from the hospital, you contacted clients, colleagues and others, but you did not bother to contact your supervisor who has been trying to reach you for days in a row."  (JX 325.)  This email never received a response.  Instead, Andriesz unloaded a firehose of recriminatory emails to others

---

[14] The Panel should note that Andriesz was either untruthful in a) this email communication to Aubin, or b) his bizarre and dramatic testimony that while he was in the hospital, Aubin's incoming Bloomberg messages were being read to him by his wife in real time and were causing him to have a trauma attack. (Tr. 1/10 SA 621:13-623:14.)

at BGC, demanding Aubin be punished for having the temerity to request that his direct report take no more than a week to directly report back to him. Andriesz emailed HR officers Carrie Fertig and Dan Aiken to initiate an investigation of Aubin (JX 322, 323, 324, 328, 329, 330). Andriesz also emailed Paul Pion, the company's Chief Ethics Officer, to initiate a separate investigation (JX 331, 332, 337, and 341). And he emailed Sulfaro with the same purpose. (JX 345.) In his emails, Andriesz *insisted* that Aubin not be told about the investigations Andriesz was trying to launch. *See, e.g.,* JX 338 at 10262-A (demanding that "this correspondence should be kept absolutely private for now between myself, HR, the compliance officer, and the general counsel" and that "Mr. Aubin should not be alerted or tipped off"). He further demanded that BGC extract answers from Aubin about ████████████████████, despite having previously refused to meet to discuss this exact topic. (*Compare* JX 330 *with* JX 318). In the hearing, he insisted that Aubin should have been banned from contacting him while the investigation was ongoing (Tr. 1/25 SA 77:15-22), without ever explaining how BGC could both bar Aubin from speaking with Andriesz while simultaneously keeping an investigation secret from him.

Ultimately, Andriesz consented to meet with Aubin remotely on December 1, 2016, in the presence of an HR witness.[15] At the meeting, Andriesz looked unwell to Aubin. (Tr. 1/17 JPA 1712:16-23.) This mirrored the opinions of other BGC employees. Sulfaro reported that Andriesz "didn't look healthy," "was sweating," and appeared to have "no color" to Dyanne Rosado in HR. (Tr. 1/25 MS 232:12-234:25.) Pion communicated the same concerns. (Tr. 2/8 PD 260:18-25.)

In his own communications to numerous BGC employees, Andriesz invoked his precarious health. (*See, e.g.*, JX 319 (telling Ms. Fertig that "[t]his is a life threatening situation"), 323 (telling Ms. Fertig that "I have already stated many times my current health situation," which was "very serious."), 328 (telling Aiken that "[g]iven the very dangerous state of my health it's unthinkable you would suggest this"), 329 (telling Aiken and Fertig that "I have a severe disability and your

---

[15] Andriesz and his counsel expressed surprise that, according to them, Eva Chan had been flown from Hong Kong for the meeting. As with all of their conspiracy theories, the reality is simpler: Chan had moved to New York earlier that year. (Tr. 2/8 PD 139:3-12.)

ongoing behavior is causing more stress"), 331 (telling Pion that "dealing with JP Aubin's agenda and HR was making me ill and I was afraid of having another heart attack at work"), 332 (telling Pion, "Paul I'm seriously ill."); 334 (telling Aubin: "I'm extremely ill and exhausted.")  Andriesz's own testimony supports that he was experiencing a break from reality:  he was paranoid, imagining that Aubin was being controlled by unnamed off-camera personnel during his call (Tr. 1/10 SA 668:16-669:3).  By this point, Andriesz was asserting that even normal acts by the Company – such as shutting off of his work access to comply with his own doctor's note (JX 310) or connecting to discuss ███████ (JX 332) – were "not how you treat someone who is recovering from a heart attack" and constituted "further intimidation" of him.  Andriesz's precarious medical state posed a risk to BGC as well as Andriesz:  Andriesz admitted that if something did happen to his health during this time, he would have held BGC responsible.  (1/24 2128:8-2129:13).

On December 2, 2016, BGC placed Andriesz on paid medical leave, specifically referring to Andriesz's recent emails.  (JX 343.)  The company noted that "one of the essential functions of your job is to properly report to your supervisor and comply with his directives."  In the letter, the Company instructed Andriesz to report to a general practitioner, Dr. Christopher Busillo, and a psychiatrist, Dr. Randall Solomon, to allow BGC to determine whether Andriesz could safely do his job and whether any accommodations were necessary.  Busillo was recommended by the firm's health insurance provider and Solomon was recommended by an attorney who had worked with him in private practice. (Tr. 2/8 PD 154:9-24.)

Andriesz did not work at all the remainder of December.  Nonetheless, BGC included Andriesz in its calculation of the Pool and honored his role in recommending broker splits for the third quarter of 2016.  As usual, Andriesz allotted to himself the largest production bonus on the London desk, $150,000.  (JX 356.)

On December 7, 2016, Andriesz – who by this point was in contact with a lawyer, Christopher Tovar (*see, e.g.,* JX 334) – sent BGC an email that was written in a conspicuously different style from his usual screeds.  (JX 348.)  The response insisted that there was no basis to

question Andriesz's ability to perform his job without serious health effects. (*Id*.) BGC continued to insist on Andriesz' attendance at the exams (JX 349, 361, 362) and to provide relevant information to the doctors in preparation for Andriesz's cooperation. (JX 350, 352.) On January 3, 2017, Andriesz emailed Patty Dreste and stated for the first time, "I will not be attending these medical examinations," which he characterized as a "transparent attempt by firm executives to coerce me into participating in a campaign to discredit me through the use of medical professionals." (JX 365.) In his letter, Andriesz indicated that he would be leaving the country for a month, making abundantly clear that he was in no hurry to resolve BGC's concerns about his ability to perform his duties. (*Id*.)

On January 31, 2017, BGC terminated Andriesz' employment. (JX 370.) In less than two years under his employment contract, he had earned over $1.4 million. (*See* JX 132, 363.) Under the Agreement, Andriesz was not eligible for his fourth quarter bonus, but he did receive over $130,000 in non-competition payments (based on his $400,000 salary and draw) over the four months following his termination of employment. (JX 396.)

## XII.    2017 to Present:  Andriesz Seeks Revenge.

Andriesz began working soon after he stopped receiving non-compete checks from BGC. He accepted work at a competitor, Square Global Markets, in July 2017, which he believed would offer "the same earning potential he had at BGC." *See* JX 467 at 3503 (notes from July 2017 interview by Smith of Andriesz). (*Id*.) In 2018, Andriesz left Square Global to join BGC competitor Tradition as "Head of Financial Futures and Options" – an equivalent position to the one he had at BGC. (JX 399.) Andriesz left that position in 2021 amidst an ongoing "grievance" (JX 465 at 3654). He claimed that ███████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████ Andriesz now asserts that he intends to sue Tradition "[d]epending on how this [arbitration] goes." (Andriesz

1/11 Tr. SA 831:18-22.) After leaving Tradition, Andriesz contracted with Kyte Broking through a company that he owns, Walronds Financial Limited. (JX 432.)

Andriesz has made less money after leaving BGC and appears to have continued to suffer from similar health and substance abuse issues to those he experienced before and during his employment at BGC. ██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████

For the entirety of his post-BGC life, Andriesz has prioritized a full-time pursuit that has drawn his attention away from his health and his work: a vendetta against BGC. Andriesz first filed TCRs to qualify as a whistleblower in February 2017, following the termination of his employment. *See* JX 421 (sworn statement from Andriesz that "soon *after* I was terminated in January 2017, I immediately filed TCRs with both the CFTC on 02.15.17 and the SEC on 10.02.17"). He then spent $600,000 of his own savings on two law firms – who he is now suing for malpractice – with the goal of making money off of BGC. (JX 451 ¶ 22 (counsel was instructed only to "file complaints with agencies that would manifestly and directly benefit Andriesz's arbitration claims or which could result in awards").) His communications with regulators were replete with far-fetched, paranoid lies, with doctored emails to fabricate evidence that BGC was involved in Russian money-laundering (*see* JX 437) and scattershot discussions of the Panama Papers (*see* Addendum to Renewed Statement of Claim). Andriesz expended "hundreds of hours"

talking to regulators about BGC (Tr. 1/24 SA 2132:24-2133:5), and "hundreds of hours" more sharing "a lot of conspiracies" with Velez.  He pressured Velez to contact regulators in support of his efforts and offered to *pay* Velez (a fact witness) out of any amounts he recovered from BGC. (1/24 2266:7-16; JX 441 at 4979.)

