# Exhibit 11

OFFICE OF DISPUTE RESOLUTION
FINANCIAL INDUSTRY REGULATORY AUTHORITY
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| SIMON D. ANDRIESZ, | : | |
| | : | |
| | : | |
| | : | |
| Claimant, | : | FINRA Case No. 22-02539 |
| | : | |
| | : | |
| - against - | : | |
| | : | |
| | : | |
| BGC FINANCIAL, L.P., CANTOR FITZGERALD & CO., JEAN-PIERRE AUBIN, MARK WEBSTER, PAUL M. PION, and WILLIAM M. SHIELDS. | | |
| Respondents. | | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### RESPONDENTS' RESPONSES TO THE
### <u>PANEL'S MAY 3, 2024 SUPPLEMENTAL QUESTIONS</u>

Nirav S. Shah, Assistant General Counsel
Virginia J. Cardenas, Assistant General Counsel
Sid Nadkarni, Assistant General Counsel
110 E. 59th Street, 7th Floor
New York, New York 10022

*Attorneys for Respondents BGC Financial, L.P., Cantor Fitzgerald & Co., Jean-Pierre Aubin, Mark Webster, Paul M. Pion, and William M. Shields.*

## PRELIMINARY STATEMENT

The short answers to the Panel's questions are as follows: (i) the documents and testimony in the record leave no doubt that BGC paid Claimant *more* than he was entitled to under the Employment Agreement; (ii) BGC's "practices" – particularly its practice of crediting of the Chicago Revenue to Chicago and not Claimant's London and New York Desks – were acknowledged and accepted by Claimant during his employment and are reflected throughout the evidentiary and testimonial record in this case; and (iii) BGC had every right under contract, statute, regulations, and case law to require that an employee who had recently been hospitalized after coming to work in contravention of his own physician's recent advice and the concerns of his coworkers, and who claimed a severe and ongoing work-related illness prevented him from regularly reporting to his manager, see a physician and psychiatrist to assess whether he could safely perform his duties or whether an accommodation was required.

More detailed responses to the Panel's questions are below, but Respondents feel compelled to note that any deficiency in the arbitration record on the above points was the result of strategic and tactical decisions by the Claimant, who had the burden of proof on each of the nineteen claims he asserted at the outset of the hearing. As to questions concerning Claimant's compensation while at BGC, Claimant chose not to present any calculation (or even the most basic analysis) of any alleged shortfall in BGC's bonus calculations. He did not dispute any "inputs" or expenses of Net Revenues, other than by taking issue only with BGC's well-established practice of crediting Chicago Revenue to centers other than the London and New York Desks. Claimant did not identify any other alleged miscalculation of the Pool: the parties' argument about whether reference to a single "Pool" in the Employment Agreement referred to a single combined Pool or two separate pools is an academic point for the Panel's purposes, since BGC never combined the London and New York desks into a single Pool. Claimant's strategic decision to ignore BGC's

1

calculations was most prominently on display when he presented an expert who shot for the moon with a lost profits model based almost entirely on years that Claimant did not even work at BGC and who ignored BGC's voluminous accounting documents, which made clear how Claimant's compensation at BGC was calculated, in favor of nothing more than his client's *ipse dixit* that he was underpaid.  Claimant compounded his decision not to meaningfully engage with the numbers when he chose not to call Tommy Attrill, his direct report who corroborated BGC's numbers each quarter in 2015 before bonuses were paid out.

Claimant's choice not to calculate an alleged shortfall guided Respondents' decision-making at hearing.  A defendant that is not charged with the burden of proof need not take on issues that the plaintiff chose to ignore.  Here, by the time Claimant rested his case, the written record made clear that he had contemporaneously acknowledged in 2015 and 2016 that BGC's practice was to credit the Chicago Revenue to its Chicago execution desk.  Claimant introduced no evidence or testimony disputing these facts.  BGC had included on its witness list individuals prepared to address the question of its accounting practices in more detail – Darryl Denyssen, its Chief Financial Officer for the UK; Carrie Fertig, who has served as both a business manager handling accounting in the US and as an HR representative; Respondent Paul Pion, a former Deloitte partner who served as BGC's Chief Ethics Officer – but none of these witness's testimony was required in light of Claimant's total failure to meet his burden of showing any underpayment.  In terms of exhibits, Respondents had the ability to present a much more detailed accounting case from the 100,000+ pages they produced in this action.  However, such a presentation was unnecessary given Claimant's choice to focus on a seemingly unending parade of side shows (*e.g.* claims that his manager caused the suicides of individuals uninvolved in the relevant events) that resulted in the proceeding running over schedule even without the testimony

2

of the above witnesses.  Respondents cannot be penalized for declining to build a record to refute points that Claimant himself never made.

The issue of medical and psychiatric examinations follows a similar course.  Claimant's accusation at hearing about the medical and psychiatric referrals from BGC were that these referrals were a "sham" and that BGC requested them to retaliate against alleged whistleblowing activity.  Claimant never argued (for example, in his Statement of Claim or the Pre-Hearing Brief) that the scheduled examinations violated any legal standard or were improper, other than claiming that they were a pretext for retaliation.  If Claimant had done so, Respondents would have had the opportunity to shape their presentation to those accusations, as they presented Ms. Dreste's testimony showing that the allegation of retaliation was nonsense.  Though it was not a focus of the hearing, the record nevertheless fully supports BGC's lawful need for a medical and psychiatric assessment of an individual who only weeks prior had ignored BGC's advice to put his health first and was hospitalized within days.

While Respondents understand the Panel's curiosity in looking beyond Claimant's messy and threadbare case-in-chief to determine whether a more coherent case might exist somewhere behind it, searching the record for a case Claimant did not make is not the role of the Panel.  Doing so risks prejudicing Respondents and denying them basic due process by asking them to rely on a now-closed record to dispute arguments that the Claimant never raised at hearing or before.  Respondents faced a kitchen sink of false accusations and addressed _all_ of them, demonstrating allegation after allegation to be false. If Claimant had attempted to make a case on the points raised by the Panel, Respondents would have methodically answered those claims as well.  Put differently, if there are gaps in the evidence, those gaps support Respondents' request that each claim be denied.

