# Exhibit 12

1                    P-R-O-C-E-E-D-I-N-G-S

2          THE CHAIRMAN:  Good morning to you all.

3   We are back on the record in the matter of Simon

4   Andriesz versus BGC LP, and et al, And the Case

5   Number is FINRA 2202539.  We're here for closing

6   arguments.  Counsel for claimant has agreed to

7   let -- or waive starting (inaudible) and allowing

8   the respondent to go first.  So Mr. Shah will go

9   until then, at which point we'll discuss whether to

10  take a break or just go directly to Mr. Brickman.

11          With that being said, the floor is yours,

12  Mr. Shah.

13          MR. SHAH:  Thank you very much, Mr. Panel

14  Chair.  The first thing I'm going to do before I get

15  started, in a handout we've put together slide decks

16  for the benefit of the panel, for opposing counsel.

17  Eventually, Mr. Nadkarni (phonetic) will be on the

18  Zoom, and so you'll be able to look up and just see

19  which slide I'm on, but until then, I'll try to kind

20  of direct us to where we are.

21          So, I'm going to hand these out.  Raise

22  the panel.

23          THE CHAIRMAN:  These are illustrative

24  exhibits -- these are illustrative exhibits?

25          MR. SHAH:  These are demonstratives,



1  they're not.

2            (Talking simultaneously.)

3            MR. SHAH:  They draw from the image.  And

4  if I can proceed?

5            THE CHAIRMAN:  Yeah, please.

6            MR. SHAH:  I want to start by thanking the

7  panel for your time and attention in this case. And

8  I always start that way, but I really mean it this

9  time.  I have tried a lot of cases before FINRA,

10  other arbitral tribunals, other courts, I think Mr.

11  Brickman would agree with me that this panel has

12  been uniquely attentive, deeply probing into the

13  issues that have been raised in the arbitration.

14  And I want to thank you in particular on behalf of

15  my individual clients, Paul Pion, William Shields,

16  Mark Webster, and Jean Pierre Aubin.  Those are

17  individuals who the claimant has taken aim at for

18  seven years, since his employment at BGC ended.

19            (Brief interruption.)

20            MR. SHAH:  Through the marvels of

21  technology, we're looking at Mr. Nadkarni's office

22  in Midtown.  Did we ever go off the record or?

23            THE CHAIRMAN:  I don't think so.

24            MR. SHAH:  So I'll just, I'll proceed.

25  The slides will go up at some point.



1  go straight to our first slide, which is a brief

2  outline of where we're going to go.  There we go.

3  It's your table of contents.  So, I'm going to start

4  where the hearings start,  the opening arguments,

5  and I want to pick through the specific allegations

6  of the claimant's level in openings.  And it's

7  important because you were told that this is a case

8  about credibility.  And if the openings themselves,

9  what the promise was from the claimant, what the

10  evidence would show, were full of broken promises,

11  you're permitted to weigh that in determining

12  whether the claimant's case was credible at all.

13          This panel was aware of what an

14  overflowing mess of allegations were part of this

15  case.  Arbitrator Keel, you specifically raised that

16  in the prehearing call where you invited the

17  claimant to narrow the claims in advance of hearing.

18  And they declined.  So I want to go through the

19  opening argument just to show how many of those

20  sprawling claims didn't stand up, and were false,

21  not disputed, not unproven, but actually false.  And

22  it's a lens with which we would invite the panel

23  when the claimant in summation says something is in

24  the record to doubt whether the record actually says

25  that unless you see it with your own eyes.



1        Second, I want to talk to you about what
2   you learned in this hearing about the claimant
3   himself, Mr. Andriesz.  So many of the allegations
4   in this case are based on nothing other than his say
5   so.  And there's even a brand new cause of action we
6   learned about in the post-hearing brief.  A cause of
7   action for oral contract with Sean McLaughlin.  It
8   doesn't appear anywhere in the world before the
9   post-hearing brief was submitted in this case and
10  it's based exclusively on Mr. Andriesz's testimony.
11  So there's no avoiding the fact that making a
12  credibility determination about Mr. Andriesz,
13  whether he was truthful with you,  whether he's even
14  capable of being truthful,  is an important task for
15  the panel.
16        Third, I want to walk through two periods
17  of time in the record that are extremely important
18  for reasons I think the panel knows, which is the
19  first quarter of 2016 and the last quarter of 2016.
20  And because of this is summation, we have delicately
21  presented over the course of the hearing documents,
22  testimony that showed what happened, who
23  communicated with whom, when an email was sent, what
24  it said, when a meeting was held.  Closing is when I
25  get to tell you why, or at least what we submit



1  explains the why.  And the why when it comes to the

2  first and last quarter of 2016 is extremely

3  illuminating because it relates to Mr. Andriesz

4  obstructing the company's access to its own

5  employees, and attempting to manipulate the company

6  in order to get his way with respect to his group,

7  in a way that was not proper.

