UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SIMON DAVID ANDRIESZ,                           Case No: 24-CV-07004 (LJL)

                Petitioner,

For an Order Pursuant to 9 U.S.C.A. §1 *et seq.*
and CPLR § 7551 Vacating or Amending an
Arbitration Award

      - against -

BGC FINANCIAL, L.P.,

                Respondent.
------------------------------------------------------------X

REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PETITION AND MOTION
TO VACATE THE ARBITRATION AWARD, OR, IN THE ALTERNATIVE TO MODIFY OR
REMAND SUCH AWARD

                                                      Neal Brickman (NB0874)
                                                      Ethan Leonard (EL2497)
                                                      The Law Offices of Neal Brickman P.C.
                                                     420 Lexington Avenue - Suite 2811
                                                       New York, New York 10017
                                                       (212) 986-6840
                                                        Attorneys for Petitioner Andriesz

Table of Contents

**Page(s)**

Table of Authorities ……………………………………………………………  ii

Preliminary Statement ………………………………………………………  1

Limited Statement of Relevant Facts …………………………………………….  3

Argument …………………………………………………………………....  6

General Standard For Vacatur …….………………………….……………….  6

Point I

The Laws That The Panel Disregarded Are Clear And Irrefutably Applicable And Petitioner Clearly And Irrefutably Demonstrated Liability Inconsistent With The Award's Damages Warranting Vacatur……………….…..………….................................................  8

      Breach of Contract …………………………………...............................  8
      Dodd-Frank Whistleblower Retaliation Claim ………………………….  11

Point II

      The Petition and Motion Were Timely ………………………………….  13

Point II

      In The Alternative, The Award Should Be Amended Or
      The Matter Remanded ……………………………………………………  14

Conclusion ……………………………………………………………………….  15

Table of Authorities

*Cases*:

*Alston v. Microsoft Corp.*,
    851 F. Supp. 2d 725, 734 (SDNY 2012)…………………………...     10

*Beth Israel Medical Center v. Local 814*,
    2000 WL 1364367 (S.D.N.Y. 2000) ………………………..………     7

*Berman v. Neo@Ogilvy LLC*,
    801 F.3d 145 (2nd Cir. 2015) ………………………………………     12

*Bletas v. Subway Intern. BV*,
    96 A.D.3d 442, 946 N.Y.S.2d 130 (1st Dept 2012) …………………..     13

*Digital Realty Tr., Inc. v. Somers*,
    583 U.S. 149 (2018) …………….…………………………………….     12

*Elwell v. Raymond James Fin. Servs., Inc.*,
    686 F.Supp.3d 281 (SDNY 2023) ………………………………….     14

*Franco v. Port Authority of New York & New Jersey*,
    643 F.Supp.3d 459 (D.N.J. 2022) …………..…………………….     9

*Gamero v. Koodoo Sushi Corp.*,
    272 F.Supp.3d 481 (S.D.N.Y 2017)
    *aff'd,* 752 F.Appx 33(2nd Cir. 2018) ….…………………………….     11

*Halligan v. Piper Jaffray, Inc.*,
    148 F.3d 197 (2nd Cir. 1998) ……………………………………….     7

*Hernandez v. Jrpac Inc.*,
    No. 14 CIV. 4176 (PAE), 2016 WL 3249493
    (S.D.N.Y June 9, 2016) …………………………………………….     11

*In re Lowe (Erie Ins. Co.)*,
    56 A.D.3d 130, 133, 865 N.Y.S.2d 465 (4th Dept 2008) ………….     13

*Lopez v. Hollisco Owners' Corp.*,
    147 F.Supp 3d 71 (E.D.N.Y. 2015)
    *aff'd,* 669 F.Appx 590 (2d Cir. 2016) ……………………………….     10

*McNulty v. County of Warren*,
    2019 WL 1080877 (N.D.N.Y 2019) ..……………………………….     10

*Port Authority Police Benevolent Ass'n, v. Port Authority of New York and New Jersey,*
    283 F.Supp.3d 72 (S.D.N.Y 2017) …………………………………….   10

*Sands Brothers & Co., Ltd. v. Generex Pharmaceuticals,*
    298 A.D. 307, 749 N.Y.S.2d 17
    (1st Dept. 10/29/02) …………………………………………………….   7,8

