UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

SIMON DAVID ANDRIESZ,

                            Petitioner,

              -v-

BGC FINANCIAL, L.P.,

                           Respondent.

------------------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  4/23/2025
```

24-cv-7004 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

       In this action, Simon David Andriesz ( "Petitioner") moves, pursuant to the Federal Arbitration Act and the New York Civil Practice Law and Rules, for an order vacating, modifying, or remanding an arbitration award dated June 17, 2024 (the "Award") which was issued against BGC Financial, L.P. ("BGC" or "Respondent"). Dkt. No. 4.

       For the reasons that follow, Petitioner's motion is denied.

## BACKGROUND

       Petitioner is a natural person currently domiciled and residing in the United Kingdom. Dkt. No. 9 ¶ 2. BGC is a Delaware limited partnership with its principal place of business in New York, New York. *Id.* ¶ 3. It does business as an inter-dealer broker that facilitates transactions in securities and other financial instruments among broker-dealers, dealer banks, and other financial institutions. *Id.*

Petitioner was employed by Defendant from November 2014 through January 31, 2017. *Id.* ¶¶ 3, 104.[1]  At the beginning of his employment with BGC, Petitioner headed a futures and options desk in London.  *Id.* ¶ 16.  In or about the third quarter of 2014, he was recruited to run the New York and Chicago futures and options desks for BGC, which were located in New York, as well as to continue to run the London desk.  *Id.* ¶ 21.

On or about January 21, 2015, Petitioner signed a four-year contract with BGC that formalized his promotion and provided for his employment as Managing Director from February 1, 2015, through February 1, 2019.  Dkt. No. 7-19.  BGC agreed to annually compensate Petitioner at a rate of $364,000 in the form of a draw plus $36,000 in salary.  *Id.* § 3(a).  Petitioner was also entitled to participate in an incentive pool compensation arrangement related to the performance of BGC's North American Futures and Option Desk (excluding the Chicago Future Execution Desk) and the London Financial Futures and Options Desk.  *Id.* § 3(b).  Petitioner's contract with BGC provided that disputes between him and BGC would be governed by BGC's Dispute Resolution Policy and Agreement.  *Id.* § 9.  The contract stated that it would "be governed by and construed in accordance with the laws of the State of New York."  *Id.* § 11(b).  Notably, Petitioner's contract contained a termination provision stating that "BGC may terminate this Agreement with Employee for Cause" and providing nine defined forms of "Cause" including "(i) dishonesty, disloyalty, insubordination, unsatisfactory performance or attendance, or failure to follow BGC's policies, rules, codes of conduct, or procedures."  *Id.* § 4(a).

Petitioner's tenure was marked by conflicts with his superior, Jean Pierre Aubin.  Petitioner was suspended in February 2016, Dkt. No. 9 ¶ 52, was subject to a written warning upon his return

---

[1] Respondent claims that Petitioner was employed by its UK-based affiliate, non-party BGC Brokers, L.P.  Dkt. No. 27-14.  The difference is immaterial for purposes of this motion.

from suspension, *id.* ¶¶ 55–56, was put on an indefinite suspension again in December 2016 and directed to submit to examination by two doctors to determine if he was fit to perform the essential functions of his job, *id.* ¶ 95, and was ultimately terminated on January 31, 2017, *id.* ¶ 104.

On June 19, 2019, Petitioner filed a Statement of Claim with FINRA Dispute Resolution Services ("FINRA") against BGC and thirteen other respondents. Dkt. No. 27-1 at 3. On June 22, 2020, Petitioner amended his Statement of Claim to eliminate six of the respondents. *Id.* at 3–4. On August 8, 2022, after Petitioner made a fourth request to postpone the hearing, the Arbitration Panel dismissed the case without prejudice under FINRA Rule 13601(c). *Id.* at 4.

Petitioner filed a new Statement of Claim on or about November 8, 2022. Dkt. No. 9 ¶ 6; Dkt. No. 7-1 at 2. He asserted nineteen causes of action: violations of the Dodd-Frank Whistleblower statute; securities fraud in violation of Section 10(b) of the Securities Exchange Act; common law fraud, breach of contract; fraud in the inducement; breach of fiduciary duty; breach of the implied covenant of good faith and fair dealing; conversion; unjust enrichment; accounting; RICO; defamation; tortious interference with prospective and actual business relationships; failure to supervise; conflicts of interest in violation of FINRA rules; intentional infliction of emotional distress; prima facie tort; civil conspiracy; and violations of the New York Labor Law ("NYLL"). Dkt. No. 7-1 at 3; Dkt. No. 36-2 at 9. He subsequently withdrew his claims for accounting, failure to supervise, conflicts of interest in violation of FINRA rules, and prima facie tort. Dkt. No. 7-1 at 4; Dkt. No. 36-2 at 10.

The arbitration was held in New York. Dkt. No. 7-1 at 2. The arbitration panel held hearings across eleven days in January and February 2024, ending on February 9, 2024. Dkt. No. 9 ¶ 7. The panel heard argument on May 15, 2024. *Id.* ¶ 11. The panel issued the Award on June 17, 2024. *Id.* ¶ 12; Dkt. No. 7-1. The Award stated as follows:

After considering the pleadings, the testimony and evidence presented at the hearing, and any post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1, Respondent BGC Financial, L.P., is solely liable for and shall pay to Claimant the sum of $500,000.00 in compensatory damages.

2. All other claims against remaining Respondents Cantor Fitzgerald & Co., Jean Pierre Aubin, Mark Webster, Paul Marc Pion, and William Michael Shields, are dismissed in their entirety.

3. Any and all claims for relief not specifically addressed herein, including any requests for prejudgment, post-judgment or statutory interest, statutory and/or punitive damages, and attorneys' fees, are denied.

Dkt. No. 7-1 at 4; Dkt. No. 36-2 at 10.  The panel assessed the total hearing session fees in the amount of $39,375 against BGC.  Dkt. No. 7-1 at 5; Dkt. No. 36-2 at 11.

After the Award was served, Petitioner requested an Explained Decision.  Dkt. Nos. 7-2, 7-4.[2]  FINRA denied the request in a letter stating that the case was closed when the Award was served on June 17, 2024, and the request did not comply with FINRA Rule 13905 regarding submissions in a closed case.  Dkt. No. 7-5.

## PROCEDURAL HISTORY

Petitioner initiated this lawsuit by filing a petition on September 17, 2024.  Dkt. No. 9.[3]

On September 19, 2024, Petitioner requested the issuance of summons to BGC.  Dkt. No. 11.  That same day, Petitioner's counsel emailed counsel for BGC to ask if he would accept service.  Dkt. No. 27-36.  On September 20, 2024, the Court issued an electronic summons to BGC.  Dkt. No. 13.  On September 24, 2024, BGC filed a waiver of service of the summons.  Dkt. No. 14.