Andriesz's obsession comes through in a great many post-termination communications, but none so clearly as the recording he made in which he states:

> I don't have any grudges against someone in the market that I would, it would be
> all-consuming that I would go around defaming them deliberately to try and destroy
> their life.  There's no one in the market I would do that to.  Well, probably Mr.
> Aubin, apart from him, right?  But that guy will get his dues when someone more
> powerful than us decides to pass judgment.

JX 439 at 11698.  In his text messages, Andriesz refers to BGC and its personnel as "bitches," "crooks," "American traitors," "9/11 fraudsters," "Russian money launderers," and "criminals."  (JX 441.)  He admits having shopped his story to the press, including speaking with someone at the BBC for "nine months," to maximize BGC's humiliation (*id*. at 4965).

Andriesz has made money off if his self-appointed role as avenger.  He spent many hours with the CFTC revealing BGC's confidences and providing access to the thousands of pages of emails and spreadsheets he stole from BGC.  In exchange for that effort, the CFTC awarded him over $400,000 that BGC was required to pay in settlement of its investigation.  While BGC does not dispute that Andriesz may have helped the CFTC pursue its claims against BGC, a review of the CFTC's press release describing the settlement makes clear that none of the violations identified by the CFTC investigation related to issues raised by Andriesz when he worked at BGC. *See generally* JX 415 (describing lapses in audit trails, record-keeping, and retention failures).

## ARGUMENT

### I.    All Claims Against CF&Co. Must be Dismissed.

As a threshold matter, Andriesz introduced no evidence to support any claims against CF&Co. – an investment banking affiliate of BGC against whom he asserts claims for Dodd-Frank whistleblower retaliation, securities fraud, RICO, and civil conspiracy.  To have any claims against

CF&Co.—which was indisputably never Andriesz's employer or party to any contract with him—he was required to prove that the various individuals whose actions he complained about acted as agents of CF&Co.  That required proving specific "facts regarding the relationship" between CF&Co. and the BGC employees with whom he took issue, and not "simply alleg[ing] general control in a vacuum." *Melito v. Am. Eagle Outfitters*, Inc., No. 14-CV-02440 (VEC), 2015 WL 7736547, at *7 (S.D.N.Y. Nov. 30, 2015).  But Andriesz failed to prove (or even attempt to prove) such facts.  For example, Andriesz did not prove any facts sufficient to show that CF&Co. could be considered a joint employer of either himself or any of the other BGC-affiliated people in question.  *See Moraetis v. Evans*, 150 A.D.3d 403, 404 (1st Dep't 2017) (finding that corporate affiliate was not a joint employer when "plaintiff [did] not allege" that entity "made any . . . decisions at all in connection with her employment.").  Consequently, his claims against CF&Co. fail entirely.  *Cf.* 15 U.S.C. § 78u-6 (Dodd-Frank protections providing that "[n]o *employer* may discharge, demote, suspend, threaten, harass, . . . a whistleblower in the terms and conditions of employment" (emphasis added)).

## II.    Andriesz's Whistleblower Claims Under Dodd-Frank Fail.

### A.    Andriesz Was Not a Dodd-Frank "Whistleblower" at the Time of Termination.

Andriesz asserts a single legal theory for whistleblower retaliation – violation of the federal Dodd-Frank Act.  The retaliation protections of this law apply only to one who "provides . . . information relating to a violation of the securities laws to the [Securities and Exchange] Commission, in a manner established, by rule or regulation, by the Commission."  15 U.S.C. § 78u-6(a)(6). This means an employee is "ineligible for Dodd–Frank's protection until they tell the SEC." *Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 166 (2018).  This also means that the employer cannot be held liable for actions that *precede* the employee's report to the SEC.  *See id.*; 17 C.F.R. § 240.21F-2(d)(2) ("To receive retaliation protection . . . you must qualify as a whistleblower . . . *before* experiencing retaliation" (emphasis added)).  At the time of Andriesz's employment, SEC regulations required him to either submit a complaint "[o]nline, through the

Commission's Web site," or "[b]y mailing or faxing a Form TCR (Tip, Complaint or Referral)" in order to qualify for Dodd-Frank's protections.  76 FR 34300, 34368 (June 13, 2011) (codified at 17 C.F.R. pt. 240); *Moniodes v. Autonomy Cap. (Jersey) LP*, No. 1:20-CV-5648-GHW, 2021 WL 3605385, at *3 (S.D.N.Y. Aug. 11, 2021).

Andriesz failed to introduce any admissible evidence showing that he qualified as a "whistleblower" at any time before his termination.  He failed to produce any signed and dated TCR form (or any other writing to the SEC) from 2016, or any correspondence directly from the SEC acknowledging receipt of a complaint.[16]  (*See* Tr. 1/11 SA 855:2-13 (Andriesz did not know the filing date of the SEC TCR).)  Instead, his sworn statement to the CFTC indicates that Andriesz only filed a TCR *after* his employment was terminated.  Accordingly, he cannot show that he qualified as a Dodd-Frank whistleblower prior to the termination of his employment with BGC. *See, e.g.*, *Price v. UBS Fin. Servs.*, Inc., No. CV 17-1882 (WJM), 2022 WL 1058374, at *5 (D.N.J. Apr. 8, 2022) (noting that "[t]he Court . . . dismissed [Plaintiff's Dodd-Frank] claim with prejudice . . . because he could not allege that he reported information to the [SEC] prior to his termination"); *Moniodes*, 2021 WL 3605385, at *8 (noting that "a conference call [with the SEC] is not one of the methods prescribed by Rule F–9(a)").

B. <u>Andriesz Cannot Make a Prima Facie Case of Retaliation Regarding Any Complaints Related to Other Brokers.</u>

To win a Dodd-Frank retaliation claim, Andriesz must first prove a *prima facie* case of retaliation by BGC.  That involves showing that "(1) [he] engaged in a protected activity, (2) [he]

---

[16] The only document introduced by Andriesz that purportedly refers to any written complaint to the SEC prior to his termination is an email to Andriesz from then-indicted (*see* JX 238), since-convicted felon Daniel Portley-Hanks (who did not testify in the arbitration), dated October 28, 2016.  (*See* JX 301.)  To conclude, from this document, that Andriesz submitted a written complaint to the SEC around this date, the Panel would need to assume the truth of the matters asserted in Mr. Portley-Hanks' email, *i.e.*, classic hearsay.  Any attempt by Andriesz to establish the content of his alleged October 2016 complaint based on evidence other than the written complaint itself also violates the best evidence rule that "[w]hen a party seeks to prove the contents of a writing . . ., the writing must be proved by production of the original."  Guide to New York Evidence rule 10.03 (Best Evidence Rule); *see also* FED. R. EVID. 1002 ("An original writing . . . is required in order to prove its content.").

suffered a materially adverse employment action, and (3) the adverse action was causally connected to the protected activity." *Hall v. Teva Pharm. USA, Inc.*, 214 F. Supp. 3d 1281, 1289 (S.D. Fla. 2016). Without a causal connection, his claim fails. *Id.* at 1290-93.

Andriesz cannot meet this standard for any of the alleged activity he presented at arbitration. Andriesz' cursory discussions of Richard Anthony took place over a year before the termination of employment and there is no evidence that he encountered any negative response from BGC with respect to those discussions (to the contrary, BGC offered to discuss Anthony's VIX trade with Andriesz and Andriesz declined.) Andriesz' discussion of Mourad Jridi was confined to a paragraph in a lengthy letter from his counsel eight months before his employment was terminated (and many months after the trade in question happened and Jridi was held to account). No one at BGC even associated Andriesz with the trading activity in question. As to Andriesz's complaints about "accounting fraud," BGC listened to Andriesz's requests that his Pool calculation be more generous to him and incorporated many of his requested accommodations; there is no evidence that the termination of employment had anything to do with those complaints. Finally, to the extent Andriesz attempts to wrap himself in the cloak of whistleblower and allege that he raised the record-keeping and audit trail issues the CFTC raised in its 2019 Order, there is no evidence that he even raised any such claims while employed at BGC.