## RESPONSES

**1(a). Identify all admitted exhibits evidencing payments made (or not made) by BGC to Claimant pursuant to Section 3(a) of Ex. 38 (NY Contract) during the 11-month period of February 1, 2015 - December 31, 2015.**

Respondents are unaware of any allegation that BGC failed to pay the full amount of the Salary and Draw payments set forth Employment Agreement Section 3(a) in 2015.  To the contrary, the Statement of Claim states clearly that by the fourth quarter of 2015, "Simon and his team had been compensated as agreed for nearly a year."  (Renewed Statement of Claim at ¶ 141.)  The Statement of Claim does not raise any issues regarding the payment of salary or draw in connection with his breach of contract and New York Labor Law claims, which take issue only with Andriesz receiving 10% of his gross earnings in restricted equity, the calculation of Andriesz's bonus pool for unspecified periods, and the circumstances under which his employment was terminated.  (*See* Statement of Claim, ¶¶ 270-278, 326-331.)  Nor does Andriesz's pre-hearing brief raise any issues regarding his salary and draw payments, as the words "salary" and "draw" do not appear a single time in the brief.  (*See* Claimant's December 21, 2023 pre-hearing brief.)

For a statement of the amounts paid to Andriesz in the United States under the Employment Agreement, *see* **JX 132**, which reflects that during the 2015 calendar year, Claimant received:

- $28,500 in regular salary payments and $4,500 in retroactive salary payments,

- $288,166.73 in regular variable draw payments and $45,500 in retroactive draw payments,

- $30,579 in cash advances,

- $540.00 in group term life insurance payments, and

- $180,464.49 attributable to production bonuses.

This does not include rent payments made on Claimant's behalf by BGC, which were not required under the original Employment Agreement but which BGC agreed to provide to diffuse Claimant's financial difficulties occasioned by his divorce.  As the Panel is aware, the reason for the retroactive amounts is that (as noted in **JX 488**), Andriesz was not eligible to receive regular payments until at least mid-March 2015 due to an error in Claimant's Social Security application.

**1(b).  Identify all admitted exhibits evidencing whether BGC fully paid Claimant the annualized equivalents of the variable draw ($364,000) and salary ($36,000) described by Section 3(a) of Exhibit 38 (NY Contract) for the 11-month period of February 1, 2015 - December 31, 2015.**

The above compensation statement demonstrates full payment for 11 months.  11 months of annualized Salary and Draw ($400,000 x (11/12)) equals $366,666.67.  BGC paid Claimant this amount (plus 6 cents):

| | |
|---|---|
| Salary: | $  28,500.00 |
| Retroactive Salary: | $    4,500.00 |
| Draw: | $ 288,166.73 |
| Retroactive Draw: | $   45,500.00 |
| Total: | $ 366,666.73 |

In her testimony, Ms. Dreste confirmed that these amounts were, in fact, paid in 2015.  2/8 Dreste, Tr.  290:9-292:3.

**1(c).  Please provide the Panel with calculations demonstrating the full payment or any underpayment, as reflected by the exhibits identified by the two preceding questions.**

Respondents are unsure whether the Panel intends to limit this question to Salary and Draw in 2015 (as in the previous questions) or to all compensation.  Out of an abundance of caution, we therefore address all categories of potential compensation set forth in the Employment Agreement.

1.  Salary and Draw

Please see Question 1(b), above.  Andriesz received the full $366,666.73 in combined Salary and Draw for the eleven-month period in 2015 when he was employed under the Employment Agreement.

2. Discretionary Bonus[1]

Under Section 3(e) of the Employment Agreement, Andriesz had no contractual entitlement to discretionary bonuses, but was merely "eligible" for such a bonus.  See also, *Marin v. AI Holdings (USA) Corp*., 35 Misc. 3d 1227(A), 953 N.Y.S.2d 550 (Sup. Ct. 2012) ("an employee has no enforceable right to compensation under a discretionary bonus plan or contract").

**JX 265** shows that in addition to Pool payments he received in the relevant years, Claimant received discretionary bonuses under Section 3(e)[2] of $12,236 in Q1 2015 and $26,677 in Q2 2015 for the New York desk, as well as a discretionary bonus of $25,000 in May 2016.  These amounts exceed Andriesz's contractual entitlement – to the extent Andriesz now argues that he was underpaid under any other category, the amount of such underpayment would be offset by the discretionary payments that BGC made without any obligation to do so.

3. Bonus Pool

The only dispute concerning the Pool calculation raised at hearing involved (i) the combination of the London and New York desks into a single Pool and (ii) the booking of the

---

[1] The cash compensation that Andriesz received for all discretionary and production bonuses was less than the total bonus number due to the provision Andriesz agreed to in his Employment Agreement providing explicitly that "ten percent" of his "aggregate compensation" from BGC would consist of a "contingent non-cash grant" of highly restricted equity which was subject to forfeiture under the provisions in the agreements governing those equity units (which Andriesz also signed).  (**JX 38** at § 3(f); *see also* **JX 16** (reflecting Andriesz's signature to BGC Holdings, L.P. Participation Plan and Partnership Agreement).)

[2] At hearing, McLachlan testified that "override" and "discretionary" were synonymous in this context. 2/9/24 McLachlan Tr. 133:19-21 ("there is no calculation of an *override* bonus. It is -- it is, I agree, a discretionary payment").

Chicago Revenue to Chicago and not to the London and New York desks. For the reasons discussed below, neither demonstrates any underpayment by BGC.

As an initial point, however, it should be noted that the percentage of the Pool payable to Claimant was never fixed or guaranteed – at most, Claimant could "recommend" what share he would take from the pool, which would then be subject to the Company's "approval." (**JX 38**, § 3(b).)