8          Fourth, under what was proven, we are

9  going to talk first about what was not even

10  intended, which are cases against certain of the

11  respondents who nevertheless continue to be named.

12  Certain of the claims have no evidence supporting

13  them.  And then we will go through,  in part, taking

14  a hint from Arbitrator Keel's email, we will go

15  through the claims one by one, which was not

16  initially our intent, so the panel understands both

17  what the standard is and what our response is to the

18  factual application of that standard.

19          And, finally, we're going to talk about

20  the equities.  Almost all the claims in this case

21  were legal, but an arbitral tribunal is permitted to

22  consider the issue of overall fairness, and we'd

23  encourage you to consider the issue of overall

24  fairness, and so I want to conclude by talking about

25  that.



1          What the respondents were on notice of was
2  not a disciplinary case, it had a specific
3  explanation or specific claims it was pursuing.  It
4  was this kitchen sink.  It was a desire to make as
5  many allegations as possible, hoping that the panel
6  will determine that if BGC can't clean them all up,
7  it will fine for the claimant.  The panel knows that
8  that is not how it works, but we want you to
9  remember that the shape of this hearing, the
10  evidence that was submitted based on the claimant
11  trying to meet a burden, and the respondent
12  addressing the specific claims that the claimant
13  made.
14          That brings me to the claimant himself.
15  His credibility is extremely important, and I just
16  want to -- or if we're able, plead for you  Mr.
17  Andriesz in his own words.  This is a tool called
18  Joint Exhibit 439,  which Mr. Andriesz authenticated
19  in his cross-examination, and stated specifically
20  that he was recording in order to capture a
21  conversation with former desk head in New York,
22  Michael Griffiths.
23          (Playing a recording.)
24          Got any enemies in the market?  People may
25  not, may think I'm annoying or whatever, and I



1  probably think the same about them, right?  We all

2  choose our friends, but I don't have the grudges

3  against someone in the market that I would -- it

4  would be all consuming that I would go around

5  defaming them deliberately to try and destroy their

6  life.  There's no one, there's no one in the market

7  I would do that to.  Well, probably Mr. Aubin, apart

8  from him.  Right, you know, but he's -- he's --

9  he'll -- that guy'll get his dues when, when, When

10  someone more powerful than us decides to pass

11  judgment on him.  There's no excuse for it, right?

12  (Inaudible).

13          (Recording stopped.)

14          THE CHAIRMAN:  I think if the panel has

15  questions, it needs to ask itself about that

16  particular passage, but one of them maybe is Mr.

17  Andriesz speaking figuratively?  Blowing off steam?

18  Making a joke?  When I, when I heard this, I thought

19  who talks like this?  I think I could rack my brain

20  for the 42 years I've been alive for a moment where

21  I've said out loud that I'm going to destroy another

22  human being and come up empty.  And I think if the

23  panel did the same thing, they would come up empty

24  as well.

25          Mr. Andriesz said this out loud on a


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

1  recording that he was making as evidence.  It's a

2  key to understanding how Mr. Andriesz operates.  He

3  does, in fact, pursue vendettas to destroy people.

4  And he recognizes that a way to do that is with

5  untruths, with lies.  People don't talk like this.

6  They don't mean it.  And this is not the only

7  instance of Mr. Andriesz is talking like this.

8          This is a text thread, KX441.  Between

9  Mr. Andriesz and Mr. Velez.  This is while ████████

   ██████████████████████████████████████, and very much

11  in the camp of helping  Mr. Andriesz destroy BGC.

12  If you look at the top right, that's Mr. Andriesz

13  saying, I'm going to destroy them.  That's right.

14  This is in preparation for this arbitration.  That's

15  what they're doing.  You can look at the whole text

16  thread, they're preparing for arbitration, and his

17  plan, consistent with his recording, is that he's

18  going to destroy them.  And lest you think he was

19  being figurative in the previous  exhibit, where he

20  said he would destroy them with defamatory lies, the

21  text thread is full of them.  Calling BGC Russian

22  money launderers, American traitors, 911 fraudsters.

23   Skip and Snelling, two lawyers at BGC, are crooks.

24  Those are people, by the way, that he reported to

25  the British Bar in an attempt to disbar them.