*Sanders v. Gardner,*
    7 F.Supp.2d 151 (E.D.N.Y 1998) …..……………………………………   7

*Santos v. GE,*
    No. 10-cv-6948 (JSR) (MHD), 2011 WL 5563544, at *7
    (S.D.N.Y. Sept. 28, 2011), report and recommendation adopted,
    2011 WL 5563536 (S.D.N.Y. Nov. 15, 2011) ……………………….   14

*Tripi v. Prudential Securities, Inc.,*
    303 F.Supp.2d 349 (S.D.N.Y. 2003) …………………………………...   13

*Wien & Malkin LLP v. Helmsley-Spear, Inc.,*
    12 A.D.3d 65, 783 N.Y.S.2d 339
    (1st Dept. 10/14/04)…………………………………………………….   7

*Wilemijn Houdestermaatschappij, BV v. Standard Microsystems Corp.,*
    103 F.3d 9, 13-14 (2nd Cir. 1997).  …………………………………   1,6

<u>Statutes</u>:

19 NYCCRR 154.4 …………………………………………………………   13

CPLR §2103(b)(6)………………………………………………………..   13

CPLR §7511………………………………………………………………   *passim*

Petitioner, Simon David Andriesz ("Andriesz"), by and through his undersigned counsel, The Law Offices of Neal Brickman, P.C., respectfully submits this Reply Memorandum of Law in further support of his Petition and Motion to Vacate, Amend, or Remand the Arbitration Award in FINRA Case No: 22002539, pursuant to 9 United States Code §§9-10, *et seq.*, New York's CPLR §7511, and relevant case law.

Preliminary Statement

Respondents' opposition is more noteworthy for what it does not address than for the insubstantiality and irrelevance of what it purports to address. Respondents raise a myriad of bases for opposition to the instant Petition and Motion to Vacate, Amend, or Remand, but they posit no even "barely colorable justification" on which the arbitrators "could have justifiably rested their decision." *Wilemijn Houdestermaatschappij, BV v. Standard Microsystems Corp.,* 103 F.3d 9, 13-14 (2nd Cir. 1997). The only possibility that the Respondents can even conjure up is that the Award was granted by the Panel as two times the amount that Mr. Andriesz asserted he was due for his earned but unpaid 2016 bonus. This only after Respondents previously asserted that there was absolutely no basis for this claim, not only because Mr. Andriesz was no longer employed at the time in 2017 that BGC paid out its 2016 bonuses, but also, *inter alia*, because Mr. Andriesz purportedly provided no evidence to support his claim of an unpaid bonus of $250,000 for the relevant time period. In order for the Panel to have awarded Mr. Andriesz his bonus for 2016, it would have had to either disregard the plain language of the contract or, as Petitioner submits, found that BGC had improperly breached the contract. However, as set forth in the Petition and initial moving papers (as well as having been clearly presented to the Panel), if BGC had breached the Contract and Mr. Andriesz's termination was without cause (as it would have had to have been for an award based on his unpaid 2016 bonus) he would also be due, at a minimum, the

1

compensation related to the remaining 2 years of his 4 year Contract. The Panel did not grant such an award, and the Award should be vacated, amended, or remanded on this basis alone.

The majority of Respondents' opposition is focused on attempting to refute arguments that are irrelevant to the Petition and the instant motion. The fact that Petitioner sought to amend his pleading as evidence and testimony came to light in the course of the arbitration proceedings is not evidence of bad faith by Mr. Andriesz, but rather the proper course of conduct when facts are adduced demonstrate that a given claim is no longer supportable. Similarly, the fact that Mr. Andriesz was properly incensed that his ex-wife's divorce attorneys had knowingly and publicly slandered him and violated evidentiary rules and orders does not impugn his credibility, but rather makes him human. Likewise, the fact that Mr. Velez, a self-proclaimed whistleblower, who submitted numerous documents under oath to regulatory authorities after leaving BGC's employ (that tellingly mirrored emails and statements that he also made directly to his BGC managers before he left BGC's employ and to whom Mr. Velez testified that he never lied), changed his story after being re-hired by BGC while Mr. Andriesz was already arbitrating against BGC, does not impugn Mr. Andriesz's credibility, but rather, if anything, impugns Mr. Velez's credibility.