---

[2] In the request, Petitioner's attorneys stated that it was their recollection that they had previously requested an Explained Decision, counsel for the respondents had not opposed the request, and the chair had agreed to provide an Explained Decision at the start of the hearings.  Dkt. Nos. 7-2, 7-4. Petitioner's counsel has subsequently confirmed that Petitioner did not make the request for an Explained Decision in writing pursuant to the applicable FINRA rules.  Dkt. No. 20 at 1.

[3] The Clerk of the Court rejected an earlier attempt by Petitioner to file the petition on September 16, 2024.  Dkt. Nos. 1–2.

On September 16, 2024, Petitioner filed the instant motion to vacate the Award, a memorandum of law in support of the motion, and three declarations of counsel.  Dkt. Nos. 4–8.  On December 6, 2024, Respondent filed a response to the petition and a memorandum of law in opposition to Petitioner's motion to vacate along with a declaration of counsel.  Dkt. Nos. 25–27.  Petitioner filed a reply memorandum of law in support of the motion and a declaration of counsel on December 23, 2024.  Dkt. Nos. 31–32.  The Court granted Respondent's request for leave to file a sur-reply in opposition to the motion, Dkt. No. 34, and on January 2, 2025, Respondent filed a sur-reply and a declaration of counsel, Dkt. Nos. 35–36.

## LEGAL STANDARD

Pursuant to Section 207 of the Federal Arbitration Act ("FAA"), "[t]he court shall confirm [an arbitration] award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention."  9 U.S.C. § 207.  Section 10 of the FAA establishes the four circumstances in which a court may vacate an arbitral award.  The fourth prong, under which Petitioner moves, provides for vacatur "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C. § 10(a)(4).  "In addition, [the Second Circuit] has 'held that the court may set aside an arbitration award if it was rendered in manifest disregard of the law.'"  *Zurich Am. Ins. Co. v. Team Tankers A.S.*, 811 F.3d 584, 589 (2d Cir. 2016) (quoting *Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 451 (2d Cir. 2011)).

Under these standards, "vacatur of arbitral awards is extremely rare."  *Hamerslough v. Hipple*, 2012 WL 5290318, at *3 (S.D.N.Y. Oct. 25, 2012).  In reviewing an arbitration award under Section 10(a)(4), a court must determine "whether the arbitrator[ ] had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrator[ ] correctly decided the issue."  *Jock v. Sterling Jewelers Inc.*, 942 F.3d 617, 622 (2d Cir.

2019) (internal quotation marks and citation omitted).  Thus, "[t]he Supreme Court has interpreted Section 10(a)(4) as requiring that 'an arbitral decision even arguably construing or applying the contract must stand, regardless of a court's view of its (de)merits.'"  *Weiss v. Sallie Mae, Inc.*, 939 F.3d 105, 109 (2d Cir. 2019) (quoting *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013)).

## DISCUSSION

Petitioner argues that the Award must be vacated or amended because it was issued in manifest disregard of the law and of the evidence and is internally inconsistent.  Dkt. Nos. 5, 31. He contends that the panel erred in failing to grant to him on his breach of contract and Dodd-Frank whistleblower claims the compensation that he would have received had his employment not been terminated.  He also argues in the alternative that the matter should be remanded to the arbitrators for further clarification.  *Id.*  Respondent argues that Petitioner's motion should be denied, and the Petition dismissed, for two independent reasons: (1) it is untimely and (2) it lacks merit.  Dkt. Nos. 26, 35.  The Court turns to each argument in turn.

As a preliminary matter, although Petitioner invokes the standards of the New York Civil Practice Law and Rules ("CPLR") as well as those of the FAA, Dkt. Nos. 5, 31, only the FAA applies to this motion to vacate.  *See Rabinowitz v. Kelman*, 730 F. Supp.3d 56, 63 (S.D.N.Y. 2024).  Petitioner is a citizen of the United Kingdom, Dkt. No. 9 ¶ 2, Respondent is a Delaware limited partnership with its principal place of business in New York, *id.* ¶ 3, and the dispute arises out of the alleged breach of an agreement to provide services in both New York and in London, Dkt. No 7-19 § 2.  Petitioner's contract provides that it "shall be governed by and construed in accordance with the laws of the State of New York."  Dkt. No. 7-19 § 11(b).  However, the courts in this District have uniformly held that "'[i]n the absence of more critical language concerning enforcement,' the provisions of the FAA [and not those of the CPLR] apply to motions to compel

arbitration and to confirm and vacate an arbitral award." *Penrod Mgmt. Grp. v. Stewart's Mobile Concepts, Ltd.*, 2008 WL 463720, at *2 (S.D.N.Y. Feb. 19, 2008) (quoting *Diamond Waterproofing Sys., Inc. v. 55 Liberty Owners Corp.*, 826 N.E.2d 802, 802 (N.Y. 2005)); *accord Whyte v. WeWork Cos., Inc.*, 2020 WL 3099969, at *4 (S.D.N.Y. June 11, 2020); *Park Lane IBS, LLC v. Unbnd Grp. Pty Ltd.*, 2024 WL 4123515, at *3 (S.D.N.Y. Sept. 9, 2024).  The Court thus applies the FAA's, not the CPLR's time restrictions and does not review Petitioner's contention that the Award is "irrational" within the meaning of CPLR § 7511.  Dkt. No. 5 at 9–10 & n.2 (arguing that "[u]nder CPLR §7511, an arbitration award shall be vacated if the award was procured by fraud or by the partiality of one or the arbitrators or if it is irrational or void as against public policy").

## I.    Timeliness

Respondent argues as a threshold matter that Petitioner is not entitled to any relief because his motion is untimely, given that it was served more than 90 days after FINRA issued its award. Dkt. No. 26 at 22–23; Dkt. No. 35.

Section 12 of the FAA provides that "[n]otice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered."  9 U.S.C. § 12.[4]  Where "the adverse party is a resident of the district in which the award was made," service is to be made "as prescribed by law for service of notice of motion in an action in the same court."  9 U.S.C. § 12.

---

[4] Under CPLR § 7511, "[a]n application to vacate or modify an award [must be] made by a party within ninety days after its delivery to him."  CPLR § 7511.  Although Respondents reference a ninety-day limitation, the FAA's three-month limitation governs.  *See supra*; *Santos v. Gen. Elec. Co.*, 2011 WL 5563544, at *3 n.5 (S.D.N.Y. Sept. 28, 2011) (noting the distinction between three months and ninety days), *report and recommendation adopted*, 2011 WL 5563536 (S.D.N.Y. Nov. 15, 2011); *Ultracashmere House, Ltd. v. Nordstrom, Inc.*, 123 F.R.D. 435, 436 (S.D.N.Y. 1988) (same).  The three-month calculation looks to actual calendar months and their variable lengths, rather than using a thirty day per month approximation.