C. Andriesz Had No Reasonable Belief of Having Exposed Securities Law Violations Before His Departure from BGC.

Per SEC regulations, in order to qualify as a Dodd-Frank whistleblower, Andriesz needed to "reasonably believe that the information [he] provide[d] to the Commission . . . relate[d] to a possible violation of the federal securities laws[.]" 17 C.F.R. § 240.21F-2(d)(1); *see also* 76 FR 34300, 34363 (June 13, 2011) (codified at 17 C.F.R. pt. 240) ("[Y]ou are a whistleblower if . . . [y]ou possess a reasonable belief that the information you are providing relates to a possible securities law violation."). This standard has both a subjective and objective component: Andriesz needed to have "a subjectively genuine belief that the information demonstrates a possible violation" *and* "this belief [must be] one that a similarly situated employee might *reasonably*

possess." 76 FR 34300, 34303 (June 13, 2011) (emphasis added). Claimant has presented his case in a manner seemingly designed to cloud this inquiry, as Andriesz has *never* identified a single statute or regulation whose violation he reported prior to the termination of his employment.

### i. Andriesz had no subjectively genuine belief that he discovered an "accounting fraud"

In his CFTC TCR form, Andriesz claimed to have witnessed "false accounting" by BGC due to the apparent[] exclu[sion]" of "rebates paid by the [CME] and by pit brokers, and matched trades made with market makers" from his desks' pool, which resulted "improper[] transfer[ of] over $2.5 million in revenue . . . to the Chicago office." (JX 371 at 2972-74.) But the evidence makes clear that this report was merely a disingenuous ploy by Andriesz to recast an attempt to re-negotiate his desk's bonus pool formula as a whistleblower complaint. For example, as indicated earlier, when BGC was calculating his desks' pool over multiple quarters in 2015, Andriesz was shown the calculations, invited to return feedback, and never raised any concerns about BGC's exclusion of the Chicago Revenue. In fact, Andriesz admitted in early 2016 that he "ha[dn't] asked for this revenue at all." As McLachlan testified, this was unsurprising, because this was a well-known company policy. Andriesz provided no testimony or other evidence to this Panel that would explain why he knowingly signed off, for several quarters, on practices that he later claimed constituted "false accounting." The inference to draw is obvious: Andriesz had no *genuine* belief that these practices violated federal law.

### ii. Andriesz had no objectively reasonable belief of a securities law violation

To prove that he had an objectively reasonable belief of a securities law violation, Andriesz must have identified specific disclosures in BGC's financial statements or other communications to shareholders whose accuracy he reasonably doubted based on the practices in issue. For example, in dismissing a former employee's Dodd-Frank claim against Tesla, a former federal judge serving as a JAMS arbitrator noted that the claimant "testified he is not aware of what is included in Tesla's financial statements or is reported to shareholders," and "provided no evidence" that the conduct in issue "had any impact on Tesla's financial statements or SEC filings

or amounted to securities violations." *See* Ex. 1 to Defs.' Mot. to Dismiss, *Hansen v. Musk*, 3:19-cv-00413-LRH-CSD, ECF No. 63-2 at 6 (Aug. 15, 2022).  The claimant's Dodd-Frank claim therefore failed because he introduced no evidence providing "an objective basis" to corroborate his speculation that "a [securities] violation had occurred." *Id.*  Furthermore, *even if* an employee "discover[s] a violation of GAAP while analyzing the accounting" for his company, he must prove that it was reasonable to believe that "this alleged GAAP violation was *material* to shareholders." *Lawrence v. Int'l Bus. Mach. Corp.*, No. 12CV8433(DLC), 2017 WL 3278917, at *11 (S.D.N.Y. Aug. 1, 2017) (emphasis added).

Andriesz did nothing of this sort at the hearing.  He introduced no testimony (even his own) or documentation indicating that he had even *seen* BGC's financial statements, SEC filings, or other public statements to shareholders during the relevant time period.  Nor did he introduce such materials at the hearing and explain (either through a lay or expert witness) what information in those filings might have been misstated, and to what extent.  Conversely, the evidence indicates that any such belief would have been objectively *unreasonable*.  Marinos and Aubin explicitly told Andriesz in January 2016 that the bonus pool calculations sent to him were preliminary and that he was welcome to suggest changes to the numbers before finalization.  (*See, e.g.*, JX 144, 160.) Nevertheless, Andriesz gave no explanation as to how the preliminary calculations of a bonus pool of only *two* desks that traded a *single* product line out of the many at BGC could possibly portend material misstatements in BGC's publicly reported financials (which are reported at the level of the entire company, not individual desks).  Consequently, his Dodd-Frank claim fails.  *See, e.g.*, *Lawrence*, 2017 WL 3278917 at *11 (complaint did "not plausibly allege that [plaintiff] held a reasonable belief that his disclosures regarding the Form 571 accounting would have materially impacted the relevant financials"); *Nazif v. Computer Scis. Corp.*, No. C-13-5498 EMC, 2015 WL 3776892, at *7 (N.D. Cal. June 17, 2015) ("[N]o objectively reasonable accountant could have believed that a revenue misstatement of 'approximately $15 million' was sufficiently material to corporation as large as [defendant] to warrant a colorable suspicion of securities fraud.").

Similarly, Andriesz could not have had a reasonable belief of reporting securities law violations with respect to his complaints regarding Jridi's and Anthony's activities. Andriesz knew next to nothing about either trade and got virtually everything wrong about the details – an objectively reasonable person who had made a good-faith attempt to apprise themselves of the facts would not have believed BGC violated securities laws based on such little information.

D.  BGC Had a Legitimate, Non-retaliatory Reason for Terminating Andriesz's Employment.

Andriesz's Dodd-Frank retaliation claim is subject to the *McDonnell Douglas* burden-shifting framework. *See* 76 FR 34300, 34304 n.41 (June 13, 2011); *Hall v. Teva Pharm. USA, Inc.*, 214 F. Supp. 3d 1281, 1288 (S.D. Fla. 2016) (adopting the *McDonnell Douglas* framework due to "the case law cited in the Federal Rules implementing Dodd-Frank"). This means that if an employee "make[s] a *prima facie* case of retaliation," the employer may then "articulate a legitimate, non-retaliatory reason for its employment decision, after which . . . the burden shifts to the employee to show that the proffered legitimate reason is in fact a pretext." 76 FR 34300, 34304 n.41 (June 13, 2011) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Even if Andriesz had shown a *prima facie* case (which he has not), BGC had a legitimate, non-discriminatory reason for terminating his employment in January 2017: he repeatedly refused to cooperate with BGC's reasonable requests in the "interactive process" to determine how his health condition could be reasonably accommodated. The record leaves no doubt that BGC acted reasonably and lawfully in seeking Andriesz's cooperation to determine the extent of his medical issues, and that his total refusal to cooperate made continued employment impossible. *See Berger v. New York City Police Dep't*, 304 F. Supp. 3d 360, 364, 372-73 (S.D.N.Y. 2018) (employer's request for plaintiff's medical exam was not unlawful after plaintiff had stated that she could not work on the floor of the office where her unit was stationed due to dust in the office); *Bates v. Long Island R. Co.*, 997 F.2d 1028, 1031–32 (2d Cir. 1993) (district court properly dismissed claim of employee who "failed to report . . . for required medical exams, failed to offer any explanation for her failure to appear," and was then terminated for "insubordination"); *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996) (employer not liable for wrongful termination

after it made "reasonable efforts . . . to communicate with the employee and provide accommodations" and employee "failed to specify a necessary accommodation" in response).