As to the issue of a combined Pool, the testimonial and evidentiary record makes clear that Andriesz was always paid based on two separate pools. Despite the Agreement's reference to a single Pool, Andriesz's London bonus was never reduced by the persistent deficits present on the New York desk he supervised. *See* **JX 65** (showing separate calculation of London and NY Desks for Q1 2015), **JX 265** (showing the two pools). As provided for in the parties' contract, bonuses were calculated by multiplying Net Revenues by 50% and then deducting compensation expense, travel and entertainment expenses, and market data (i.e., Bloomberg).

For 2015, Claimant received production bonuses from the London Desk of $90,152 in Q1, $73,198 in Q2, and $35,917 in Q4. He received no production bonus for Q3, when the London Desk was in deficit. While he received discretionary bonuses in Q1 and Q2 for the New York Desk (as noted above), he did not receive production bonuses in any quarter for New York because the Desk was in deficit for all four quarters. Claimant and his business manager had access to all financial data involving the Desk and received the company's calculations. After review, Claimant was given the opportunity to raise any concerns. He ultimately approved the Pool numbers and recommended a bonus allocation to the members of the Desks. *See, e.g.,* **JX 50, 66, 75, and 356**.

As to the Chicago Revenue, BGC had the right to book Chicago Revenue to the Chicago execution desk, consistent with Andriesz's contract[3] and its established accounting practice of booking revenue accordingly, which Andriesz acknowledged contemporaneously.  (*See* **JX 146** (referring to crossed trades: "100% goes to BGC as this was the model set up when I joined"); **JX 151** ("pit rebates, CME rebates, and crosses I haven't asked for this revenue at all . . . I don't mind you keeping it, but don't say I'm negative."), **JX 153** (for the Chicago Revenue "I absolutely accept as revenue for BGC)).

BGC's contemporaneous bonus calculations, which are in the record (*see, e.g.,* **JX 65, 228, 265**), therefore demonstrate that Claimant has no basis to allege an underpayment related to the Pool.

**1(d). Identify all admitted exhibits evidencing payments made by BGC to Claimant pursuant to Ex. 7 (London contract) during calendar years 2014 and 2015.**

See **JX 46** which includes a summary of amounts Claimant received from BGC's UK affiliated from January 2014 through January 2015.  During 2014 and 2015, Claimant received a total of $310,045 in salary payments (including $21,903 for the month of January 2015) and $216,446 in additional payments attributable to bonuses.[4]

**1(e). Identify all admitted exhibits or testimony evidencing or establishing the date when SA moved to NYC in or about Q4 2014.**

---

[3] **JX 38** at §3(b) expressly excludes the Chicago Execution Desk from the Pool and establishes that the agreement does not supersede BGC's ordinary accounting practices with respect to booking of revenue.

[4] Respondents note that these amounts have no relevance to this arbitration, in which Claimant's UK employer is not a named party and in which there are no claims for underpayment of amounts owed under Claimant's London contract.

Claimant's testimony indicates that he moved to New York "in November" of 2014, which Respondents do not contest. (*See* 1/11 Andriesz, Tr., 942:12-16.) This timeframe is consistent with **JX 31**, in which Claimant and Jean-Pierre Aubin discuss tentative plans for Claimant to "meet" a potential hire who is "in NYC" on November 20.

**1(f). Identify all admitted exhibits or testimony evidencing or establishing the date when SA commenced working out of any BGC NY office, in or about Q4 2014, before receiving his US work visa or passing his Series 30 examination.**

Please see the response to Question 1(e), above. Andriesz did not begin "supervising" the New York desk before he passed his Series 30 examination – the record establishes that supervisory functions prior to this date were performed by Kristi Haas, BGC's Head of Surveillance. (*See* 1/9 Andriesz, Tr. 168:16-24; 1/17 Aubin ,Tr., 1582:13-16; 2/9 McLachlan, Tr. 53:6-20.) The December 11, 2014 date of Claimant's work visa (**JX 489**) indicates that Claimant received authorization to work soon after arriving in the United States.

**1(g). Identify all admitted exhibits evidencing or establishing the date when SA commenced managing or supervising the NY desk prior to February 1, 2015.**

Respondents refer the Panel to the response to Question 1(f), and further identify **JX 31** (Claimant and Jean-Pierre Aubin discuss tentative plans for Claimant to "meet" a potential hire who is "in NYC") and **JX 38** (Claimant agrees to pass his Series 30 exam within 30 days of his February 1, 2015 Start Date under the agreement).

**2(a). Identify all admitted exhibits that reflect the calculation of Net Revenue for each of the London and New York incentive pools for each quarter from Q4 2014 through Q4 2016.**

Claimant did not ever put in issue the calculation of his Pool in either Q4 2014 (before the Employment Agreement was executed) or any of the quarters in 2016, and expressly acknowledged that the first three quarters of 2015 were calculated "as agreed." (Renewed

Statement of Claim, ¶ 141.)  As a result, documents setting forth more detailed calculations for 2016 bonuses were included among the joint exhibits, but were not admitted during the hearing (*see, e.g.*, JX 358, 367.)  The Statement of Claim placed at issue the calculation of the Pool in connection with 2015 fourth quarter bonuses (SOC ¶¶ 141-158), as well as alleging that BGC "recalculate[d] the New York Desk's 2015 production" (*id.* ¶ 141).  There is therefore more detail in the record regarding the calculation of the Pool in 2015.

Respondents identify:

- **JX 38:** Section 3(b) of Andriesz's contract provides definition of Net Revenues (including that Net Revenues are determined "in accordance with BGC's policies and practices currently in effect"), explains BGC's right to assign and reassign members of the desk (and, therefore, the brokers whose revenues constitute the Pool's Net Revenues), and states that bonuses are "payable within 45 days after the last day of the Calculation Period" and "[i]t is a condition precedent to receiving and earning payment of the Commission Payment that Employee remains employed by BGC (or any Affiliate) at the time payment is made."  Importantly, it explains that the Pool includes revenues from the New York and London futures desks, "*excluding the Chicago futures execution desk*."