1   Mr. Andriesz was aware that those revenues from the

2   Chicago execution desk, not only were not written

3   into his contract, but were not, as a matter of

4   practice, included in his bonus.  If you go to 85,

5   you'll see why that might be.  This is -- 85 is a

6   picture from JX265, which is our best document to

7   explain to you how these calculations work.  If you

8   want to see what's going on quarter to quarter, this

9   is a document that you might want to spend a minute

10  with.  But in the last sheet, BGC describes what the

11  Chicago revenue was and makes clear in real time,

12  not for the purposes of this panel, but in its own

13  accounting, most of that revenue has nothing to do

14  with Simon Andriesz.  Period.  Most of the volumes

15  are traded from Switzerland.  Other desks, about 20

16  percent of the volumes, relate to Mr. Andriesz.  Why

17  would he get the whole amount of that revenue, as he

18  claims in this case?  It makes no sense.

19          Go to slide 86.  Mr. Andriesz admits over,

20  and over, and over again before he decides he wants

21  to sue BGC for breach of contract, he admits again

22  and again, this is the system that was set up when I

23  arrived at BGC.  I don't get this revenue in my

24  bonus pool.  He's being honest, because in January

25  the only thing he's asking for is for a non-bonus



1  pool discretionary payment to be paid to the people

2  he promised it to.  So he has no reason not to tell

3  the truth, and in these email communications, he's

4  saying this is not part of my bonus pool, but when

5  you're considering my discretionary bonus, can you

6  please consider it?  No deception here.  There's

7  full knowledge between all parties.  The Chicago

8  revenue is not part of the bonus pool.

9           I'm going on to the more detailed numbers.

10 If you go to slide 87.  In the post-hearing brief,

11 the claimant said that Mr. Andriesz, under Section

12 3A, his salary draw was underpaid $133,333.33.  The

13 panel said, can you provide us a calculation?  And

14 you maybe saved BGC $50,000 there when you asked for

15 that.  Because now the calculation is $83,333.

16 That's the second one.  But it turns out we don't

17 need the help, because actually BGC paid the full

18 amount.  We did the math for you in our brief, but

19 if you take 11 months of the year, which is the

20 amount of months under the contract, we've actually

21 overpaid Mr. Andriesz by six cents.  We don't want

22 the six cents back.  We're good.

23           He's wrong on the numbers in other ways,

24 and slide 88 is important to me because this is

25 really the only time we can address this claim.



1  It's not raised at the hearing at all.  Now claims
2  that Mr. McLaughlin promised him $1.823 million.
3  News to me.  Certainly not a claim in the Statement
4  of Claims, certainly not a claim anywhere else.
5
6  First time post-hearing brief.  And the 1.823
7  million -- first of all, there's no evidence of that
8  agreement, there's just none.  You have Mr. Andriesz
9  who will lie about anything to get money.  That's
10  the only evidence.  The only other evidence other
11  than testimony in the record is an email sent by
12  Mr. Andriesz that Mr. McLaughlin doesn't respond to.
13  They sued Mr. McLaughlin.  They dismissed that claim
14  against him, and they didn't make any effort to
15  actually call him to the hearing room.
16         Just ask yourself whether you think Sean
17  McLaughlin would have agreed to this
18  characterization.  I think to ask it is to answer
19  it. And you don't need to assume that, there is an
20  HR memo from February 22nd, 2016, that includes the
21  results of investigation that included an interview
22  with Mr. McLaughlin.  It says, the company has no
23  obligation to allocate any rebates to the desk.  If
24  you were to take this seriously, this claim is -- it
25  is fatally disposed of just by the fact the



1 employment agreement says it can't be orally

2 modified.  But just to gild the lily for a moment,

3 that $1.823 million dollar number, that is all the

4 execution that is taking place on the Chicago

5 execution desk at a certain point in time.

6            Meaning, the Switzerland desk that is most

7 of the money, Hong Kong, Dubai, the money that the

8 Chicago execution desk is doing directly, but the

9 way this is written, Mr. Andriesz is saying, I am

10 entitled to $1.823 million dollars.  He's not.  Even

11 if it had to do with his desk, which is a slim

12 percentage of this.  They made no attempt to tell

13 you how much is in his desk.  That's a desk that has

14 like 15 to 20 people.  You've seen the book.  Mr.

15 Andriesz doesn't get a hundred percent.  He doesn't

16 get close to that.  It's just a money grab.  It's a

17 money grab on a claim that he didn't provide notice

18 of.

19            There is a claim that the fourth quarter

20 2016 bonuses owed, this is one that the contract

21 just fully disposes of, period.  It says explicitly,

22 you have to be present as an employee, it's a

23 condition, when the bonuses are paid in order to be

24 paid the bonuses.  Mr. Andriesz -- you know, you

25 heard in Mr. Brickman's opening, they fired him the



1  day before they were paying.  They didn't.  You saw

2  that Q4 bonuses were paid in March 27th.  But he

3  wasn't even close.  He didn't work any of December.