Respondents also spend significant time attempting to refute charges in the underlying arbitration that were not the primary focus of the Petition or the instant motion. The claims for underpayments related to Mr. Andriesz's work while still employed by BGC and issues concerning BGC's improper attempts to penalize brokers on one desk for the losses on another desk, or to improperly apply credits to desks under Mr. Andriesz's supervision, while clearly reflective of improper activities are simply not the gravamen of this motion.[1] By issuing the Award and finding

---

[1] Neither is the $1.8M that was promised to Mr. Andriesz by his direct supervisors as recompense for the credits improperly withheld from Mr. Andriesz and his Desk. While Mr. Andriesz offered clear and unrefuted testimony concerning this promise and the clear basis for the same, it is true that an arbitration

2

BGC liable for compensatory damages owed to Mr. Andriesz, the Panel determined that Mr. Andriesz was successful in demonstrating liability on the part of BGC. The two legal theories that Mr. Andriesz provided the best evidence for were his breach of contract and Dodd-Frank whistleblower retaliation causes of action. Under neither of these theories of liability is there any colorable basis on which the Panel could have justifiably determined damages of $500,000. This is the gravamen of Mr. Andriesz's Petition and the instant motion, and, given the lack of any colorable basis, vacatur -- or in the alternative, amendment or remand -- is warranted. Respondents' opposition, in fact, supports vacatur as, much like Petitioner, they cannot find, and do not cite to, any even "barely colorable justification" upon which the arbitrators "could have justifiably rested their decision" to award Andriesz only $500,000.00.

Limited Statement of Relevant Facts[2]

Prior to May 28, 2012, Andriesz had a successful career as a broker selling listed products at several well-respected financial institutions. (P15). Up until this point in his decades-long, highly successful, and highly profitable career in finance, Andriesz had neither received any performance, customer, regulatory, or personnel complaints whatsoever, nor been a position where he was compelled to make any regulatory complaints. (P27; LD Ex. FFFF). BGC Brokers recruited Andriesz and his team to join it in May of 2012, with Andriesz heading a futures and options desk in London. (P16). Despite some initial irregularities on the part of BGC and Andriesz' supervisor, Aubin, Andriesz was successful. (P18-9). Andriesz was promoted and given a new

---

Panel may disregard testimony and that under at least the FAA there is no basis for vacatur based solely on a manifest disregard of the evidence.

[2] Petitioner respectfully refers to his Petition, the exhibits attached to the Leonard Declarations, and his initial motion papers for a more fulsome discussion of the relevant facts, as well as the background and corroboration of the limited facts set forth herein. References to the Petition are to the relevant paragraphs of the Petition as "P#" herein).

contract (the "Contract") in early 2015. (P21; LD Ex. Q).

Starting in April 2015, Andriesz recognized several regulatory issues within BGC and raised his concerns – complaints that he reiterated through his employment concerning improper supervision; conducting business without proper registration and licenses; various acts of fraudulent accounting; tax fraud; and improper harassment, abuse and retaliation: each in violation of applicable law, industry rules, and/or securities regulations. (P26,28,37-9). Andriesz was threatened by Aubin to stop raising these regulatory issues, but Andriesz remained steadfast and began to suffer improper retaliatory discipline as a result. (P 40-4, 46-51-6). In April and May 2016, Andriesz escalated his concerns and complaints and involved counsel to write a whistleblower complaint on his behalf, but still no *bona fide* investigation was conducted and certainly no corrective action was taken. (P57,59-65). Andriesz then, in September 2016, filed a complaint with the SEC and informed HR of the filing. (P68).

Additional retaliation and the false accusations – proffered in a thinly veiled attempt to justify later employment actions, but which were clearly abject pretext – followed directly. First, after ignoring working restrictions from Andriesz's doctor for almost two weeks (the note called for restricted duty for two weeks), BGC locked Andriesz out of the office on his busiest trading day of the year – the stress of which landed him in the hospital. (P70-3). Then, despite Andriesz's communicating to HR that he was in the hospital, and while he was heavily medicated and in cardiac distress, Aubin repeatedly contacted him and harassed him for missing a meeting that was in no way time sensitive (Aubin, when scheduling the meeting, had indicated that he did not care when it occurred). The harassment was so troubling that Andriesz's wife reached out to another colleague to see if it could be stopped. (P74-6,79). Upon his return to work, Andriesz was given a letter from Aubin – actually ghost written by HR, a fact never communicated to Andriesz –

4

renewing the same insubordination trope that had been used against Mike Riffice ("Riffice"), another whistleblower retaliated against by Aubin and BGC. (P77-9).