The FAA's three-month period functions as a statute of limitations.  *See Tarulli v. Ameriprise Fin. Servs., Inc.*, 2020 WL 9219110, at *2 (S.D.N.Y. Apr. 14, 2020), *report and recommendation adopted*, 2020 WL 13562062 (S.D.N.Y. Sept. 24, 2020); *Hamilton v. Navient Sols., LLC*, 2019 WL 633066, at *4 (S.D.N.Y. Feb. 14, 2019); *Ne. Sec., Inv. v. Quest Cap. Strategies, Inc.*, 2003 WL 22535093, at *2 (S.D.N.Y. Nov. 7, 2003)) (denying motion to vacate as untimely for being served one day too late); *see also Marshak v. Original Drifters, Inc.*, 2020 WL 1151564 at *4 (S.D.N.Y. Mar. 10, 2020) (holding that 9 U.S.C. § 12 "offers no exception to the three-month service period" (internal quotations omitted) (quoting *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 175 (2d Cir. 1984)));  *Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 2024 WL 4100555, at *12 (S.D.N.Y. Sept. 6, 2024) (noting that the language of Section 12 "is indistinguishable from that customarily used for statutes of limitations").

The Award here was issued on June 17, 2024.  Dkt. No. 7-1.  However, while Petitioner's motion to vacate the Award was filed on September 16, 2024, Petitioner did not request the issuance of a summons to BGC until September 19, 2024, Dkt. No. 11, the Court did not issue an electronic summons to BGC until September 20, 2024, Dkt. No. 13, and BGC did not file a waiver of service until September 24, 2024, Dkt. No. 14.  Petitioner did not even inform BGC of the motion to vacate and request the waiver of service until September 19, 2024, more than three months after the Award was issued.  Dkt. No. 27-36.  Respondent argues that Petitioner's motion was therefore untimely.  Dkt. No. 26 at 22–23; Dkt. No. 35; *see Hamilton*, 2019 WL 633066, at *4 (denying motion as untimely where "service was not completed until one day after a deadline for which there are no exceptions"); *Elboute v. Highgate Hotels, L.P.*, 2024 WL 3567298, at *3 (S.D.N.Y. July 29, 2024) (dismissing motion to vacate as untimely); *Tarulli*, 2020 WL 9219110, at *2 (same).

Petitioner makes two arguments in response.[5]  He contends: (1) his notice of motion and memorandum of law were all initially filed on Monday, September 16, 2024, within 90 days of the date on which he received the Award, and (2) even if the motion was not served until September 19, 2024, the proper date for measuring the 90 days runs from June 19, 2024 because he did not receive notice of the Award until it was posted on FINRA's website at 7:35 PM., after the close of business, on June 18, 2024.

Petitioner's first argument is easily dispensed of.  The Second Circuit has repeatedly held, albeit in summary orders, that Section 12 requires that the notice of motion be served upon the respondent and not merely filed in court.  *See Marin v. Deutsche Bank Sec. Inc.*, 676 F. App'x 27, 28 n.2 (2d Cir. 2017) (summary order); *Hakala v. J.P. Morgan Sec., Inc.*, 186 F. App'x 131, 133 (2d. Cir. 2006) (summary order) (citing *Am. Postal Workers Union, AFL-CIO v. United States*, 823 F.2d 466, 470 (11th Cir. 1987)); *see also Arshad v. Transp. Sys., Inc.*, 2021 WL 5417017, at *2 & n.1 (S.D.N.Y. Nov. 19, 2021).  It thus is irrelevant that Petitioner filed his motion on the docket on September 16, 2024.  He was required to *serve* it upon Respondent or Respondent's attorney by the end of the limitations period.

Second, Petitioner claims that although the Award was issued on June 17, 2024, the Award was not actually "filed or delivered" until June 18, 2024.  Dkt. No. 31 at 13–14.  In support, Petitioner submits a screenshot of an email preview dated June 18, 2024, and timestamped 7:35 PM, informing him that FINRA had posted a new document.  Dkt. No. 32 ¶ 4, p. 4.  The screenshot does not identify the document or even the arbitration at issue.  *Id.*  Petitioner argues that under NYCRR 154.4, service of after-hours emails are deemed served the next business

---

[5] Notably, Petitioner does not allege facts that would establish equitable tolling.  *See Eletson*, 2024 WL 4100555, at *16 (holding that equitable tolling applies to time limits under FAA for filing of a motion to vacate).

morning and thus that the limitations period should be calculated from June 19, 2024. Dkt. No. 31 at 13–14 n.9. In response, Respondent submits a copy of the current "Documents" tab on the FINRA DR Portal (the "Portal") for the arbitration, which lists information including the date the Award was filed on the Portal as well as the dates of other documents filed on the Portal by FINRA and the parties. Dkt. No. 36 ¶ 4.[6] The page from the Portal reflects that the Award was posted on June 17, 2024, at approximately 12:40 PM, along with an Award Service Letter. Dkt. Nos. 36-1, 36-2. The letter advising the parties of the Award specifically warned: "There are limited grounds for vacating an arbitration award, and a party must bring a motion to vacate within the time period specified by the applicable statute." Dkt. No. 36-2 at 5. Respondent's evidence is corroborated by the copy of the email it received from FINRA at 12:45 PM on June 17, 2024, stating that the Award had been posted. Dkt. No. 36-3. Respondent sent a copy of the Award by email to Petitioner at 11:30 AM on June 18, 2024. Dkt. No. 36-5. Petitioner responded to that email at 1:08 PM on June 18, 2024, stating, in part, "How did you get a copy of the Award? We did not receive anything and the first we knew of it is when you sent your note." *Id.*

The parties' protracted dispute concerning the precise time Petitioner received the Award is ultimately irrelevant. Even if the Award was not "delivered"[7] to Petitioner until a later date, the

---

[6] Respondent notes that FINRA's Code of Arbitration Procedure for Industry Disputes § 13300 provides that parties "must use the Party Portal to . . . serve pleadings and any other documents on the Director or any other party." Dkt. No. 35 at 2. FINRA states that "[t]he Dispute Resolution Portal [] is a self-service system that allows participants in an arbitration or mediation to log into a secure area of our website so they can submit documents and manage case information." *Dispute Resolution Portal (DR Portal)*, FINRA, https://www.finra.org/arbitration-mediation/rules-case-resources/dr-portal. This language does not precisely align with Section 12's nod to "filing" or "delivery" of the award. To make the timing constraints clearer for future applications, parties may wish to specify in their arbitration agreements—or FINRA may wish to specify in its rules—that posting the arbitration award on the Portal constitutes "filing" for purposes of the FAA.