### III.    Andriesz's Contract-Based Claims Fail.

A.    BGC Did Not Breach Contract in Terminating Andriesz's Employment.

Andriesz's refusal to comply with BGC's reasonable requests – to either timely report to his manager or otherwise promptly cooperate with BGC to determine a reasonable accommodation for his health – breached his contract with BGC and justified the termination of his employment. Under New York law (which applies to Andriesz's contract), BGC is "entitled to direct how" its employees "perform [their] duties," and "[s]o long as such directions are not unreasonable," employees such as Andriesz are "bound to obey them". *Rudman v. Cowles Commc'ns, Inc.*, 35 A.D.2d 213, 216 (1st Dep't 1970). Furthermore, a failure to comply with a reasonable order to attend work is a material breach that supports termination. *See Reilly v. Polychrome Corp.*, 872 F. Supp. 1265, 1268 (S.D.N.Y.); *cf. AM Cosms., Inc. v. Solomon*, 67 F. Supp. 2d 312, 317 (S.D.N.Y. 1999) ("Under New York law, if one party commits a material breach of contract, the other party to the contract is relieved of further performance.").

BGC placed Andriesz on leave after his repeated hospitalizations in the fall of 2016 left the company genuinely concerned that Andriesz could not perform his job without life-threatening risks to his health. BGC then made a sensible request that Andriesz attend medical exams, as part of the interactive process, to determine if any reasonable accommodations could be made.[17] *See id*. But Andriesz continuously refused to cooperate with this request. First, he failed to attend both his exams on their scheduled dates in December 2016. (JX 361.) Then, after BGC rescheduled his visits for dates in January 2017 (*see* JX 362), Andriesz sent BGC an email in which he stated that he would "not be attending these examinations." (JX 365.) In this missive, Andriesz brazenly asserted that BGC's purported reasons for requesting the exams were "clearly fabricated" and were an "attempt to deflect from and cover up" the purported accounting violations that he

---

[17] Andriesz's employment agreement specifically permitted BGC "to place [him] on paid administrative leave . . . if it determine[d] that the circumstances so warrant." (Agreement, § 2.)

had alleged in his internal reports.  (JX 365.)  He added that he would be taking a month-long trip to Sri Lanka that had never been approved by BGC, making clear that his ongoing, intentional failure to cooperate with BGC would not cease any time soon.  And at no point in this process did he ever provide a doctor's note to substantiate his claim that due to his health, he could not timely respond to Aubin or propose an alternative work arrangement that he believed would protect his health while also maintaining communication with his manager.

Andriesz' behavior left BGC in the untenable position of either keeping him on indefinite highly-compensated leave, with no end in sight, or allowing him to return – without any medical clearance – to a job that he had demonstrated he could not perform without serious risk of hospitalization.  Thus, by January 31, 2017, it was clear that Andriesz's ongoing refusal to cooperate was jeopardizing the company's interests and undermining the basic tenet of his employment.  Faced with an obvious material breach of his Employment Agreement, BGC permissibly terminated Andriesz's employment.

The Panel should reject any attempt by Andriesz to invite it to second-guess the wisdom of BGC's good-faith choices.  That BGC may not have been *required* to place Andriesz on leave in December 2016, or to terminate him when he refused to cooperate in the interactive process, or that BGC *could* have chosen different physicians for Andriesz to visit, is irrelevant.  The only question is whether BGC's actions were legally permitted under Andriesz's Agreement.  Bedrock law makes clear that this Panel "does not sit as a super-personnel department that reexamines an entity's business decisions."  *Dale v. Chicago Trib. Co.*, 797 F.2d 458, 464 (7th Cir. 1986).

B.  BGC Did Not Breach with Respect to Andriesz's Non-Cash Equity Compensation.

In signing his Agreement, Andriesz explicitly agreed that "ten percent" of his "aggregate compensation-related amount" may "consist of . . . a contingent non-cash grant, *subject to the terms of the grant documents under which such non-cash grant was awarded*."  (Agreement, § 3(f) (emphasis added).)  He also represented that he "underst[ood] that such non-cash grant may consist of" various types of equity units "as those terms are defined in the BGC Holdings, L.P. Agreement of Limited Partnership, as Amended and Restated."  (*Id.*)  Andriesz thus has no claim for breach

42

of contract related to his equity compensation if he cannot show any violation of any of the contractual provisions governing these equity units.

Andriesz produced no evidence whatsoever that BGC or any affiliates breached any contractual obligation to permit him to sell, liquidate, or otherwise redeem – at any time of his choosing – the equity units he received as ten percent of his compensation. (*See* JX 448, ¶ 273.) That is because no such provisions existed. To the contrary, the agreements governing such awards proved that there was no automatic right to redeem the units.[18] For example, Andriesz's Participation Plan Award Certificate provided that such "[u]nits are not exchangeable unless as otherwise provided in the [a]ward notification." (JX 16 at 152.) And his July 2, 2013 unit award provided that the units were "not exchangeable . . . unless and until otherwise determined by the General Partner." (*Id.* at 154.) Similarly, his 2012 sign-on grant of partnership units merely provided that 25% of any units due would be exchangeable at some point "prior to the expiry of . . . (5) years from the commencement of [his] employment." (JX 8 at 127.) Because Andriesz identified no contractual obligation for BGC or any affiliate to permit him to sell his awarded equity units at any time of his choosing, the claim fails. *See W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990) ("[W]hen parties set down their agreement in a clear, complete document," the agreement is "enforced according to its terms.").

C. BGC Did Not Breach Contract in Its Calculation of Andriesz' Bonus Pool.

Andriesz also alleges that BGC breached contract by not "pa[ying him] certain compensation based upon a legitimate accounting of the net revenue realized by the Desks he managed" (*see* JX 448, ¶ 275), apparently referring to his complaints that netting his two Desks' performance in calculating his pool, failing to exclude certain brokers' compensation from the pool's costs, or failing to attribute rebate and market maker cross revenues to his pool would constitute "false accounting." This theory fails for a multitude of reasons.

---

[18] Andriesz also failed to show that Respondent BGC Financial, L.P. was even a party to any of the applicable agreements other than the employment agreement – such as the Partnership Agreement (JX 1), Participation Plan and related award certificate (JX 16), or his sign-on award (JX 8), all of which are with non-party BGC Holdings, L.P.

iii. BGC did not breach with respect to "netting" Andriesz's pool or excluding certain brokers' costs.

For the entire time Andriesz worked at BGC under his 2015 employment agreement, he received a quarterly bonus based solely on the performance of the London desk, as well as a quarterly bonus based on the separate performance of the less profitable New York desk (for all quarters in which the New York desk was profitable). (*See, e.g.*, Tr. 1/18 JPA 1997:22-1999:2; Tr. 2/9 JM 66:16-22; JX 66 (awarding Q1 2015 bonus for New York), 75 (awarding Q1 2015 bonus for London). In short, BGC never "netted" or "offset" one desk against the other in his pool. This was due to an agreement between the parties that there would be a "grace period" before any consolidation of the two pools occurred. (Tr. 2/9 JM 60:14-61:16.) This arrangement was for Andriesz's benefit – the New York desk was unprofitable when he was promoted, and the grace period gave him time to improve its performance before the desk's revenue might impact the bonuses of the more profitable London desk. (*Id.* 60:4-13, 76:21-78:5.)

As noted earlier, Aubin agreed, as another concession, to exclude the compensation costs of certain brokers from the calculations of the New York desk's bonus pool for certain quarters in 2015. Andriesz introduced no evidence that BGC ever paid him any production bonuses in which the costs of such brokers were nonetheless deducted from his pool, in a manner inconsistent with this concession. Rather, the record refutes this claim and indicates that in 2015, costs attributable to at least five different brokers were excluded from the calculation of Andriesz's bonus for the New York desk. (*See, e.g.*, JX 265 (attaching Excel calculations labeled "Futures 2015 Complete Summary" showing calculations of bonus pool for London and New York desks in 2015).)

iv. BGC did not breach contract by excluding the Chicago Revenue from the Pool

Andriesz's contract provides that the "Net Revenues" – which determine the numerator in his pool – were to be determined "in accordance with BGC's policies and practices currently in effect at the time." (Agreement, § 3(b).) The record leaves no doubt that BGC's "policies and practices" at the time the Employment Agreement was executed were to exclude the Chicago Revenue from the Pool. Importantly, Andriesz was aware of the practice. He did not raise issue with it throughout 2015. And he even admitted in 2016 that he never asked for such revenues to

be included in his pool.  *See* Part II.C, *supra.*  This indisputable evidence of the parties' mutual understanding that such revenues were not "Net Revenues" as defined in Andriesz's contract thus defeats his claim.  *See Faulkner v. Nat'l Geographic Soc.*, 452 F. Supp. 2d 369, 381 (S.D.N.Y. 2006) ("[T]he parties' course of dealing . . .  is highly relevant" and "the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence" (quoting *Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 118 (1913)) (internal quotation marks omitted).).