- **JX 65:** Email from McLachlan attaching the New York and London desks' Pool Calculations for Q1 2015, including that the total amount of Net Revenue in the Pool was equal to the sum of the net revenue from voice brokering transactions generated by each broker on the desks.  (*See* **JX 65**, attached Excel printouts labeled "FUTURES – OPTIONS" (London desk) and "NY FUTURES" (New York desk).)  As Mr. McLachlan testified, categories of revenue such as CME rebates, pit broker rebates, and revenue from crossed trades with market makers were not included in the net revenues attributable to the Pool of the New York or London desks, per BGC practice.  (*See* 2/9 McLachlan, Tr., 70:4-23.)

- **JX 265:** Summary of the calculation of the Pool – including its Net Revenue totals (and the amount attributable to each broker) and the expenses deducted from the Pool – for both the New York and London desks, for each quarter in 2015.  The final page of the exhibit reflects the Chicago Revenue and explains that this was not booked to the Pool, and was instead attributed to the Chicago execution team.

**2(b). Identify all admitted exhibits that reflect the source and amount of each revenue input used to calculate the Net Revenue for each of the London and New York incentive pools for each quarter from Q4 2014 through Q4 2016.**

Please see the response to Question 2(a), above.

**2(c). Identify all admitted exhibits that reflect the source and amount of each cost, expense, and other adjustments used to calculate the Net Revenue for each of the London and New York incentive pools for each quarter from Q4 2014 through Q4 2016.**

Please see the response to Question 2(a), above.

Additionally, **<u>JX 191</u>** – the Sulfaro memorandum – followed an investigation and interviews of BGC's Brokerage Receivables group and concludes that certain expenses that would otherwise have been deductions from the Pool's Net Revenues (for example, clearing costs paid to ABN AMRO and the expenses concerning trading platforms like Ffastfill and Tao) were never charged to the Pool, and were instead directly paid by BGC, outside the Pool, using Chicago Revenue. This was confirmed by the testimony of Aubin and McLachlan, who emphasized that the use of the Chicago Revenue to pay these costs was a benefit to London and New York brokers like Claimant, because the costs otherwise would have been passed onto the Pool in the form of lower Net Revenues. 1/18 Aubin, Tr. 1774:6-1775:20, 1835:8-1836:12; 2/9 McLachlan, Tr. 70:24-72:6.

Aubin's and McLachlan's testimony on this subject was not seriously challenged. Other than asserting that the Chicago Revenue should have been counted as Net Revenue attributable to the Pool of the London and New York desks, Claimant did not challenge any other metrics such as the specific categories of expenses deducted from the Pool or BGC's reconciliation of gross revenues to Net Revenues. Consequently, more detailed calculations or contemporaneous documentation of these practices were not presented to establish these facts in the record.

**2(d). Identify all admitted exhibits that reflect any change to the revenue and cost inputs used to calculate the Net Revenue for each of the London and New York incentive pools for each quarter from Q4 2014 through Q4 2016.**

Please see the response to Question 2(a), above.

**2(e). Identify all admitted exhibits that document the existence of any written accounting policies and practices in effect during each quarter from Q4 2014 through Q4 2016**

**addressing the revenue inputs to be used in calculating Net Revenue for each of the London and New York incentive pools for each quarter from Q1 2013 through Q4 2016.**

In the Employment Agreement, both parties agreed that Net Revenues for the Pool would be determined "in accordance with BGC's policies and practices currently in effect" (*see* **JX 38**). By definition, "practices" are not formal written procedures, but are instead "a repeated or customary action," or "the usual way of doing something." *"Practice,"* Merriam-Webster (2024), *available at* www.merriam-webster.com/dictionary/practice. The Panel's request for "written accounting policies and practices" is therefore more restrictive than what is relevant under the contract, which provides that BGC is permitted to calculate the Pool consistent with its ordinary practices.

The record is replete with evidence of BGC's practices, including its practice of presenting draft calculations to desk heads like Claimant to solicit their feedback (*see, e.g.*, **JX 65**) and its practice of working collaboratively with them to resolve and questions or concerns in real time. As relevant to the practice that received the most discussion at hearing, the following documents show the parties' mutual understanding of BGC's practice of booking the Chicago Revenue outside the bonus pool of the New York and London futures desks:

- **JX 146**: In a January 25, 2016 email to Mr. Aubin, Claimant discussed the practice that "100%" revenue for trades crossed in the pit of the CME "goes to BGC," describing that allocation as "the model set up when I joined" – a clear admission that he was aware of BGC's practice of allocating Chicago Revenue to the Chicago execution desk at all relevant times.

- **JX 151**: In a January 28, 2016 email to Mr. Aubin, Claimant described "all the revenue being generated" from "pit rebates, CME rebates, and crosses," and then conceded, "I haven't asked for this revenue at all . . . . I don't mind you keeping it, but don't say I'm negative." This was another clear acknowledgment of BGC's practice concerning booking of the Chicago Revenue.

- **JX 153**: In a January 28, 2016 email to Mr. Aubin, Claimant stated that "the pit MM crosses, pit rebates and CME rebates *I absolutely accept as revenue for BGC*" but requested that "credit [be] given to me for generating this income." Claimant was acknowledging that the Chicago Revenue was not part of "Net Revenues" for purposes of

Section 3(b), and was instead requesting that these amounts nevertheless factor into BGC's thinking concerning discretionary bonuses under Section 3(e).

- **JX 191**: Chief Compliance Officer Michael Sulfaro's February 18, 2016 memorandum discussed BGC's "accounting practices" in response to Claimant's statement during Compliance's self-exam that "the desk does not get credit for liquidity rebates from the CME and Pit rebates." The memorandum states that these revenues were used to pay down the substantial expenses of the global futures group, including clearing costs and costs of the execution platform.

- **JX 195**: Human Resources officers Patricia Dreste and Dyanne Rosado's February 22, 2016 memorandum discussed that they reviewed Andriesz's claim of "false accounting" and conducted interviews with "senior members of the BGC team" to understand, in part, BGC's "accounting practices." The memorandum confirms that BGC "allocate[s] the rebates to other business costs."