4  He received, on the other hand, in December, he

5  received his bonus for that year.  And, in fact,

6  while he was suspended, the record shows BGC emailed

7  him the full bonus pool and said, What would you

8  recommend?  That's BGC going above and beyond, and

9  making sure they're complying with the terms of the

10  agreement.  He's not owed any additional money.  But

11  this $250,000 number, it is picked from the ether.

12  If you look at that number, the citation is to

13  Exhibit 448.  Exhibit 448 is a statement of claims.

14  It's not evidence.  Just what they pled at the

15  beginning of the hearing, they didn't provide any --

16  this is an admission, there's no evidence supporting

17  what they were saying.

18          I'd also encourage you when you're looking

19  at this post-hearing brief, just to look at how many

20  of their claims are supported only by Simon

21  Andriesz's testimony and the statement of claim.

22  You can cross those out.  You don't even have to

23  consider it.  Just as another example for why we

24  just think, if they wanted to tell you there was a

25  miscalculation, they had the burden to show it to



1  you at the hearing and not after.  So much of what
2  they presented in post-hearing briefing is just not
3  true.  Including the statement that the London desk
4  is never in deficit in 2015.  It was.  In Q3, it was
5  in a deficit.  This is an email from Tommy Attrell,
6  who we were told is the great oracle of desk pool
7  accounting.  To calculate these things involves
8  work.  BGC did the work.  Did it in real time.  And
9  it provided that work to Mr. Andriesz in real time.
10  And most quarters, when he wasn't having a tantrum,
11  he ratified it.  He agreed to it.  He's not
12  permitted now, after the fact, to try to change that
13  reality, to pretend that some kind of fraud took
14  place.
15          The labor law claim largely tracks the
16  contract.  If he was due money, and this doesn't
17  relate to lost profits, if he was due money that was
18  an earned wage, the labor law applies, but he's not.
19  It doesn't.  I'll give you a couple of case sites,
20  but that is clear as bell.  The Securities Fraud
21  Claim in this case.  I don't know what the
22  Securities Fraud Claim is in this case, actually.  I
23  don't even know what the theory is, but here are
24  the elements in the Securities Fraud Claim, and you
25  can find out from Mr. Brickman what on earth



1   canon prevents a finder of fact from ascribing to

2   one word, a meaning so broad, that it is

3   inconsistent with its accompanying words, thus

4   giving unintended breadth to that one word.

5   Insubordination is next to dishonesty.

6           Mr. Shah would now say, well, he was also

7   dishonest.  It's next to the word disloyalty.

8   Mr. Shah will now say, Well, that's what we really

9   meant when we said continuing insubordination.  We

10  meant dishonesty, disloyalty, unsatisfactory

11  performance.  That's all in Section 4A of

12  Exhibit 38.  Now, I asked Mr. Aubin to point to any

13  portion of Simon's performance that was

14  unsatisfactory.  So there was no unsatisfactory

15  point.  Again, everyone returned except Mr. Shah,

16  who needs to do an after the fact justification for

17  what was written.  Everyone returns to the word

18  insubordination.  If an employer mandates an

19  employee lie under oath when the employee refuses to

20  do so, no one would say that's insubordination.

21  When this employer asked Mr. Andriesz to ratify

22  their manufactured reason, he was well within his

23  rights to disregard it.

24          The word salad excuses that BGC posits,

25  even today, to justify its December 2nd, that's the



1  suspension letter, and January 31, 2017, that's the

2  termination letter, roots are all unavailable.

3  Simon has proved, by overwhelming evidence, not just

4  the preponderance of the evidence that is his

5  burden, the second prong of his breach of contract

6  claim  is termination was clearly wrongful,

7  constituting a breach of contract.

8          The panel should then turn to the question

9  of what damages are reasonable or should be

10 recovered by Simon on this claim.  We're talking

11 about the breach of contract claim.  On the first

12 prong the failure to include the rebates and crosses

13 in the net revenue calculation for Simon's pool, he

14 should recover at least $1,823,844.14, or

15 historically, whatever portion of that he allocated

16 to himself, which is 60 percent.  And the oral

17 contract with Sean McLaughlin for the same amount.

18         Now, Mr. Shah says, the first we ever

19 heard of that was in the post-hearing brief.  Day 2,

20 Simon Andriesz, 4772, line 20 to 480, line 10,

21 specifically talks to Mr. McLaughlin's oral

22 agreement to pay him that sum.  Now, I'm sorry,

23 it's also at 380 to 382, the oral agreement. Now,

24 Mr. Shah says, There's no evidence of an oral

25 agreement.  Well, there is, Simon's testimony.