Andriesz responded to Aubin within the hour and made complaint to HR still not knowing that HR were the actual bad actors in conjunction with Aubin. HR then put Andriesz on a modified work schedule of 40 hours per week but, again, never monitored his compliance, demonstrating the clear pretextual nature of their defense of caring about Andriesz's health. (P80-3,88). Andriesz, contrary to Respondents' manufactured allegations, continued, as he had throughout his work at BGC, to respond to instructions from Aubin and answer all of Aubin's questions. Andriesz did complain that same was improper and retaliatory. Tellingly, in the normal course, BGC would separate and create a different reporting line, even if temporarily, when an employee complained that they were being harassed by a supervisor. (P84-5,98). HR did not even request from Aubin the communications that he had sent to Andriesz while the hospital in cardiac distress and conducted no *bona fide* investigation whatsoever, but rather attempted to create a false record concerning the same. (P86-90). On December 1, 2016, Andriesz met with Aubin and again addressed all open questions; no mention of Andriesz's job performance was made aside from the knowingly false trope that he had not been in sufficient communication with Aubin. (P91-4). Nevertheless, on December 2, 2016, Andriesz was placed on an indefinite suspension and improperly directed to submit to examinations by two doctors to ascertain if he was able to fulfill the essential functions of his job. (P95).

At the arbitration, Dreste, after attempts at subterfuge, admitted that the only alleged function of his job that was at issue was his willingness to communicate with Aubin. The evidence, both documentary and testimonial demonstrated that – despite Andriesz's complaints to management and HR – which were ignored – and the ongoing abusive behavior of Aubin, Andriesz

5

continued, as always, to communicate with, and respond to each of the demands of, Aubin. (P96-100). Andriesz was able to speak to Aubin, he just posited that he should not have to do so while his complaints of harassment against Aubin were under investigation. Nonetheless, Andriesz still did communicate with Aubin as directed. (P100). Dreste did nothing to vet either doctor: one, an infectious disease specialist, who was then involved with a suit concerning a patient misdiagnosed with AIDS; and the second, a doctor based two hours outside of New York City and known as a hired gun for school boards looking to certify teachers as unable to work. (P99). Andriesz wrote to Dreste three times between December 7, 2016 and January 3, 2017, seeking a basis for his suspension and what alleged essential function of his job was to be examined by the "doctors," but Dreste, as admitted at the arbitration, never provided any substantive response, much less an answer to his repeated inquiries. She then transmitted, on January 31, 2017, just before an additional $250,000 would have been due to Andriesz under the explicit terms of his Contract, a termination letter citing the debunked non-communication issue and Andriesz's failure to meet with the doctors as the sole bases for his termination. (P100-104). Thereafter, Andriesz was confirmed as a whistleblower and given an award by the CFTC for the information that he provided leading to sanctions against BGC for the same issues about which he had complained internally and then to the SEC on several occasions. (P105-7).

Argument

General Standard For Vacatur

The Parties are in accord that vacatur is a high standard. However, as Respondents' themselves note, vacatur is warranted if, as here, there is no "barely colorable justification" on which the arbitrators "could have justifiably rested their decision." *Wilemijn Houdestermaatschappij, BV,* 103 F.3d at 13-14. "While judicial review of an arbitrator's factual

determinations is quite limited, a court may modify or vacate an arbitrator's award for manifest disregard of the law or the evidence if there is 'strong evidence' contrary to the findings of the arbitrator and the arbitrator has not provided an explanation of his decision." *Beth Israel Medical Center v. Local 814*, 2000 WL 1364367 (S.D.N.Y. 2000); see also, *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197 (2nd Cir. 1998) (Court vacated award finding strong evidence contradicting award and because no explanation or rationale for the denial of relief was proffered by the arbitrator); *Sanders v. Gardner*, 7 F.Supp.2d 151 (E.D.N.Y. 1998) (Court held if the error of arbitrators is perceivable by the average person qualified to serve as an arbitrator and a clearly governing legal principle was ignored or disregarded by the arbitrators, the award should be vacated); *Wien & Malkin LLP v. Helmsley-Spear, Inc.*, 12 A.D.3d 65, 783 N.Y.S.2d 339 (1st Dept. 10/14/04).