[7] "Surprisingly few decisions have directed addressed what it means for an award to be 'delivered.'" *Webster v. A.T. Kearney*, 507 F.3d 568, 572 (7th Cir. 2007). Courts note that in some circumstances, arbitral rules or contractual provisions will specify a meaning of the word

record indicates that it was "filed" [8] on the Portal on June 17, 2024.  Dkt. Nos. 36-1, 36-2.  The

statute is stated in the disjunctive such that only one of the two is required.  *See* 9 U.S.C. § 12

(stating that the motion must be served "within three months after the award is filed *or* delivered"

(emphasis added)).  The Second Circuit has indicated that district courts should look to the date of

the award's "issuance" as the start of the limitations period.  *See Dalla-Longa v. Magnetar Cap.*

*LLC*, 33 F.4th 693, 696 (2d Cir. 2022) ("Here, the arbitration award was issued on September 9,

2019[,] Dalla-Longa thus had until December 9, 2019, to properly serve notice of any motion or

petition to vacate the award." (citing 9 U.S.C. § 12)).  "In accordance with that ruling, courts in

this Circuit . . . have subsequently held that Section 12 of the FAA's three-month service clock

starts when an award is issued, not when it is legally served upon the parties to the arbitration."

*Terwilliger v. Res. Am., Inc.*, 2023 WL 3582342, at *3 (S.D.N.Y. May 22, 2023) (citing *Moster v.*

---

"delivered."  *See, e.g.*, *id.* at 573 (arbitral rule); *Salus Cap. Partners, LLC v. Moser*, 289 F. Supp.
3d 468, 476 (S.D.N.Y. 2018) (arbitral rule); *Choice Hotels Int'l, Inc. v. F & R Grp. Invs., LLC*,
2014 WL 3405030, at *3 (D. Md. July 9, 2014) (arbitration agreement provided method of notice);
*Prospect Funding Holdings (NY), LLC v. Ronald J. Palagi, P.C., L.L.C.*, 410 F. Supp. 3d 1077,
1083 (D. Neb. 2019) (arbitration agreement provided method of notice).  However, absent such
external guidance, the consensus holding developed by these few courts that have addressed the
issue is that delivery is not equivalent to mailing but rather is equivalent to receipt.  *See Sargent v.
Paine Webber Jackson & Curtis, Inc.*, 882 F.2d 529, 531 (D.C. Cir. 1989); *Pfannenstiel v. Merrill
Lynch, Pierce, Fenner, & Smith*, 477 F.3d 1155, 1158 (10th Cir. 2007); *Santos*, 2011 WL 5563544,
at *6; *Possehl, Inc. v. Shanghai Hia Xing Shipping*, 2001 WL 214234 *3 (S.D.N.Y. Mar. 1, 2001);
*Russ v. United Servs. Auto. Ass'n*, 2019 WL 3083015, at *6 (D. Ariz. July 15, 2019); *Silicon Power
Corp. v. Gen. Elec. Zenith Controls, Inc.*, 2009 WL 1971390, at *5 (E.D. Pa. July 7, 2009);
*Nordahl Dev. Corp. v. Salomon Smith Barney*, 309 F. Supp. 2d 1257, 1269 (D. Or. 2004), *aff'd
sub nom. Olson v. Salomon Smith Barney, Inc.*, 137 F. App'x 972 (9th Cir. 2005); *Prospect
Funding*, 410 F. Supp. 3d at 1083; *ABNL Ltd. v. Baker Hughes Process Sys.*, 2005 WL 8164068,
at *7 (S.D. Tex. May 16, 2005); *Smith v. Shell Chem. Co.*, 333 F. Supp. 2d 579, 585 (M.D. La.
2004).

[8] Though the statute does not define the term, Black's Law Dictionary defines the verb "file" as
"[t]o deliver a legal document to the court clerk or record custodian for placement into the official
record."  *File*, Black's Law Dictionary (12th ed. 2024).  The Supreme Court has repeatedly
embraced that definition.  *See United States v. Lombardo*, 241 U.S. 73, 76 (1916) (similar); *Artuz
v. Bennett*, 531 U.S. 4, 8 (2000) (similar).

*Credit Suisse Sec. (USA) LLC*, 2022 WL 4467626, at *7 (S.D.N.Y. Sept. 25, 2022); *Gross v. HSBC Bank USA, N.A.*, 2022 WL 2967630, at *2 (S.D.N.Y. July 27, 2022); *Kaplan v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2022 WL 2110391 at *3 (S.D.N.Y. June 10, 2022)); *see also Safran Elecs. & Def. SAS v. Exail SAS*, 2025 WL 327921, at *3 (S.D.N.Y. Jan. 29, 2025); *Elboute*, 2024 WL 3567298, at *3.

Because the Award was filed on June 17, 2024, Petitioner's deadline to serve Respondent notice of his motion to vacate was September 17, 2024.  *See Dalla-Longa*, 33 F.4th at 696. Petitioner failed to serve Respondent by that date, and his motion is accordingly untimely.  *See Florasynth*, 750 F.2d at 175 ("[A] party may not raise a motion to vacate, modify, or correct an arbitration award after the three month period has run."); *Safran*, 2025 WL 327921, at *7 ("Petitioners failed to effectuate service of the Petition in compliance with 9 U.S.C. § 12, and . . . dismissal is therefore warranted under Rule 12(b)(5)").  Petitioner's motion to vacate the Award may be denied on that basis alone.

## II.    Manifest Disregard of the Law

Even if Petitioner's motion was timely, it would still fail on the merits.  Petitioner argues that the Award should be vacated, amended, or remanded because it is in "manifest disregard of the applicable, clearly presented, law and facts of this matter."  Dkt. No. 5 at 10.  He claims that the panel necessarily found in his favor on his breach of contract and Dodd-Frank Whistleblower claims because it awarded a damage figure with no tie to the claims and evidence at the hearing. *Id.*  Petitioner claims that he is unquestionably entitled to many more millions of dollars in damages, amounts he derives by construing all of the evidence presented at the arbitration in his favor, drawing all inferences in his favor and engaging in a number of extrapolations.  *Id.* at 11–24.  Petitioner's claim is without merit.