## IV.    Andriesz's New York Labor Law Claim Fails.

Andriesz's New York Labor Law ("NYLL") claim "rises and falls with [his] claim for breach of contract" because any "[f]ailure to establish a contractual right to wages necessarily precludes a statutory claim under New York's [L]abor [L]aw." *Apple Mortg. Corp. v. Barenblatt*, 162 F. Supp. 3d 270, 289 (S.D.N.Y. 2016) (quoting *Simas v. Merrill Corp.*, No. 02–cv–4400 (RCC), 2004 WL 213013, at *2 (S.D.N.Y. Feb. 4, 2004)) (internal quotation marks omitted).  Thus, because Andriesz's breach of contract claim fails, *see* Part III, *supra*, his NYLL claim fails as well.

## V.    Andriesz's Implied Covenant Claim fails.

Per New York law, Andriesz must show that BGC acted with "improper motive" to prove breach of the implied covenant.  *See Wagner v. JP Morgan Chase Bank*, No. 06 CIV 3126 RJS, 2011 WL 856262, at *4 (S.D.N.Y. Mar. 9, 2011)).  "This standard is not satisfied by policies that are 'misguided or ignorant or even merely negligent.'"  (*Id.* (quoting *Keene Corp. v. Bogan*, No. 88 CIV. 0217 (MBM), 1990 WL 1864, at *16 (S.D.N.Y. Jan. 11, 1990).)  Furthermore, Andriesz cannot base his claim on actions BGC is permitted to take under his Agreement, as a party "does not breach its duty of good faith and fair dealing by exercising its rights under the contract." *DCMR v. Trident Precision Mfg.*, 317 F. Supp. 2d 220, 226 (W.D.N.Y. 2004) (alterations and internal quotation marks omitted).

Andriesz's claims that BGC breached the implied covenant by not crediting him with certain "revenue assets that BGC received" (*see* JX 448 ¶ 288) fail to meet this high bar.  Not only

did BGC credit Andriesz's bonus pool with the exact categories of revenues that were consistent with BGC's policies and practices at the time, (*see* Part III.C, *supra*), but, contrary to acting with an "improper" motive, BGC made repeated concessions to Andriesz to allow him to receive *larger* bonuses than he would have been entitled to otherwise (*see id.*).  Furthermore, the record is devoid of support for Andriesz's claims that BGC breached the implied covenant by "failing and refusing to provide timely accounting and financial records" regarding "Claimant's Newton Plan holdings" and "undermining his relationship with his trading team members . . . and with his institutional and other clients" (*see id.*).  There is no proof that BGC did anything other than act fully in accordance with its rights under the Agreement, which include "the right to assign or reassign all employees of the Desk after consultation with" Andriesz.  (Agreement, § 3(b).)  Having shown no "evidence of bad faith," Andriesz's implied covenant claim thus fails.  *See Hunter v. Deutsche Bank AG, N.Y. Branch*, 56 A.D.3d 274, 274, (1st Dep't 2008).

## VI.    Andriesz's Conversion and Unjust Enrichment Claims Fail.

Andriesz's claims for conversion and unjust enrichment against BGC and Aubin are meritless.  "The existence of a valid and enforceable written contract" – Andriesz's employment agreement with BGC – "precludes recovery" in unjust enrichment "for events arising out of the same subject matter.'"  *AdiPar Ltd. v. PLD Int'l Corp.*, No. 01 CIV. 0765 (MBM), 2002 WL 31740622, at *11 (S.D.N.Y. Dec. 6, 2002) (quoting *Clark–Fitzpatrick, Inc. v. Long Island R.R.*, 70 N.Y.2d 382, 388, (1987)).  At no point has Andriesz alleged, nor did he introduce any evidence suggesting, that BGC and Aubin enriched themselves at his expense or deprived him of any property through any manner other than (allegedly) denying him compensation that he claims he was owed to under his contract.  On that basis alone, his unjust enrichment claim is barred.

The same rule applies to his conversation claim, which requires that Andriesz prove "a wrong that is distinct from any contractual obligations."  *Command Cinema Corp. v. VCA Labs, Inc.*, 464 F. Supp. 2d 191, 199 (S.D.N.Y. 2006).  He has not.  Furthermore, "[t]he mere right to payment cannot be the basis for a cause of action alleging conversion."  *Zendler Const. Co. v. First*

*Adjustment Grp.*, 59 A.D.3d 439, 440 (2d Dep't 2009) (quoting *Selinger Enters. Inc. v. Cassuto*, 50 A.D.3d 766, 768 (2d Dep't 2008)).  Andriesz's conversion claim thus fails because he has not proven "an immediate right of possession of the funds" he seeks.  *Zendler*, 59 A.3d at 440-41.

**VII.    Andriesz's Defamation Claim Fails.**

Andriesz asserts a defamation claim against BGC, Aubin, and Webster.  This cause of action is apparently the sole basis for Andriesz seeking damages for lost earnings for any periods beyond 2019 (when his four-year contract was slated to expire).  (*See* Tr. 1/12 SS 1181:16-1182:6 (identifying only alleged "career stains and damaged reputations" as the basis for seeking lost income beyond contract period).)

The law requires that Andriesz have identified specific details about the allegedly defamatory statements for which he seeks to hold any Respondent liable, such as "who they were made to and the time, place and manner in which they were uttered or published."  *ExamWorks, Inc. v. Soltys*, No. 17-CV-0080-LJV-MJR, 2017 WL 4712206, at *8 (W.D.N.Y. Aug. 10, 2017).  At the hearing, Andriesz vaguely claimed that BGC made negative communications about him to "his peers and others in the markets" that led to "[n]o one want[ing[ to hire" him (*see* JX 448, ¶ 15; Tr. 1/11 SA 766:14-19).  But Andriesz failed to specify (*e.g.* by identifying the dates, speakers, and wording of the communications in question) the statements made by any of the three Respondents in issue.  Andriesz's claim therefore fails at the onset, as it is not sufficient to assert "based on nothing but conjecture" that "the reason he did not receive a job offer from a third party that was considering him for employment" was that his employer "defamed him."  *Smulyan v. New York Liquidation Bureau*, 158 A.D.3d 456, 457 (1st Dep't 2018).

At best, Andriesz only identified statements made by the actions of third parties, such as Tim O'Leary of Ronin Capital (*see* JX 246, Tr. 1/10 SA 527:20-528:12) and Stuart Hale, a former BGC employee who no longer worked at BGC at the time of the statement in question (*see* JX 466, Tr. 1/11 SA 829:10-830:24).  But he introduced no competent evidence that those statements were actually made or showing that any Respondent induced those third parties to make these

statements.  BGC, Aubin, and Webster cannot be held liable for statements made by others, without their involvement.  *See, e.g.*, *Marom v. Pierot*, No. 18CIV12094VBJCM, 2020 WL 1862974, at *7 (S.D.N.Y. Jan. 16, 2020).

Even if Hale or O'Leary were associated with BGC when they made the alleged statements – and, to be clear, neither was – the alleged statements in question are non-actionable under the law.  *Shinn v. Williamson*, 225 A.D.2d 605, 606 (2d Dep't 1996) (statement of "opinion either accompanied by a recitation of the facts upon which it is based or . . . which does not imply that it is based on undisclosed facts" is "protected pure opinion").

## VIII.    Andriesz's IIED Claim Fails.

Andriesz's IIED claim against BGC and Messrs. Aubin and Webster, as pleaded (*see* JX 448, ¶¶ 317-319), appears to be based only on purportedly defamatory statements that are also at issue in his defamation claim (*see id.*, ¶¶ 304-306).  Under New York law, such a claim is "properly dismissed as duplicative."  *Ghaly v. Mardiros*, 204 A.D.2d 272, 273 (2d Dep't 1994).