- **JX 265**: The Excel attachment entitled "Futures 2015 complete summary" contains the calculations for the Pool for both New York and London desks, for each quarter in 2015. The calculations illustrate the Net Revenue totals (and the amount attributable to each broker) and the total expenses deducted from the Pool. The last page of the attachment explains that Chicago Revenues are not part of the London or New York desks, and are instead booked to "Chicago execution team." The spreadsheet indicates that this approach is common sense: most of the ██████████ in Chicago Revenue from 2015 and 2016 was not attributable the London or New York desks, but rather BGC's Swiss futures desk ("Most of the volumes traded annually on CME/CBOT come from Switzerland" . . . "about 20% of the CBOT/CME volumes traded from Feb to May 2016 come from S. Andriesz US/UK teams").


**2(f) Please provide the Panel with a discussion of who has the burden of establishing or proving the existence of any BGC accounting policies and practices in effect during each quarter from Q4 2014 through Q4 2016.**

Neither party had this burden as neither party argued that BGC's Pool calculations were inconsistent with BGC's internal policies and practices. To the contrary, as discussed above, both parties appeared to agree – both during the arbitration and in communications dating back to 2015 and 2016 – that BGC's calculations in 2015 and 2016 were consistent with its established practices. Parties have no obligation to present evidence about facts that are not at issue in a case.

If, hypothetically, Claimant *were* seeking breach of contract damages for a failure to calculate the Pool consistent with BGC's policies and practices, black-letter law makes clear that

it would be his burden to establish such a failure. *Choquette v. Motor Info. Sys., Inc.*, 2017 WL 3309730, at *3 (S.D.N.Y. Aug. 2, 2017) ("[U]nder New York law, a plaintiff . . . bear[s] the burden of proof as to all elements of a breach of contract claim," which includes proving "breach by the other party.")  It would be Claimant's burden to show evidence of a policy or practice and to then demonstrate that such policy or practice was not followed.  Plaintiff had *years* to pursue such a theory in discovery and declined to do so.

**2(g) Identify all admitted exhibits relating to the payment of bonus overrides for each quarter from Q4 2014 to Q4 2016 for both the London and NY Pools.**

BGC notes that the term "override" as used by McLachlan and in certain internal documents is synonymous with the term "discretionary bonus" as used Section 3(e) of the Employment Agreement.  2/9/24 McLachlan Tr. 133:19-21 ("there is no calculation of an *override* bonus. It is -- it is, I agree, a discretionary payment").

- **JX 265** (see attached Excel printout labeled as "265a") contains a full itemization of all bonuses paid to all members of the London and New York desks for each quarter in 2015 (including discretionary bonuses of $12,236 and $26,677 to Andriesz for Q1 and Q2 in New York, respectively, along with $199,167 worth of production bonuses to Andriesz from the London desk) and notes a $25,000 discretionary bonus paid to Andriesz in Q1 2016.

- **JX 50** reflects that for Q4 2014, Claimant received a bonus of $32,600 for the London desk and $21,677 for the New York desk.

- **JX 363** is Andriesz's 2016 pay stub, showing $278,946.33 in total bonus compensation.

**2(h) Identify all admitted exhibits that evidence whether the NY or London Pools were in deficit during the quarterly periods from Q4 2014 to Q 2016.**

Respondents note that the reference to the "NY or London *Pools*" contradicts the Employment Agreement, which establishes the existence of a single "Pool," but acknowledge that the Panel's framing is consistent with the accommodation BGC provided to Claimant by calculating two separate pools and paying Claimant a production bonus based on the

14

performance of the London desk despite the stark underperformance of the New York desk.

Respondents identify the following documents as the clearest calculations of these calculations:

- **JX 50**: Email from Attrill reflecting that for Q4 2014, the London desk was not in deficit and as a result the brokers on the desk, including Claimant, were able to receive a total of $110,030 in production bonuses.

- **JX 265**: (*see* attached Excel printout labeled as "265a," lines stating "UK Pool Deficit" and "US Pool Deficit") reflects that for the 2015 year, the London desk was only in deficit during Q3, whereas the New York desk was in deficit for all four quarters. As the document reflects (*see* box titled "Adjustments agreed to with JPA and Simon"), under the additional accommodations BGC granted Andriesz regarding the exclusion of certain charges from the Pool calculations, the New York desk would have had a surplus of ██ in the first quarter of 2015, a balance of ██ in the second quarter, and deficits in Q3 and Q4 totaling ████.

As noted above, detailed calculations of 2016 bonus pools exist, but were not admitted in evidence by either party.

**3(a): What are the applicable NY City, State, Federal and contractual standards, if any, which authorized BGC to direct SA to submit to a mental and physical health examination and what are the elements of the standards that are required to be met?**

**3(b) What are the applicable NY City, State, Federal and contractual standards, if any, which permit BGC to warn SA of possible employment termination for any refusal to comply or cooperate with BGC's mandate that he submit to the mental and physical health examinations, what are the elements of the standards that are required to be met?**

**3(b) What are the applicable NY City, State, Federal and contractual standards, if any, which authorized SA to refuse to submit to an employer requested mental and physical health examination and what are the elements of the standards that are required to be met?**

**3(c) What evidence in the record supports or refutes the satisfaction of those standards?**

## I.    Authority to Submit to Medical Examination

As a threshold matter, none of Claimant's nineteen causes of action alleges disability discrimination or a failure to accommodate his medical condition.  Claimant has not alleged that BGC lacked a legal right to submit him for a medical or psychiatric examination to determine his fitness for work – he only claims that BGC's decision to invoke this procedure was retaliatory and pretextual.  If he had argued that BGC had no legal right to seek an independent examination, the parties would have discussed in their pre-hearing and post-hearing briefs the Americans with Disabilities Act, 42 U.S.C. § 12112(d)(4) and its enacting regulations, which permit an employer to require the employee submit to a medical examination under specific circumstances. That statute, alongside the plain language of the Employment Agreement itself, make clear that BGC was within its rights to refer Claimant for psychiatric and medical examination, to provide him notice that failure to cooperate could result in termination of employment, and, ultimately, to terminate his employment for his refusal to work with BGC as part of an interactive process.