1  Choose to believe it or not believe it, but whether

2  or not you proceed with an oral agreement, and this

3  is a good point to point it out, Mr. Shah says

4  somehow Mr. Andriesz should be punished for not

5  calling these witnesses.  That why didn't he call

6  these witnesses to let them defend the case?  Well,

7  BGC had ample opportunity but did not call Diane

8  Rosato, Terry Firthly, Baldrick Marinos, William

9  Shields, Paul Pion (phonetic).  Anyone from Cantor

10 Fitzgerald, even though all these people had, except

11 Mr. Marinos, had Cantor Fitzgerald email addresses.

12 And Sean McLaughlin, why didn't he call any of those

13 people?

14          Simon gave you an explanation, but we

15 don't even have to go into Simon's explanation.  If

16 they thought they had testimony that would defend

17 against this contract claim, why didn't BGC bring

18 them?  So we have the $1,823,844.14, or if you look

19 at Exhibit 265, it's the wrongfully excluded revenue

20 inputs was ███████████    On the wrongful termination

21 breach of contract claim, it doesn't involve Mr.

22 Smith or Dr. Smith's analysis.  Mr. Andriesz should

23 recover at least what he would have made in the

24 two years remaining on the term of his contract,

25 which would have been $1,966,512.  And, by the way,



1  because he's a consummate professional.  Always

2  maintained his consummate professionalism.

3         So, their attempts were to manufacture a

4  reason to terminate Simon's employment, deprive him

5  of his earned compensation, attempt to silence him,

6  or in the alternative permanently besmirch his

7  reputation with the aim to ruin his career. Rarely

8  do you get a respondent telling you, threatening to

9  do to you what he ends up doing.  If you don't shut

10 up, you're going to go the way of Riffis.

11 Manufacture an insubordination reason to terminate

12 him.

13         Respondents miscalculated one thing, and

14 it's easy to miscalculate because I've never met

15 someone with Simon's resolve and his persistence.

16 Respondent's day of reckoning is nigh.  We implore

17 the panel to make this right, to make Simon whole,

18 at least to the extent that an award of substantial

19 money damages can do that.  We've provided you ample

20 tools in terms of legal theories.  All you have to

21 really concentrate is on the breach of contract, the

22 New York labor law, and the Dodd-Frank

23 whistleblower.  Compelling evidence and supportable

24 damage calculations that don't have to be calculated

25 with precision.  We just have to reasonably estimate



1  the damages that were suffered to accomplish that

2  end.  At the absolute minimum, on the breach of

3  contract claims and the New York labor law claims,

4  the panel should award Simon, and I can go into the

5  various components, but we have them, we have the

6  unpaid wages of $3.4 million, the unallocated

7  revenue input of $1.8 million, with two years of

8  lost wages of $1.1 million, $250,000 of quarter 4

9  2016 bonus. $89,000 of available but unpaid bonuses

10 for Q3 and Q4 of 2014.  Remember, that's Exhibit 46.

11 And $83,000, that's the unpaid -- the difference

12 between the 400,000 and what he received in 2000 --

13 for 2015.  Liquidated damage of 100 percent those

14 amounts. So there's another 3.4 million.  Interest

15 at 9 percent, that's 1.6 million.  Loss value of his

16 life, that's a minimum of 2.7 million.  And

17 attorney's fees subject to further submission for a

18 total, not counting attorney fees, of $11,210,762.

19         In addition, this panel, despite

20 Mr. Shah's feigned outrage of these witnesses who

21 never appeared in defense of their claims, the panel

22 should order that BGC, not Mr. Andriesz, pay all of

23 the costs, including arbitrator fees associated with

24 this arbitration. If you are convinced that Simon

25 has also proved his Dodd-Frank whistleblower case,



1  which we believe that you must, the panel should

2  also award Simon an additional amount of between 27

3  million and 43 million based on Dr. Smith's

4  analysis which is Exhibit 459, representing his lost

5  wages to age 65 retirement, plus punitive damages in

6  a sufficient amount to deter respondents who are

7  professionals, not at brokering, but litigating

8  these arbitration claims.