Under CPLR §7511, an arbitration award shall be vacated if the award was procured by fraud or by the partiality of one or the arbitrators or if it is irrational or void as against public policy. See *e.g. Sands Brothers & Co., Ltd. v. Generex Pharmaceuticals*, 298 A.D.2d 307, 749 N.Y.S.2d 17 (1st Dept. 10/29/02) (After finding award irrational and arbitrator conflict of interest, Court remanded to new Panel for reassessment of damages). As in *Halligan* and *Wein*, the overwhelming facts and the irrefutable manifest disregard for the law by the Arbitrators in rendering the Award mandates vacatur. Under the admitted factual circumstances the plain and common meaning of various applicable laws as presented to arbitrators, the Award is, simply, unsupportable in reason or logic. The quantum of damages awarded by the Panel is completely irrational, untethered to any evidence presented at the hearing, and in contravention of logic and the applicable and clear law presented to the Panel.

The Arbitrators' Award should be vacated as it manifestly disregards the applicable, clearly presented, law and facts of this matter. Vacatur is also warranted as the Award is irrational given

7

that the Panel found exclusively for Andriesz, directing that BGC pay all applicable hearing fees, but awarded damages with no tie to the claims and evidence submitted and demonstrated by Andriesz at the hearing as necessarily computed per undisputable legal standards. See *e.g., Sands Brothers & Co., Ltd., v. Generex Pharmaceuticals, Inc.,* 298 A..2d 307 (1st Dept 2002) (An arbitration award will be vacated if it is irrational).

Point I

<u>The Laws That The Panel Disregarded Are Clear And Irrefutably Applicable And Petitioner<br>Clearly And Irrefutably Demonstrated Liability Inconsistent With The Award's Damages<br>Warranting Vacatur</u>

In the instant Petition, the laws that the Panel disregarded have the qualities required by courts -- namely that they are widely known, clear in intent and logic, and directly applicable to the allegations proffered by Andriesz from the commencement of this dispute -- to support a vacatur. Moreover, the damages that stem from the causes of action for breach of contract are governed by the plain terms of the contract which are at odds with the Award. Similarly, compensatory damages awarded for Dodd-Frank retaliation claims are clear and undisputed, and, in this case, also do not correlate in any way to the Award.

<u>Breach of Contract</u>

In attempting to rebut Andriesz's claim for breach of contract and damages stemming from the early termination of the Contract by BGC, Respondents focus solely on their contention that there was "cause" to terminate Andriesz.

As noted in Andriesz' moving papers, Section 4(a) of the Contract provides for the circumstances under which BGC could properly terminate Simon's employment for "Cause." Contrary to the current contentions of Respondents, there was no "Cause," as that term is plainly defined, to terminate Andriesz's agreement, and it is undisputed that BGC never provided written

8

notice to Andriesz "identifying the duties [allegedly] not being performed by [him]." (LD Ex. Q, Section 4). The relevant facts are clear and dispositive.

The only acts that BGC ever even contended constituted Cause were that Andriesz allegedly did not communicate with Aubin and that he refused to attend the two pretextual "doctors" appointments as directed by BGC to assess his ability apparently to speak to Aubin, the only even alleged essential element of his job that was purportedly not performing.

As set forth above, as well as in the Petition, in material detail, and dispositively, Andriesz was responsive to Aubin except for the few days when he was in the hospital, heavily medicated, suffering from cardiac distress, and while recovering from the same. Andriesz was in regular communication with Aubin regularly during the week directly prior to his hospitalization; communicated his medical status to BGC and Aubin through his HR contact; responded to Aubin's letter inquiry the following Monday morning within one hour; met with the individuals directed by Aubin that week; communicated thereafter via email with Aubin; held the requested meeting with Aubin and the next time scheduled by BGC; and continued to complete all of his essential job functions during that same period with no complaint. In the two days before his suspension for allegedly not communicating with Aubin and his purported medical inability to do the same, Andriesz had an email exchange with Aubin and an over thirty-minute video conference. These are the facts. They are undisputed and preclusive of a finding of Cause as a matter of fact and law.