Review of an arbitration award for manifest disregard of law is "severely limited." *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 208 (2d Cir. 2002) (Sotomayor, J.) (quoting *Gov't of India v. Cargill Inc.*, 867 F.2d 130, 133 (2d Cir. 1989)). Vacatur under the manifest disregard standard is limited to "those exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent." *Weiss*, 939 F.3d at 109 (quoting *T.Co Metals, LLC v. Dempsey Pipe & Supply*, 592 F.3d 329, 339 (2d Cir. 2010)). The Court may "not vacate an award because of 'a simple error in law or a failure by the arbitrators to understand or apply it' but only when a party clearly demonstrates 'that the panel intentionally defied the law.'" *STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 78 (2d Cir. 2011) (quoting *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389, 392–93 (2d Cir. 2003)); *see also Westerbeke*, 304 F.3d at 208 ("To vacate an arbitral award on grounds of manifest disregard, the court "must find 'something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law.'" (quoting *Saxis S.S. Co. v. Multifacs Int'l Traders, Inc.*, 375 F.2d 577, 582 (2d Cir. 1967))).

The challenge does not offer a dissatisfied party the opportunity to wholly relitigate the law and evidence that was submitted to the arbitrator; the Court's role is not to reassess the evidentiary record. *See Wallace v. Buttar*, 378 F.3d 182, 189 (2d Cir. 2004) ("A motion to vacate filed in a federal court is not an occasion for *de novo* review of an arbitral award."); *accord Oldcastle Precast, Inc. v. Liberty Mut. Ins. Co.*, 838 F. App'x 649, 651 (2d Cir. 2021) (summary order); *Gross*, 2022 WL 2967630, at *3; *Bus. Credit & Cap. II LLC v. Neuronexus, Inc.*, 2019 WL 1426609, at *4 (S.D.N.Y. Mar. 29, 2019). Such re-review would "frustrate[ ] the basic purpose of arbitration, which is to dispose of disputes quickly and avoid the expense and delay of extended court proceedings" and "would make an award the commencement, not the end, of litigation."

*STMicroelectronics*, 648 F.3d at 78 (first quoting *Saxis*, 375 F.2d at 582, and then quoting *Burchell v. Marsh*, 58 U.S. 344, 349 (1854)).

Instead, the governing standard permits a court to vacate "an arbitral award based on manifest disregard only upon a finding that '(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case.'" *Precision Castparts Corp. v. Schultz Holding GmbH & Co. KG*, 2020 WL 4003578, at *2 (S.D.N.Y. July 15, 2020) (quoting *Zurich Am. Ins. Co.*, 811 F.3d at 589). "The test has sometimes been described in three parts, as requiring a demonstration that (1) 'the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators'; (2) 'the law was in fact improperly applied, leading to an erroneous outcome;' and (3) 'the arbitrator must have known of [the law's] existence, and its applicability to the problem before him.'" *Id.* (quoting *T.Co Metals*, 592 F.3d at 339); *see also Duferco*, 333 F.3d at 390. An award should be confirmed if there is even a barely colorable justification for the outcome reached. *See Wallace*, 378 F.3d at 190.

This standard governs even if the arbitrator is silent as to the basis for the award. "[T]here is no general requirement that arbitrators explain the reasons for their award." *Sobel v. Hertz, Warner & Co.*, 469 F.2d 1211, 1214 (2d Cir. 1972). Although "a requirement that arbitrators explain their reasoning in every case would help to uncover egregious failures to apply the law to an arbitrated dispute[,] . . . such a rule would undermine the very purpose of arbitration, which is to provide a relatively quick, efficient and informal means of private dispute settlement." *Id.*; *see also Koch Oil, S.A. v. Transocean Gulf Oil Co.*, 751 F.2d 551, 554 (2d Cir. 1985) ("Such limited review is necessary if arbitration is to serve as a quick, inexpensive and informal means of private dispute resolution"). The Second Circuit has reasoned that "[w]e will, of course, not vacate an

arbitral award for an erroneous application of the law if a proper application of law would have yielded the same result." *Duferco*, 333 F.3d at 390. "In the same vein, where an arbitral award contains more than one plausible reading, manifest disregard cannot be found if at least one of the readings yields a legally correct justification for the outcome." *Id.* Therefore, "[e]ven where explanation for an award is deficient or non-existent, we will confirm it if a justifiable ground for the decision can be inferred from the facts of the case." *Id.* (citing *Sobel*, 469 F.2d at 1216; *Siegel v. Titan Indus. Corp.*, 779 F.2d 891, 893–95 (2d Cir. 1985) (per curiam)); *see also STMicroelectronics*, 648 F.3d at 78 ("Where, as here, the arbitrators do not explain the reason for their decision, we will uphold it if we can discern any valid ground for it.").

Thus, "arbitrators may render a lump sum award without disclosing their rationale for it, and . . . when they do, courts will not inquire into the basis of the award unless they believe that the arbitrators rendered it in 'manifest disregard' of the law or unless the facts of the case fail to support it." *Koch Oil*, 751 F.2d at 554; *see, e.g.*, *Siegel*, 779 F.2d at 895 (holding that the arbitrator's unexplained damage calculation did not provide grounds for remand because a party's submission "indicates that the arbitrators could have calculated the award" in accordance with evidence that was submitted to the arbitrators). With respect to both liability and damages, "[i]f a ground for the arbitrator's decision can be inferred from the facts of the case, the award should be confirmed." *Kurt Orban Co. v. Angeles Metal Sys.*, 573 F.2d 739, 740 (2d Cir. 1978) (quoting *Sobel*, 469 F.2d at 1216).[9]

---

[9] This approach creates a somewhat perverse incentive for arbitrators who might otherwise provide reasoned awards to instead keep quiet. The Second Circuit has stated that where an arbitrator provides a basis for their judgment, the reviewing court is limited to assessing whether the stated basis is premised on colorable legal justification, and may not review the record to determine whether other legal justification might have supported the same judgment. *See Hardy v. Walsh Manning Sec., L.L.C.*, 341 F.3d 126, 131 (2d Cir. 2003); *accord Wallace*, 378 F.3d at 193. However, an entirely unexplained award prompts the Court to try to reverse-engineer a

To determine whether the arbitrators knew, but ignored, a well-defined and clearly applicable governing legal principle, the Court describes the parties' warring accounts of the underlying dispute and the evidence and argument presented to the arbitrators to determine whether a proper application of the law could have resulted in the Award. *See Duferco*, 333 F.3d at 390; *Siegel*, 779 F.2d at 895.

### A. Petitioner's Arguments

Petitioner claims that the evidence and legal arguments he advanced in the arbitration left the arbitrators no choice but to rule in his favor on the breach-of-contract and whistleblower retaliation claims. Petitioner's argument is largely drawn from his own testimony and that of the expert he called to testify at the hearing. *See* Dkt. No. 7-7.