Additionally, Andriesz cannot base this claim on the same actions at issue in his breach of contract and retaliation claims (such as Messrs. Webster and Aubin's criticisms of him or BGC's termination of his employment).  These actions do not come close to the "extreme" or "outrageous" conduct required to go beyond regular adverse employment actions (even if wrongful) and to the level of IIED.  New York law is clear that "mere insults, indignities, and annoyances" – even those that involve "slurs" that are viewed as "deplorable and reprehensible" – do not meet this bar, unlike a "deliberate and malicious campaign of harassment or intimidation."  *Leibowitz v. Bank Leumi Tr. Co. of N.Y.*, 152 A.D.2d 169, 182 (2d Dep't 1989).  Likewise, "an employer's infliction of a humiliating discriminatory termination, without more," does not "rise to the level of extreme and outrageous conduct" necessary to support an IIED claim."  *Payne v. Mount Hope Hous. Co.*, No. 04 CV 2897 JG, 2007 WL 900034, at *4 (E.D.N.Y. Mar. 25, 2007).

IX.    **Andriesz's Tortious Interference Claim Fails.**

Andriesz's claim against BGC and Aubin for "tortious interference with prospective and actual business relationships" (*see* JX 448 ¶¶ 307-309) requires him to prove that he had "business relations with a third party" and that the Respondents "interfere[ed] with those business relations . . . with the sole purpose of harming" him or with the use of "dishonest, unfair, or improper means." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012) (citing *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir. 1994)).  But this claim fails primarily for the same reason as Andriesz's defamation claim—he has produced zero evidence (other than his own self-serving conjecture) that any Respondent took any actions directed at specific third parties that hurt his later efforts to obtain employment.  *See, e.g., Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 192 (2004) ("[C]onduct constituting tortious interference with business relations is, by definition, conduct, directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship.").  The claim also fails because the record is devoid of evidence that any Respondent acted with the requisite motive or "dishonest, unfair, or improper means."  Even if a Respondent had provided "a negative job reference" that dissuaded other firms from hiring Andriesz, New York courts have held that such statements do "not constitute interference by 'wrongful means.'" *Miller v. Mount Sinai Med. Ctr.*, 288 A.D.2d 72, 73 (1st Dep't 2001).

X.    **Andriesz's Fraud Claims Fail.**

Andriesz asserts three fraud-based claims: 1) 10b-5 Securities Fraud (Count 2, against BGC and CF&Co.); 2) Common-Law Fraud (Count 3, against BGC and Aubin); and 4) Fraud in the Inducement (Count 5, against BGC and Aubin). To prove any of them, he must show "*by clear and convincing evidence*: (1) a misrepresentation or omission of material fact; (2) that the [Respondent] knew to be false; (3) that the [Respondent] made with the intention of inducing reliance; (4) upon which [Andriesz] reasonably relied; and (5) that caused injury to [him]." *Hunt v. Enzo Biochem, Inc.*, 530 F. Supp. 2d 580, 592 (S.D.N.Y. 2008) (emphasis added); *see also Tsinias Enterprises Ltd. v. Taza Grocery, Inc.*, 172 A.D.3d 1271, 1273 (2d Dep't 2019) (applying same requirements to fraudulent inducement claim).  His securities fraud claim additionally

49

requires "that the fraud was in connection with the purchase or sale of securities." *380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 216 (S.D.N.Y. 2008). The record shows that all of these claims are groundless.

A. Andriesz's Reliance on Any False Oral Statements Regarding His Equity Compensation Would Be Unreasonable

To the extent Andriesz claims that BGC's agents committed securities fraud (or any other type of fraud) by orally communicating that he could have sold his awarded equity units at any time he pleased, he could not reasonably have relied on such statements. As indicated above (*see* Part III.B, *supra*), Andriesz's employment agreement made crystal clear that the equity compensation he would receive, which would constitute 10% of his overall compensation, was governed by agreements such as the Partnership Agreement, the Participation Plan, and any related award certificates. Those agreements accurately described the conditions under which Andriesz would be allowed to sell or otherwise redeem any awarded units. As Andriesz received and signed all of these agreements, it would not have been reasonable for him to rely on oral statements from other BGC employees that were inconsistent with the language of the written agreements. *See, e.g.*, *Brown v. E.F. Hutton Grp.*, 991 F.2d 1020, 1031 (2d Cir. 1993) (dismissing Section 10(b) securities fraud claim because "the Limited Partners' reliance on the oral statements presumptively made by [defendant] . . . is not justified as a matter of law and . . . the alleged oral statements are contradicted by the offering materials sent to the Limited Partners").

In any event, the record is clear that Andriesz never *actually* relied on any such statements (whose existence is not supported by any evidence other than Andriesz's vague and self-serving testimony). In his divorce proceeding, he accurately represented to the matrimonial court that the present value of such equity "units [was] zero" because they "may only become exchangeable at the sole and absolute discretion of the Managing General Partner." (*See* JX 30 at 11270.)

B. Andriesz's Fraud Claims Relating to His Compensation and Contractual Duties Fail.

Andriesz also alleges that BGC committed common-law fraud by making "false statements regarding his employment status and their contractual obligations to him," and fraudulent

inducement by misrepresenting his "actual role or roles in the firm to be performed in New York." (*See* JX 448, ¶¶ 268, 280.)  However, all of this information is contained in Andriesz's written Agreement with BGC, which explicitly supersedes "any promises, representations, or inducements, written, oral or otherwise, which are not set forth in this Agreement."  (Agreement, § 10(a).)  Thus, as with his equity compensation theory, this theory of "fraud" fails because it would not have been reasonable for Andriesz to rely on such statements (which he did not even identify at the hearing).  *See also McKernin v. Fanny Farmer Candy Shops, Inc.*, 176 A.D.2d 233, 234 (2d Dep't 1991) (fraud claim cannot be "premised upon an alleged breach of contractual duties" unless "the supporting allegations . . . concern representations which are collateral or extraneous to the terms of the parties' agreement").

C. Andriesz Produced No Evidence of Any Other Fraudulent Statements.

In his statement of claim, Andriesz also alleges that certain Respondents committed fraud by making knowingly false statements with respect to "the sale of eSpeed" (in support of his securities fraud and common-law fraud claims), "paying for ███████ to operate in his stead as the Series 30 for the New York Desk"[19] and "participate[ng] in the Charity Day Event," (in support of his common law fraud claim), and "the soundness of the compliance culture" at BGC (in support of his fraudulent inducement claim).  (*See* JX 448, ¶¶ 255, 268, 280.)  The record is bereft of any evidence that any Respondent, or any individual whose actions could be imputed to a Respondent, made any such knowingly false statements.  Consequently, any fraud theories related to these purported communications also fail.

**XI. Andriesz's Fiduciary Duty Claim Fails.**

Under New York law, "employment relationships do not create fiduciary relationships." *Rather v. CBS Corp.*, 68 A.D.3d 49, 55 (1st Dep't 2009).  There is no evidence at all that Messrs. Aubin, Shields, and Pion – against whom Andriesz asserts a claim for breach of fiduciary duty – had anything more than a conventional, arms-length relationship in the workplace with Andriesz.

---

[19] The record at the hearing reflected that Andriesz was repaid for a ███████████ in the spring of 2015 with a $20,000 one-time payment.  (*See* JX 72, 233; Tr. 2/9 JM 53:9-56:15.)

His claim therefore fails. *See Schenkman v. N.Y. Coll. Of Health Prof'ls*, 29 A.D.3d 671, 672 (2d Dep't 2006) (upholding dismissal of fiduciary duty claim against a college, its president, and the chairman of its board because plaintiffs "failed to plead any facts demonstrating how the arm's-length, employer-employee relationship . . . gave rise to any fiduciary duty").