### a.  The ADA

The ADA provides that private employers may "require a medical examination" if "such examination or inquiry is shown to be job-related and consistent with business necessity."  42

U.S.C. § 12112(d)(4).  The question of whether the examination is job-related and consistent with business necessity is fact-specific. "[W]hat constitutes a business necessity will undoubtedly vary in different workplaces." *Conroy v. New York State Dep't of Corr. Servs*., 333 F.3d 88, 99 (2d Cir. 2003). A business necessity exists if an employer can "demonstrate that a medical examination or inquiry is necessary to determine [ ] whether the employee can perform job-related duties when the employer can identify legitimate non-discriminatory reasons to doubt the employee's capacity to perform his or her duties." *Id*. at 98.

### b.  The Contract

Andriesz's employment contract with BGC gave BGC the right to terminate his employment if it determined in its "judgment" that "by reason of physical or mental disability, Employee is incapable of performing the essential functions of his position."  (**JX 38, § 4(c).**) Contracts should be interpreted in a commercially reasonable manner.  BGC does not employ doctors and lacks any expertise to make determinations about disability; it is reasonable that this provision contemplates BGC referring an employee to a medical professional to aid in its judgment of whether the employee was capable of performing his duties and essential job functions.

As set forth below, Respondents went above and beyond in attempting to accommodate the Claimant, who had been hospitalized after ignoring BGC and his doctor's concerns only weeks before and by his own words was on the verge of another heart attack, and having daily panic attacks, when asked to meet with his supervisor.  Claimant refused BGC's lawful efforts to understand whether he could perform his duties safely, a clear example of insubordination justifying termination of employment.

II.    **Applying the ADA Standard**

a.    **Factual Background**

Applying the ADA's standard, BGC had countless reasons to doubt Andriesz's capacity to perform his duties in the days leading up to his being placed on administrative leave pending examinations from two medical professionals on December 2.

In late October 2016, Claimant submitted a note from his doctor stating that he should "not return to work for 2-3 weeks." (**JX 300**.) Andriesz refused to comply with his doctor's directive, and kept coming to work despite his superior, Shawn McLoughlin, telling him to put his health first and go home. JX 302. On November 8, in response to BGC's request that he not work until his doctor signed off, Andriesz again refused and demanded that HR reinstate his badge to enter the building on November 8. (**JX 305**.) Claimant proceeded to work multiple consecutive 16-hour days in contravention of his doctor's orders. According to his medical records, Andriesz was admitted to the Chelsea and Westminster Hospital in the UK days for "chest pain and potential panic attacks" that weekend, and was admitted to New York Presbyterian for evaluation from Monday, November 14 until Wednesday, November 16. (**JX 352**.) He then reported to work on a "part time schedule" of 7am until 3pm. (**JX 352**.) During this time, he refused multiple requests from his supervisor to meet, citing his health.

On November 30, Claimant wrote to Mike Sulfaro, BGC's Chief Compliance Officer, that "he is "hav[ing] panic attacks every day and chest pains that make me feel like I'm having another heart attack." (**JX 345**.) The same day, he recounted a meeting he had with Paul Pion that morning. He reported that "you [Pion] repeatedly asked me if I was feeling ok. I [Claimant] replied that no, I'm not feeling okay. I'm having panic attacks all the time. The tightness in my chest that comes with these panic attacks makes me feel like I'm having another heart attack…I was afraid

of having another heart attack at work." (**JX 331**.)  Andriesz sent Pion another email that day, stating that he was "Asking for help and protection given the very serious state of my health...I was having panic attacks last night and my ultimate priority was my health." (**JX 332**.)  Pion shared this information with Dreste, the head of HR.  2/8/24 Dreste, Tr. 130:12-14; 260:18-20; 262:2-3.  Dreste also heard about Andriesz's complaints about his health from Popok and Shields.  *Id*. 262:14-20.

On December 1, Claimant agreed to meet with Aubin (the first time he agreed after four attempts over two weeks).  However, he required "a member of HR present in our meeting[.]" (**JX 334**.)  He said that Aubin's "false allegations" were "causing me unnecessary anxiety at a time when I'm trying to recover from a harrowing order."  *Id*.  Following the meeting with Aubin on December 1, Claimant wrote to the HR representative Eva Chan that he "has an extreme disability" and reminded her that he "was in hospital with a suspected heart attack[.]" (**JX 344)**.

The next day, concerned that he could not safely perform his job duties, BGC put Andriesz on administrative leave pursuant to Section 2 of his contract. (**JX 38** ("BGC retains the right, in its sole discretion, to place Employee on paid administrative leave (such payment to include all compensation provided for in this Agreement as and when payable hereunder) if it determines that the circumstances so warrant[.]"))  At this point, BGC could have terminated his employment for his past repeated refusal to meet with his supervisor about pressing business priorities, as well as his own representations indicating that Section 4(c) could apply.  *Id*. ("If in BGC's judgment during the Term of Employment, by reason of physical or mental disability, Employee is incapable of performing the essential junctions of his position, with or without reasonable accommodation for a period of 60 out of 180 consecutive days, BGC at its option may thereafter terminate this Agreement with Employee and notice of such termination may be sent to Employee.")

In keeping with its history of patience and indulgence of the Claimant's erratic conduct, BGC instead offered Claimant the chance to justify his refusal to meet with his supervisor and demonstrate whether he could continue his employment with a reasonable accommodation. It requested he visit two medical professionals in order to determine the type of accommodation he required. Dreste testified that that the purpose of the doctors' appointments was "to examine him to see if he was fit for duty, that he was able to perform his job responsibilities." 2/8/24 Dreste, Tr. 264:19-21. This was consistent with what was written in the letters to Claimant, which advised that the purpose of the examinations was to "determine (1) your fitness to perform the essential functions of your position, with or without a reasonable accommodation; and (2) what, if any, reasonable accommodations may be provided to allow you to perform the essential functions of your job." (**JX 343.**) It was also consistent with what Dreste told the doctors in e-mails to them referring Andriesz on December 12 and 13 **(JX 350, 352.)**

Andriesz refused to show up for the scheduled appointments. BGC, again in an effort to accommodate the Claimant, rescheduled the appointments. Andriesz refused to attend, stating that the request he undergo medical examinations was "simply another attempt to deflect from and cover up these [accounting] issues and protect the employees who are responsible for these internal policy and regulatory violations." (**JX 365.**) At no point did Claimant suggest other physicians he would see or offer a compromise whereby BGC could understand his condition and its impact on his duties.[5] After not hearing from Claimant for all of January, BGC terminated Andriesz's employment.