9          Mr. Shah has done, as he said, many of

10  them, and he was impressed with this panel as

11  extraordinary, as was I.  But the many he has done

12  in this are BGC.  You also have all that evidence of

13  BGC sanctions by FINRA, by CFTC, by the SEC.

14          And Mr. Shah, in fact, interrupted me at

15  one point and said, All the brokers have those kinds

16  of  sanctions.  All of those brokers get dinged by

17  FINRA.  I know you've all told your kids if you have

18  them, just because everyone else does it, doesn't

19  make it right.  They are a criminal enterprise that

20  have become expert at demonizing anyone who stands

21  up to them.  So, punitive damages, particularly as

22  to BGC, so that they don't engage in this similar

23  abhorrent behavior in the future, punitive damage

24  award is sustainable, and the cases say it, of

25  anywhere from 10 to 15 times any compensatory damage



ARBITRATION                                          May 15, 2024
SIMON ANDRIESZ vs BGC FINANCIAL

 1 | award.
 2 |         Again, thank you very much for your time,
 3 | attention, and hard work.  It has truly been a
 4 | privilege to appear before you. I would be happy to
 5 | answer any further questions the panel might have on
 6 | anything we've discussed today with the
 7 | understanding, the theme to remember here, is words
 8 | matter, not after the fact lawyers.
 9 |         THE CHAIRMAN:  Thank you, gentlemen.  I'd
10 | like to I'd like to briefly discuss and talk to my
11 | fellow panelists on the solid issue of process.
12 | Before we go off the record, I just have a question.
13 | As I understand your agreement, if we choose not to
14 | ask any questions, I'm not suggesting we're going to
15 | do that, but if we choose, neither of you have
16 | anything else to say.
17 |         MR. BRICKMAN:  We are done.
18 |         MR. SHAH:  Look, my belief is, I now
19 | understand why they went second.  We have a lot that
20 | we would share in the form of, you know --
21 |         MR. BRICKMAN:  But that's not our
22 | agreement.
23 |         MR. SHAH:  We had no agreement.
24 |         THE CHAIRMAN:  And we may have questions.
25 | I just wanted to confirm that if that's what we



1   so --

2           MR. BRICKMAN:  Right, so that --

3           ARBITRATOR KEEL:  If he was a million

4   eight, whether it be a hundred percent or 50

5   percent, it's reduced to 60 percent.

6           MR. BRICKMAN:  No, it's -- it's even

7   reduced more than that.  It would be 50 percent of

8   the one, eight or 2 million, depending on what

9   number you use.  And then Simon would get 60 percent

10  of that 50 percent.

11          ARBITRATOR ALCON:  Well, actually, that's

12  probably not entirely accurate.  The 50 percent is

13  the starting point for a number, but if I understand

14  correctly, that revenue.

15          MR. BRICKMAN:  Yes.

16          THE CHAIRMAN:  Then there's some haircuts.

17  There's salary haircuts.  You know, there's -- you

18  know, some attribution of expenses attributable to

19  the two desks, and then there's a net number.

20          MR. BRICKMAN:  Right, but.

21          ARBITRATOR ALCON:  But that number --

22          MR. BRICKMAN:  That's a really great

23  question.  With respect to the bonus pools for 2015,

24  those deducts have already been made.  This is just

25  additional revenue against which there are no



1  further deducts because the deducts have already

2  been made in terms of desk compensation.

3          ARBITRATOR ALCON:  Well, okay, that's you

4  know -- that's -- that's perfect. Yeah, that makes

5  sense.

6          THE CHAIRMAN:  Mr. Shah, I think you want

7  to move on to the next subject.

8          MR. SHAH:  What should have happened here

9  is an actual bonus pool calculation if they claimed

10 ours wasn't good.  The one -- they should have

11 presented an actual calculation, because you're

12 exactly right, Arbitrator Keel.  And there's a few

13 different points in this --

14         MR. BRICKMAN:  He thinks you're Mr. Keel.

15         ARBITRATOR KEEL:  I'm Keel.

16         MR. SHAH:  Well, he's also right, but you

17 were specifically --

18         ARBITRATOR ALCON:  You can call me Keel,

19 it's okay.

20         THE CHAIRMAN:  We work together, so

21 it's -- I wouldn't take offense.

22         MR. SHAH:  So, point one, 60 percent is

23 pulled out of the ether.  It is not a real number.

24 265 has the bonuses that are paid to the New York

25 and the London desks each quarter.  Quarter 1,



1   ███████  How much does Simon get?  90,000.  Not

2   great at math, but ███████████████████████████

3   Quarter 2, ████████  How much does Simon get?

4   73,000. ███████████████████████  Quarter 4,

5   ██████████  How much does Simon get?  This much, zero.

6   Quarter 4, ███████  How much does Simon get?

7   35,000. █████████████████████  ████████

8          Which is to say --

9          MR. BRICKMAN:  How much did he get in Q3?

10         MR. SHAH:  -- 60 percent is just a grab.

11  And what you should have been presented if this was

12  a measure of damages was exactly the calculation you

13  described, because there's periods with deficits.

14  Periods where others need to get paid.  But you're

15  right, you're supposed to take 50 percent, reduce it

16  by the related expenses, and then multiply it maybe

17  by an average allocation.  But of course, the

18  allocation, BGC has the right to make determinations

19  about it.

20         ARBITRATOR ALCON:  Right.

21         MR. SHAH:  And it has a right to refuse

22  the allocations, as Mr. Andriesz suggests.