It is also clear, and undisputed, that the Americans with Disabilities Act ("ADA") 42 USC §12112(d)(4)(A) -- prohibits an employer from requiring an employee to submit to a mental and/or physical health examination, "…unless such examination or inquiry is shown to be job-related and consistent with business necessity." The burden of demonstrating a business necessity is on the employer and "is high, and the test is an objective one." *Franco v. Port Authority of New York &*

9

*New Jersey*, 643 F. Supp. 3d 459,467-68 (D.N.J. 2022); see also *Port Authority Police Benevolent Ass'n,* v. *Port Authority of New York and New Jersey*, 283 F. Supp. 3d 72, 81-82 (S.D.N.Y. 2017) (The request must be as narrow as possible and tied to a vital business function); *McNulty v. County of Warren*, 2019 WL 1080877 *11 (N.D.N.Y. 2019) (When employee placed on leave before medical examination on its own constituted a violation); *Lopez* v. *Hollisco Owners' Corp.*, 147 F. Supp 3d 71,77 (E.D.N.Y. 2015), aff'd, 669 F. Appx. 590 (2d Cir. 2016) (Absent demonstration by employer of *bona fide* basis, employee need not attend requested doctor examinations).[3]

BGC now asserts that it was concerned with Andriesz's health. However, he had been suffering the same or similar issues, including a full-blown heart attack over the prior two years without any similar "concern" from BGC. (LD Ex. UUU (AE347); Ex. VVV (AE348); Ex. H - D2: SA 679:7-17). Similarly, the receipt of two notes from Andriesz's doctor -- the two to three week leave letter (Exhibit 300) and the part time work letter (Exhibit 306) -- did not interrupt or diminish Andriesz's job performance, nor did these letters cause BGC to conduct any sort of inquiry into the extent of Andriesz disability, if any. (D2: SA: 676: 7-13; 679: 7-17). Instead, BGC instituted a "part time" work arrangement -- from 7 a.m. to 3 p.m., 5 days per week (a full-time work schedule by law) (LD Ex. OOO (AE323) -- that it did nothing to monitor. (LD Ex. O - D10: PD 124:17-25). Clearly, the "concern" only arose when BGC decided it needed to quash Andriesz's regulatory complaints once and for all.[4]

---

[3] The case cited by Respondents, *Alston v. Microsoft Corp.*, 851 F. Supp. 2d 725, 734 (SDNY 2012), is distinguishable on its facts and certainly does not refute the unequivocal cases referenced above. In *Alston*, the employee had been given numerous accommodations and had been on leave for eleven months when he refused to respond to the employer's request that he visit their doctor. In contract. Andriesz duly and repeatedly responded to BGC (and repeatedly offered to discuss the matter further but was ignored or rebuffed) and specifically contended that the visits were improper under the law and BGC's own policies. BGC refused to engage with him and then improperly terminated him in retaliation.

[4] BGC does not even attempt to refute the reality that their purported justification for "cause" conflates two separate sections in the Contract – neither of which provides a basis for their termination of Andriesz

Absent Cause, the term of the Contract would have extended, by its express terms, to February 1, 2019.  (Ex. 38, Section 1(a); "for a term beginning February 1, 2015, … and ending of the fourth (4th) anniversary of the State Date …"), mandating a minimum award of $400,000.00 per annum (for two years) plus interest at 9% or a total of $1,160,000.00: or $1,567,5000 with Andriesz 2016 earned, but unpaid, bonus of $250,000 and interest thereon. See *e.g., Hernandez v. Jrpac Inc.*, No. 14 CIV. 4176 (PAE), 2016 WL 3248493, at *36 (S.D.N.Y. June 9, 2016).  BGC does not dispute these calculations or the applicability of New York Labor Law ("NYLL") to these amounts which would mandate liquidated damages of 100% of the unpaid wages. *Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 515–16 (S.D.N.Y. 2017), *aff'd*, 752 F. App'x 33 (2nd Cir. 2018).  Applying the NYLL liquidated damages, the Award should have been $3,135,000, less the monies he actually earned ($812,175), or $2,322,825.  The numbers only increase if the Panel would have considered Andriesz's actual earnings for 2016 and used them as a basis to calculate his damages.  Same – after accounting for mitigation efforts – would have resulted in damages for two years of $1,678,138.65, or $3,356,277.30 with the 100% penalty mandated by the NYLL.[5]

As the damage amount of the Award was clearly irrational, erroneous, and contrary to clear and unequivocal existing law, vacatur is warranted.