In his account, Petitioner generated substantial revenue for BGC and was a "stellar employee," who had "no performance complaints of any kind" until he raised complaints concerning accounting irregularities and supervisory violations beginning in 2015. Dkt. No. 9 ¶¶ 25, 27, 40–41. He claimed that BGC failed to investigate any of his complaints and instead undertook a series of retaliatory acts. *Id.* ¶¶ 39–41, 50, 52–53. He asserted that he was improperly suspended in February 2016, *id.* ¶ 52, was subject to a retaliatory written warning upon his return from suspension, *id.* ¶¶ 55–56, was improperly put on an indefinite suspension again in December 2016 and directed to submit to examination by two doctors to determine if he was fit to perform the essential functions of his job, *id.* ¶ 95, and then was improperly terminated on January 31, 2017, *id.* ¶ 104.

According to Petitioner, his evidence and legal arguments demonstrated that he could not have been removed for Cause in accordance with the contract. He argues that he was never

---

justification from the entire universe of proper legal bases, no matter whether such justification ever crossed the arbitrator's mind. *See Duferco*, 333 F.3d at 390.

insubordinate and was never provided with notice of duties he supposedly failed to perform.  Dkt. No. 5 at 11–12.  He claims he was responsive to Aubin, except for when Petitioner was in the hospital.  *Id.* at 12.  And although he admits he did not submit to examination by the two doctors he had been directed to visit, Petitioner argues that such direction violated the Americans with Disabilities Act ("ADA") and thus that termination on that basis could not have been legally justified.  *Id.* at 13–16.  He notes that the ADA "prohibits an employer from requiring an employee to submit to a mental, and/or physical health examination, '. . . unless such examination or inquiry is shown to be job-related and consistent with business necessity.'"  *Id.* at 13 (quoting U.S.C. § 12112(d)(4)(A)).  According to Petitioner, Respondent failed to show any business necessity.  *Id.* at 14–15.

Petitioner argues that because BGC had no valid grounds to terminate Petitioner, the contract would have continued to run until February 1, 2019, the specified end date.  *Id.* at 16; *see also* Dkt. No. 7-19 § 1(a).  He  asserts that because the contract provides for guaranteed remuneration of $400,000, Dkt. No. 7-19 § 3, he was entitled to an award of at least $400,000 for each year plus 9% prejudgment interest.  Dkt. No. 5 at 16.[10]  He thus arrives at minimum damages of $1,160,000, representing the $800,000 in base salary plus $360,000 in interest.  *Id.*  In addition, Petitioner claims that he was entitled to his 2016 Fourth Quarter bonus of no less than $250,000[11]

---

[10] Upon finding a breach of contract, New York law awards pre-judgment interest as a matter of right.  *See* CPLR § 5001(a) (providing that pre-judgment interest "shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property"); *Koziar v. Blammo, Ltd.*, 2024 WL 5119312, at *7 (S.D.N.Y. Dec. 16, 2024).  New York law further prescribes a statutory pre-judgment interest rate of 9% per annum calculated on a simple-interest basis.  CPLR § 5004.

[11] The contract stated "[i]t is a condition precedent to receiving and earning payment" of the bonus "that Employee remains employed by BGC . . . at the time payment is made," and bonuses were not required to be remitted until "45 days after" the end of the quarter.  Dkt. No. 7-19 § 3(b).

plus prejudgment interest, bringing the total contractual damages up to $1,567,500. *Id.* at 16–17. Next, Petitioner claims that the New York Labor Law ("NYLL") provides for liquidated damages for unpaid wages, thus causing the damages to double to $3,135,000, from which he then subtracts $812,175 as "the monies he actually earned." *Id.* (citing cases).[12]  As a result, Petitioner claims the arbitrators could not have awarded damages of less than $2,322,825. *Id.* at 17.

As an alternative to this "minimum" award, Petitioner argues that that arbitrators were obligated to assume that his remuneration for 2017, 2018, and the first month of 2019—the portion of his contract that was unfulfilled post-termination—would have been equal to his total compensation for 2016, including both his guaranteed salary and his incentive compensation based on participation in the pool. *Id.* at 17.  He received a total of $734,756 in 2016, though with the Fourth Quarter bonus, the total would have been $986,756 for the year. *Id.*[13]  Multiplying this across 2017 and 2018, he arrives at owed wages of $1,969,512. *Id.*[14]  From that calculation he subtracts the $812,175 actually paid, arriving at a "damages delta" of $1,157,337 before adding prejudgment interest, and arrives at a final damages calculation of $1,678,138.65, noting that that figure does not include liquidated damages under the NYLL. *Id.* at 17–18.

In addition to either of those lost wage damage calculations, Petitioner argues that "the only expert presented at the arbitration" testified that depending upon determination of Petitioner's level of impairment, Petitioner "suffered damages, for the reduction of his value of life, of as little as $2,718,196 to as much as $3,386,657." *Id.* at 18 n.6.  Petitioner claims that the expert's

---

[12] Petitioner does not explain why he subtracts his actual earnings *after* calculating liquidated damages at a rate of 100%.

[13] $734,756 plus $250,000 is $984,756, not $986,756.  Petitioner's reference to $986,756 seems to be a typo as the rest of his calculations use the $984,756 figure.

[14] Although he notes that he would have been owed wages for the first month of 2019, Petitioner excludes that time from his calculation. *Id.*

testimony "was not refuted in any way." *Id.*; *but see Oldcastle Precast*, 838 F. App'x at 651 ("Even assuming the testimony and evidence in question were unrebutted, that does not obligate the arbitrator to find them an adequate and reliable basis for an award[;] . . . the law does not deem unrebutted statements true or conclusive on a matter of fact.").

With respect to his Dodd-Frank whistleblower retaliation claim, Petitioner was required to show, by a preponderance of the evidence, that: (1) he engaged in a protected activity, (2) he suffered an adverse employment action, and (3) that the adverse action was causally connected to the protected activity. *See Cellucci v. O'Leary*, 2020 WL 977986, at *10 (S.D.N.Y. Feb. 28, 2020); *accord Rinaldi v. NICE, Ltd.*, 2021 WL 4295263, at *2 (S.D.N.Y. Sept. 21, 2021), *aff'd sub nom. Rinaldi v. Mills*, 2022 WL 17480081 (2d Cir. Dec. 7, 2022). Petitioner argues that he introduced evidence at the arbitration of repeated internal complaints to BGC and emailed a written complaint to the SEC "setting forth his myriad complaints against BGC and Aubin." Dkt. No. 5 at 20–21. Petitioner claims that BGC retaliated against him by (a) "denying him access to the London office for Election Day 2016, one of the busiest brokering days of the year," (b) indefinitely suspending Petitioner without justification, and (c) ultimately terminating Petitioner on January 31, 2017. *Id.* at 22. He claims those actions had no legitimate business reasons and were "clearly retaliate[ory]." *Id.* at 21–22.