**XII.    Andriesz's RICO Claim Fails.**

Andriesz has alleged that Respondents violated 18 U.S.C. § 1962(c)-(d), which are part of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"). In order to prove a violation of either subsection, Andriesz must have proven the existence of a RICO "enterprise." *See id.* §1962(c) (prohibiting "any person employed by or associated with any enterprise" from conducting or participating "in the conduct of such enterprise's affairs through a pattern of racketeering activity"); *Black v. Ganieva*, 619 F. Supp. 3d 309, 329 (S.D.N.Y. 2022) (plaintiff is required to prove existence of enterprise to win a Section 1962(d) claim). Importantly, the law requires that a RICO defendant and the enterprise must be distinct. *Espire Ads LLC v. TAPP Influencers Corp.*, 655 F. Supp. 3d 223, 254 (S.D.N.Y. 2023). And a purported enterprise that consists "merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant" does not meet this requirement. *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 121 (2d Cir. 2013). Similarly, "corporations that are legally separate but operate within a unified corporate structure and guided by a single corporate consciousness cannot be both the "enterprise" and the "person" under § 1962(c)." *Id.* (internal quotation marks and citation omitted).

Andriesz introduced no evidence at the hearing, nor did he provide any testimony, suggesting that any of the remaining individuals against whom he brings this claim—Messrs. Aubin, Shields, and Pion—did anything other than act on behalf of BGC in the course of their employment. Moreover, he has also brought this claim against both BGC and CF&Co.—who are corporate affiliates operating within a unified corporate structure. Thus, to the extent that Andriesz's purported "enterprise" is simply BGC, CF&Co., other corporate affiliates, and their

employees, his claim is barred.  *See id* at 120-21 (affirming dismissal of RICO claim because a purported RICO enterprise consisting of defendant firm, its corporate affiliate, and multiple executives failed distinctness requirement).

Nor can Andriesz rescue his claim by asserting that the alleged "enterprise" includes non-BGC affiliated individuals or entities such as O'Leary, Ronin, or the numerous random individuals and entities discussed in his 23-page "addendum" to his Statement of Claim.  A so-called "association-in-fact enterprise" under RICO (such as an enterprise involving both BGC and Ronin, or their employees) requires that the members of the enterprise "share a common purpose . . . to violate RICO or to act unlawfully.  A separate purpose or objective that does not involve illegal conduct will not do."  *Black*, 619 F. Supp. 3d at 331 (internal citations omitted).  But Andriesz introduced zero evidence indicating that BGC, CF&Co., or any of its employees acted under a "common purpose" with any non-BGC affiliated individuals or companies to commit unlawful actions.  *See, e.g.*, *Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*, 924 F. Supp. 449, 471-72  (S.D.N.Y. 1996) (dismissing RICO claim in which purported enterprise "ha[d] no evidentiary , support" and the "dizzying array of conflicting theories" in plaintiff's "breathtakingly imaginative story" were "unsupported by facts").

### XIII. Andriesz's Civil Conspiracy Claim Fails.

As "New York does not recognize an independent tort of conspiracy," Andriesz's civil conspiracy claim against all remaining Respondents (other than Webster) requires that Andriesz prove the commission of "torts underlying the alleged conspiracy."  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006).  As indicated above, Andriesz has failed to prove the existence of any underlying torts committed by these Respondents or their agents, and therefore his civil conspiracy claim fails as well.  *See id.*

### XIV.    Andriesz Has No Case for Damages.

Andriesz introduced into evidence a report from his damages expert, Dr. Stan Smith, that calculates two categories of losses suffered by Andriesz: 1) lost earnings from 2015 through 2033

(his age 65 year), estimated at between \$27.7-\$44.0 million; and 2) \$2.7-\$3.4 million in damages for "loss of enjoyment of life." (JX 459 at 4343.) Additionally, Andriesz seeks punitive damages. (JX 448 at 76.) But based on the record, Andriesz cannot be awarded any damages at all.

## A. Andriesz Suffered No Actionable Damages.

### i. Andriesz suffered no pre-termination economic loss

s are for a period beginning on February 1, 2015. (JX 459 at 4335.) Per his expert's report, Andriesz seeks damages for the 2015 and 2016 years – when he was still employed at BGC – because he claims to have earned "less than he was due" during this period and "should have earned approximately \$1 million in 2015" and then "\$1.5 million" in 2016. (*Id.* at 4329.) But, as indicated previously, the hearing generated no evidence whatsoever that BGC ever paid Andriesz less than he was owed while he was on the job. *See* Parts III.B-C, *supra*. Conversely, Andriesz received *more* money than he was entitled to earn. In all, he has no economic losses preceding the date on which his employment was terminated.

### ii. Andriesz has no basis to seek lost earnings post-termination

The hearing also established that Andriesz has no basis to seek any damages for lost income after the termination of his employment. First, he has no actionable damages related to the termination of his contract because the evidence established that BGC was fully justified in terminating him for cause. *See* Parts II.D-III.A, *supra*. Indeed, Andriesz's refusal to cooperate in the interactive process was the final straw in a series of transgressions, all of which, whether independently or in aggregate, constitute grounds for termination. These included: at least three separate threats to resign as head of the New York futures desk in the middle of his term; the mess he made in recruiting Ms. Choukroun due to his failure to follow direction and be transparent in his communications; his refusal to meet with his supervisor, in part because he was trying to frustrate BGC's strategy with respect to a BGC employee ███████; and his disclosure of highly confidential and sensitive revenue figures to a competitor. (*See* Factual Background, *supra*.) All of these actions constitute "cause" for termination under the explicitly listed categories in the

Agreement, such as "dishonesty," "insubordination," "unsatisfactory performance of attendance," or "serious neglect or gross negligence in performing [his] duties." (*See* Agreement, § 4(a).)

Second, Andriesz failed to establish any basis for lost income post-dating January 21, 2019 – the end date of his term – which apparently constitutes more than three-quarters of his purported lost earnings. (*See* JX 459 at 4343-4352.) As an initial matter, because Andriesz had already given notice to BGC that he would not be extending his initial term, he cannot receive damages relating to his contract termination for any periods beyond the term. *See, e.g.*, *Wiener v. Lawrence-Picaso, Inc.*, 295 A.D.2d 273, 274 (1st Dep't 2002) (limiting plaintiff's damages for breach of employment agreement to "the remainder of the initial three-year term of the employment agreement less the unemployment benefits he received"). Indeed, Dr. Smith identified only Respondents' alleged defamation of Andriesz as the basis for seeking post-term lost income. (*See* Tr. 1/12 SS 1181:16-1182:6.) But because Andriesz's defamation claim is groundless (*see* Part VII, *supra*), he cannot recover these amounts.

Lastly, even if any Respondent were found liable for claims that supported an award of lost earnings, Andriesz fully mitigated his damages within seven months of leaving. Under the law, a plaintiff is "not entitled to any further relief" once he "fully mitigate[s] his damages by obtaining employment under the same terms." *Andrews v. Sotheby Int'l Realty, Inc.*, 586 F. App'x 76, 77 (2d Cir. 2014). Andriesz received such a position no later than July 24, 2017, when (after receiving six months' worth of non-compete payments from BGC) he was hired as a "Managing Director and Senior Broker" at Square (*see* JX 385), or, at the very latest, July 5, 2018 when he was hired as "Head of the Financial Futures and Options desk" at Tradition, another brokerage (*see* JX 399). He in fact admitted to his expert that these roles would have been sufficient to fully mitigate any lost earning potential, as he stated that "the compensation at another firm would have been the same o[r] better than that at BGC." (JX 467 at 3500.) Consequently, Andriesz is ineligible to receive any damages for lost income that post-date his hire at Square. *See Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 236 (1982) ("[T]he victim of discrimination who finds a better or

substantially equivalent job no longer suffers ongoing injury stemming from the unlawful discrimination.").

       iii.  <u>Respondents did not proximately cause any noneconomic damages</u>

      Andriesz also seeks $2.7 to $3.4 million for what his expert calls "hedonic damages," or damages for "loss of enjoyment of life," from 2015 (when his BGC contract began) until 2050, when he would turn 82. (*See* JX 459 at 4343, 4358-4361.) But Andriesz has not remotely met his burden of "prov[ing] a causal connection" between any actionable conduct by BGC "and his alleged injuries." *Santana v. State*, 91 A.D.3d 937, 939 (2d Dep't 2012).