---

[5] The record demonstrates that simply speaking to Andriesz's existing physician would not have assisted BGC in assessing Claimant's demand that he not communicate with his supervisor in connection with his employment. At this point in time, the record establishes that Andriesz had not yet been diagnosed with the stress disorder that he claims resulted in his near-constant state of

**b. BGC's Requirement to Submit to a Medical Exam was Reasonable, and Necessary Under the Circumstances**

In reviewing a company's decision to require an employee to submit to a medical exam, the relevant inquiry is based on the information available to the employer at the time. "The question is not whether Plaintiff *in fact* . . . possessed the ability to perform the essential elements of her job, but whether Defendant had a sufficient basis to request an [fitness for duty] exam *in order to determine* whether Plaintiff could perform her duties safely and cooperatively." *Hanfland v. Brennan*, 2015 WL 6134177, at *9–10 (W.D.N.Y. Oct. 16, 2015) (emphasis in original). Here, BGC was aware of Andriesz's doctor's instruction not to return to work for 2-3 weeks which was ignored, two recent hospitalizations, several complaints of daily panic attacks, a statement that the Claimant had a "severe disability", erratic emails and outbursts, and a several complaints that the job was putting his health at risk. In addition, nearly everyone interacting with Claimant at the time – Sulfaro, Pion, Dreste, Aubin – observed that Andriesz appeared unwell.

Most workplaces, including BGC, require a level of professionalism and ability to deal with stress. Courts recognize the ability to handle stress to be a legitimate job requirement. For example, in *Fritsch v. City of Chula Vista*, the district court upheld an employer's decision to require a staff attorney to undergo a psychological exam after she had an emotional outburst and a verbal altercation with opposing counsel during a court hearing. 2000 WL 1740914, at *4 (S.D. Cal. Feb. 22, 2000). The court noted that the attorney's job as a litigator required her to meet with opposing counsel and appear in court and that she should be able to perform those functions in a professional manner and be able to handle the conflict and pressures inherent in a legal dispute.

---

anxiety, panic, and fear of imminent cardiac arrest. (*See* **JX 414** at Andriesz003613 (noting that Andriesz was "diagnosed with PTSD" in "2017/2018").)

Here too, the nature of Claimant's job required him to report to his supervisor and deal with high-pressure situations. (*See* **JX 256** (June 2016 doctor's report noting that "finance . . . is a stressful profession" and that Andriesz experienced the "normal stress that would be expected in his world of finance").)  As the head of BGC's London and New York Futures Desks, and a Series 30 supervisor, he was responsible for supervising high-volume, highly regulated trading activity that required focus and vigilance in order to ensure regulatory compliance, management of BGC's financial risk, and ultimately best execution for BGC's clients.

Outbursts, emotional dysregulation, and "worrisome behavior" can justify an employer requiring a medical exam. *Grassel v. Dep't of Educ. of City of New York*, 2017 WL 1051115, at *7 (E.D.N.Y. Mar. 20, 2017) (finding "psychological capacity to properly carry out his duties is a vital business necessity"); *Hanflad*, 2015 WL 6134177, at *6 (noting the first prong of the test satisfied where defendant asserted that a general health and psychiatric exam was initiated "to determine whether Plaintiff experienced a mental health issue that compromised her ability to work safely and cooperatively").  BGC was entirely reasonable in ordering a medical exam in these circumstances. *Conrad v. Bd. of Johnson Cnty. Comm'rs*, 237 F. Supp. 2d 1204, 1233–34 (D. Kan. 2002) (Plaintiff's string of erratic "behavior by Plaintiff and her own unsolicited statement that she was suffering from exhaustion and chronic fatigue syndrome provided the County with a legitimate concern about Plaintiff's ability to perform her job"); *Sullivan v. River Valley School Dist.*, 20 F. Supp. 2d 1120, 1126 (W.D. Mich. 1998) (a school district had both a right and a duty to determine the teacher's ability to perform his job duties after the teacher displayed confrontational outbursts and a breakdown of interpersonal skills), *aff'd*, 197 F.3d 804 (6th Cir. 1999).  Indeed, the record shows that Andriesz suffers from post-traumatic stress disorder and "frequently dissociates." (**JX 406, 414, 453.)**

### c. The Medical Exams Were Related to the Job and a Business Necessity

As set forth above, it is unrebutted evidence that the purpose of Andriesz's medical examinations were to "determine (1) your fitness to perform the essential functions of your position, with or without a reasonable accommodation; and (2) what, if any, reasonable accommodations may be provided to allow you to perform the essential functions of your job. **(JX 343**.)  "[T]he Second Circuit has found that medical inquiries 'seeking to determine the extent and types of accommodation that were truly necessary for [a] plaintiff were 'job-related and consistent with business necessity.'" *Grimes v. New York & Presbyterian Hosp*., 2024 WL 816208, at *14 (S.D.N.Y. Feb. 26, 2024) (citing cases); *Delson v. Mineta*, 144 Fed.Appx. 136, 138 (2d Cir. 2005) (quoting 42 U.S.C. § 12112(d)(4)(A)) (When "seeking to determine the extent and types of accommodation that were truly necessary for [P]laintiff, [Defendants'] inquiries were 'job-related and consistent with business necessity.' ")

A business necessity has also been found where the employer has received inconsistent and unreliable medical complaints from the Claimant.  *See Montague v. Nat'l Grid USA*, 2020 WL 6833418, at *20 (W.D.N.Y. Nov. 20, 2020) ("[W]hen Defendant received what it perceived was an inconsistent medical report that Plaintiff submitted, Defendant had a business necessity to confirm Plaintiff's condition to determine whether an accommodation was required.").  Here, Andriesz had already refused his doctor's orders, convinced him to write a new note overnight, and was not seeing any mental health professionals. BGC had reason to enlist independent medical providers, including a mental health professional, to evaluate the Claimant in these circumstances.