23         MR. BRICKMAN:  I would ask the panel to

24  look at the allocation out of the Q3 2016 bonus,

25  where Mr. Andriesz got 150,000, and it's



1  particularly mentioned that, not surprisingly, I

2  think they say in their post-hearing brief,

3  Mr. Andriesz took 150,000 of this.

4          THE CHAIRMAN:  Okay.  Thank you very much

5  for this.  We got it.

6          Mr. Brickman, this is under the words

7  matter category, going back to contract, Exhibit 38.

8  You've talked about the portion of the contract that

9  says you get 50 percent of the net revenue.  You did

10  not talk about the second part of that sentence,

11  which says that they're entitled to 50 percent of

12  net revenues of the desk of --

13          MR. BRICKMAN:  The missing word is less.

14          THE CHAIRMAN:  Basis -- no.  On the basis

15  in accordance with BGC's then current accounting

16  policies and practices, and that's the subject that

17  we talked about in the supplemental question.  It

18  seemed to -- at least it's arguable, is it not, that

19  those words are part of the sentence and that you

20  cannot say that net revenues includes everything

21  attributable to the desk if that, in fact, was not

22  the way it was being accounted for in those desks

23  historically.

24          MR. BRICKMAN:  Let me divide your question

25  into two parts, because I think it needs to.  There



1   the sort of about face we saw there was, I think, a

2   little funny, which is, of course, they didn't pay

3   it in 2015.  That's what the money they're asking

4   for.  They acknowledge, we all acknowledge none of

5   this was paid in 2015.  And so my point to the panel

6   is --

7            ARBITRATOR KEEL:  The first portion of the

8   year.  So, you know, there was no -- assuming it

9   wasn't paid for the first portion of it, and

10  Mr. Andriesz signed off on those.  You cited that as

11  evidence, that that is his understanding, that it

12  wasn't called for.  So that's what I'm probing at.

13           MR. SHAH:  It's very strong evidence

14  because you've seen the degree to which this is all

15  made available to Mr. Andriesz and Mr. Attrell, but

16  I think the most telling evidence comes from January

17  of 2016 when he says, I want this discretionary

18  bonus.  BGC says, It doesn't look like there's some

19  money right now, at this moment.  Mr. Andriesz says

20  in five consecutive emails, This is not money that

21  we ever receive.  This is not money that's

22  attributed to the pool.  And he says specifically,

23  this is 100 percent good for BGC.  This is what the

24  plan that was put in place when I joined.  It

25  couldn't have been clearer that his understanding



1  was this money, not Ronan money executed in the UK,

2  but Chicago floor revenue belongs to the Chicago

3  execution desk.  That is a specific exclusion in

4  section 3B. And, also, if we're not gonna put weight

5  on the exclusion, then certainly BGC's practices is

6  overwhelmingly clear based on it.

7          MR. BRICKMAN:  And I would just ask the

8  panel to refer to section 10B of the Exhibit 38.

9  Which talks about 10 is it -- it's 10A and 11A which

10 talks about what Simon might have agreed to does not

11 constitute a modification of what the contract

12 provides, and in order for it to be a modification

13 of what the contract provides or a waiver of any

14 provision that's 11A, it has to be in writing,

15 signed by both parties and --

16          ARBITRATOR KEEL:  Which is a very good

17 segue to my last question before we get kicked out.

18 You have a claim for an oral agreement modifying

19 this, how can you -- assume it's in place, how can

20 you sue an enforcement in the face of that kind of

21 language?

22          MR. BRICKMAN:  It doesn't modify, because

23 it doesn't modify the contract.  The oral agreement,

24 and, again, I cited testimony, it's --

25          ARBITRATOR KEEL:  Mr. Andriesz testified



1   there's no contemporaneous writing, though.

2           MR. BRICKMAN:  Right, but what he

3   testified to, he went and spoke to McLaughlin and

4   Aubin when I discovered the accounting fraud, and

5   they agreed to pay it.  That is -- that has nothing

6   to do with the contract.  That's not a modification

7   of the contract.  They agreed that there was a sum

8   of money that Simon Andriesz said was not proper --

9   was excluded.

10          ARBITRATOR KEEL:  But that's the first

11  50 percent.  You're claiming an oral agreement to

12  pay not 50 percent, but 100 percent on this group of

13  revenues.  And that strikes me as a modification.

14  No?

15          MR. BRICKMAN:  No, because he complained

16  that it wasn't included, and if you buy the argument

17  that it was properly excluded, then they say --

18  Simon coming to them and saying, I have this

19  problem, I think it was improperly excluded.  And

20  they said, don't worry, we'll pay it.  Just like

21  they paid discretionary bonuses.  They were

22  absolutely free to pay additional amounts above and

23  beyond what was called for in the contract.  And

24  yet, Sean McLaughlin, who is the president --

25          ARBITRATOR KEEL:  But accepting that they



1  could give money away, it doesn't follow what

2  they're contractually obligated to do so.  And

3  because it's arguably an oral modification of

4  agreement that says we don't have to pay more than

5  X.

6          MR. BRICKMAN:  Arguably yes, or is it --

7  or is it a set up.