Dodd-Frank Whistleblower Retaliation Claim

Respondents raise four arguments as to Andriesz's claim under Dodd-Frank.  While none are dispositive, it must again be noted that what is at issue is not ultimately whether Andriesz demonstrated this claim, but whether there is any colorable justification for the damages

---

without cause and subsequently withholding the monies clearly due under the express terms of the Contract. (*See e.g.*, FN #6 on page 18 of Andriesz's Memorandum in Support of the instant motion).
[5] Respondents' attacks on Mr. Smith's expert report and testimony are erroneous at best and also misleading.  The quotation lifted from Mr. Smith's report is taken out of context and clearly refers not to the future, but the past and was, in all cases, a hypothetical. (Shah Decl. Ex.34 at Andriesz 003500).

11

determined upon which the arbitrators could have justifiably relied. Nevertheless, it should be noted that Andriesz clearly filed with the SEC in October 2016, while still employed by BGC (LD Ex. EEE (AE301); Ex. G - D1: SA 110:21 - 111:5; 126:9 - 127:20). The SEC duly confirmed receipt of that written complaint in an email dated October 28, 2019. (LD Ex. EEE). Immediately thereafter, in or about late October 2016, Andriesz advised both Rosado and Dreste, as he had previously forewarned them, that he had reported BGC's and Aubin's wrongdoing to the SEC. (LD Ex. G - D1: SA 128:4-7; 128:12-21; 128:25 - 130:7; 131:2 - 132:17; 132:21 - 133:3).[6] Moreover, the TCRs referenced by Respondents clearly corroborate Andriesz's testimony in that they clearly demonstrate that contact had previously been made with Ms. Keyes (her name appears as a prior contact). (LD Ex. EEE (AE301); Ex. IIII; Ex. JJJJ, both @ 3(a) and 3(b)). This testimony also addresses BGC second argument, namely that Dreste simply did not recall Andriesz telling her of this filing. Andriesz clearly testified that he did. Third, and as noted continually, it is clear not only that Simon had a reasonable belief that his complaints concerned securities law violations protected by Dodd-Frank, but that they actually did as he received a CFTC whistleblower award for making similar complaints to that regulatory body. (P105-7). Fourth, as discussed above, BGC did not have a reasonable non-discriminatory basis for terminating Andriesz.

The damages proximately caused by this unlawful whistleblower retaliation are the lost wages and lost value of life detailed in Dr. Smith's report. (LD Ex. FFFF). *Berman v. Neo@Ogilvy LLC*, 801 F.3d 145, 150 (2nd Cir. 2015), abrogated by *Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 138 S. Ct. 767, 200 L. Ed. 2d 15 (2018). As set forth above, we know that Andriesz's

---

[6] Shortly after his January 31, 2017 termination, Andriesz made a similar report -- including the allegations in his initial and subsequent SEC filings (including the TCRs drafted in January 2017 and filed at that time (LD Ex. IIII (AE368); Ex. JJJJ (AE369)) and in the May 9, 2016 whistleblower complaint letter (LD Ex. BBB (AE251)) -- to the CFTC. (LD Ex. CCCC (AE371), Simon's 2-14-17 Whistleblower Complaint and the CFTC's 2-17-17 Receipt of Filing Letter).

reasonably calculated lost income for 2017 and 2018 was $1,157,337. Using the same calculus for the years 2019 through 2023, Andriesz should have earned $984,756 per annum for a total of $4,923.780. In fact, he was only able to earn $941,331, resulting in a loss of $3,982,449. As such, Andriesz's losses attributable to this claim would be $7,857,982 ($2,718,196 + $1,157,337 + $3,982,449). This claim is irrefutable, but its properly attributed damages far exceed, and bear no relation to, the $500,000.00 awarded. Vacatur is warranted on this basis as well.[7]

Point II

The Motion Was Timely

Respondents also contend that the Petition and motion should be denied as untimely. Under CPLR §7511, an action to vacate an award must be made within 90 days of service of the award. While the Award was dated June 17, 2024, Petitioner's counsel did not receive notice of the Award's posting on FINRA's website from FINRA until 7:35 p.m. (See Leonard Declaration Ex. 1), after the close of business, on June 18, 2024.[8] The Notice of Motion, Memorandum of Law In Support, Petition, Civil Cover Sheet, Rule 7.1 Statement, and Declaration in Support were all initially filed on Monday, September 16, 2024, prior to the 90th day after receipt of the Award, and, as such, were timely. A similar result is warranted under the FAA.[9]