Petitioner's supposed damages on his retaliation claim are based upon the same lost wages and lost value of life claimed as a result of his breach-of-contract claim, although he cites some of the interim calculations rather than the final numbers he claimed to be owed for that claim. *Id.* at 23. For example, he claims a minimum of $1,157,337 in lost income for 2017 and 2018, which includes his guaranteed salary under the contract and his 2016 Fourth Quarter bonus, but not prejudgment interest. *Id.* On top of that, he asserts that he should have earned $984,756 per year

"for years 2019 through 2033,"[15] which he claims to lead to a total of $4,923,780, representing the compensation he would have received for those years if BGC had continued to employ him at the same salary and incentive structure as under the contract and if his incentive payments were equal to those he received in 2016. *Id.* However, Petitioner claims he was able to earn only $941,331 during that time, resulting in a loss of $3,982,449. *Id.* Ultimately, Petitioner claims his damages sum to $7,857,982, representing $2,718,196 in lost value of life, $1,157,337 in lost income for 2017 and 2018, and $3,982,449 in lost income for 2019 through 2023.

Because the Award of $500,000 bears no resemblance to any of Petitioner's damage calculations, he claims the arbitrators must have manifestly disregarded the law.

## B.    Respondent's Arguments

Respondent counters that the arbitrators could have properly disregarded Petitioner's evidence concerning both liability and damages. Dkt. No. 26 at 23–31.

It first points to the fact that Petitioner's testimony was significantly undercut by evidence presented at the hearing. Petitioner was caught stating in a recorded conversation that he was going to defame his supervisor and "try and destroy their life." Dkt. No. 27-12 at 8–9.[16] A BGC employee who had previously sent communications to regulators purporting to corroborate some of Petitioner's claims testified that Petitioner had "used and manipulated" him based on his personal circumstances, including that he was destitute, and that the communications were written with the assistance of Petitioner who pressured the witness to send them. Dkt. No. 27-6 at 3, 5–6, 12.[17] In his Statement of Claim and testimony, Petitioner attributed his heart attack to harshly worded comments from a BGC executive, but the communication from the BGC executive at issue

---

[15] Petitioner presumably meant 2023, not 2033.
[16] ECF pagination.
[17] ECF pagination.

post-dated Petitioner's heart attack, and contemporaneous emails time show Petitioner blaming his ex-wife's divorce lawyers for the heart attack.  Dkt. No. 27-3 at 4–6[18]; Dkt. No. 27-17.

Respondent's account, which differs significantly from Petitioner's, is corroborated by contemporaneous documents upon which the arbitrators could have relied.   According to Respondent, Petitioner was hospitalized twice and, after the first incident, submitted a doctor's note recommending that he be placed on medical leave for several weeks.  Dkt. No. 8-32.  He later submitted a second doctor's note stating that the doctor felt Petitioner could immediately return to work part-time.  Dkt. No. 8-33.  At this same time, Petitioner displayed a lengthy pattern of dodging requests by Aubin to communicate with him and argued that Aubin's missives caused Petitioner "further panic attacks and anxiety" which "in turn cause[d] him chest pains and shortness of breath," such that he sought "protection" from others at BGC "given the very serious state of [his] health."  Dkt. No. 8-43; *see also* Dkt. No. 8-7 (letter from BGC's human resources directed stated that at a meeting, Petitioner stated that he was unable to comply with Aubin's requests to connect "due to the severity of [his] medical condition"); Dkt. No. 8-8 (similar).  Based on Petitioner's continuing medical issues and professed inability to meet with his supervisor because of them, BGC determined that medical and psychological exams were necessary to determine Petitioner's fitness to perform the essential functions of his position and what, if any, reasonable accommodations could be provided.  Dkt. No. 8-7.  When BGC reminded Petitioner to attend his scheduled visits with the two doctors, Petitioner informed human resources that he would be on his honeymoon at that time, and later, after the appointment was rescheduled, that he was spending the majority of the month of the new appointment date in Sri Lanka, despite not requesting approval for the time off for his honeymoon or Sri Lanka trip.  Dkt. Nos. 8-8, 8-54.

---

[18] ECF pagination.

Respondent argues that the evidence shows Petitioner was terminated for failing to comply with the direct orders to visit the two doctors.  Respondent provided legal authority to the arbitrators disputing Petitioner's contention that the ADA prohibited it from requiring Petitioner to undergo a medical examination.  Dkt. No. 27-11.  Its submission pointed out that the ADA provides that "[a] covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, *unless such examination or inquiry is shown to be job-related and consistent with business necessity*."  *Id.* at 16–17 (quoting 42 U.S.C. § 12112(d)(4)(A) (emphasis added)); *see also* 42 U.S.C. § 12112(d)(4)(B) ("A covered entity may make inquiries into the ability of an employee to perform job-related functions.").  Respondent cited a holding by the Second Circuit that a business necessity exists if an employer can "demonstrate that a medical examination or inquiry is necessary to determine [] whether the employee can perform job-related duties when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties."  Dkt. No. 27-11 at 17 (quoting *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 98 (2d Cir. 2003)); *see also Conroy*, 333 F.3d at 98 (one example of a business necessity justification would be "frequent absences or a known disability that had previously affected the employee's work").

Respondent next argues that there were multiple grounds on which the arbitrators could have properly found that Petitioner failed to prove his Dodd-Frank whistleblower retaliation claim. Chief among them were that Petitioner's termination, or other supposedly adverse employment acts "could not have been causally connected to any protected activity" and that "BGC had a legitimate, non-retaliatory reason for terminating [Petitioner's] employment."  Dkt. No. 26 at 13–14, 26–27; *see Cellucci*, 2020 WL 977986, at *10 (causal connection required).

On the question of damages, Respondent takes the unsurprising position that Petitioner was not entitled to any monetary award but that the arbitrators could have properly determined that Petitioner was owed $500,000 in compensatory damages. Dkt. No. 26 at 14–18, 28–31.

### C.    Analysis

Petitioner fails to show that the arbitrators knew of a well-defined, applicable, governing legal principle and refused to apply it.

Although Petitioner repeatedly describes the "overwhelming facts" of the record as being on his side, Dkt. No. 5 at 10, 20–21, Dkt. No. 31 at 7, the arbitration materials submitted to the Court simply do not support that characterization. The arbitrators could have properly found, based on the evidence presented at the arbitration, that in light of Petitioner's lengthy history of medical issues requiring multiple hospitalizations and interfering with his ability to work normal hours and purported ability to communicate with his supervisor, a medical evaluation was a business necessity. *See Gajda v. Manhattan & Bronx Surface Transit Operating Auth.*, 396 F.3d 187, 189 (2d Cir. 2005) ("[R]epresentations by plaintiff, signed by his doctor, on an application for intermittent leave under the Family and Medical Leave Act that '[m]y own serious health condition renders me unable to perform the functions of my position,' that his condition left him 'unable to perform work of any kind,' and that '[patient] will need intermittent leave at undetermined times for lifetime,' demonstrates that the employer had legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his . . . duties." (quotation omitted)); *Conroy*, 333 F.3d at 98 (collecting cases). The arbitrators resultingly could have found that Petitioner's failure to attend the scheduled medical evaluations and representation that he would not be cooperating with the directive to submit to examination represented "dishonesty, disloyalty, insubordination, unsatisfactory performance or attendance, or failure to follow BGC's policies, rules, codes of conduct, or procedures," within the contract's definition of "Cause." Dkt.