      The admitted evidence indicates that throughout Andriesz's life, he has battled numerous medical, emotional, and psychological ailments that have affected his "enjoyment of life," yet have nothing to do with BGC. Many of these – including a traumatic childhood, a decade of psychotherapy, a history of alcohol and cocaine abuse (which led to multiple rehab stints), and multiple years of using antidepressants – *preceded* his time at the company, which began in 2012.

      Even after he joined BGC, the main contributing factors to Andriesz's deteriorating health were not connected to the company. As indicated previously, he blamed his ex-wife's attorney for causing his July 2015 heart attack. Indeed, Andriesz's own physician noted ███████████

███████████████████████████████████████████████████████████████████

███████." (*See* JX 256 at 2388, 2391.) After Andriesz departed BGC, he continued to suffer numerous health issues, including ████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████ Andriesz has also blamed Tradition for exacerbating his health problems to such a great extent that he plans on suing them.

      In response, Andriesz offered little more than testimony from himself as well as doctors who only saw him *after* he left BGC, and whose only knowledge of the company's actions is through Andriesz. As a psychotherapist who Andriesz called to testify – who did not begin seeing him until October 2017 – succinctly put it, "my truth is his truth." (Tr. 1/17 PP 1493:24-1494:4, 1517:6-1518:4.) By contrast, Andriesz did not call any of the doctors who treated him during the

time he worked at BGC, such as Dr. Stuart Orsher (*see* JX 256), to testify.  Given the fact that Andriesz wholly relies on testimony regarding BGC's actions that – either directly or indirectly – comes from himself, this Panel should join the many courts that have confronted similar scenarios and refused to give much "credit [to the] subjective representations or the testimony of" an "interested witness." *Kerman v. City of New York*, 374 F.3d 93, 123–24 (2d Cir. 2004).  Andriesz has not met his burden of showing that BGC proximately caused his current maladies.  *Id.* (upholding jury's refusal to award plaintiff damages for "emotional suffering" and "psychological injuries" when his psychiatrist's opinion "was not sufficiently specific to link" his injuries to "conduct for which [defendant] could be held liable").[20]

### B. Andriesz Cannot Prove Any Lost Earnings with Reasonable Certainty.

Furthermore, Andriesz cannot establish any lost earnings with the "reasonable certainty" required by law.  *See, e.g.*, *Superior Vending Servs., Inc. v. Workmen's Circle Home & Infirmary Found. for Aged*, 148 A.D.3d 960, 961 (2d Dep't 2017); *Toscarelli v. Purdy*, 217 A.D.2d 815, 818 (3d Dep't 1995).  "Damages that are merely speculative" or "possible" do not suffice.  *Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp.*, 28 F. Supp. 2d 126, 131 (S.D.N.Y. 1998).

Andriesz's three lost earnings scenarios project that he should have earned $1 million in 2015 and $1.5 million in 2016 (while at BGC), before increasing to a steady state of between $2.21-$3.74 million per year until age 65.  (**JX 459** at 4329-30, 4345, 4348, 4351.)  These numbers are fantasy.  First, despite working at *three* brokerages over his *seven* years since leaving BGC, Andriesz has not earned more than $462,000 in a single year – barely *one-fifth* of Dr. Smith's *lowest* estimate.  (**JX 459** at 4332.)  Furthermore, as detailed above (*see* Factual Background, Part XII, *supra*), Andriesz's physical and mental health has deteriorated significantly since he left BGC, limiting his ability to work.    Given this history, it is *anything but* "reasonably certain" that Andriesz would work continuously as a full-time futures broker through age 65 – much less at a

---

[20] Dr. Smith's attempt to put a number to this harm should also be disregarded, as "the overwhelming majority of courts . . . have concluded that [Dr. Smith's] 'willingness-to-pay' methodology is either unreliable or not likely to assist the [factfinder] in valuing hedonic damages, or both."  *Smith v. Jenkins*, 732 F.3d 51, 66 (1st Cir. 2013).

capacity that would generate more than two million dollars in pay during an average year.  *See, e.g.*, *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996).

Equally fatal is the fact that Dr. Smith concedes that his calculations under all three scenarios are based on Andriesz's unverified claim that his future earnings would approximate his pay during the *four best years* of his decades-long career from 2007-2011.  (**JX 459** at 4329-30.) Andriesz's $2.36-$3.53 million in annual earnings from these years at MF Global dwarfs his approximately $634,000 in average earnings during his following two years at Nomura (*see* **JX 468**), as well as the approximately $700,000 per year that Andriesz received during his last two years at BGC (**JX 459** at 4329)  On this basis alone, Dr. Smith's analysis should be discarded by the Panel, as "courts have consistently excluded expert testimony that 'cherry-picks' relevant data" and "produces a misleadingly favorable result by looking only to 'good' outcomes."  *E.E.O.C. v. Freeman*, 778 F.3d 463, 469–70 (4th Cir. 2015) (citing cases).

Furthermore, even though Andriesz's past contracts (*see* **JX 7**, **38**, **399**) indicate that a futures broker's pay comes primarily from production bonuses from a "pool" based on their desk's profits, neither Andriesz nor Dr. Smith calculated a hypothetical bonus pool, reviewed Andriesz's post-BGC production volume, or evaluated the market conditions in the industry to evaluate the likelihood that Andriesz would transact sufficient business to generate two to four million dollars in compensation annually.   (Tr. 1/12 SS 1195:2-13, 1199:8-1200:8, 1204:11-24, 1207:21-1208:21.)  This Panel should follow the many courts that routinely exclude damages opinions that favor the client's "orally communicated estimates" over "hard data" when determining "essential numbers that would drive [the] ultimate conclusions," as this approach bears "none of the hallmarks of a reliable method for measuring lost income."  *Lava Trading, Inc. v. Hartford Fire Ins. Co.*, No. 03 Civ. 7037, 2005 WL 4684238, at *12-13 (S.D.N.Y. Apr. 11, 2005).

C.  Andriesz Is Not Entitled to Punitive Damages.

Although punitive damages are not available for claims such as Dodd-Frank retaliation (*see, e.g.*, *Rosenblum v. Thomson Reuters (Markets) LLC*, 984 F. Supp. 2d 141, 149 (S.D.N.Y. 2013)), punitive damages can be awarded on tort claims, such as defamation, only if Andriesz

shows that such damages are necessary to deter "gross" and "morally reprehensible" conduct that is of "such wanton dishonesty as to imply a criminal indifference to civil obligations." *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 315–16 (1995) (internal quotation marks and citation omitted); *see also Prozeralik v. Cap. Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 479–80 (1993) (punitive damages can be awarded for defamation only for "outrageous conduct which is malicious, wanton, reckless, or in willful disregard for another's rights").

Andriesz has not come close to showing that BGC's treatment of him meets this standard. As indicated above, during the last two years of his employment at BGC, he engaged in a litany of unprofessional conduct. (*See* Part XIV.A.ii, *supra*) In response, BGC's employees not only spent countless hours patiently addressing his complaints, but made repeat concessions to him, such as paying him additional sums of money, and agreeing to adjust his work schedule in accordance with his demands. BGC terminated Andriesz's employment after he refused to cooperate with its genuine attempt to accommodate his serious health issues. The evidence thus illustrates that BGC's actions were the polar opposite of the nature required to justify punitive damages.

## <u>CONCLUSION</u>

For the foregoing reasons, Respondents respectfully request that the Panel deny in full all claims asserted by Claimant, assess all hearing fees against Claimant, and grant such other and further relief that the Panel deems just and proper.

Dated: New York, NY
      April 12, 2024

                             */s/ Nirav S. Shah*
                             Nirav S. Shah, Assistant General Counsel
                             Virginia J. Cárdenas, Assistant General Counsel
                             Sid Nadkarni, Assistant General Counsel
                             110 E. 59th Street, 7th Floor
                             New York, NY 10022
                             (212) 294-7873 (NSS)
                             nirav.shah@cantor.com
                             virginia.cardenas@cantor.com
                             sid.nadkarni@cantor.com

                             *Attorneys for Respondents BGC Financial, L.P.,*
                             *Cantor Fitzgerald & Co., Jean-Pierre Aubin,*
                             *Mark Webster, Paul M. Pion, and William M.*
                             *Shields.*