### d. Andriesz Left BGC No Choice but to Terminate his Employment

When BGC asked Andriesz to attend examinations with two medical professionals, he refused.  In a case that bears striking similar to this one, a senior consultant with Microsoft

experiencing health issues returned to work and was told he would not be receiving a bonus that year. *Alston v. Microsoft Corp.*, 851 F. Supp. 2d 725, 734 (S.D.N.Y. 2012), *aff'd*, 519 F. App'x 23 (2d Cir. 2013). He requested that a meeting with his supervisor, Albert Kim, later that day "be replaced by a brief telephone discussion that avoided any topics related to his performance" and "given his fragile health balance, being confined to a room for 2.5 hours while absorbing a deluge of unpleasant news must be avoided at all costs." *Id*. He avoided having a review with his supervisor for the next month, stating that "Albert Kim and the overall management of the practice have already circled the wagons and I will be denied a fair review." *Id*. He requested that Kim be removed from overseeing his review, that he be transferred to a new department, and proposed a "compromise solution" including payment of a bonus. *Id*. He said that if Microsoft granted that "compromise", he would be willing to resume his client-facing duties. Microsoft declined, expressing concern that he was basing his ability to work with clients on whether or not he received his bonus, not his health. *Id*. Plaintiff decided he would not report to his clients that day "because his blood pressure was too high." *Id*. Microsoft agreed that "the important thing right now is that you address your health issues." *Id*. Approximately a week and a half later, on October 10, Kim met with Plaintiff to discuss his performance review. Plaintiff "looked very agitated." *Id*. He walked out of the office and the office building for good. This all took place inside of one minute." *Id*. Plaintiff requested, and received, a leave of absence effective October 13, 2003. *Id*. After Microsoft's insurance carrier denied Plaintiff's claim for longterm disability benefits, Microsoft "determined that he would need to return to work or submit to independent medical examinations to support his claim that he was unable to work due to a disability." *Id*. "Accordingly, [Microsoft] sent Alston a letter dated April 1, 2004 that requested that he either submit a medical release from his physician by April 12, 2004 and return to work,

or report for independent medical examinations by an internist and psychologist." *Id*. He never responded, and Microsoft terminated his employment. The court's reasoning in denying Plaintiff's claim of disability discrimination for Microsoft's decision to terminate the plaintiff is instructive here.

The court found that "[t]he basis for Alston's termination was his failure to respond to those efforts as well as his failure to return to work." *Id*. The court reasoned that "Microsoft is not required to infer—from plaintiff's total silence—that Alston had intentions to either return to work or to undertake the medical examinations. Microsoft gave plaintiff ample opportunity to arrange for the medical examinations. Plaintiff's failure to act is not a failure to accommodate on the part of Microsoft." The court reasoned that "Microsoft reasonably and repeatedly attempted to ascertain when Alston would return to work. Alston failed to respond to all inquiries." *Id*. Similarly here, Andriesz made clear that he had no plans to ever attend medical appointments, yet simultaneously gave no indication of when he would be fit to return to work following his wedding and unapproved, month-long visit to Sri Lanka. As the *Microsoft* court reasoned, "[r]equiring an employer to keep an employee on an extended leave of absence with no indication of whether or when the employee will return constitutes an undue hardship under the facts of this case." *Id*. BGC's only option when the head of two of its Futures desks refused to return to work or submit to a medical examination to ascertain the extent of his required accommodation was to terminate his employment.

The record is clear that BGC's actions were reasonable and do not run afoul of the ADA. As the Second Circuit has reasoned, "[e]mployers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims under §§ 12112(a) and 12102(2)(C)." *Eustace v. S. Buffalo Mercy Hosp*., 36 Fed. Appx. 673, 675 (2d Cir.

2002).  Any other decision by BGC would be "reckless." *Garner v. Gwinnett Cnty., GA., 1998 WL 1048471, at \*4 (N.D. Ga. Mar. 29, 1998)* ("[T]he ADA did not require defendant to . . . rely on the conflicting medial opinions of plaintiff's therapists" because "it would have been reckless to reinstate an employee defendants perceived to pose a threat to the community.").  BGC has an obligation to ensure that employees behaving erratically or claiming they are at immediate risk of serious health issues are safe while on the job.  An employer need not wait for the employee to harm himself or others in the office to justify a medical exam.  *Hanfland*, 2015 WL 6134177, at \*9–10

The law supports BGC's exercise of common sense under these circumstances.  Claimant had alleged that he could not, and would not, continue to perform his duties (including his obligation to report to Aubin) as a result of what he identified as a "severe disability."  His statements followed a month during which time he had concealed the seriousness of his health condition, refused to follow doctors' orders, was hospitalized twice, and attempted to supervise the trading of many billions of dollars of notional trading volume while "under a . . . very strong medication" (**JX 318** at BGC00010808) and experiencing severe and ongoing panic attacks.  It was lawful – and morally responsible – for BGC to require an independent expert judgment of whether Claimant was, in fact, able to do his job without grave harm to himself.

Dated: New York, New York
       May 10, 2024

/s/ Nirav S. Shah
_____

Nirav S. Shah, Assistant General Counsel
Virginia J. Cardenas, Assistant General Counsel
Sid Nadkarni, Assistant General Counsel
110 E. 59th Street, 7th Floor
New York, NY 10022
(212) 294-7873 (NSS)
nirav.shah@cantor.com
virginia.cardenas@cantor.com
sid.nadkarni@cantor.com
*Attorneys for Respondents BGC Financial, L.P.,*
*Cantor Fitzgerald & Co., Jean-Pierre Aubin, Mark*
*Webster, Paul M. Pion, and William M. Shields.*