8          ARBITRATOR ALCON:  -- an adjustment to a

9  practice, accounting practice.  Well, this is --

10 that's why we asked about whether the policies and

11 practices were reduced to some sort of a writing

12 somewhere.  And, again, it feels like, I'm not

13 saying they are, but it feels like from what we --

14 what limited window we have on this, that these

15 practices could have been modified or adjusted for

16 any broker who had a similar contract or tweaked

17 without having to actually modify in writing the

18 contract.  I have issues with oral agreements that

19 are not at least contemporaneously reflected in some

20 writing as to what the agreement was.  You know, so

21 even put that aside for a moment, you're not saying

22 for that -- your oral agreement, you know, with the

23 CEO that 1.8 million is due to be paid Simon?

24         MR. BRICKMAN:  Yes, I am.

25         ARBITRATOR ALCON:  Why is that?



```
 1           MR. BRICKMAN:  Because that's what they
 2   agreed to.  And even if you don't consider it an
 3   oral modification -- even if you consider it a
 4   modification of the agreement, which I don't think
 5   it is, I think it's a separate agreement --
 6           ARBITRATOR KEEL:  Can I -- maybe I
 7   misunderstood.  I thought under the contract he
 8   allocated what portion of whatever was in the pool.
 9           MR. BRICKMAN:  That's right, but this
10   wasn't in the pool.
11           ARBITRATOR ALCON:  We understand that,
12   but --
13           MR. BRICKMAN:  But the other thing I would
14   ask the panel to consider.
15           ARBITRATOR KEEL:  He should get all.
16           MR. BRICKMAN:  Huh?
17           ARBITRATOR KEEL:  All 100 percent of it
18   rather than 25 percent.
19           MR. BRICKMAN:  That's what his
20   conversation with McLaughlin, Aubin, and Windyat
21   (phonetic) indicated. And that's testimony.  And the
22   Windyat conversation is supported by an exhibit.
23   But, also, don't forget about Section 3E of the
24   contract.  And section 3E of the contract provides
25   for the payment of discretionary bonuses. So if you
```



1  say this isn't -- we're not going to consider this

2  an oral modification of the contract.  There is

3  uncontroverted testimony that they agreed to pay it.

4  No one -- Mr. McLaughlin didn't come in and say, no,

5  no, I never agreed to that.  Mr. Aubin never came in

6  and said, no, no, I didn't agree to that.  Mr.

7  Windyat didn't come in and say, no, no, I didn't

8  agree to that.  So why, if you don't want it to be,

9  if you don't trust oral modifications, why isn't it

10 a Section 3E agreement to pay him a discretionary

11 bonus?  And a certain amount of which they were

12 completely entitled to do.

13         THE CHAIRMAN:  Oh, Mr. Shah.

14         MR. SHAH:  I would like the panel to take

15 Mr. Brickman's answer to your question and take

16 whatever credibility you feel that answer has and

17 apply it to all the damages calculations he's trying

18 to do for you.  Because that is absurd.  There's

19 no --

20         THE CHAIRMAN:  We got to -- before we

21 close the record, because of the extra week you guys

22 weaseled out of us with the hearing, this today as

23 opposed to last week, we have a scheduling issue.

24 Mr. Alcon goes on vacation tomorrow.  And so we're

25 going to reserve the right to issue our opinion



1  between 30 and 45 days, rather than within 30 days.

2  We hope you'll give it to us, but we're going to

3  insist on it.

4          MR. BRICKMAN:  We willingly give it to you

5  with one consideration.  We'd appreciate whenever

6  the panel gets around to it, and I don't even care

7  if it's 60 days, but whatever the panel gets, we'd

8  appreciate if like with your supplemental questions.

9          THE CHAIRMAN:  Give you direct --

10          MR. BRICKMAN:  You fax it to us.

11  Otherwise it could get lost.

12          THE CHAIRMAN:  If let us do it, they may

13  not.

14          MR. SHAH:  I don't think they will.

15          MR. BRICKMAN:  Oh, they do.

16          THE CHAIRMAN:  Well, yeah, the answer is

17  I will ask.  If FINRA permits it, then I will do it.

18  But I don't want to get in trouble with FINRA.

19          But the last comment I want to make to you

20  is that FINRA is the same one we began with whenever

21  we began.  Under FINRA's rules, they encourage

22  mediation.  You guys are free to settle at any time

23  before our decision, and FINRA encourages it.  So I

24  want to say that we really enjoyed the

25  professionalism of the company, and the name