---

[7] Tellingly, even if the owed, but unpaid, $250,000 was not made part of the calculus (as it clearly should have been), the net losses for 2017 and 2018 would have been $657,337 and for 2019 through 2023 would have been $2,732,449 (5 x $734,756 = 3,673,780 - $941,331) for compensatory losses of $3,389, 786 without even accounting for interest or the loss of life suffered by Andriesz valued at $2,718,196 to $3,386,657: all clearly in excess of, and completely unrelated to, the $500,000 awarded.
[8] CPLR §7511's 90–day time limit for an application to vacate or modify the award runs from the date of receipt, not the date of mailing or transmittal. See *e.g., Bletas v. Subway Intern. BV*, 96 A.D.3d 442, 946 N.Y.S.2d 130 (1st Dept 2012); *In re Lowe (Erie Ins. Co.)*, 56 A.D.3d 130, 133, 865 N.Y.S.2d 465 (4th Dept 2008). Moreover, Even using the 17th, the filing would still be timely under CPLR §7511 – applicable as the Contract and any arbitration was to be "governed and construed in accordance with the laws of the State of New York, without giving effect to the principles of conflicts of laws thereof." (LD Ex. Q §11 (b)).
[9] As the notice of Award being posted – no mailing of the Award ever occurred – was not received until after the close of business on June 18, 2024, the date for computing the applicable statute of limitations is June 19, 2024. By way of example, the New York Secretary of State holds that service of after-hours emails will be deemed served the next business morning. See, 19 NYCRR 154.4. Similarly, CPLR §2103(b)(6) in

13

Point III

In The Alternative, The Award Should Be Amended Or The Matter Remanded

Alternatively, the Award should be amended to provide for the legally required and proved damages for the clearly demonstrated causes of action for breach of contract and for retaliation in contravention of the protections of Dodd-Frank as set forth above.

In the second alternative, remand is warranted. While arbitrators may present a lump sum award without disclosing any rationale for it, courts may inquire into the basis of such an award when there appears to be no legal or factual basis for it. See *e.g., Tripi v. Prudential Securities, Inc.,* 303 F.Supp.2d 349,353 (S.D.N.Y. 2003) (Court remanded for clarification based on difficulty in ascertaining justification for the arbitrators' award). Unlike the case cited by Respondents, *Elwell v. Raymond James Fin. Servs., Inc.,* 686 F.Supp.3d 281, 293 (SDNY 2023) in which the Court found that the damages awarded could have stemmed from any number of hundreds of purportedly improper transactions, the *Tripi* case is more dispositive. In that case, the claim for churning was clearly demonstrated, but the Panel ignored the quantum of churning demonstrated by the brokerage statements introduced into evidence. Similarly, herein, the causes of action are clear and the damages prescribed for these causes of action are essentially black letter law. They simply do not correlate with the Award, and amendment or remand is, therefore, warranted.

---

asserting that, "Service by overnight delivery service shall be complete upon deposit of the paper enclosed in a properly addressed wrapper into the custody of the overnight delivery service for overnight delivery, prior to the latest time designated by the overnight delivery service for overnight delivery," tacitly acknowledges that after-hours service is not deemed effective until the following day. As such, the September 19, 2024 notice by Petitioner of the Petition and motion – as acknowledged by Respondents in their papers -- was timely as the FAA does not explicitly require service of process, but rather "notice" of the vacatur application. See *e.g., Santos v. GE*, No. 10-cv-6948 (JSR) (MHD), 2011 WL 5563544, at *7 (S.D.N.Y. Sept. 28, 2011), report and recommendation adopted, 2011 WL 5563536 (S.D.N.Y. Nov. 15, 2011)).

Conclusion

WHEREFORE, for all of the foregoing reasons, Andriesz respectfully requests that the Court (1) vacate the Panel's Award, or, in the alternative, modify the Award as set forth above; (2) or, in the second alternative, remand for clarification of the current Award; and (3) award to Andriesz any such other and further relief as this Court deems just and proper.

Dated: New York, New York
December 23, 2024

Respectfully submitted,

_____
Neal Brickman (NB0874)
Ethan Leonard (EL2497)
The Law Offices of Neal Brickman
420 Lexington Avenue - Suite 2811
New York, New York 10017
(212) 986-6840
Attorneys for Petitioner Andriesz

15