No. 7-19 § 4(a). Such a finding would permit a holding of no liability for both Petitioner's breach-of-contract and whistleblower retaliation claims.

The slightly trickier question is how to explain the Award of $500,000. To award compensatory damages, the arbitration panel must have found Respondent liable for at least one of Petitioner's claims. And if there is liability, Petitioner argues, the only legally valid damages for his breach-of-contract and whistleblower claims far exceed those awarded. *See* Dkt. No. 31 at 7 ("The quantum of damages awarded by the Panel is completely irrational, untethered to any evidence presented at the hearing, and in contravention of logic and the applicable and clear law presented to the Panel."). However, "there is no requirement that the amount of the arbitration award correspond to any claimed amount, particularly when the award granted is less than the amount requested." *Singh v. Raymond James Fin. Servs., Inc.*, 2014 WL 11370123, at *3 (S.D.N.Y. Mar. 28, 2014), *aff'd*, 633 F. App'x 548 (2d Cir. 2015); *see also Elwell v. Raymond James Fin. Servs., Inc.*, 686 F. Supp. 3d 281, 293 (S.D.N.Y. 2023) (holding that arbitrators need not rely on a party's theory of recovery). What matters is whether some combination of claims and facts could have produced the ultimate award. *See Koch Oil*, 751 F.2d at 554.

It is possible that notwithstanding the evidence in Respondent's favor, the arbitration panel found Respondent partially liable for Petitioner's breach-of-contract or whistleblower claims, but was unpersuaded by Petitioner's evidence or calculation concerning damages. *See Tully Constr. Co. v. Canam Steel Corp.*, 684 F. App'x 24, 28 (2d Cir. 2017) (summary order) (noting that "there are many reasons that the arbitrator might have decided to award a certain amount of each claim," and that, in particular, "variation in the credibility and amount of evidence of damages could have resulted in more or less being awarded for certain claims"). For example, Respondent posits, the

$500,000 figure could represent a good-faith estimate of the bonus Petitioner would have received for the 2016 Fourth Quarter along with prejudgment interest.  Dkt. No. 26 at 30.[19]

As another alternative, the arbitrators could have found Respondent not to be liable for breach of contract or for a violation of the Whistleblower Statute but to be liable for damages relating to one or multiple of Petitioner's other claims, such as fraud; breach of fiduciary duty; breach of the implied covenant of good faith and fair dealing, conversion; unjust enrichment; RICO; defamation; tortious interference with prospective and actual business relationships; intentional infliction of emotional distress; civil conspiracy; or violations of the NYLL.  Dkt. No. 7-1.  Ultimately, the amount of the Award does not show that the arbitrators "could not have rationally based its decision on any valid combination of claims against Respondent."  *Singh*, 2014 WL 11370123, at *3; *see also Koch Oil*, 751 F.2d at 554 ("In opposition to the arbitration award, Gulf offers only its speculation that the arbitrators ordered compensation in violation of the parties' contracts. . . . Consequently, we conclude that Gulf has failed to show that the arbitrators ignored the law in rendering the award, and, accordingly, we must accept the award without attempting an analysis of the arbitrators' purported reasoning process."); *Elwell*, 686 F. Supp. 3d at 294 (upholding lump some damage award because "[u]ltimately, it is not for the Court to reconstruct how exactly the arbitrators reached their conclusion" so long as petitioners "failed to show that the arbitrators ignored any governing law").

Because he has not made a showing of manifest disregard of the law by the arbitrators, Petitioner fails to show any basis for vacating or amending the Award.

---

[19] Although Petitioner now estimates the amount of the unpaid bonus to be $250,000 before interest, Respondent notes that at the arbitration, the parties heavily contested what revenues would be used to calculate the bonus, thereby permitting the panel to arrive at a different number.  Dkt. No. 27 at 7–9 (citing Dkt. No. 27-9); *see Elwell*, 686 F. Supp. 3d at 293.

### III.    Remand

In the alternative, Petitioner asks the Court to remand the issue to the arbitration panel for clarification of the basis for the Award.  Dkt. No. 5 at 24; Dkt. No. 31 at 14.  He cites *Tripi v. Prudential Securities*, for the proposition that "[w]hile arbitrators may present a lump sum award without disclosing any rationale for it, courts may inquire into the basis of such an award when there appears to be no legal or factual basis for it."  Dkt. No. 5 at 24 (citing *Tripi v. Prudential Sec., Inc.*, 303 F. Supp. 2d 349, 356 (S.D.N.Y. 2003)); Dkt. No. 31 at 14 (citing same); *but see Koch Oil*, 751 F.2d at 554 (arbitrators may issue a lump sum award without explanation).  In *Tripi*, the district court noted that, based on a record showing overwhelming evidence of Prudential's liability, "it is hard to imagine any justification for the arbitrators' award, which holds Prudential responsible for only three percent of Tripi's losses."  *Tripi*, 303 F. Supp. 2d at 356.  "Nor has Prudential pointed to any facts in the record to support such a bizarre award."  *Id.*  The instant case is readily distinguishable as the record is not so devoid of justification for the award.  More importantly, the Second Circuit has rejected the district court's approach in *Tripi*, noting that although many courts in the Circuit had relied on a prior decision to hold "that an arbitral award may be vacated on the ground of manifest disregard of the facts when the award runs contrary to strong evidence favoring the party bringing the motion to vacate[,] . . . [s]uch reliance is mistaken."  *Wallace*, 378 F.3d at 191 (quotation and citations omitted) (citing *Tripi*, 303 F. Supp. 2d 349).  "To the extent that a federal court may look upon the evidentiary record of an arbitration proceeding at all, it may do so only for the purpose of discerning whether a colorable basis exists for the panel's award so as to assure that the award cannot be said to be the result of the panel's manifest disregard of the law."  *Id.* at 193.

Petitioner provides no other argument in favor of remand, and his request is therefore denied.

## CONCLUSION

Petitioner's motion to vacate, modify, or remand the arbitration award is DENIED and the Petition is DISMISSED.

The Clerk of Court is respectfully directed to terminate all pending hearings and deadlines and to close this case.

SO ORDERED.

Dated: April 23, 2025
      New York, New York

                                                LEWIS J. LIMAN
                                     United States District Judge